## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ALTEGRITY, INC., *et al.*,[1] | Case No. 15-10226(___) |
| Debtors. | Joint Administration Requested |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING POSTPETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363 AND 364, (B) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (C) AUTHORIZING THE USE OF CASH COLLATERAL, (D) GRANTING ADEQUATE PROTECTION AND (E) SCHEDULING A FINAL HEARING

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") seek entry of an interim order (the "**Interim Order**"), substantially in the form attached hereto as **Exhibit A**, and a final order (the "**Final Order**" and, together with the Interim Order, the "**DIP Orders**"),[2] pursuant to sections 105, 361, 362, 363 and 364 of chapter 11 of title 11 of the United States Code, 11. U.S.C. §§ 101 *et seq.* (as amended, the "**Bankruptcy Code**"), and Rules 2002,

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Altegrity, Inc. (9985); Albatross Holding Company, LLC (2688); Albatross Marketing and Trading, LLC (8643); Altegrity Acquisition Corp. (1480); Altegrity Holding Corp. (1481); Altegrity Risk International LLC (6350); Altegrity Security Consulting, Inc. (5452); CVM Solutions, LLC (9526); D, D & C, Inc. (9552); Engenium Corporation (2269); FDC Acquisition, Inc. (2387); HireRight Records Services, Inc. (1944); HireRight Solutions, Inc. (8954); HireRight Technologies Group, Inc. (1660); HireRight, Inc. (5016); John D. Cohen, Inc. (1738); KCMS, Inc. (0085); KIA Holding, LLC (1333); Kroll Associates, Inc. (6880); Kroll Background America, Inc. (4830); Kroll Crisis Management Group, Inc. (3811); Kroll Cyber Security, Inc. (2393); Kroll Factual Data, Inc. (9911); Kroll Holdings, Inc. (4648); Kroll Inc. (1019); Kroll Information Assurance, Inc. (2283); Kroll Information Services, Inc. (2381); Kroll International, Inc. (1243); Kroll Ontrack Inc. (1650); Kroll Recovery LLC (7082); Kroll Security Group, Inc. (5514); National Diagnostics, Inc. (7132); Ontrack Data Recovery, Inc. (3148); Personnel Records International, LLC (0716); The Official Information Company (1805); US Investigations Services, LLC (9260); USIS International, Inc. (3617); and USIS Worldwide, Inc. (4258).  The location of the Debtors' corporate headquarters is 7799 Leesburg Pike, Suite 1100 North, Falls Church, VA 22043.

[2]    The Debtors will provide a proposed Final Order to the Court, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") and all parties in interest upon appropriate notice in advance of the Final Hearing.

4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 2002-1 and 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Code for the District of Delaware (the "**Local Rules**"), that, among other things:

      (a)     authorizes Altegrity, Inc. (the "**Borrower**") to obtain, and authorizes each of the other Debtors (collectively the "**Guarantors**") to guarantee, jointly and severally, the Borrower's obligations in respect of a secured debtor-in-possession financing (the "**DIP Facility**" or the "**DIP Financing**") of up to an aggregate principal amount of $90,000,000 pursuant to the terms and conditions of (i) the Interim Order and (ii) that certain Superpriority Debtor-in-Possession Credit and Guaranty Agreement substantially in the form attached hereto as **<u>Exhibit B</u>** (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**DIP Loan Agreement**")[3] by and among the Borrower, the Guarantors, Cantor Fitzgerald Securities, as administrative agent and collateral agent (the "**DIP Agent**"), and the lenders named therein (the "**DIP Lenders**"), which, if approved on a final basis, would consist of $90,000,000 in respect of new money funding, of which up to $22,500,000 would be available upon entry of the Interim Order, up to $45,000,000 (inclusive of prior draws) would be available upon entry of the Final Order, and the remaining amounts would be available upon the Effective Date of an Acceptable Plan (together, the "**DIP Loans**"), each subject to the terms and conditions of the Interim Order, the Final Order and the DIP Documents (as defined below) (all DIP Loans and all guarantees and other "Obligations" (as defined in the DIP Loan Agreement) and liabilities arising under the DIP Loan Agreement, collectively, the "**DIP Obligations**") (the

---

[3]    Unless otherwise indicated, capitalized terms used but not defined herein shall have the meanings set forth in the DIP Loan Agreement.

DIP Loan Agreement, together with all agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, collectively, the "**DIP Documents**");

(b)      authorizes the Debtors to use the proceeds of such DIP Loans to fund working capital and operational expenses, make adequate protection payments and pay costs and expenses associated with the DIP Documents and these chapter 11 cases and, on a final basis (and only pursuant to the Final Order), use proceeds thereof to pay pre-petition interest accrued under the Debtors' Prepetition Credit Agreement and First Lien Indenture (each as defined below) and to fund payments associated with an Acceptable Plan;

(c)      authorizes the Debtors to grant liens in favor of the DIP Agent on all prepetition and postpetition property of the Debtors' estates and all proceeds thereof, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and accords the DIP Obligations superpriority administrative claim status;

(d)      authorizes the Debtors to use "cash collateral" pursuant to section 363(c) of the Bankruptcy Code, Bankruptcy Rule 4001(b) and the Local Rules, including Local Rule 4001-2;

(e)      authorizes the Debtors to provide adequate protection to (i) Goldman Sachs Bank USA, in its capacity as Administrative Agent and Collateral Agent (the "**Prepetition First Lien Agent**") under, and to the lenders (the "**Prepetition First Lien Lenders**") party to, the Prepetition Credit Agreement and (ii) Wilmington Trust, National Association, solely in its capacity as Trustee and Note Collateral Agent (the "**Prepetition First Lien Notes Agent**" and, together with the Prepetition First Lien Agent, the "**Prepetition First Lien Agents**") under, and to the holders (the "**Prepetition First Lien Holders**" and, together with the Prepetition First

Lien Lenders and the Prepetition First Lien Agents, collectively, the "**First Lien Secured Parties**") of the Prepetition First Lien Notes (as defined below);

(f)      authorizes the Debtors to provide adequate protection to Wilmington Trust, National Association, in its capacity as trustee and note collateral agent (the "**Prepetition Second Lien Notes Agent**"), under, and to the holders (the "**Prepetition Second Lien Holders**") of the Prepetition Second Lien Notes (as defined below);

(g)      authorizes the Debtors to provide adequate protection to Wilmington Trust, National Association, in its capacity as trustee and note collateral agent (the "**Prepetition Third Lien Notes Agent**"), under, and to the holders (the "**Prepetition Third Lien Holders**") of the Prepetition Third Lien Notes (as defined below);

(h)      vacates the automatic stay imposed by section 362 of the Bankruptcy Code in accordance with the terms of the Interim Order to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order;

(i)      sets a date for the hearing (the "**Final Hearing**") to consider the entry of the Final Order; and

(j)      waives any applicable stay (including under Bankruptcy Rule 6004) and provides for immediate effectiveness of the Interim Order.

In support of this motion, the Debtors submit, and incorporate by reference, the Declaration of Jeffrey Campbell, President and Chief Financial Officer of Altegrity, Inc., in Support of First Day Pleadings (the "**First Day Declaration**").  In further support of this motion, the Debtors respectfully state as follows:

01:16644582.1

**Preliminary Statement**

1.      The Debtors commenced these chapter 11 cases to implement a consensual restructuring that will modify their capital structure and reshape their business operations to adapt to the sudden and unexpected loss of a substantial part of their USIS business in August and September 2014, all as more fully detailed in the First Day Declaration.  Less than six months after the USIS business disruption, the Debtors have achieved broad consensus among their funded debtholders around the terms of a financial restructuring that will allow their remaining businesses to continue uninterrupted.

2.      Specifically, the Debtors have entered into a Restructuring Support Agreement, as described in more detail in the First Day Declaration, in which holders of approximately 78% of their funded first lien debt and approximately 95% of their second and third lien debt have entered into an agreement (the "**Restructuring Support Agreement**") to support a comprehensive restructuring that, among other things, provides the Debtors with $90 million of new capital (including necessary new-cash availability to finance these chapter 11 cases pursuant to the DIP Facility), modifies key debt covenants to reflect the Debtors' new financial projections following the business disruptions in the USIS business, and reduces the amount of the Debtors' overall indebtedness by approximately 40% (the "**Proposed Restructuring**").  To facilitate the Proposed Restructuring, the Debtors have already consummated the sales of two business units for total net cash proceeds of approximately $150 million, a majority of which will be used to offer to pay down debt, begun active work to wind down the remaining USIS business operations in light of the contract expirations described above, and consensually amended their existing first lien debt documents to waive existing defaults and facilitate the restructuring.  The

01:16644582.1

commencement of these chapter 11 cases and the related requested relief, including this motion, mark the next step in the consensual restructuring process.

3.      A fundamental component of the Proposed Restructuring is the *ad hoc* group of second and third lien noteholders' agreement to invest $90 million in new capital in the Debtors in the form of the DIP Facility — a multi-draw, junior-priority secured debtor-in-possession financing facility that, so long as no Event of Default shall have occurred, rather than being payable in cash upon the Debtors' exit from chapter 11 upon the effectiveness of the Proposed Restructuring, will be converted into a new second lien debt instrument that will provide necessary liquidity to fund the Proposed Restructuring and the Debtors' business and capital obligations post-restructuring.

4.      The Debtors and the *ad hoc* group of first lien creditors (the "**Ad Hoc First Lien Group**") negotiated, in arms-length, hard fought discussions, both regarding the terms of the DIP Facility and –critically–to ensure that the entire amount of the DIP Facility will be funded into escrow at the beginning of the chapter 11 cases to provide certainty that the necessary funding will be available for the Debtors both during the chapter 11 cases and to consummate the chapter 11 plan contemplated by the Restructuring Support Agreement at the conclusion of the process.

5.      As noted, it is a fundamental premise of the DIP Facility that, once approved, the entire $90 million commitment will be funded into escrow immediately.  In this motion, the Debtors seek authority to make the Initial Draw from the Escrow Account of up to $22.5 million within 3 days of the entry of an interim order approving the DIP Facility.  That amount is needed to ensure adequate funding for operations and administrative expenses in the period between the entry of the Interim Order and the Final Hearing.  The DIP Facility then

permits – and the Debtors seek authorization to make – one or more additional drawings following entry of a final order approving the financing of up to an additional $22.5 million. The remainder of the DIP Facility will be drawn at the effective date of the plan of reorganization, and will become a new-money infusion that will fund payments due on the effective date and will provide the Debtors with adequate liquidity to fund operations post-restructuring.

6.      Importantly, the Restructuring Support Agreement contemplates that, rather than being repaid in cash, the amounts borrowed under the DIP Facility (assuming no Event of Default shall have occurred) will be repaid with a new second lien debt instrument with an interest rate of 13.5% PIK interest, convertible to 11.5% cash pay interest once the Debtors' total leverage ratio reaches 5x.

7.      Several compelling reasons justify approval of the DIP Facility.  First, the DIP Facility provides new financing on substantially better-than-market terms.  It is a junior loan, in which the debtor-in-possession financing will rank below approximately $1.1 billion in first-lien secured debt.  By its terms, it does not need to be paid in cash upon the Debtors' emergence from chapter 11 (unless there is a default under the DIP Loan Agreement or the Proposed Restructuring cannot be consummated).  The Debtors' advisors have determined, upon market inquiry, that financing on the proposed terms would not be available from any third-party market participant.  Indeed, the DIP Facility is being provided by the DIP Lenders as part of a comprehensively negotiated restructuring that requires them to make this new-money investment in support of the Debtors and their operations.

01:16644582.1

8.      In that context, it is not surprising that the terms of the DIP Facility are reasonable and provide the Debtors with the necessary flexibility to operate during, and emerge from, these chapter 11 cases by providing immediate liquidity while also providing the Debtors and the Prepetition First Lien Holders with the security that much needed funds will be available upon emergence.  The DIP Facility includes favorable (better-than-market) non-cash payment and payment-in-kind interest terms, reasonable adequate protection measures for the secured creditors, and remains junior to the Senior Priority Obligations (as defined below).  While still providing certain negotiated protections for the DIP Lenders, the DIP Facility represents a favorable loan and is the product of good faith negotiations, with a robust give-and-take process, among the Debtors, the DIP Lenders and the other secured creditors.  For all of these reasons, entering into the DIP Facility is well within the Debtors' sound business judgment.

9.      By this motion, the Debtors hereby seek entry of two orders.  First, the Debtors seek entry of the Interim Order.  Second, following notice of this motion and the Interim Order and the Final Hearing on the relief requested herein, the Debtors seek entry of the Final Order granting the relief requested herein on a final basis.  The entry of the Interim Order is necessary to satisfy the conditions to borrowing under the DIP Facility.

### **Jurisdiction and Venue**

10.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D), and the Debtors confirm their consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this motion to the extent that it is

later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for relief requested herein are sections 105(a), 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 and Local Rules 2002-1 and 4001-2.

### Background

11.     On the date hereof (the "**Commencement Date**"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  Each Debtor is authorized to continue to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner or statutory committee has been appointed in these chapter 11 cases.

12.     The events leading to the Commencement Date and the facts and circumstances supporting the requested relief are more fully set forth in the First Day Declaration, which is filed contemporaneously herewith and incorporated herein by reference in support of the requested relief.

### Concise Statement Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2

13.     Pursuant to Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2, the Debtors submit this chart listing certain material terms of the relief set forth in

01:16644582.1

the proposed DIP Facility and DIP Orders, together with the location of such terms in the DIP

Loan Agreement and the Interim Order:[4]

| | |
|---|---|
| **Borrower**<br><br>*DIP Loan Agreement preamble; Interim Order at ¶ (a)* | Altegrity, Inc. |
| **Guarantors**<br><br>*DIP Loan Agreement preamble; Interim Order at ¶ (a)* | All the Debtors in these chapter 11 cases. |
| **DIP Lenders**<br><br>*DIP Loan Agreement Schedule 2.01; Interim Order at ¶ (a)* | The institutions identified on Schedule 2.01 to the DIP Loan Agreement. |
| **DIP Agent**<br><br>*DIP Loan Agreement preamble; Interim Order at ¶ (a)* | Cantor Fitzgerald Securities |
| **DIP Facility / Borrowing Limits**<br><br>*DIP Loan Agreement recitals, definition of "Commitment" and §2.01; Interim Order at ¶¶ (a), (f)* | Aggregate $90,000,000 secured multi-draw term loan debtor-in-possession financing:<br><br>• Funded into the Escrow Account immediately upon the entry of the Interim Order.<br><br>• <u>Interim Order</u>:  Up to $22,500,000 within 3 days of the entry of the Interim Order (the "**Initial Draw**")<br><br>• <u>Final Order</u>:  Up to $45,000,000 less the Initial Draw.<br><br>• <u>Effective Date</u>:  The balance of the facility immediately prior to the effective date of a plan of reorganization. |
| **DIP Repayment**<br><br>*DIP Loan Agreement §§ 2.08-2.10* | • Payable in full, in cash, on the Maturity Date<br><br>• Payable by a new issuance of second lien notes in a face amount equal to principal and interest outstanding under the facility if on or prior to the |

---

[4]    The summaries and descriptions of the terms and conditions of the DIP Loan Agreement and the Interim Order set forth in this motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such. This motion is qualified in its entirety by reference to the provisions of the DIP Loan Agreement and the Interim Order. In the event that there is a conflict between this motion and the DIP Loan Agreement, the DIP Loan Agreement shall control in all respects, or in the case of a conflict between this motion and/or the DIP Loan Agreement and the Interim Order, the Interim Order shall control in all respects.

|  | Maturity Date, the Effective Date shall have occurred. |
|  | • Amounts borrowed under the DIP Facility that are repaid or prepaid may not be reborrowed. |
| **Use of Proceeds and Cash Collateral**<br><br>*Interim Order at ¶11(a)* | Used for (a) working capital and other general corporate purposes, including to make Adequate Protection Payments (as defined in the Interim Order), (b) payment of costs of administration of these chapter 11 cases, (c) payment of such prepetition expenses as permitted under the DIP Loan Agreement and approved by the Court, (d) upon entry of the Final Order, payment of accrued but unpaid interest with respect to the Senior Priority Obligations as adequate protection; and (e) with respect to the Final Draw only, providing liquidity to the Debtors to fund working capital needs after consummation of an Acceptable Plan. |
| **Entities with Interest in Cash Collateral**<br><br>*Interim Order at ¶E-1(e)* | The Prepetition First Lien Agent and the other First Lien Secured Parties. |
| **Maturity**<br><br>*DIP Loan Agreement definition of "Maturity Date" and §2.08* | On the earliest of (i) the date that is 180 days from the Commencement Date, (ii) the date that is 45 days following entry of the Interim Order if the Final Order has not been entered by such date, (iii) the effective date of the Debtors' chapter 11 plan, (iv) the dismissal of the chapter 11 cases or the conversion of the chapter 11 cases to a chapter 7 liquidation, (v) the sale of all or substantially all of the Debtors' assets or (vi) the appointment of a trustee or examiner with expanded powers or a receiver. |
| **Termination Date**<br><br>*Interim Order at ¶20* | The earliest of (such date, the "**Termination Date**") (unless waived or extended, if applicable, as set forth in the DIP Documents):<br><br>• the first business day that is 45 days after the Commencement Date if the Final Order has not been entered by this Court on or before such date;<br><br>• the date upon which, after notice and an opportunity to cure, the Debtors fail to comply in any material respect with the terms and provisions of the Interim Order;<br><br>• the termination of that certain Restructuring Support Agreement dated as of February 2, 2015, by and among the parties thereto (the "**Restructuring Support Agreement**") (other than due to a breach by the Consenting First Lien Creditors (as defined in the Restructuring Support Agreement));<br><br>• the entry of an order reversing, amending, supplementing, staying, vacating, or otherwise modifying the Interim Order without the consent of the DIP Agent, the Requisite Consenting First Lien Creditors (as defined in the Restructuring Support Agreement) and the Debtors;<br><br>• if Total Liquidity shall be less than $25,000,000 on a measurement date;<br><br>• the occurrence of the Maturity Date; and<br><br>• the date upon which an Event of Default shall have occurred and be continuing. |
| **Interest Rate**<br><br>*DIP Loan Agreement §2.06* | • 12% paid in kind interest accruing from the Closing Date on the full amount of the DIP Facility funded into the Escrow Account. |

| | |
|---|---|
| | • 14% cash interest, payable on demand, shall accrue during the continuance of an Event of Default. |
| **Events of Default**<br><br>*DIP Loan Agreement Article VII* | The DIP Loan Agreement sets forth a number of events of default, including, among others, the occurrence of the Maturity Date prior to the Effective Date and the termination of the Restructuring Support Agreement. |
| **Budget**<br><br>*DIP Loan Agreement §5.08;*<br>*Interim Order at ¶12* | So long as the DIP Facility has not been terminated, the Debtors shall operate generally in accordance with the Budget in the ordinary course of the Debtors' business and generally consistent with the Debtors' business plan. |
| **DIP Liens**<br><br>*DIP Loan Agreement Article X;*<br>*Interim Order at ¶7* | The Debtors grant the following as collateral securing all DIP Obligations (collectively, the "**DIP Liens**"):<br><br>• <u>Liens on Unencumbered Property</u>:  Pursuant to section 364(c)(2) of the Bankruptcy Code, senior, valid, binding, enforceable and perfected security interests in, and liens upon, all of the assets (other than Excluded Collateral (as defined below)) of the Debtors not otherwise subject to any prepetition lien as of the Commencement Date, including the Senior Priority Liens (as defined below).<br><br>• <u>Junior Liens</u>:  Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, binding, enforceable and perfected junior security interests in, and liens upon, all of the assets of the Debtors subject to a valid and enforceable lien as of the Commencement Date, including the Senior Priority Liens.<br><br>• <u>Priming Liens</u>:  Pursuant to section 364(d) of the Bankruptcy Code, senior, valid, binding, enforceable and perfected security interests in, and senior priming liens upon, all of the assets of the Debtors subject to a lien securing the Prepetition Second Lien Obligations or the Prepetition Third Lien Obligations (each as defined below).  The DIP Liens will extend to the Escrow Funds on an exclusive basis.<br><br><u>Future Property</u>:  The "Collateral" (as further set forth in Article X of DIP Loan Agreement) (referred to herein as the "**DIP Collateral**") includes all of the property and assets of the Debtors and their estates, real and personal, tangible and intangible, including all causes of action (except as provided below), whether owned as of the Commencement Date or thereafter acquired or arising, and regardless of where located or by whomsoever held, and whether now owned or in which the Debtors have any interest or hereafter acquired or in which the Debtors obtain an interest.<br><br><u>Excluded Collateral</u>:  The DIP Collateral shall not include, and the DIP Agent shall not be granted a lien on, the following ("**Excluded Collateral**"):  (a) property consisting of voting equity interests of any Foreign Subsidiary in excess of 65% of the equity interests representing the total combined voting power of all classes of equity interests of such Foreign Subsidiary entitled to vote, (b) any general intangibles or other rights arising under contracts or other documents to the extent that a grant of a security interest would require any government approval (unless such approval has been received or is excused by operation of the Bankruptcy Code) or violate any law or (c) actions for preferences, fraudulent conveyances and other avoidance power claims under sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code (collectively, "**Avoidance Actions**"); provided, however, that the DIP Collateral shall include the proceeds of such actions; provided, further, that (x) the Adequate |

| | |
|---|---|
| | Protection Liens (as defined below) shall encumber proceeds of such Avoidance Actions on a first priority basis and (y) the Adequate Protection Claims (as defined below) shall have recourse to the proceeds of such Avoidance Actions. *See also* ¶ 14(d) of this motion. |
| **Priority of DIP Liens**<br><br>*Interim Order at ¶7* | The DIP Liens shall be subject to the Carve-Out (as defined below), the Adequate Protection Liens and the Senior Priority Liens.  The DIP Liens will extend to the Escrow Funds on an exclusive basis.<br><br>Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Liens on the Prepetition Collateral (as defined below) and the DIP Collateral shall be junior in all respects to the Senior Priority Liens and other unavoidable liens in existence immediately prior to the Commencement Date, or to any other valid and unavoidable liens in existence immediately prior to the Commencement Date that are perfected subsequent to the Commencement Date as permitted by section 546(b) of the Bankruptcy Code, to the extent such other unavoidable liens are senior to the Senior Priority Liens.<br><br>The DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) unless otherwise provided for in the DIP Documents, any liens arising after the Commencement Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors. |
| **Superpriority Administrative Claims**<br><br>*DIP Loan Agreement definition of "Super-priority Claim" and § 10.01; Interim Order at ¶10(a)* | The DIP Obligations shall constitute allowed superpriority administrative claims with priority over any and all administrative expenses, diminution claims and all other claims against the Debtors and over any and all administrative expenses or other claims, provided that such claims shall be junior to the Adequate Protection Claims, the Senior Priority Obligations and the Carve-Out. |
| **Adequate Protection Payments**<br><br>*DIP Loan Agreement definition of "Permitted Adequate Protection Provisions" and § 5.08(c); Interim Order at ¶13* | As adequate protection in accordance with sections 361 and 363 of the Bankruptcy Code, the Debtors will pay to:<br><br>• the Prepetition First Lien Agent: regularly scheduled interest on the Prepetition Term Loan (as defined below) outstanding at the applicable non-default rate per the terms of the Prepetition Credit Agreement.<br><br>• the Prepetition First Lien Notes Agent: regularly scheduled interest on the Prepetition First Lien Notes Obligations (as defined below) outstanding at the applicable non-default rate per the terms of the First Lien Indenture (as defined below). |
| **Adequate Protection Liens and Claims for Prepetition First Lien Lenders and Prepetition First Lien Holders**<br><br>*DIP Loan Agreement definition of "Permitted Adequate Protection Provisions"; Interim Order at ¶14(a)-(c)* | Pursuant to sections 361, 363(c)(2) and 363(e) of the Bankruptcy Code, the Prepetition First Lien Agents are granted additional adequate protection in the form of replacement liens on the DIP Collateral (the "**First Priority Adequate Protection Liens**").<br><br>Pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, holders of Senior Priority Obligations shall have allowed superpriority administrative claims against each of the Debtors' estates with priority over any and all administrative expenses and priority or unsecured claims arising under sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (upon entry of the Final Order, |

| | to the extent therein approved), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provisions of the Bankruptcy Code or otherwise, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (the "**Senior Adequate Protection Claims**"). The Senior Adequate Protection Claims shall be senior in all respects to the DIP Obligations but shall be junior to the Carve-Out. |
|---|---|
| **Adequate Protection Liens for Prepetition Second Lien Holders and Prepetition Third Lien Holders**<br><br>*Interim Order at ¶14(e)-(f)* | Pursuant to sections 361, 363(c)(2) and 363(e) of the Bankruptcy Code, both the Prepetition Second Lien Notes Agent and the Prepetition Third Lien Notes Agent are granted additional adequate protection in the form of junior replacement liens on the DIP Collateral (the "**Second Priority Adequate Protection Liens**" and the "**Third Priority Adequate Protection Liens**" respectively, and together with the Senior Adequate Protection Liens, the "**Adequate Protection Liens**").<br><br>Pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, the Prepetition Second Lien Notes Agent and the Prepetition Third Lien Notes Agent shall have allowed superpriority administrative claims against each of the Debtors' estates with priority over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (upon entry of the Final Order, to the extent therein approved), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provisions of the Bankruptcy Code or otherwise (the "**Second Priority Adequate Protection Claims**" and the "**Third Priority Adequate Protection Claims**" respectively, and together with the Senior Adequate Protection Claims, the "**Adequate Protection Claims**").<br><br>The Second Priority Adequate Protection Liens and Second Priority Adequate Protection Claims shall be senior in all respects to the Third Priority Adequate Protection Liens, the Prepetition Third Priority Notes Liens (as defined below) and the Third Priority Adequate Protection Claims but shall be junior to the Carve-Out, the First Priority Adequate Protection Liens, the Senior Adequate Protection Claims, the Senior Priority Liens and the DIP Liens.<br><br>The Third Priority Adequate Protection Liens shall be junior to the Carve-Out, the First Priority Adequate Protection Liens, the Senior Adequate Protection Claims, the Senior Priority Liens, the DIP Liens, the Second Priority Adequate Protection Liens, the Second Priority Adequate Protection Claims and the Prepetition Second Priority Notes Liens (as defined below). |
| **Fees and Expenses**<br><br>*Interim Order at ¶13(c); DIP Loan Agreement § 2.05* | The DIP Facility contemplates the payment of fees and reimbursement of expenses of the DIP Agent, the Consenting First Lien Creditors, the Consenting Second Lien Creditors and Consenting Third Lien Creditors (each as defined in the Restructuring Support Agreement) and each of their respective professionals. |
| **Carve-Out**<br><br>*Interim Order at ¶10(b)* | The "**Carve-Out**" shall equal the sum total of:  (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) fees and expenses of up to $25,000 incurred by a trustee that would otherwise be entitled to priority under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by interim order, procedural order or otherwise, all fees, costs, and expenses (the "**Professional Fees**") incurred by persons or firms retained by the Debtors or any statutory committee (a "**Creditors' Committee**") pursuant to section 327, 328, or 363 |

| | |
|---|---|
| | of the Bankruptcy Code (collectively, the "**Professional Persons**") at any time before or on the first business day following the Termination Date, whether allowed by the Bankruptcy Court prior to or after the Termination Date; and (iv) after the first business day following the Termination Date, to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of (x) all Professional Fees of Professional Persons retained by the Debtors and (y) the payment of Professional Fees of Professional Persons incurred by the Creditors' Committee, if any, in an aggregate amount for clauses (x) and (y) not to exceed $2,000,000 incurred on and after the Termination Date. |
| | The Carve-Out shall be senior in all respects to the DIP Obligations, the DIP Liens, the First Priority Adequate Protection Liens, the Adequate Protection Claims, the Senior Priority Liens, the Senior Priority Obligations, the Primed Liens (as defined below), the Prepetition Second Lien Obligations, and the Prepetition Third Lien Obligations. |
| **Governing Law**<br><br>*DIP Loan Agreement § 11.07* | The DIP Documents will be governed by the law of New York, except to the extent that the provisions of the Bankruptcy Code are applicable and specifically conflict with the foregoing. |

## Provisions to Be Highlighted Pursuant to Local Rule 4001-2

14.     The Debtors believe the following provisions of the DIP Loan Agreement must be highlighted pursuant to Local Rule 4001-2:

a.      Cross Collateralization (Local Rule 4001-2(a)(i)(A)).  Not applicable.

b.      Binding the Estate to Validity, Perfection, or Amount of Secured Debt (Local Rule 4001-2(a)(i)(B)).  The Debtors stipulate as to liability with respect to obligations arising under the Prepetition First Lien Credit Facility (as defined below), the Prepetition First Lien Notes Obligations, the Prepetition Secured Obligations (as defined below), the Prepetition Second Lien Notes, the Prepetition Second Priority Notes Liens, the Prepetition Third Lien Notes and the Prepetition Third Priority Notes Liens; the perfection and priority of security interests in the Prepetition Collateral; and validity of the Senior Priority Liens and the Primed Liens. *See* Interim Order, ¶ E.

c.      Waiver of Rights Under Section 506(c) (Local Rule 4001-2(a)(i)(C)). Effective as of entry of the Final Order, the Debtors the ability to charge costs or expenses of administration of these chapter 11 cases against or recover from the DIP Collateral, the Prepetition Collateral or the Cash Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law or equity without the prior written consent of the

DIP Agent or the Prepetition First Lien Agents, as applicable. *See* Interim Order, ¶ 19.

d.   <u>Liens on Avoidance Actions (Local Rule 4001-2(a)(i)(D))</u>.   The DIP Collateral shall not include, and the DIP Agent shall not be granted a lien on, Avoidance Actions (as defined above and in the Interim Order); <u>provided</u>, <u>however</u>, that the DIP Collateral shall include the proceeds of such Avoidance Actions; <u>provided</u>, <u>further</u>, that (x) the Adequate Protection Liens shall encumber proceeds of such Avoidance Actions on a first priority basis and (y) the Adequate Protection Claims shall have recourse to the proceeds of such Avoidance Actions. *See* Interim Order, ¶ 7(b).

e.   <u>Provisions that Deem Prepetition Debt to be Postpetition Debt (Local Rule 4001-2(a)(i)(E))</u>.   Neither the DIP Documents nor the DIP Order contemplate a roll-up, but proceeds of the DIP Facility will be used to make adequate protection payments, including payments of interest (including catch-up interest) on the principal amount of certain prepetition debt. *See* Interim Order, ¶ 13.

f.   <u>Provisions that Provide Disparate Treatment of Professionals Retained by a Creditors' Committee (Local Rule 4001-2(a)(i)(F))</u>.   In no instance shall any fees or expenses incurred by any statutory committee or any other party to (xx) investigate any Claims or Defenses (as defined in the Interim Order) against any of the Prepetition Secured Parties (as defined below) in excess of the Investigation Budget (as defined in the Interim Order) or (yy) initiate or prosecute any Claims or Defenses against any of the Prepetition Secured Parties be subject to, or benefit from, the Carve-Out. *See* Interim Order, ¶ 10(b).

g.   <u>Provisions that Prime Secured Liens Without the Consent of the Lienholder (Local Rule 4001-2(a)(i)(G))</u>.   The Prepetition Second Lien Holders and the Prepetition Third Lien Holders consented to the priming of, respectively, the Prepetition Second Priority Notes Liens and the Prepetition Third Priority Notes Liens.

h.   <u>Provisions that Seek to Affect the Court's Power to Consider the Equities of the Case (Local Rule 4001-2(a)(i)(H))</u>.   Subject to entry of the Final Order, the Adequate Protection Provisions (as defined in the Interim Order) shall not be subject to the "equities of the case" exception of section 552 of the Bankruptcy Code. *See* Interim Order, ¶¶ E-4, 14(c), 18.

**Prepetition Debt**

15.    As of the Commencement Date, the Debtors have funded debt facilities in place with a face amount of approximately $1.8 billion, of which approximately $1.6 billion is secured debt and $138.4 million is unsecured debt.

16.    Prior to the Commencement Date, the Borrower and the Guarantors were provided financing pursuant to:  (a) a first lien senior secured revolving credit facility (the "**Prepetition Revolving Credit Facility**") under the Prepetition Credit Agreement, (b) a first lien senior secured term loan facility (the "**Prepetition Term Loan**" and, together with the Prepetition Revolving Credit Facility, the "**Prepetition First Lien Credit Facility**") under that certain Credit Agreement, dated as of July 3, 2014, among Altegrity Acquisition Corp., Altegrity, Inc., as the borrower, the Prepetition First Lien Lenders, the Prepetition First Lien Agent and other parties thereto from time to time (the "**Prepetition Credit Agreement**"), (c) first lien notes (the "**Prepetition First Lien Notes**," and together with the Prepetition First Lien Credit Facility, the "**First Lien Indebtedness**") issued under that certain Indenture, dated as of July 3, 2014 (the "**First Lien Indenture**" and, together with the Loan Documents (as defined in the Prepetition Credit Agreement), including any ancillary documents related thereto or referenced thereby, collectively, the "**Senior Priority Documents**"), among the Borrower as Issuer, the other Debtors party thereto as guarantors and the Prepetition First Lien Notes Agent (the obligations under such Prepetition First Lien Notes, the "**Prepetition First Lien Notes Obligations**" and, together with the obligations under the Prepetition First Lien Credit Facility, the "**Senior Priority Obligations**", and the holders of the Senior Priority Obligations, the "**Senior Priority Holders**"), (d) certain Senior Second Lien Secured 12.00% Cash Pay and

2.00% Pay-in-Kind Notes due 2020 (the "**Series 1 Prepetition Second Lien Notes**") and certain Senior Second Lien Secured 10.50% Cash Pay and 2.50% Pay-in-Kind Notes due 2020 (the "**Series 2 Prepetition Second Lien Notes**" and, together with the Series 1 Prepetition Second Lien Notes, the "**Prepetition Second Lien Notes**", and the obligations under such Notes, the "**Prepetition Second Lien Obligations**") issued under that certain Indenture, dated as of July 3, 2014 (the "**Second Lien Indenture**"), among the Borrower as Issuer, the Debtors party thereto as guarantors and the Prepetition Second Lien Notes Agent, (e) certain Senior Third Lien Secured 15.00% Pay-in-Kind Notes due 2021 (the "**Prepetition Third Lien Notes**," the obligations under such Notes, the "**Prepetition Third Lien Obligations**," and together with the Senior Priority Obligations and the Prepetition Second Lien Obligations, collectively, the "**Prepetition Secured Obligations**") issued under that certain Indenture, dated as of July 3, 2014 (the "**Third Lien Indenture**"), the Borrower as Issuer, the Debtors party thereto as guarantors and the Prepetition Third Lien Notes Agent (the Prepetition Third Lien Notes Agent, together with the Prepetition Third Lien Holders, the Prepetition Second Lien Notes Agent, the Prepetition Second Lien Holders, and the First Lien Secured Parties, collectively, the "**Prepetition Secured Parties**"), (f) certain unsecured 12.00% Senior Notes due 2015 (the "**2015 12.00% Senior Notes**") (g) certain unsecured 10.50% Senior Notes due 2015 (the "**2015 10.50% Senior Notes**" and, together with the 2015 12.00% Senior Notes, the "**2015 Senior Notes**"), (h) certain unsecured 11.75% Senior Subordinated Notes due 2016 (the "**2016 Senior Subordinated Notes**") and (i) certain unsecured zero coupon junior subordinated notes (the "**Junior Subordinated Notes**").

17.    The chart below summarizes the Debtors' prepetition indebtedness, including approximate current outstanding amounts as of December 31, 2014;[5] further detail with respect to each category of debt obligation is provided below.

| Debt Obligation | Original Amount | Approximate Amount Outstanding | Maturity Date | Security Status |
|---|---|---|---|---|
| Prepetition Revolving Credit Facility | $60 million total commitments | $23.4 million in issued and outstanding letters of credit[6] | April 1, 2019 | First Lien Secured |
| Prepetition Term Loan | $275 million | $273.6 million | July 5, 2018 | First Lien Secured |
| Prepetition First Lien Notes | $825 million | $825 million | July 1, 2019 | First Lien Secured |
| Prepetition Second Lien Notes | $480.5 million | $486 million | July 1, 2020 | Second Lien Secured |
| Prepetition Third Lien Notes | $60.8 million | $65.3 million | July 1, 2021 | Third Lien Secured |
| 2015 Senior Notes[7] | $22.2 million | $22.2 million | November 1, 2015 | Unsecured |
| 2016 Senior Subordinated Notes[8] | $29.2 million | $29.2 million | May 1, 2016 | Unsecured |
| Junior Subordinated Notes[9] | $50 million | $85.9 million | January 4, 2022 | Unsecured |

---

[5]    Payment-in-kind interest of $10 million applicable to the Prepetition Second Lien Notes and Prepetition Third Lien Notes as of January 1, 2015 is also reflected below.

[6]    As of the Commencement Date, the amount of issued and outstanding letters of credit is approximately $21 million.

[7]    Untendered balance as of July 2014 Recapitalization.

[8]    Untendered balance as of July 2014 Recapitalization.

[9]    As of the Commencement Date, the outstanding amount of the Junior Subordinated Notes is $87 million.

18.     Most of the Debtors' current capital structure was put into place in July 2014 as part of a recapitalization of the Debtors' then-existing indebtedness to address certain near-term debt maturities (the "**July 2014 Recapitalization**").  The July 2014 Recapitalization consisted of (a) a consent solicitation and exchange offer (the "**Exchange Offer**"), pursuant to which the Debtors (i) offered to the holders of the 2015 Senior Notes and the 2016 Senior Subordinated Notes a combination of cash and new debt in the form of the Prepetition Second Lien Notes and the Prepetition Third Lien Notes in exchange for their existing notes and (ii) amended the indentures governing the 2015 Senior Notes and the 2016 Senior Subordinated Notes that were not tendered as part of the Exchange Offer, (b) a refinancing of the Debtors' then-existing senior secured credit facility with the proceeds of the Prepetition First Lien Notes and the Prepetition First Lien Credit Facility, (c) an amendment of the Junior Subordinated Notes extending their maturity to January 4, 2022 and (d) a $25 million equity contribution by Providence Equity Partners, LLC, Providence Equity Partners VI LP and Providence Equity Partners VI-A, LP (collectively, "**Providence**") to Altegrity Holding Corp. ("**Holding Corp.**").

A.     **Senior Priority Obligations**

19.     As a result of the July 2014 Recapitalization, the Debtors have an aggregate of approximately $1.1 billion in principal amount of First Lien Indebtedness outstanding, consisting of the Prepetition First Lien Credit Facility and the Prepetition First Lien Notes, which rank *pari passu* with one another.

(i)     **Prepetition First Lien Credit Facility**

20.     The Prepetition Term Loan had an initial aggregate principal amount of $275 million.  Due to subsequent amortization payments, as of December 31, 2014, the aggregate

01:16644582.1

principal amount of the Prepetition Term Loan was $273.6 million. The aggregate revolving commitments under the Prepetition Revolving Credit Facility total $60 million, with a $45 million letter of credit sublimit. As of December 31, 2014, no amounts had been drawn under the Prepetition Revolving Credit Facility, but $23 million of letters of credit were issued under the Prepetition Revolving Credit Facility.[10]

21.      The Prepetition Term Loan was originally scheduled to mature on July 1, 2019, and the Prepetition Revolving Credit Facility was scheduled to mature on April 1, 2019. As a result of amendments to the Prepetition First Lien Credit Facility effectuated immediately before the Commencement Date, upon the effectiveness of an Acceptable Plan, the Prepetition Term Loan is now scheduled to mature on July 5, 2018. Interest on both the Prepetition Term Loan and the Prepetition Revolving Credit Facility is equal to, at the option of the Borrower, (i) the alternate base rate (minimum 2.00%) plus 7.25% or (ii) the LIBOR (minimum 1.00%) rate plus 8.25%.

22.      In the event of a re-pricing or refinancing of the Prepetition Term Loan, the Prepetition Term Loan is subject to a "soft-call" premium of: (i) prior to July 1, 2016, 3.00%, (ii) between July 1, 2016 and July 1, 2017, 2.00% and (iii) between July 1, 2017 and July 1, 2018, 1.00%. In addition, prior to July 1, 2015, the Prepetition Term Loan provides for payment of a "make-whole" premium in the event that the Prepetition Term Loan is (i) voluntarily prepaid or (ii) accelerated as a result of an event of default under the Prepetition Credit Agreement (including the commencement of an insolvency proceeding).

---

[10]   During January 2015, certain letters of credit were reduced, such that the outstanding total as of the Commencement Date is approximately $21 million.

01:16644582.1

23.     The Senior Priority Obligations are secured by duly perfected first priority security interests (the "**Senior Priority Liens**") in all "Collateral" (as defined in the Prepetition Credit Agreement) (the "**Prepetition Collateral**").

**(ii)    Prepetition First Lien Notes**

24.     The Borrower issued the Prepetition First Lien Notes in an aggregate principal amount of $825 million pursuant to the First Lien Indenture.  The Prepetition First Lien Notes mature on July 1, 2019.  Interest on the Prepetition First Lien Notes accrues at 9.50%, payable in cash on July 1 and January 1 of each year.  Prior to July 1, 2017, the First Lien Indenture provides for payment of a "make-whole" premium in the event that any such Prepetition First Lien Notes are (i) redeemed pursuant to the redemption provisions under the First Lien Indenture or (ii) accelerated as a result of an event of default under the First Lien Indenture (including the commencement of an insolvency proceeding).

**B.     Prepetition Second Lien Notes**

25.     The Borrower issued the Prepetition Second Lien Notes in an initial aggregate principal amount of approximately $480.5 million, consisting of approximately $200.1 million Series 1 Prepetition Second Lien Notes and $280.4 million Series 2 Prepetition Second Lien Notes, each pursuant the Second Lien Indenture.

26.     The Prepetition Second Lien Notes mature on July 1, 2020.  Interest on the Series 1 Prepetition Second Lien Notes accrues at 12.00% payable in cash and 2.00% payable in kind, each on July 1 and January 1 of each year.  Interest on the Series 2 Prepetition Second Lien Notes accrues at 10.50%, payable in cash and 2.50%, payable in kind, each on July 1 and January 1 of each year.  Due to subsequent payment in kind interest payments, as of January 1,

2015, the aggregate principal amount of the outstanding Prepetition Second Lien Notes totaled approximately $486 million—$202 million outstanding under the Series 1 Prepetition Second Lien Notes and $284 million outstanding under the Series 2 Prepetition Second Lien Notes.

27.    The Debtors' obligations due and owing on account of the Prepetition Second Lien Notes are secured by duly perfected second priority security interests in all of the Prepetition Collateral (the "**Prepetition Second Priority Notes Liens**").

**C.    Prepetition Third Lien Notes**

28.    The Borrower issued the Prepetition Third Lien Notes in an aggregate principal amount of approximately $60.8 million, pursuant to the Third Lien Indenture.  Due to subsequent payment in kind interest payments, as of January 1, 2015, the aggregate principal amount of the outstanding Prepetition Third Lien Notes was $65.3 million.

29.    The Prepetition Third Lien Notes mature on July 1, 2021.  Interest on the Prepetition Third Lien Notes accrues at 15.00%, payable in kind on July 1 and January 1 of each year.

30.    The Debtors' obligations due and owing on account of the Prepetition Third Lien Notes are secured by duly perfected third priority security interests in all of the Prepetition Collateral (the "**Prepetition Third Priority Notes Liens**" and, together with the Prepetition Second Priority Notes Liens, collectively, the "**Primed Liens**").

**D.    2015 Senior Notes**

31.    On October 24, 2007, the Borrower issued $290 million in aggregate principal amount of the 2015 10.50% Senior Notes pursuant to that certain indenture, dated as of October

24, 2007, among the Borrower, each of the other Debtors except Holding Corp. as guarantors and the Wells Fargo Bank, N.A., in its capacity as indenture trustee.  On August 3, 2010, the Borrower issued $210 million in aggregate principal amount of the 2015 12.00% Senior Notes pursuant to that certain indenture, dated as of August 3, 2010, among the Borrower, each of the other Debtors except Holding Corp. as guarantors and the Wells Fargo Bank, N.A., in its capacity as indenture trustee.  On September 26, 2014, Wilmington Trust, National Association succeeded Wells Fargo Bank, N.A. in its capacity as indenture trustee.  The 2015 Senior Notes are unsecured.  As of the Commencement Date, $10.9 million of the 2015 10.50% Senior Notes and $11.3 million of the 2015 12.00% Senior Notes remain outstanding, representing notes that were not tendered as part of the July 2014 Recapitalization.

32.    The 2015 Senior Notes mature on November 1, 2015.  Interest on the 2015 10.50% Senior Notes accrues at 10.50%, payable in cash on May 1 and November 1 of each year.  Interest on the 2015 12.00% Senior Notes accrues at 12.00%, payable in cash on May 1 and November 1 of each year.

E.    **2016 Senior Subordinated Notes**

33.    On October 24, 2007, the Borrower issued $150 million in aggregate principal amount of the 2016 Senior Subordinated Notes pursuant to that certain indenture, dated as of October 24, 2007, among the Borrower, each of the other Debtors except Holding Corp. as guarantors and Wells Fargo Bank, N.A., in its capacity as indenture trustee.  On September 26, 2014, Wilmington Trust, National Association succeeded Wells Fargo Bank, N.A. in its capacity as indenture trustee.  The 2016 Senior Subordinated Notes are unsecured and are subordinated in right of payment to other senior indebtedness of the Debtors (including the Prepetition First Lien

Credit Facility, the Prepetition First Lien Notes, the Prepetition Second Lien Notes, the

Prepetition Third Lien Notes and the 2015 Senior Notes).  As of the Commencement Date, $29.2

million of the 2016 Senior Subordinated Notes remains outstanding, representing notes that were

not tendered as part of the July 2014 Recapitalization.

34.     The 2016 Senior Subordinated Notes mature on May 1, 2016.  Interest on the

2016 Senior Subordinated Notes accrues at 11.75% payable in cash on May 1 and November 1

of each year.

**F.     Junior Subordinated Notes**

35.     On August 3, 2010, the Borrower issued $50 million in aggregate principal

amount of Junior Subordinated Notes with an aggregate face amount of $104.1 million.  The

Junior Subordinated Notes initially matured on August 2, 2016, with the face amount payable in

full upon maturity.  In connection with the July 2014 Recapitalization, 100% of the holders of

the Junior Subordinated Notes agreed to extend the maturity of such notes until January 4, 2022.

The Junior Subordinated Notes do not bear periodic cash interest, but rather accrete in principal

amount at a yield of 13.00%, compounded annually.   The Junior Subordinated Notes are

unsecured and are subordinated in right of payment to all senior indebtedness of the Debtors

(including the Prepetition First Lien Credit Facility, the Prepetition First Lien Notes, the

Prepetition Second Lien Notes, the Prepetition Third Lien Notes, the 2015 Senior Notes and the

2016 Senior Subordinated Notes).

**<u>Relief Requested</u>**

36.     By this motion, the Debtors seek entry of the Interim Order and the Final Order,

pursuant to sections 361, 363(b), 364(c)(2), 364(c)(3), 364(d) and 364(e) of the Bankruptcy

Code, authorizing the Debtors to enter into the DIP Documents.  More specifically, the Debtors

seek authority to:

a.     to incur debt and obtain postpetition senior secured debtor-in-possession financing up to an aggregate principal amount of $90,000,000, with $22,500,000 available on an interim basis, in accordance with the DIP Loan Agreement and incur the obligations as provided for and defined in the DIP Loan Agreement;

b.     obtain credit and incur debt secured by liens (as defined in section 101(37) of the Bankruptcy Code) on property of the Debtors' estates pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and with priority, as provided in section 364(c) and 364(d) of the Bankruptcy Code;

c.     use cash collateral pursuant to sections 363(c) and 363(e) of the Bankruptcy Code, Bankruptcy Rule 4001(b) and Local Rule 4001-2 on the terms and conditions set forth in the Interim Order;

d.     provide adequate protection to the (i) the Prepetition First Lien Agent, solely in its capacity as such and for the ratable benefit of the Prepetition First Lien Lenders, (ii) the Prepetition First Lien Notes Agent, solely in its capacity as such and for the ratable benefit of the Prepetition First Lien Holders, (iii) the Prepetition Second Lien Notes Agent, solely in its capacity as such and for the ratable benefit of the Prepetition Second Lien Holders and (iv) the Prepetition Third Lien Notes Agent, solely in its capacity as such and for the ratable benefit of the Prepetition Third Lien Holders, in each case to protect such parties from any diminution in the value of their interests in the Prepetition Collateral;

e.     grant the DIP Agent, for the ratable benefit of the DIP Agent and the DIP Lenders, liens upon the Debtors' property, as provided in and as contemplated by the Interim Order and the DIP Documents and pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code;

f.     use the proceeds of the DIP Facility for working capital purposes of the Debtors and to otherwise fund the operations of the Debtors during these chapter 11 cases as set forth in the Interim Order and the DIP Documents;

g.     pay costs and expenses in connection with the DIP Facility and these chapter 11 cases, including, but not limited to, the reasonable fees and expenses of the professionals retained as provided for in the DIP Documents;

h.    execute and deliver the DIP Documents and perform such other and further acts as may be necessary or appropriate in connection therewith; and

i.    pursuant to Bankruptcy Rule 4001, set a date for a hearing to consider entry of the Final Order, authorizing and approving the transactions described herein on a final basis.

### Basis for Relief

37.    The continued viability of the Debtors' businesses and the success of the Debtors' reorganization efforts hinge upon obtaining immediate access to financing.  Absent an immediate infusion of capital or access to financing, the Debtors simply cannot operate their businesses.  At this time, the Debtors' liquidity needs can be satisfied only if the Debtors are authorized to borrow up to a total of $90,000,000 under the proposed DIP Loan Agreement, with $22,500,000 being available for draws on an interim basis, and use such proceeds to satisfy, among other things, working capital and operational needs.  Approval of the DIP Loan Agreement will allow the Debtors to remain operational, including paying their current and ongoing operating expenses (e.g., postpetition wages, salaries and other capital expenditures).

38.    As set forth in detail above, given the Debtors' current financial condition, financing arrangements and capital structure, they are unable to obtain financing on terms more favorable than the DIP Facility from sources other than the DIP Lenders, who are willing to provide debtor-in-possession financing junior to the Debtors' roughly $1.1 billion of First Lien Indebtedness.

39.    The Debtors have been unable to procure sufficient financing (a) in the form of unsecured credit allowable under section 503(b)(l) of the Bankruptcy Code or solely as an administrative expense under section 364(a)-(b) of the Bankruptcy Code, (b) secured by a lien

allowable only under sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code except under the terms and conditions provided in Interim Order and the DIP Documents and (c) without granting to the DIP Agent liens on various of the assets of the Debtors pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code.  In fact, the Debtors have had an extremely difficult time securing this financing on the terms set forth herein, engaging in several months of negotiations with the Debtors' key stakeholders to get to this point.  Thus, with literally no alternative available, the Debtors propose to obtain the DIP Facility by providing, *inter alia*, security interests and liens pursuant to section 364 of the Bankruptcy Code.

### A.    The Debtors Satisfy the Requirements for Obtaining Credit Pursuant to Bankruptcy Code Section 364(c)

40.    Pursuant to section 364(c) of the Bankruptcy Code, a court may authorize a debtor to incur debt that is (a) entitled to a superpriority administrative expense status, (b) secured by a lien on otherwise unencumbered property or (c) secured by a junior lien on encumbered property if the debtor cannot obtain postpetition credit on an unsecured basis, on an administrative expense priority or secured solely by junior liens on the debtor's assets.  *See* 11 U.S.C. § 364(c);[11]  *In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (denying motion

---

[11]    Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

> If the trustee [or debtor-in-possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt – (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2) secured by a junior lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

for authorization to enter into postpetition credit facility where debtors could not prove that they were unable to obtain unsecured credit allowable as an administrative expense).

41.    More specifically, in evaluating a debtor's proposed postpetition financing, courts consider a number of factors, including whether (a) the debtor is unable to obtain unsecured credit under Bankruptcy Code section 364(b), i.e., by allowing a lender only an administrative claim, (b) the postpetition financing is necessary to preserve the assets of the estate and (c) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.  *See In re L.A. Dodgers LLC*, 457 B.R. at 312; *see also In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (citing *In re Crouse Grp., Inc.*, 71 B.R. at 549); *In re Ames Dep't Stores*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *Norris Square Civic Ass'n v. St. Mary Hosp.* (*In re St. Mary Hosp.*), 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988).

42.    For the reasons set forth below, the Debtors submit that entry into the DIP Facility satisfies each of these factors.

### (i)    The Debtors Could Not Obtain Unsecured Financing

43.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate by a good faith effort that credit was not available on an unsecured or administrative expense basis. *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also In re Gen. Growth Props., Inc.*, 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009) (debtor has an obligation to make "reasonable efforts, under the circumstances . . . to obtain [unsecured financing], in the ordinary course of business or

01:16644582.1

29

otherwise"). Indeed, when few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [a debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989).

44.     The Debtors' and their advisors' discussions with potential sources of financing revealed that debtor in possession financing on an unsecured or junior basis was simply not available. The Debtors' capital structure largely consists of funded debt obligations secured by substantially all of the Debtors' assets. The significant secured obligations of the Debtors and lack of unencumbered assets rendered the debtors unable to obtain financing other than on a secured, super-priority basis. Moreover, the lengthy refinancing process that culminated in the July 2014 Recapitalization (as described in more detail above), in addition to further encumbering the assets of the debtors with significant new secured debt obligations, amply demonstrated to the Debtors that they were not able to access capital on an unsecured basis—and the Debtors' financial situation has only deteriorated since July 2014.

**(ii)     The DIP Facility Is Necessary to Preserve Estate Assets and Is an Exercise of the Debtor's Reasonable Business Judgment**

45.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 313 ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender.); *In re Barbara K. Enters.*, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest." *In re Ames Dep't Stores, Inc.*, 115 B.R. at

40); *Trans World Airlines, Inc. v. Travelers Int'l AG* (*In re Trans World Airlines, Inc.*), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because the facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 (noting that courts permit debtors-in-posession to "exercise their basic business judgment" when obtaining debtor-in-possession financing).

46.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code."). Furthermore, a court may take into consideration non-economic benefits to a debtor offered by a proposed postpetition financing facility. *In re ION Media Networks, Inc.*, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (noting that "a business decision to obtain credit from a particular lender is almost never based purely on economic terms" and the court must evaluate "non economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.").

47.     The Debtors' decision to enter into the proposed DIP Facility indisputably satisfies this standard. The Debtors' decision to enter into the DIP Loan Agreement is the culmination of an intense, months-long process targeted at procuring the best available financing under the circumstances. During their search for financing, the Debtors engaged with their major

01:16644582.1

creditor constituencies in order to chart a course that would preserve the value of the existing business, provide for a fair resolution of the claims of creditors, and prepare the Debtors to run a successful enterprise upon emergence.  The willingness of the DIP Lenders to forgo cash repayment of the DIP Facility in exchange for new debt upon confirmation of an Acceptable Plan is predicated on the fact that the DIP Lenders, by virtue of their Prepetition Second Lien Notes, are intended to be the primary equity owners of the Debtors upon emergence.  This unique position of the DIP Lenders, and their resulting interest in putting the Debtors back on their feet as a successful business after confirmation, yielded terms that are far superior to any other debtor in possession financing the Debtors could have obtained, and which enjoy crucial buy-in from the Ad Hoc First Lien Group.

48.    The DIP Lenders are the only party willing to allow the Debtors access to the amount of funding, and on the timeline, necessitated by the Debtors' current liquidity position and expected liquidity needs going forward.  The structure of the DIP Facility, where proceeds are funded into escrow at the beginning of the case and drawn down as important milestones are met, was the result of a crucial and hard fought compromise.  This escrow structure provides the DIP Lenders the protection they demanded during the progression of these chapter 11 cases, while still assuring the Debtors, the Debtor's business partners and the creditors of the Debtor's estate, that the liquidity the Debtors' need to fund the chapter 11 cases and run a successful enterprise upon emergence will be ready and available when needed.

49.    Entry into the DIP Facility and securing financing thereunder is absolutely necessary to the preservation of estate assets and is in the best interest of the Debtors' creditors and all parties in interest; therefore entry into the DIP Facility is an exercise of the Debtors'

sound business judgment.   Given the Debtors' significantly constrained liquidity, the DIP Facility is of critical importance to operating the Debtors' business and preserving going concern value.

50.     As with most large businesses with billions in revenue, the Debtors have significant cash needs.  The Debtors have an urgent need to obtain access to the DIP Facility to, among other things, continue the operation of their businesses in an orderly manner, maintain business relationships with customers, pay nearly 2,300 full-time employees and satisfy other working capital and operational needs – each of which is vital to preserving and maintaining the Debtors' going concern value.  The inability to meet payments to pay employees and ensure the continuation of the Debtors' business operations without interruption would impair, if not destroy, the Debtors' prospects for reorganization.  In short, without immediate access to the DIP Facility, the Debtors would shut down their businesses to the detriment of all parties in interest in these chapter 11 cases.

51.     The only liquidity available at this time is that afforded by the DIP Facility. Moreover, the Debtors' access to the DIP Facility will ensure that the going concern value of their assets are preserved, thereby providing a greater recovery to the Debtors' creditors than would be realized if the Debtors were forced to cease operations immediately and engage in a piecemeal liquidation of their assets.  Accordingly, the Debtors submit that the availability of credit under the DIP Facility is necessary to preserve and enhance the value of their estates for the benefit of all stakeholders in these chapter 11 cases.

01:16644582.1

33

52.     For these reasons, the Debtors submit that entry into the DIP Facility is in the best interests of the Debtors' creditors, is necessary to preserve the value of estate assets and is an exercise of the debtors' sound and reasonable business judgment.

### (iii)    The Terms of the DIP Facility Are Fair, Within the Range of Reasonableness and Appropriate Under the Circumstances

53.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender.   *In re Farmland Indus., Inc.*, 294 B.R. 855, 879, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. of Escanaba* (*In re Elingsen McLean Oil Co.*), 65 B.R. 358, 364-65 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).   When judged from the foregoing perspective, the terms and conditions of the DIP Facility are fair, within the range of reasonableness, and appropriate under the circumstances.

### (a)     The Scope of the Carve-Out Is Appropriate

54.     The proposed DIP Facility and Interim Order provide that the DIP Obligations, the DIP Liens, the First Priority Adequate Protection Liens, the Adequate Protection Claims, the Senior Priority Liens, the Senior Priority Obligations, the Primed Liens, the Prepetition Second Lien Obligations and the Prepetition Third Lien Obligations are subject to the Carve-Out. Carve-outs for professional fees have been found to be reasonable and necessary to ensure that statutory creditors' committees and debtors' estates are adequately assisted by counsel and other professionals.   *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40; *see also In re Gen. Growth Props. Inc.*, 412 B.R. at 136-37.   The DIP Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for

which professionals may be paid in these cases.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve-Out protects against administrative insolvency during the course of the case by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of the Debtors and any committee of unsecured creditors notwithstanding the grant of additional liens and claims under the DIP Facility and the Interim Order.

### (b)      The Payment of Fees to the DIP Lenders and the Prepetition First Lien Lenders Is Appropriate

55.      The various fees and charges to be paid to the DIP Lenders, as described in the overview of the proposed DIP Facility and provided for in section 2.05 of the DIP Loan Agreement (or otherwise disclosed to the Bankruptcy Court) are reasonable and appropriate under the circumstances.  Courts recognize that similar lender incentives beyond the explicit liens and rights specified in section 364 of the Bankruptcy Code are often the only way to obtain financing, and routinely approve them. *See Resolution Trust Corp. v. Official Unsecured Creditors' Comm.* (*In re Defender Drug Stores, Inc.*), 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) (approving financing facility pursuant to section 364 of the Bankruptcy Code that included a lender "enhancement fee").

56.      Accordingly, the Debtors respectfully submit that the terms of the DIP Facility are fair, within the range of reasonableness and appropriate under the circumstances, and the DIP Agent and the DIP Lenders should be accorded the benefits of Bankruptcy Code section 364(e) in respect of such facility.

01:16644582.1

**B.    Financing Pursuant to Bankruptcy Code Section 364(d) Is Appropriate**

57.    The proposed DIP Facility and Interim Order provide that the DIP Agent, for its benefits and for the benefit of the DIP Lenders, be granted security interests in, and senior priming liens upon, all of the assets of the Debtors subject to a lien securing the Prepetition Second Lien Obligations or the Prepetition Third Lien Obligations, except that the proposed DIP Facility does not prime the Senior Priority Liens.

58.    Section 364(d)(1) of the Bankruptcy Code provides that a court may authorize a debtor to incur postpetition debt on a senior or "priming" basis if (a) the debtor is unable to obtain credit otherwise and (b) there is "adequate protection" of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. *See* 11 U.S.C. § 364(d)(1).

**(i)    The Debtors Are Unable to Obtain Financing Solely Under Bankruptcy Code Section 364(c)**

59.    Under Bankruptcy Code section 364(d)(1)(A), the adequacy of a debtors' efforts to obtain postpetition financing is a case-specific inquiry.  Courts generally have found that a debtor's good-faith efforts to seek credit from other sources is sufficient to carry this burden, however.  See *In re Snowshoe Co.*, 789 F.2d at 1088 (recognizing "there is no duty to seek credit from every possible lender"); *In re 425 Cent. Park Ave. Corp.*, 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (noting that while "[s]ection 364(d)(1) does not require the debtor to seek alternate financing from every possible lender," it "must make an effort to obtain credit without priming a senior lien").

01:16644582.1

60.     As described above, the Debtors provided information to and engaged in discussions with numerous sophisticated potential lenders to make debtor-in-possession financing, but none of the potential lenders was in a position to provide financing that satisfied the Debtors' needs on as beneficial a basis as that proposed by the DIP Lenders pursuant to the Restructuring Support Agreement.  In determining to enter into the DIP Loan Agreement, the Debtors considered a number of factors, including that the DIP Lenders have irreplaceable institutional knowledge of and familiarity with the Debtors' capital structure, the Prepetition Collateral and the Debtors' business, all of which enabled them to act with the speed and flexibility necessitated by the Debtors' liquidity requirements.

### (ii)     Prepetition Second Lien Holders and the Prepetition Third Lien Holders Do Not Object to Being Primed

61.     The Prepetition Second Lien Holders and the Prepetition Third Lien Holders consent to being primed by the DIP Facility and the DIP Obligations.  Moreover, in accordance with Bankruptcy Code section 364(d) and consistent with the purposes underlying the provision of adequate protection, the proposed Interim Order provides the Prepetition Second Lien Notes Agent, for the ratable benefit of the Prepetition Second Lien Holders, and the Prepetition Third Lien Notes Agent, for the ratable benefit of the Prepetition Third Lien Holders, with additional adequate protection in the form of junior replacement liens on the DIP Collateral to secure any diminution in value of their interests in the Prepetition Collateral during the pendency of the Debtors' chapter 11 cases and to avoid needless litigation with such parties.

62.     The Bankruptcy Code does not explicitly define "adequate protection." Bankruptcy Code section 361 suggests, however, that adequate protection may be provided by (i) periodic cash payments to the extent that there is a decrease in the lien holder's interest in the

01:16644582.1

property, (ii) providing additional or replacement liens or (iii) other relief resulting in the realization of the "indubitable equivalent" of the lien holder's interest in the property.  The third possibility is regarded as a "catch-all" provision, affording courts discretion, on a case-specific basis, to determine what level of protection is appropriate to provide a secured party.  *See Resolution Trust Corp. v. Swedeland Dev. Grp., Inc.* (*In re Swedeland Dev. Grp., Inc.*), 16 F.3d 552, 564 (3d Cir. 1994); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case.").  In *Swedeland*, the Third Circuit pointedly noted that the purpose of adequate protection "is to insure that the creditor receives the value for which he bargained prebankruptcy," and "should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been postpetition superpriority financing." *In re Swedeland*, 16 F.3d at 564; *see also Shaw Indus., Inc. v. First Nat'l Bank of PA* (*In re Shaw Indus., Inc.*), 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) ("The purpose of providing 'adequate protection' is to insure that a secured creditor receives in value essentially what he bargained for."); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (noting that the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process.")  Adequacy, held the Third Circuit, "depends directly on how effectively it compensates the secured creditor for loss of value".  *In re Swedeland*, 16 F.3d at 564 (quoting *In re Am. Mariner Indus., Inc.*, 734 F.2d 426, 435 (9th Cir. 1984)).

63.    The proposed adequate protection as set forth herein is justified to protect the Prepetition Second Lien Holders and the Prepetition Third Lien Holders resulting from the

priming of their liens.  Accordingly, the Court should permit the Debtors to prime the liens securing the obligations under the Prepetition Second Lien Notes and Prepetition Third Lien Notes in connection with the proposed DIP Facility, as the requirements of Bankruptcy Code section 364(d) have been satisfied.

## C.    The Debtors' Proposed Grant of Adequate Protection to Use Cash Collateral Is Appropriate

64.    Pursuant to section 363(c) of the Bankruptcy Code, the Debtors may only use cash collateral of the Prepetition First Lien Lenders and the Prepetition First Lien Holders subject to the consent of those parties or the grant of adequate protection. 11 U.S.C. § 363(c)(2).

65.    As set forth above and in the Interim Order, upon the entry of the Final Order, the Debtors will make regularly scheduled payments of interest on the Prepetition Term Loan and on the Prepetition First Lien Notes at the non-default rates applicable on the Commencement Date pursuant to the Prepetition Credit Agreement or the First Lien Indenture, as applicable. Moreover, as further set forth in the Interim Order, the Prepetition First Lien Lenders and the Prepetition First Lien Holders will each be given replacement liens on the collateral securing the DIP Facility as a result of any diminution in value of their respective interests in the Prepetition Collateral during the pendency of the Debtors' chapter 11 cases.

66.    In accordance with Bankruptcy Code section 364(c) and consistent with the purposes underlying the provision of adequate protection, the proposed Interim Order provides the First Lien Secured Parties with adequate protection to protect the First Lien Secured Parties from any diminution in value of their respective interests in the Prepetition Collateral during the pendency of the Debtors' chapter 11 cases and to avoid needless litigation with such parties.

01:16644582.1

Furthermore, the First Lien Secured Parties have agreed to permit the Debtors to use the Prepetition Collateral, including the Cash Collateral, subject to the terms and conditions set forth in the Interim Order, including the protections afforded a party acting in "good faith" under section 364(e) of the Bankruptcy Code. Accordingly, the adequate protection proposed herein and in the DIP Orders is fair and reasonable and is sufficient to satisfy the requirements of section 363(c) of the Bankruptcy Code.

**D.     The DIP Facility Was Negotiated in Good Faith and Should Be Afforded the Protection of Section 364(e) of the Bankruptcy Code**

67.     Pursuant to section 364(e) of the Bankruptcy Code, any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity of that debt incurred or priority or lien granted as long as the entity that extended credit "extended such credit in good faith." *See* 11 U.S.C. § 364(e).

68.     As explained in detail herein, the terms of the DIP Facility and the Interim Order were negotiated in good faith and at arms' length among the Debtors, on the one hand, the DIP Agent, the DIP Lenders and certain of the Prepetition Secured Parties, on the other hand, and all of the DIP Obligations will be extended by the DIP Lenders in good faith (as such term is used in section 364(e) of the Bankruptcy Code). No consideration is being provided to any party to, or guarantor of, obligations arising under the DIP Financing, other than as set forth herein. Moreover, the DIP Facility has been extended in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Lenders should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise.

01:16644582.1

**E.      Modification of the Automatic Stay Provided Under Section 362 of the Bankruptcy Code Is Appropriate Under the Circumstances**

69.      The proposed Interim Order provides that the automatic stay imposed under section 362(a) of the Bankruptcy Code be lifted, as necessary, to permit (i) the Debtors to grant the DIP Liens to the DIP Agent, (ii) the Debtors to perform their obligations under the DIP Obligations and incur the DIP Obligations, (iii) any action of the DIP Agent or DIP Lenders to file and record financing statements, mortgages or other instruments to provide further notice of and evidence the grant and perfection of the DIP Liens and (iv) the DIP Agent and DIP Lenders to exercise certain rights and remedies under the DIP Documents against the Debtors and the DIP Collateral (including their right of set-off against the Escrow Funds).

70.      Stay modifications of this sort are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the present circumstances. *See, e.g., In re Peak Broad, LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Jan. 12, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Jan. 11, 2010) (same); *In re Stallion Oilfield Servs. Ltd.*, No. 09-13562 (BLS) (Bankr. D. Del. Nov. 18, 2009) (same). Accordingly, the Court should modify the automatic stay to the extent contemplated under the DIP Loan Agreement and the proposed DIP Orders.

01:16644582.1

41

**F.       Liens on the Proceeds of Avoidance Actions Are Appropriate**

71.      The Interim Order contemplates that the proceeds of Avoidance Actions will be subject to the DIP Liens, Adequate Protection Liens and Adequate Protection Claims.  Here, the DIP Agent and the DIP Lenders require liens on the proceeds of Avoidance Actions as a necessary condition to extending financing under the DIP Facility (which ranks junior to the Senior Priority Obligations), and the Debtors acutely require financing under the DIP Facility. Accordingly, granting liens on the proceeds of Avoidance Actions is justified under the circumstances.  Courts in this district have approved such liens in similar circumstances.  *See, e.g.*, *In re Restora Healthcare Holdings, LLC,* Case No. 14-10367 (PJW) (Feb. 27, 2014); *In re Ablest Inc.,* Case No. 14-10717 (KJC) (Apr. 2, 2014); *In re Bicent Holdings, LLC*, Case No. 12-11304 (KG) (May 16, 2012); *In re Delta Petroleum Corp.*, Case No. 11-14006 (KJC) (Jan. 11, 2012); *In re Townsends, Inc.*, Case No. 10-14092 (CSS) (Jan. 28, 2011).

72.      Furthermore, the Adequate Protection Liens will encumber the proceeds of Avoidance Actions on a first priority basis and the Adequate Protection Claims will have recourse to the proceeds of Avoidance Actions.  Courts have recognized that liens on avoidance actions serving as adequate protection for prepetition debt are appropriate under certain circumstances. *See, e.g.*, *In re Atrium Corporation, et al.*, 2010 WL 2822131 at *15 (Bankr. D. Del. 2010) (granting replacement liens in all collateral securing the DIP facility, including avoidance action proceeds); *In re True Temper Sports, Inc.*, 2009 WL 7226692 at *15 (Bankr. D. Del. 2009) (granting replacement liens in all collateral securing DIP facility, including avoidance actions, as adequate protection for diminution in value of collateral securing debt to prepetition first lien and second lien lenders); *In re Comfort Co., Inc.*, 2008 WL 8191314 at *10 (Bankr. D.

Del. 2008) (granting prepetition lenders liens in all property securing the DIP facility, including proceeds of avoidance actions, as adequate protection for diminution in value of prepetition collateral).  Granting Adequate Protection Liens in the proceeds of Avoidance Actions is appropriate in this case.  Post-petition causes of action such as the Avoidance Actions are the Debtor's only remaining material unencumbered assets and should be granted to the Senior Priority Holders, the Prepetition Second Lien Holders and the Prepetition Third Lien Holders as adequate protection for their fully secured prepetition position.

## G.    Approval of the DIP Facility on an Interim Basis Is Necessary to Prevent Immediate and Irreparable Harm

73.    Bankruptcy Rules 4001(b) and 4001(c)(2) provide that a final hearing on a motion to obtain credit pursuant to Bankruptcy Code section 364 may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, a bankruptcy court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.  *See* FED. BANKR. R. PROC. 4001(b), 4001(c)(2).  Similarly, Local Rule 4001-2(b) provides that the Court may grant interim relief regarding a financing motion filed on or shortly after the Commencement Date, pending review by interested parties of the DIP Facility, to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

74.    Moreover, to the extent the Debtors are seeking authority to sell, use or otherwise incur an obligation regarding property of their estates, Bankruptcy Rule 6003 provides that the Court may only grant such relief to the extent it is necessary to avoid immediate and irreparable harm.  FED. BANKR. R. PROC. 6003(b).

01:16644582.1

75.      Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. at 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).  In examining requests for interim relief under the immediate and irreparable harm standard, courts apply the same business judgment standard applicable to other business decisions.  *See, e.g.*, *Id.* at 36; *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985).  After the 14-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business.  *In re Ames Dep't Stores*, 115 B.R. at 36.

76.      Immediate and irreparable harm would result if the relief requested herein is not granted on an interim basis.  As described in detail above and in the First Day Declaration, the Debtors have an immediate need to obtain access to liquidity under the DIP Facility in order to, among other things, continue operation of their businesses, make payroll, make capital expenditures and satisfy other working capital and operational needs.  Funding each of these expenditures is necessary to the Debtors' ability to preserve and maintain their going-concern values for the benefit of all parties in interest.

77.      Absent access to liquidity under the DIP Facility and authorization to use cash collateral, the Debtors will be unable to pay their current and ongoing operating expenses.  The availability to the Debtors of sufficient working capital and liquidity is vital to the confidence of the Debtors' employees, major customers, and to the preservation and maintenance of the value of the Debtors' estates.

01:16644582.1

78.     The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district in similar circumstances.  *See, e.g.*, *In re AbitbiBowater, Inc.*, No. 09-11296 (KJC) (Bankr. D. Del. Apr. 17, 2009) (authorizing debtors to obtain postpetition financing on an interim basis); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) (same); *In re Exide Techs.*, No. 02-11125 (KJC) (Bankr. D. Del. Apr. 17, 2002) (same).

79.     Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rules 4001(b) and 4001(c)(2) and Local Rule 4001-2(b) to support the relief requested on the terms described herein.

## Request for Final Hearing

80.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date that and time for the Final Hearing that is no sooner than 14 days after the date of this motion and no later than 28 days from the Commencement Date for consideration of entry of the Final Order.

## Waiver of Bankruptcy Rule 6004(h) and Local Rule 9013-1(m)

81.     The Debtors further seek a waiver of any stay of the effectiveness of the Interim Order.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).

82.     Pursuant to Local Rule 9013-1(m), requests for relief on less than seven (7) days' notice and prior to the earlier of the creditors' committee formation meeting or the 11 U.S.C.

§ 341 meeting of creditors are "confined to matters of a genuinely emergent nature required to preserve the assets of the estate and to maintain ongoing business operations and such other matters as the Court may determine appropriate." Local Rule 9013-1(m).

83.     As set forth above, without immediate access to capital, the continued operation of the Debtors' business would be nearly impossible, resulting in serious and irreparable harm to the Debtors and their estates. Accordingly, the Debtors submit that they have satisfied the requirements of Local Rule 9013-1(m) to support immediate authority to access the requested capital under the DIP Facility.

## Notice

84.     The Debtors have provided notice of this motion to (a) the Office of the U.S. Trustee, (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims, (c) counsel to the Prepetition First Lien Agent (on behalf of itself and the Prepetition First Lien Lenders), (d) counsel to the DIP Agent (on behalf of itself and the DIP Lenders), (e) the indenture trustee for each of the Debtors' outstanding bond issuances, (f) counsel to the *ad hoc* group of prepetition first lien debt holders, (g) counsel to the *ad hoc* group of second and third lien noteholders, (h) counsel to certain equity holders of Debtor Altegrity Holding Corp., (i) the Internal Revenue Service, (j) the United States Attorney for the District of Delaware and (k) the United States Office of Personnel Management. The Debtors will serve copies of this motion and any order entered in respect of this motion as required by Local Rule 9013-1(m). In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

01:16644582.1

### No Previous Request

85.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court (a) enter the Interim Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and (b) grant such other and further relief as is just and proper.

| | | |
|---|---|---|
| Dated: | February 8, 2015<br>Wilmington, Delaware | */s/ Edmon L. Morton* |

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Edmon L. Morton (No. 3856)
Joseph M. Barry (No. 4221)
Ryan M. Bartley (No. 4985)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:     (302) 571-6600
Fax:     (302) 571-1253
Email:  emorton@ycst.com
          jbarry@ycst.com
          rbartley@ycst.com

-and-

DEBEVOISE & PLIMPTON LLP
M. Natasha Labovitz (*pro hac vice* pending)
Jasmine Ball (*pro hac vice* pending)
Craig A. Bruens (*pro hac vice* pending)
919 Third Avenue
New York, New York 10022
Tel:     (212) 909-6000
Fax:     (212) 909-6836
Email:  nlabovitz@debevoise.com
          jball@debevoise.com
          cabruens@debevoise.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

01:16644582.1