## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ALTEGRITY, INC., *et al.*,[1] | Case No. 15-10226 (___) |
| Debtors. | Joint Administration Requested |

### DECLARATION OF JEFFREY CAMPBELL, PRESIDENT AND
### CHIEF FINANCIAL OFFICER OF ALTEGRITY, INC., IN SUPPORT
### OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

1.      My name is Jeffrey Campbell.  I am the President and Chief Financial Officer of Altegrity, Inc. ("**Altegrity**").  Altegrity is organized under the laws of the State of Delaware and is (a) a wholly-owned direct subsidiary of Altegrity Acquisition Corp. and indirect subsidiary of Altegrity Holding Corp. ("**Holding Corp.**") and (b) the direct or indirect parent of each of the other debtors and debtors in possession in the above-captioned chapter 11 cases (collectively with Altegrity, Altegrity Acquisition Corp. and Holding Corp., the "**Debtors**").  I have been employed by Altegrity since 2010.  In addition to my title at Altegrity, I hold officer or director-

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Altegrity, Inc. (9985); Albatross Holding Company, LLC (2688); Albatross Marketing and Trading, LLC (8643); Altegrity Acquisition Corp. (1480); Altegrity Holding Corp. (1481); Altegrity Risk International LLC (6350); Altegrity Security Consulting, Inc. (5452); CVM Solutions, LLC (9526); D, D & C, Inc. (9552); Engenium Corporation (2269); FDC Acquisition, Inc. (2387); HireRight Records Services, Inc. (1944); HireRight Solutions, Inc. (8954); HireRight Technologies Group, Inc. (1660); HireRight, Inc. (5016); John D. Cohen, Inc. (1738); KCMS, Inc. (0085); KIA Holding, LLC (1333); Kroll Associates, Inc. (6880); Kroll Background America, Inc. (4830); Kroll Crisis Management Group, Inc. (3811); Kroll Cyber Security, Inc. (2393); Kroll Factual Data, Inc. (9911); Kroll Holdings, Inc. (4648); Kroll Inc. (1019); Kroll Information Assurance, Inc. (2283); Kroll Information Services, Inc. (2381); Kroll International, Inc. (1243); Kroll Ontrack Inc. (1650); Kroll Recovery LLC (7082); Kroll Security Group, Inc. (5514); National Diagnostics, Inc. (7132); Ontrack Data Recovery, Inc. (3148); Personnel Records International, LLC (0716); The Official Information Company (1805); US Investigations Services, LLC (9260); USIS International, Inc. (3617); and USIS Worldwide, Inc. (4258).  The location of the Debtors' corporate headquarters is 7799 Leesburg Pike, Suite 1100 North, Falls Church, VA 22043.

level positions with many of the other Debtors.  In my capacity as Altegrity's President and Chief Financial Officer, I am familiar with the Debtors' day-to-day operations, business affairs and books and records.

2.      On the date hereof (the "**Commencement Date**"), each of the Debtors commenced with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  Each Debtor is operating its businesses and managing its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Declaration, the Debtors have requested that their chapter 11 cases be consolidated for procedural purposes.

3.      To minimize the adverse effects of the commencement of these chapter 11 cases on their businesses, the Debtors have requested a variety of relief in "first day" motions and applications (each, a "**First Day Pleading**" and, collectively, the "**First Day Pleadings**"), filed concurrently herewith.  A list of the First Day Pleadings is attached hereto as **Exhibit A**.  I am familiar with the contents of each of the First Day Pleadings, and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.  Indeed, I believe that the Debtors' estates would suffer immediate and irreparable harm absent the immediate ability to obtain financing and make certain essential payments and otherwise continue their business operations as sought in the First Day Pleadings.  In my opinion, approval of the relief requested in the First Day Pleadings will minimize disruptions to the Debtors' business operations and clients, thereby preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a successful reorganization.

4.      This Declaration is submitted pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and I am authorized to submit it on behalf of

the Debtors.  No one individual at Altegrity has personal knowledge of all of the facts set forth in

this Declaration.   All facts set forth herein are based upon my personal knowledge of the

Debtors' operations and finances, information learned from my review of relevant documents,

and/or information supplied to me by other members of the Debtors' management and the

Debtors' advisors.  If called upon to testify, I would testify to the facts set forth herein on that

basis.

### Situation Overview

5.     Altegrity, together with its Debtor and non-Debtor subsidiaries and affiliates

(collectively, the "**Company**"), is a privately held global, diversified risk and information

services company serving commercial customers and government entities.  It currently employs

nearly 3,300 full-time employees.

6.     Headquartered in Falls Church, Virginia, Altegrity is the parent company of three

separately managed businesses:  (i) Kroll, a leading provider of investigative and due diligence

advisory services, e-discovery technologies, data recovery solutions, and risk mitigation and

verification services, with offices in over 20 countries; (ii) HireRight, a leading provider of

employment background screening, drug/health screening and employment eligibility solutions,

with services offered globally; and (iii) USIS, which, until recently, provided background

investigations and information management and security services to U.S. federal government

agencies.

7.     For some time, Altegrity has been engaged in efforts to manage its capital

structure.  In January 2014, the Company was faced with upcoming maturities for its then-$1.8

billion in bank and bond debt for which refinancing prospects were complicated by certain

pending litigation and related media speculation.  Altegrity engaged in constructive discussions

with the holders of its bank and bond debt regarding potential refinancing and maturity

3

extensions of that debt.  Those discussions were ultimately successful, and, on July 3, 2014, Altegrity consummated a comprehensive refinancing and restructuring transaction (as described more fully herein, the "**Prepetition Recapitalization**") that, among other things, extended the maturities of the vast majority of its funded debt to no earlier than July 1, 2019, set financial covenants to achievable levels for its business plan, and resulted in an additional equity infusion of $25 million provided by the Company's primary shareholders.

8.      Over the period immediately following the Prepetition Recapitalization, the Company's cash performance was generally in line with forecasts.  However, in August 2014, this performance was interrupted by an unforeseen business disruption relating to the Company's USIS business, stemming from a state-sponsored cyber-attack that USIS had previously identified, self-reported and remediated.  On August 6, 2014, the U.S. Office of Personnel Management ("**OPM**") provided written notice of its decision to temporarily suspend all work performed by USIS on a substantial OPM contract, despite OPM's own statement issued just days earlier that it intended to renew that contract in the ordinary course.  As detailed in this declaration, the OPM notice was unforeseen by the Company and was an extraordinary measure in the context of other cyber-attacks or data breaches associated with government vendors.

9.      These events caused a substantial erosion in the USIS business, which caused the Company's overall liquidity position and projected financial performance to deteriorate dramatically, forcing the need for further financial restructuring.

10.     Now, less than six months after this unexpected business disruption in the USIS business, the Debtors have again achieved broad consensus among their funded debtholders around the terms of a financial restructuring that will allow their remaining businesses to continue uninterrupted.  Specifically, the Debtors have entered into a Restructuring Support

Agreement, as described in more detail below, in which holders of approximately 78% of their funded first lien debt and approximately 95% of their second and third lien debt have agreed to support a comprehensive restructuring that, among other things, provides the Debtors with $90 million of new capital (including necessary new-cash availability to finance these chapter 11 cases), modifies key debt covenants to reflect the Company's new financial projections following the business disruptions in the USIS business, and reduces the amount of the Company's overall indebtedness by approximately 40% (as described in more detail below, the "**Proposed Restructuring**"). To facilitate the Proposed Restructuring, the Debtors have already consummated the sales of two business units for total net cash proceeds of approximately $150 million, a majority of which will be used to offer to pay down debt, begun active work to wind down the remaining USIS business operations in light of the contract expirations described above, and consensually amended their existing first lien debt documents to waive existing defaults and facilitate the restructuring. The commencement of these chapter 11 cases is the next step in the consensual restructuring process.

11.    As of the Commencement Date, the Debtors believe the Proposed Restructuring provides a path that, thanks to the overwhelming support of all four classes of their secured funded debt representing more than $1.4 billion in secured obligations, will lead to a smooth and successful reorganization. As described in more detail below, the Debtors anticipate an efficient chapter 11 process that will, in the end, significantly enhance the Debtors' balance sheet, improve the Company's financial flexibility, and ultimately remove the overhang of uncertainty that has shadowed the Company's otherwise strongly-performing remaining businesses, thus enhancing value for the benefit of all constituents.

<u>**Description of the Debtors' Corporate History, Business**</u>
<u>**Operations and Prepetition Capital Structure**</u>

12.     In order to familiarize the Court with the Debtors, their chapter 11 petitions, and the relief requested in the First Day Pleadings, this Declaration (a) provides background information with respect to the Debtors' corporate history and their business operations, as well as a summary of the Debtors' prepetition capital structure, (b) describes the circumstances leading to the commencement of these chapter 11 cases and (c) supports the Debtors' chapter 11 petitions and the relief requested in the First Day Pleadings.

**A.      Overview of the Company, Its History and Its Corporate Structure**

13.     As noted above, the Company is a privately held global, diversified risk and information services company serving commercial customers and government entities.  For the last twelve months ("**LTM**") ended June 30, 2014, the Company generated approximately $1.4 billion in revenue on a consolidated basis.  As of June 30, 2014, the Company had approximately $1.7 billion in assets and $2.1 billion in liabilities on a consolidated basis.

14.     The Company's three businesses—Kroll, HireRight, and USIS—were brought together through a series of acquisitions supported by Providence Equity Partners, LLC, the owner of more than 94% of the Company's equity through its affiliates Providence Equity Partners VI L.P. and Providence Equity Partners VI-A L.P. (together with Providence Equity Partners, LLC, "**Providence**").

15.     In 1996, USIS was initially formed from the privatization of a unit of OPM under an initiative of Congress and the President.  In conjunction with the privatization, USIS was awarded a five-year contract with OPM to provide security-clearance background investigation services for federal agencies.  Following the privatization, USIS made certain acquisitions to expand its business to include commercial customers and additional government contracts.  In

6

2007, that business was sold by its then-existing owners to Altegrity Acquisition Corp., an affiliate of Providence. Since that time, the Company has expanded through a number of significant acquisitions, including the 2008 acquisition of HireRight, Inc., and the 2010 acquisition of Kroll Inc. The Company's three primary businesses, Kroll, HireRight and USIS, are described below. To provide still more detail, a chart setting forth the Company's current organizational structure, including a depiction of the Debtors and their non-Debtor affiliates, is attached as **Exhibit B** hereto.

**B.     The Company's Business Operations**

16.     The Company's three businesses, Kroll, HireRight and USIS, are summarized in the following table and described in more detail below:

| Business Segment | Nature of Business | Approximate Percent of Total Net Revenues LTM June 30, 2014[2] |
|---|---|---|
| Kroll | Provider of investigative and due diligence advisory services, e-discovery technologies, data recovery solutions, and risk mitigation and verification services. | 37% |
| HireRight | Provider of employment background screening, drug/health screening and employment eligibility solutions. | 24% |
| USIS | Provider of background investigations and information management and security services to U.S. federal government agencies. | 39% |

**i.     Kroll**

17.     Founded over 40 years ago, Kroll is a leading provider of investigative and due diligence advisory services, e-discovery technologies, data recovery solutions, and risk mitigation and verification services, with offices located in 50 cities across more than 20

---

[2]     Note that the percentages set forth in this table reflect revenues prior to the unanticipated business disruptions experienced in the USIS business beginning in August 2014.

countries.  Headquartered in New York, New York, with more than 1,750 employees, Kroll provides critical work on widely publicized investigations, due diligence checks, e-discovery and data management solutions, and risk mitigations services for corporations, financial institutions and law firms.

18.     Kroll currently consists of two business divisions: Kroll Advisory and Kroll Ontrack.[3]  Kroll Advisory provides a broad range of investigative, compliance, due diligence, and cyber security services to its clients and customers, including financial institutions, corporations, law firms and insurance companies.  Kroll Ontrack provides law firms and corporations with technology-driven e-discovery and data management services and software solutions to help its clients manage, recover, backup, search, analyze, produce and present data efficiently.

19.     For the LTM ended June 30, 2014, Kroll generated approximately $509 million in revenues, which represented approximately 37% of the Company's consolidated revenue for the same period.

### ii.     HireRight

20.     Headquartered in Irvine, California, HireRight is one of the world's leading providers of employment background screening, drug/health screening and employment eligibility solutions.  HireRight offers services globally and counts among its clients and customers a significant portion of Fortune 500 companies.  HireRight developed one of the first internet-based background screening solutions and continues to introduce a variety of innovative

---

[3]     As described in more detail in paragraphs 66 – 67 below, the assets of a third business division, Kroll Factual Data, were sold before the Commencement Date.

technology-based tools to better serve its customers.

21.     Employing more than 1,400 individuals, HireRight generated approximately $336 million in revenue during the LTM ended June 30, 2014, which accounted for approximately 24% of the Company's consolidated revenue for the same period.

### iii.     USIS

22.     USIS is headquartered in Falls Church, Virginia, and previously consisted of two divisions: the Investigations Services Division ("**ISD**") and the Global Security & Solutions Division ("**GS&S**").   ISD was the largest commercial provider of background investigations to the federal government until the Fieldwork and Support Services contracts previously held by USIS ended on September 30, 2014, as detailed in paragraphs 55 – 61 below.   ISD is now in wind-down mode.   At this time, only two contracts with U.S. Government customers remain within USIS (the "**Retained USIS Contracts**").   The revenue from the Retained USIS Contracts for the LTM ended June 30, 2014 was less than $1.3 million.   The Company intends to wind down its services under those contracts.

23.     GS&S provided personnel, information, biometric screening and security services to U.S. governmental agencies.   GS&S also offered litigation support and records management services, and investigative analytics, such as fact-finding, threat vulnerability assessments, and site monitoring services.   As described in more detail in paragraph 68 below, substantially all of GS&S was sold prior to the Commencement Date.

24.     Before the unexpected business disruption in ISD and the sale of GS&S, USIS had employed more than 5,700 individuals and generated approximately $537 million in revenue for the LTM ended June 30, 2014.   That revenue accounted for approximately 39% of the Company's consolidated revenue for the same period.   Now, in sharp contrast, USIS currently

employs approximately 60 individuals who are engaged in transition services following the Company's sale of GS&S, the winding down of the remaining USIS business, and, as discussed further below, the prosecution of claims for equitable adjustment and other recovery against OPM and the United States. The only other current business operations of USIS are to perform under the Retained USIS Contracts until it is able to wind down the provision of those services.

**C.    The Debtors' Non-Debtor Affiliates and Subsidiaries**

25.    The group of entities making up the Company includes numerous affiliates and subsidiaries that are not Debtors in these chapter 11 cases. These non-Debtor affiliates and subsidiaries include 66 entities located in the U.S., Europe, Asia and South America.

**D.    The Debtors' Prepetition Capital Structure**

**i.    Overview**

26.    As of the Commencement Date, the Debtors have funded debt facilities in place with a face amount of approximately $1.8 billion, of which approximately $1.6 billion is secured debt and $138.4 million is unsecured.

27.    The Debtors' secured debt includes: (a) a $60 million first lien senior secured revolving credit and letter of credit facility, of which $21 million is currently being utilized in the form of outstanding letters of credit, and $39 million is undrawn (the "**Revolving Credit Facility**"); (b) a $273.6 million first lien senior secured term loan (the "**Term Loan**" and, together with the Revolving Credit Facility, the "**First Lien Credit Facility**"); (c) $825 million outstanding under certain 9.50% Senior First Lien Secured Notes due 2019 (the "**First Lien Notes**," and together with the First Lien Credit Facility, the "**First Lien Indebtedness**"); (d) $202.1 million outstanding under certain Senior Second Lien Secured 12.00% Cash Pay and 2.00% Pay-in-Kind Notes due 2020 (the "**Series 1 Second Lien Notes**"); (e) $283.9 million

10

outstanding under certain Senior Second Lien Secured 10.50% Cash Pay and 2.50% Pay-in-Kind Notes due 2020 (the "**Series 2 Second Lien Notes**" and, together with the Series 1 Second Lien Notes, the "**Second Lien Notes**"); and (f) $65.3 million outstanding under certain Senior Third Lien Secured 15.00% Pay-in-Kind Notes due 2021 (the "**Third Lien Notes**").

28.    The Debtors' unsecured debt includes:  (a) $11.3 million outstanding under certain 12.00% Senior Notes due 2015 (the "**2015 12.00% Senior Notes**"); (b) $10.9 million outstanding under certain 10.50% Senior Notes due 2015 (the "**2015 10.50% Senior Notes**" and, together with the 2015 12.00% Senior Notes, the "**2015 Senior Notes**"); (c) $29.2 million outstanding under certain 11.75% Senior Subordinated Notes due 2016 (the "**2016 Senior Subordinated Notes**"); and (d) $87 million outstanding under certain zero coupon junior subordinated notes (the "**Junior Subordinated Notes**").

11

29.     The chart below summarizes the Debtors' prepetition indebtedness, including approximate current outstanding amounts as of December 31, 2014[4]; further detail with respect to each category of debt obligation is provided below.

| Debt Obligation | Original Amount | Approximate Amount Outstanding | Maturity Date | Security Status |
|---|---|---|---|---|
| Revolving Credit Facility | $60 million total commitments | $23.4 million in issued and outstanding letters of credit[5] | April 1, 2019 | First Lien Secured |
| Term Loan | $275 million | $273.6 million | July 5, 2018 | First Lien Secured |
| First Lien Notes | $825 million | $825 million | July 1, 2019 | First Lien Secured |
| Second Lien Notes | $480.5 million | $486 million | July 1, 2020 | Second Lien Secured |
| Third Lien Notes | $60.8 million | $65.3 million | July 1, 2021 | Third Lien Secured |
| 2015 Senior Notes[6] | $22.2 million | $22.2 million | November 1, 2015 | Unsecured |
| 2016 Senior Subordinated Notes[7] | $29.2 million | $29.2 million | May 1, 2016 | Unsecured |
| Junior Subordinated Notes[8] | $50 million | $85.9 million | January 4, 2022 | Unsecured |

---

[4]     Payment-in-kind interest of $10 million applicable to the Second Lien and Third Lien Notes as of January 1, 2015 is also reflected in the chart.

[5]     As of the Commencement Date, the amount of issued and outstanding letters of credit is approximately $21 million.

[6]     Untendered balance following the Prepetition Recapitalization.

[7]     Untendered balance following the Prepetition Recapitalization.

1000461132v12

ii.    **The Prepetition Recapitalization**

30.    Most of the Debtors' current capital structure was put into place on July 3, 2014 as part of a recapitalization of the Debtors' then-existing indebtedness to address certain near-term debt maturities.  The Prepetition Recapitalization consisted of (a) a consent solicitation and exchange offer (the "**Exchange Offer**"), pursuant to which the Debtors (i) offered to the holders of the 2015 Senior Notes and the 2016 Senior Subordinated Notes a combination of cash and new debt in the form of the Second Lien Notes and the Third Lien Notes in exchange for their existing notes and (ii) amended the indentures governing the 2015 Senior Notes and the 2016 Senior Subordinated Notes that were not tendered as part of the Exchange Offer, (b) a refinancing (the "**First Lien Refinancing**") of the Debtors' then-existing senior secured credit facility with the proceeds of the First Lien Notes and the First Lien Credit Facility, (c) an amendment of the Junior Subordinated Notes (the "**Junior Notes Amendment**") extending their maturity to January 4, 2022 and (d) a $25 million equity contribution (the "**Equity Contribution**") by Providence to Holding Corp.

31.    The Prepetition Recapitalization resulted from discussions that the Debtors began with their then-existing lenders in early 2014, in advance of funded-debt maturity dates that were approaching in just over a year.  At that time, the Debtors, together with their financial advisors, then explored the possibility of simply refinancing all of their funded debt in advance of its due dates, they were informed by market participants that their refinancing ability was shadowed by pending litigation involving allegations against Debtor US Investigations, LLC and by media reports and speculation associated with the USIS business. Despite these added complexities,

---

[8]    As of the Commencement Date, the outstanding amount of the Junior Subordinated Notes is $87 million.

after several months of negotiations, Altegrity, Providence and certain holders of the 2015 Senior Notes, the 2016 Senior Subordinated Notes, and the Junior Subordinated Notes reached agreement on the terms of a consensual recapitalization that was intended and expected to provide a longer-term capital structure for the businesses. In the Prepetition Recapitalization, the First Lien Refinancing was accomplished through the open market, supported by the substantial Equity Contribution provided by the existing primary shareholders, as well as the Exchange Offer and Junior Notes Amendment that consensually extended the maturity of most junior debt. To further facilitate the First Lien Refinancing, the existing primary shareholders provided $150 million of the capital invested in the refinanced first lien debt and agreed to extend the maturities of the Junior Subordinated Notes, of which they hold 90.8% of the aggregate outstanding amount.

32. On May 5, 2014, the parties entered into a transaction support agreement to effectuate the Prepetition Recapitalization, and the transaction was consummated on July 3, 2014. Pursuant to the Exchange Offer, 95.6% of the 2015 Senior Notes and 80.5% of the 2016 Senior Subordinated Notes were exchanged.

### iii.    First Lien Indebtedness

33. As a result of the Prepetition Recapitalization, the Debtors have an aggregate of approximately $1.1 billion in principal amount of First Lien Indebtedness outstanding, consisting of the First Lien Credit Facility and the First Lien Notes, which rank *pari passu* with one another.

### a.    The First Lien Credit Facility

34. The First Lien Credit Facility consists of the Term Loan and the Revolving Credit Facility, each of which are provided for under that certain Credit Agreement, dated as of July 3,

2014 (the "**Credit Agreement**"), among Altegrity Acquisition Corp., Altegrity, Goldman Sachs Bank USA, in its capacity as administrative agent and collateral agent, and the lenders party thereto.  The First Lien Credit Facility is guaranteed by each of the other Debtors except Holding Corp., and is secured by a first priority security interest in substantially all of the assets of the Debtors.  The Term Loan had an initial aggregate principal amount of $275 million, and carried an outstanding balance of $273.6 million as of December 31, 2014.  The aggregate revolving commitments under the Revolving Credit Facility total $60 million, with a $45 million letter of credit sublimit.  As of December 31, 2014, no amounts had been drawn under the Revolving Credit Facility, but $23 million of letters of credit were issued under the Revolving Credit Facility.[9]

35.    The Term Loan was originally scheduled to mature on July 1, 2019, and the Revolving Credit Facility was scheduled to mature on April 1, 2019.  As a result of amendments to the First Lien Facility effectuated immediately before the Commencement Date, as described in paragraph 78 below, the Term Loan is now scheduled to mature on July 5, 2018.  Interest on both the Term Loan and the Revolving Credit Facility is equal to, at the option of Altegrity, (i) the alternate base rate (minimum 2.00%) plus 7.25% or (ii) the LIBOR (minimum 1.00%) rate plus 8.25%.

36.    In the event of a re-pricing or refinancing of the Term Loan, the Term Loan is subject to a "soft-call" premium of: (i) prior to July 1, 2016, 3.00%, (ii) between July 1, 2016 and July 1, 2017, 2.00% and (iii) between July 1, 2017 and July 1, 2018, 1.00%.  In addition, prior to July 1, 2015, the Term Loan provides for payment of a "make-whole" premium in the

---

[9]    During January 2015, certain letters of credit were reduced, such that the outstanding total as of the Commencement Date is approximately $21 million.

event that the Term Loan is (i) voluntarily prepaid or (ii) accelerated as a result of an event of default under the Credit Agreement (including the commencement of an insolvency proceeding).

### b.    The First Lien Notes

37.    Altegrity issued the First Lien Notes in an aggregate principal amount of $825 million, pursuant to that certain indenture dated as of July 3, 2014 (the "**First Lien Indenture**"), among Altegrity, each of the other Debtors except Holding Corp. as guarantors and Wilmington Trust, National Association, in its capacity as indenture trustee.  The First Lien Notes are secured by a first-priority security interest in substantially all of the assets of the Debtors.

38.    The First Lien Notes mature on July 1, 2019.  Interest on the First Lien Notes accrues at 9.50%, payable in cash on July 1 and January 1 of each year.  Prior to July 1, 2017, the First Lien Indenture provides for payment of a "make-whole" premium in the event that any such First Lien Notes are (i) redeemed pursuant to the redemption provisions under the First Lien Indenture or (ii) accelerated as a result of an event of default under the First Lien Indenture (including the commencement of an insolvency proceeding).

### iv.    The Second Lien Notes

39.    Altegrity issued the Second Lien Notes in an initial aggregate principal amount of approximately $480.5 million, consisting of approximately $200.1 million Series 1 Second Lien Notes and $280.4 million Series 2 Second Lien Notes, each pursuant to that certain indenture dated as of July 3, 2014 (the "**Second Lien Indenture**"), among Altegrity, each of the other Debtors except Holding Corp. as guarantors and Wilmington Trust, National Association, in its capacity as indenture trustee.  The Second Lien Notes are secured by substantially all of the assets of the Debtors and, with respect to such assets, rank (i) junior to the First Lien Credit Facility, (ii) junior to the First Lien Notes and (iii) senior to the Third Lien Notes.

16

40.     The Second Lien Notes mature on July 1, 2020.  Interest on the Series 1 Second Lien Notes accrues at 12.00% payable in cash and 2.00% payable in kind, each on July 1 and January 1 of each year.  Interest on the Series 2 Second Lien Notes accrues at 10.5%, payable in cash and 2.5%, payable in kind, each on July 1 and January 1 of each year.  As of January 1, 2015, the aggregate principal amount of the outstanding Second Lien Notes totaled approximately $486 million—$202 million outstanding under the Series 1 Second Lien Notes and $284 million outstanding under the Series 2 Second Lien Notes.

### v.     The Third Lien Notes

41.     Altegrity issued the Third Lien Notes in an aggregate principal amount of approximately $60.8 million, pursuant to that certain indenture dated as of July 3, 2014 (the "**Third Lien Indenture**"), among Altegrity, each of the other Debtors except Holding Corp. as guarantors and Wilmington Trust, National Association, in its capacity as indenture trustee. The Third Lien Notes are secured by substantially all of the assets of the Debtors and, with respect to such assets, rank (i) junior to the First Lien Credit Facility, (ii) junior to the First Lien Notes and (iii) junior to the Second Lien Notes.

42.     The Third Lien Notes mature on July 1, 2021.  Interest on the Third Lien Notes accrues at 15.00%, payable in kind on July 1 and January 1 of each year.  As of January 1, 2015, the aggregate principal amount of the outstanding Third Lien Notes was $65.3 million.

### vi.     2015 Senior Notes

43.     On October 24, 2007, Altegrity issued $290 million in aggregate principal amount of the 2015 10.50% Senior Notes pursuant to that certain indenture, dated as of October 24, 2007, among Altegrity, each of the other Debtors except Holding Corp. as guarantors and the Wells Fargo Bank, N.A., in its capacity as indenture trustee.  On August 3, 2010, Altegrity

1000461132v12

issued $210 million in aggregate principal amount of the 2015 12.00% Senior Notes pursuant to that certain indenture, dated as of August 3, 2010, among Altegrity, each of the other Debtors except Holding Corp. as guarantors and the Wells Fargo Bank, N.A., in its capacity as indenture trustee.  On September 26, 2014, Wilmington Trust, National Association succeeded Wells Fargo Bank, N.A. in its capacity as indenture trustee.

44.    As of the Commencement Date, $10.9 million of the 2015 10.50% Senior Notes and $11.3 million of the 2015 12.00% Senior Notes remain outstanding, representing notes that were not tendered as part of the Prepetition Recapitalization.  Certain terms of the untendered 2015 Senior Notes were consensually modified as part of the Exchange Offer.

45.    All of the 2015 Senior Notes are unsecured and mature on November 1, 2015. Interest on the 2015 10.50% Senior Notes accrues at 10.5%, payable in cash on May 1 and November 1 of each year.  Interest on the 2015 12.00% Senior Notes accrues at 12.0%, payable in cash on May 1 and November 1 of each year.

### vii.    2016 Senior Subordinated Notes

46.    On October 24, 2007, Altegrity issued $150 million in aggregate principal amount of the 2016 Senior Subordinated Notes pursuant to that certain indenture, dated as of October 24, 2007, among Altegrity, each of the other Debtors except Holding Corp. as guarantors and Wells Fargo Bank, N.A., in its capacity as indenture trustee.  On September 26, 2014, Wilmington Trust, National Association succeeded Wells Fargo Bank, N.A. in its capacity as indenture trustee.

47.    As of the Commencement Date, $29.2 million of the 2016 Senior Subordinated Notes remains outstanding, representing notes that were not tendered as part of the Prepetition Recapitalization.  Certain terms of the untendered 2016 Senior Subordinated Notes were

1000461132v12

consensually modified as part of the Exchange Offer.

48.    The 2016 Senior Subordinated Notes are unsecured and are subordinated in right of payment to other senior indebtedness of the Debtors (including the First Lien Credit Facility, the First Lien Notes, the Second Lien Notes, the Third Lien Notes and the 2015 Senior Notes). The 2016 Senior Subordinated Notes mature on May 1, 2016.  Interest on the 2016 Senior Subordinated Notes accrues at 11.75% payable in cash on May 1 and November 1 of each year.

### viii.    Junior Subordinated Notes

49.    On August 3, 2010, Altegrity issued $50 million in aggregate principal amount of Junior Subordinated Notes with an aggregate face amount of $104.1 million.  The Junior Subordinated Notes initially matured on August 2, 2016, with the face amount payable in full upon maturity.  In connection with the Prepetition Recapitalization, 100% of the holders of the Junior Subordinated Notes agreed to extend the maturity of such notes until January 4, 2022. The Junior Subordinated Notes are held primarily by Altegrity's majority shareholder, and the agreement to extend the majority of these notes (along with the majority shareholder's $25 million equity infusion) was a voluntary concession to facilitate the Prepetition Recapitalization.

50.    The Junior Subordinated Notes do not bear periodic cash interest, but rather accrete in principal amount at a yield of 13.0%, compounded annually.  The Junior Subordinated Notes are unsecured and are subordinated in right of payment to all senior indebtedness of the Debtors (including the First Lien Credit Facility, the First Lien Notes, the Second Lien Notes, the Third Lien Notes, the 2015 Senior Notes and the 2016 Senior Subordinated Notes).

### Circumstances Leading to These Chapter 11 Cases

51.    As described below, these chapter 11 cases would not have occurred but for a series of events involving the Company's USIS business in the summer of 2014, starting with a

state-sponsored data intrusion (described in more detail below) and culminating with unforeseen stop-work orders and the loss of contracts generating approximately 22% of the Company's overall revenue for the twelve-month period ending June 30, 2014.  Prior to those events, the Company had completed the Prepetition Recapitalization that appeared to have addressed its debt maturities and left the Company with a new equity infusion, adequate liquidity and achievable debt covenants.  Following the USIS data intrusion, work stoppage and contract losses described below, however, both the Company's cash position and EBITDA forecasts were dramatically and adversely affected.  These new events thus raised the specter of potential defaults under the Company's secured debt obligations, and ultimately necessitated a new restructuring.

A.      **Events at USIS Leading to the Loss of the OPM Contracts and the Closure of ISD**

   i.      **Data Intrusion**

52.      In early June of 2014, USIS personnel detected the possibility that USIS's technology infrastructure had been the subject of an external intrusion attack (the "**Data Intrusion**").   Upon detecting the Data Intrusion, the Company responded swiftly and comprehensively to ensure that the attack was contained, to remediate any harm and to implement security enhancements designed to minimize future risks.  Among other things, USIS immediately notified ISD's primary customer, OPM, of the Data Intrusion.   USIS also communicated with federal law enforcement agencies as well as its other customers, and provided frequent and ongoing briefings to various federal government officials.  The Company disclosed the Data Intrusion to its lenders at least as early as June 23, 2014, in connection with the Exchange Offer.

53.      Following the Data Intrusion, USIS's outside legal counsel initiated an investigation, retained an independent and internationally respected third-party computer

forensics investigative firm to assist in the investigation and remediation efforts, and notified law enforcement.  USIS invested substantial resources in investigating, containing and remediating the Data Intrusion following the incident, and has also invested substantial resources since the Data Intrusion in further enhancing the security of its certified and compliant information systems.

54.    On August 1, 2014—nearly two months after the Company notified OPM of the Data Intrusion—OPM issued letters to USIS indicating the government's preliminary intent to exercise its contract options for the next twelve-month period, commencing on October 1, 2014, for two key USIS contracts, the Background Investigation Fieldwork ("**Fieldwork**") contract, and the Background Investigation Support Services ("**Support Services**") contract.  Those two contracts together had accounted for approximately $304.5 million, or 57% of USIS's revenues, for the LTM ended June 30, 2014.

### ii.    Temporary Stop-Work Orders

55.    Following the Data Intrusion and the Prepetition Recapitalization, the Company focused its efforts on the performance of its three businesses.  In the midst of these efforts, however, OPM executed a sharp about-face on August 6, 2014, when it unexpectedly issued notice of a temporary stop-work order related to USIS's Fieldwork contract.  In the stop-work notice—which was issued just five days after OPM had conveyed its preliminary intent to exercise its Fieldwork contract renewal option—OPM instructed USIS to temporarily stop work under its Fieldwork contract until such time as OPM was satisfied that all risks related to the Data Intrusion were fully identified and understood, and until sufficient remedies were satisfactorily in place.

56.    Upon receipt of the stop-work order, the Company implemented immediate

21

actions to stop work and, as had been directed by OPM, to minimize the incurrence of costs allocable to the work covered by the Fieldwork contract, including the immediate furlough of over 2,000 USIS employees.

57.     Following the issuance of the August 6, 2014 stop-work order by OPM, the Company received stop-work orders related to services performed on other USIS government contracts, resulting in additional lost revenue.

### iii.     Loss of OPM Contracts

58.     Approximately five weeks after OPM issued the temporary stop-work order, the Company submitted a report to OPM on September 9, 2014 from the independent computer forensics firm that was engaged to investigate and remediate the Data Intrusion.  The report explained that, after conducting an extensive investigation, the forensics investigations firm concluded that USIS had been the victim of an advanced state-sponsored attack.  The independent forensic report further concluded that (i) USIS appropriately responded to the attack; (ii) there had been no external intrusion activity in USIS's systems for over two months; (iii) the attack had been contained; and, perhaps most significantly, (iv) USIS had met all of the government's stated conditions for lifting the stop-work orders.

59.     On the same day that the Company provided OPM with the independent forensic report, OPM notified the Company that, notwithstanding both the report and OPM's August 1, 2014 letter indicating the government's intent to renew, the government had decided not to exercise its remaining options on either the Fieldwork or the Support Services contracts.  Thus, both contracts expired by their terms on September 30, 2014.

60.     The loss of the Fieldwork and Support Services contracts carried substantial collateral costs for the Company.  *First*, USIS had to immediately move to transition all of its

22

work to new service providers, as required under the contracts.  *Second*, USIS shifted its focus from improving the performance of ISD to winding it down.  *Third*, USIS spent substantial time preparing detailed submissions to OPM to recover remediation and transition of services costs to which it is entitled under the OPM contracts.  USIS continues to vigorously pursue these cost recovery actions against OPM.

61.    In sum, the stop-work orders coupled by the loss of the Fieldwork and Support Services contracts resulted in the entirely unforeseen loss of revenue to USIS of approximately $304 million or 22% of the Company's overall revenue for the twelve-month period ended June 30, 2014.

**B.    Concerns regarding Liquidity and Covenant Demands under the Existing Credit Agreement and the Debtors' Secured Note Indentures**

62.    As a result of the change in circumstances at USIS in the fall of 2014, the Company examined its liquidity and its future ability to comply with the terms of its existing indebtedness.  In particular, the cost of remediation efforts related to the Data Intrusion and the loss of revenues associated with the USIS work stoppage had left the Company with significantly less cash than forecasted.  At the same time, cash interest payments totaling $65.2 million for the First Lien Notes and the Second Lien Notes were due on January 1, 2015.  A default in the payment of interest on the First Lien Notes or the Second Lien Notes would trigger cross-default provisions in the Existing First Lien Credit Facility and, if such a default caused an acceleration of the First Lien Notes or the Second Lien Notes, would trigger cross-default provisions in the Third Lien Indenture as well.

**C.    The Debtors' Prepetition Restructuring Efforts**

63.    In the fall of 2014, the Company diligently pursued cash management and cost reduction initiatives in order to preserve liquidity, and also began to explore the sale of certain

non-core assets.  Nevertheless, in light of the substantial risk that the Company would have insufficient cash available to meet upcoming interest payments on its funded debt, the Company initiated restructuring discussions with its secured creditor constituencies.

64.     The Company's sale and cash conservation efforts did not leave them with sufficient liquidity to make interest payments on their funded debt at the beginning of January 2015.   Ultimately, however, the Company's prepetition efforts resulted in the Company successfully completing two sale transactions shortly before the Commencement Date, and entering into a restructuring support agreement for the consensual restructuring of the Company with the support of the overwhelming majority of its secured creditors, including controlling votes in four separate issuances of debt representing more than $1.4 billion in secured obligations.

   **i.      Sale of KFD and GS&S Businesses**

65.     As previously described, the Company had begun to explore a sale of certain assets in the fall of 2014 as part of its liquidity management efforts.  Two of those assets—the Kroll Factual Data business and GS&S, the remaining portion of the USIS business—attracted buyer interest at favorable prices.  Ultimately, in consultation with their secured lender groups, the Debtors determined to complete the sales of those businesses.

66.     On September 23, 2014, Debtor Kroll Inc. entered into a letter of intent with CBC Companies, Inc. ("**CBC**") to sell substantially all of the assets of Debtor Kroll Factual Data, Inc. (the "**KFD Business**").  In addition to an unsuccessful marketing process for the KFD Business in 2013, the Company's financial advisors and representatives held discussions with a number of other potential buyers during this period in 2014 regarding the sale of the KFD Business, but no other party indicated a willingness to acquire the business on better terms than those offered by CBC.

67.     On December 12, 2014, the parties entered into an asset purchase agreement pursuant to which an affiliate of CBC agreed to purchase the KFD Business for $106 million (subject to a $10 million escrow for certain indemnification obligations and customary closing adjustments) (the "**KFD Sale**").  The asset purchase agreement provided that all employees of the KFD Business would be offered employment by the purchaser.  In addition, Debtor Kroll Inc. provided an indemnity to the purchaser for substantially all pre-closing liabilities and agreed to provide (and be compensated for) certain transition services to CBC following the closing.  The KFD Sale closed on January 20, 2015.

68.     In October 2014, the Company engaged a financial advisor to conduct a comprehensive marketing process for GS&S.  During the following two months, the Company's financial advisor held discussions with approximately 20 potential strategic and financial buyers and conducted an extensive due diligence process.  On December 24, 2014, following two months of marketing and negotiations, Debtor US Investigations Services, LLC entered into a stock purchase agreement with purchaser PAE Shield Acquisition Company, Inc., an affiliate of Pacific Architects and Engineers Incorporated, to sell two of its subsidiaries—Labat-Anderson Incorporated and US Investigations Services, Professional Services Division, Inc.—and certain of its assets, which together comprise substantially all of GS&S, for a purchase price of $60 million (subject to customary closing adjustments) (the "**GS&S Sale**").  In connection with the GS&S Sale, the Company agreed to provide (and be compensated for) certain transition services to the purchaser following the closing and the purchaser agreed to hire GS&S' existing employees.  The GS&S Sale closed on January 15, 2015.

69.     The KFD and GS&S Sales, together with the winding-down of the ISD business, have left the Debtors' ongoing operations concentrated around the core Kroll and HireRight

businesses, both of which continue to be strong businesses with significant opportunities for growth.

### ii.    Creditor Negotiations

70.     In the fall of 2014, the Company, with the assistance of its restructuring advisors, began discussions with an *ad hoc* group of second and third lien noteholders (the "**Ad Hoc Second Lien Group**") and the professionals representing an *ad hoc* group of first lien creditors (the "**Ad Hoc First Lien Group**") concerning a restructuring of the Company and its debt obligations.

71.     Beginning in mid-October 2014, in order to facilitate an open dialogue with the Ad Hoc Second Lien Group, the Company entered into confidentiality agreements with certain of its members and held the first of many in-person meetings that would take place over the next several months.   Over time, additional group members also entered into confidentiality agreements with the Company and joined discussions, along with their legal and financial advisors.   Throughout the fall, the Company's senior management and advisors met with the group's restricted members and their advisors on numerous occasions, hosted multiple individual business-level meetings, and provided access to data and information through a document datasite.

72.     On November 12, 2014, the Ad Hoc Second Lien Group, through its advisors, provided the Company with its initial proposal for a comprehensive restructuring to be implemented through a prepackaged chapter 11 plan of reorganization.  Taking this proposal as an indication of the Ad Hoc Second Lien Group's willingness to pursue a consensual path forward, the Company began arm's-length negotiations with the Ad Hoc Second Lien Group on the specific terms of a financial restructuring of the Company.

26

73.    As negotiations with the Ad Hoc Second Lien Group progressed, the Company also began discussions with the professionals for the Ad Hoc First Lien Group, who entered into confidentiality agreements with the Company on October 28, 2014 and November 5, 2014.  As with the Ad Hoc Second Lien Group, the Company's senior management met with the professionals for the Ad Hoc First Lien Group on multiple occasions and facilitated a robust due diligence process.  In December 2014 and January 2015, individual members of the Ad Hoc First Lien Group entered into confidentiality agreements with the Company and engaged in diligence and negotiations.

74.    Throughout this period, the Debtors and their advisors continued to engage in constructive discussions with each of the Ad Hoc First Lien and the Ad Hoc Second Lien Group.  Over time, it became clear that a consensual restructuring on terms agreeable to both creditor groups would, if achievable, result in minimum disruption to the Company's business operations, minimize administrative expenses associated with the restructuring and, therefore, maximize the Company's overall value for the benefit of constituents.   The Debtors and their advisors, therefore, began actively negotiating the terms of a consensual restructuring with both creditor groups.

75.    On January 14, 2015, the Company and its advisors met with members of the Ad Hoc First Lien Group, the Ad Hoc Second Lien Group and their advisors, as well as advisors to Providence, for an all-day in-person negotiation session to reach an agreement in principle on the terms of an in-court restructuring.  The agreement contemplated a pre-arranged chapter 11 filing by the Company in order to implement the following restructuring transactions: (i) a new-money investment by holders of the Second Lien Notes and Third Lien Notes of $90 million, initially provided in the form of debtor-in-possession financing and ultimately convertible to a second-

27

lien investment in the reorganized Company; (ii) the pre-petition amendment and subsequent reinstatement of the First Lien Credit Facility and the First Lien Notes; (iii) the offer to pay down $110 million of the First Lien Indebtedness using proceeds of the KFD Sale and GS&S Sale; and (iv) the conversion of Second Lien Notes and Third Lien Notes to substantially all of the equity in the reorganized Company.

76.    Over the ensuing three weeks, the parties worked together closely to negotiate and finalize a number of key restructuring documents, including a restructuring support agreement, a plan term sheet, amendments to each of the Credit Facility and the First Lien Indenture and a DIP credit agreement.  On February 2, 2015, the Company signed the Restructuring Support Agreement (attached hereto as **Exhibit C**), which as of the Commencement Date had been countersigned by lenders representing approximately 78% of the funded First Lien Indebtedness and approximately 95% of Second Lien Notes and Third Lien Notes, well above the required threshold for effectiveness.

### iii.    The Restructuring Support Agreement

77.    As described above, as a result of unanticipated events at USIS, the Debtors had been faced in the fall of 2014 with an immediate need for liquidity, covenant relief and a deleveraging of the Debtors' capital structure.  The Restructuring Support Agreement is the culmination of several months' negotiation among the Debtors' key stakeholders and represents a comprehensive solution to the Debtors' needs.  With the support of the overwhelming majority of the Debtors' secured creditors, the Restructuring Support Agreement provides a roadmap for the implementation of a series of transactions that (i) address certain existing defaults under the First Lien Indebtedness and reset financial covenants to levels that are consistent with the Debtors' revised business plan, (ii) reduce outstanding debt by 40%, and (iii) provide the Debtors with $90 million of new money to fund these chapter 11 cases and ongoing business operations.

### a.    First Lien Facility Amendment and First Lien Notes Amendment

78.    Pursuant to the Restructuring Support Agreement, the Debtors and their lenders under the Credit Agreement entered into an amendment on February 6, 2015 to, among other things, (i) shorten the maturity of the Term Loan by one year to July 5, 2018; (ii) waive the Financial Performance Covenant for all quarters prior to emergence from these chapter 11 cases and eight quarters following emergence, and thereafter reset the covenant to a cushion of 25% - 30% of the Company's business plan; (iii) waive the change of control default that would otherwise be triggered by the restructuring; (iv) add a minimum total liquidity covenant of $30 million starting the fifth quarter after emergence; (v) permit the Debtors to obtain a new super-priority revolving credit facility of up to $60 million; and (vi) waive all existing defaults under the Credit Agreement (the "**First Lien Facility Amendment**").  In exchange for their consents to the First Lien Facility Amendment, the Company paid a cash fee equal to 350 basis points to eligible lenders.

79.    Also pursuant to the Restructuring Support Agreement, the Debtors entered into a February 6, 2015 amendment of the First Lien Indenture to, among other things, permit the Debtors to obtain a new super-priority revolving credit facility of up to $80 million (the "**First Lien Notes Amendment**").  No amendment fee was paid in connection with the First Lien Notes Amendment.

### b.    Deleveraging of the Debtors' Balance Sheet

80.    The Restructuring Support Agreement provides that holders of Second and Third Lien Notes will convert their debt into equity and become the new majority owners of the Debtors.  In addition, the Restructuring Support Agreement provides that the debtors will segregate $110 million of the net cash proceeds from the KFD Sale and GS&S Sale, and will use those proceeds to offer to pay down the First Lien Indebtedness upon exit from these chapter 11

29

cases.  The Ad Hoc First Lien Group agreed to permit the Debtors to retain the remaining net cash proceeds from these sales for reinvestment in the business (principally capital expenditures) and to fund payment of the amendment fee payable in connection with the First Lien Facility Amendment.

### c.    New Capital Investment

81.    A fundamental component of the Restructuring Support Agreement is the Ad Hoc Second Lien Group's agreement to invest $90 million in new capital in the Debtors in the form of a multi-draw, junior-priority secured debtor-in-possession financing (the "**DIP Facility**") that, rather than being payable in cash upon the Debtors' exit from chapter 11, will be converted into a new second lien debt instrument that will provide necessary liquidity to fund the Debtors' business and capital obligations post-restructuring.

82.    The Debtors and the Ad Hoc First Lien Group negotiated, in arm's-length, hard fought discussions, both regarding the terms of the DIP Facility and—critically—to ensure that the entire amount of the DIP Facility will be funded into escrow at the beginning of the chapter 11 cases to provide certainty that the necessary funding will be available for the Debtors both during the chapter 11 cases and to consummate the chapter 11 plan at the conclusion of the process.

83.    As noted, it is a fundamental premise of the DIP Facility that, once approved, the entire $90 million commitment will be funded into escrow.  In the DIP Motion, the Debtors will seek authority from the Court to make an initial drawing of up to $22.5 million (such amount drawn, the "**Initial Draw**") of the DIP Facility within three days of the entry of an interim order approving the DIP Facility.  That amount is needed to ensure adequate funding for operations and administrative expenses in the period between the interim and final DIP hearing.  The DIP Facility then permits the Debtors to make one or more additional drawings following entry of a

30

final order approving the financing of up to an additional $22.5 million.  The remainder of the DIP Facility will be drawn at the effective date of the plan of reorganization, and will become a new-money infusion that will fund payments due on the effective date and will provide the Debtors with adequate liquidity to fund operations post-restructuring.

84.    Importantly, the Restructuring Support Agreement contemplates that, rather than being repaid in cash, the amounts borrowed under the DIP Facility will be repaid with new Second Lien Notes with an interest rate of 13.5% PIK interest, convertible to 11.5% cash pay interest once the Debtors' total leverage ratio reaches 5x.

### d.    Plan Treatment

85.    The Restructuring Support Agreement also specifies the treatment of prepetition claims of the Debtors, including the following:

- All claims outstanding under the First Lien Credit Facility (as amended by the First Lien Facility Amendment) and the First Lien Notes (as amended by the First Lien Notes Amendment), after par offers to pay down on account of $110 million from proceeds of the KFD and GS&S Sales, will be reinstated under section 1124 of the Bankruptcy Code.

- On account of their allowed claims under the Second Lien Indenture, holders of Second Lien Notes will receive their pro rata share of 98% of the new common stock of the reorganized Debtors.

- On account of their allowed claims under the Third Lien Indenture, holders of Third Lien Notes shall receive their pro rata share of 2% of the new common stock of the reorganized Debtors.

- On account of their allowed claims, holders of general unsecured claims against all Debtors other than those Debtors filing a chapter 11 plan of liquidation[10] (including holders of Second Lien Notes and Third Lien

---

[10]    The Restructuring Support Agreement provides that Debtors US Investigations Services, LLC, USIS International, Inc., USIS Worldwide, Inc. and John D. Cohen, Inc. (the "**Liquidating Debtors**") will file a chapter 11 plan of liquidation to facilitate the winding down of the USIS business.

Notes, to the extent of any unsecured deficiency claims) will receive their pro rata share of the value of any unencumbered assets, *provided that* the holders of Second Lien Notes and Third Lien Notes will waive any recovery on account of their unsecured deficiency claims if the class of general unsecured creditors votes in favor of the Debtors' chapter 11 plan.

- On account of their allowed claims, holders of all other unsecured claims against the Liquidating Debtors will receive no distribution.

### e.    Case Milestones

86.    Finally, the Restructuring Support Agreement also contains certain case milestones which reflect the desire of the Debtors and their key stakeholders to exit chapter 11 as quickly as possible.  To accomplish that goal, the Debtors must file a plan and disclosure statement within 40 days of the Commencement Date, and obtain confirmation of the plan within 140 days of the Commencement Date.  The Debtors will seek to emerge from chapter 11 within 150 days of the Commencement Date.  While this timeline is a tight one that requires full cooperation from all of the Debtors' key stakeholders, the Debtors believe that it is in the best interests of the estates to exit chapter 11 as quickly as possible in order to minimize business disruption.

87.    In light of the foregoing, the Debtors have determined that commencing these chapter 11 cases with the support of the overwhelming majority of their secured lenders on the terms described above and obtaining the proposed debtor-in-possession financing represents the best available alternative for the Debtors to meet their immediate and ongoing liquidity needs and to deleverage their balance sheet.  Accordingly, after a process that has included the preparation of each of the First Day Pleadings filed with the Court and the negotiation of the Debtors' proposed debtor-in-possession financing credit agreement, the Debtors have commenced these chapter 11 cases to provide the Debtors with the tools and the opportunity to achieve a comprehensive financial restructuring.

32

**The Debtors' First Day Pleadings**

88.     To enable the Debtors to minimize the adverse effects of the commencement of these chapter 11 cases on their ongoing business operations and to promote a smooth transition to operations in chapter 11, the Debtors have requested various relief in their First Day Pleadings.  The First Day Pleadings seek authority to, among other things, obtain debtor-in-possession financing on an interim basis, preserve client and customer relationships, maintain employee morale, and ensure the continuation of the Company's cash management systems and other business operations without interruption.  Receiving Court approval of the relief sought in the First Day Pleadings is essential to giving the Debtors an opportunity to work towards a successful restructuring that will benefit all of the Debtors' constituents.

89.     Several of the First Day Pleadings request authority to pay certain prepetition claims.  Rule 6003 of the Federal Rules of Bankruptcy Procedures provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 20 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Other relief will be deferred for consideration at a later hearing.

90.     I have reviewed each of the First Day Pleadings.  The facts stated therein are true and correct to the best of my information and belief, and I believe that the relief sought in each of the First Day Pleadings is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully restructuring the Debtors' businesses.

1000461132v12

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___2/8/15___

By: _/s/_____

Name:    Jeffrey S. Campbell

Title:    President and
          Chief Financial Officer
          Altegrity, Inc.

**<u>Exhibit A</u>**

**First Day Pleadings**

**Exhibit A**

**List of First Day Motions**

1. Debtor's Motion for Entry of an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases

2. Debtors' Motion for Entry of an Order (A) Authorizing Payment of Certain Prepetition Taxes and Fees and (B) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers

3. Debtors' Motion for Entry of an Order (A) Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors and (B) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests

4. Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to Honor and Pay (I) Prepetition Customer Obligations and (II) Prepetition Obligations That Are Reimbursable by Customers and (B) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations

5. Debtors Motion for Entry of an Order (A) Authorizing the Debtors to Pay and Honor Certain Prepetition Wages, Benefits and Other Compensation Obligations and  (B) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations

6. Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to (I) Continue Using Their Existing Cash Management System, Including Bank Accounts, and Honor Related Prepetition Fees and Expenses, and (II) Maintain Their Existing Business Forms, (B) Authorizing Continued Intercompany Transactions and Granting Postpetition Intercompany Claims Administrative Priority Status and (C) Granting a Waiver of the Investment and Deposit Requirements of Section 345(b) of the Bankruptcy Code

7. Debtors' Motion For Entry of Interim and Final Orders (A) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance and (C) Establishing Procedures for Determining Adequate Assurance of Payment

8. Debtors' Motion For Entry Of An Order (A) Authorizing The Debtors To (I) Continue Prepetition Insurance Programs In The Ordinary Course Of Business and (II) Pay All Prepetition Obligations In Respect Thereof and (B) Authorizing Financial Institutions To Honor and Process Related Checks And Transfers

01:16638800.1

1000457394v2

9.  Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364, (B) Granting Liens and Superpriority Claims, (C) Authorizing the Use of Cash Collateral; (D) Granting Adequate Protection and (E) Scheduling a Final Hearing

10. Debtors' Application for Entry of an Order Authorizing the Debtors to Retain and Appoint Prime Clerk LLC as Claims and Noticing Agent Effective *Nunc Pro Tunc* to the Commencement Date

## Exhibit B

**The Company's Corporate Organization Chart**



Altegrity

# Corporate Structure Chart

**Exhibit C**

**Restructuring Support Agreement**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

<u>**RESTRUCTURING SUPPORT AGREEMENT**</u>

**Dated as of February 2, 2015**

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits and schedules attached hereto, and as may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "*Agreement*")[1] is entered into by and among the following parties:

(a)  Altegrity, Inc. ("*Altegrity*");

(b)  Altegrity Holding Corp. ("*Holding Corp.*");

(c)  Altegrity Acquisition Corp. ("*Acquisition Corp.*");

(d)  each of the direct and indirect domestic subsidiaries of Altegrity that are party hereto (collectively with each of Altegrity, Holding Corp., and Acquisition Corp., the "*Debtors*" and each such entity, a "*Debtor*");

(e)  Providence Equity Partners VI L.P. and Providence Equity Partners VI-A L.P. (together, the "*Consenting Interest Holders*"), which together hold interests with respect to 94.658% of Old Common Stock and 99.983% of Old Preferred Stock (collectively, the "*Old Equity Interests*");

(f)  the undersigned holders or investment advisors or managers and discretionary accounts that hold claims[2] against the Debtors under the Second Lien Notes (such claims, the "*Consenting Second Lien Creditor Claims*" and such holders, collectively, the "*Consenting Second Lien Creditors*) and the Third Lien Notes (such claims, the "*Consenting Third Lien Creditor Claims*", and such holders, collectively, the "*Consenting Third Lien Creditors*" and, together with the Consenting Second Lien Creditors, the "*Consenting Second and Third Lien Creditors*"). "*Requisite Consenting Second and Third Lien Creditors*" shall mean, as of any time of determination, the Consenting Second and Third Lien Creditors holding greater than two-thirds of the aggregate amount of Consenting Second Lien Creditor Claims and Consenting Third Lien Creditor Claims;

(g)  the undersigned holders or investment advisors or managers and discretionary accounts that hold claims against the Debtors under the First Lien Term Loan (such claims, the "*Consenting First Lien Term Loan Creditor Claims*" and such holders, collectively, the "*Consenting First Lien Term Loan Creditors*") and the First Lien Notes (such claims, the "*Consenting First Lien Notes Creditor Claims*" and such holders, collectively, the "*Consenting First Lien Notes Creditors*"). The Consenting First Lien

---

[1]  Capitalized terms used but not otherwise defined in this Agreement shall have the meaning ascribed to such terms in the restructuring term sheet attached hereto as <u>**Exhibit A**</u> (the "*Restructuring Term Sheet*").

[2]  As used herein the term "*claim*" has the meaning ascribed to such term in section 101(5) of the Bankruptcy Code.

Term Loan Creditor Claims and the Consenting First Lien Notes Creditor Claims are collectively referred to herein as the "**_Consenting First Lien Creditor Claims_**"; the Consenting First Lien Term Loan Creditors and the Consenting First Lien Notes Creditors are collectively referred to herein as the "**_Consenting First Lien Creditors_**" and each such entity, a "**_Consenting First Lien Creditor_**," each solely in their capacities as such. "**_Requisite Consenting First Lien Creditors_**" shall mean, as of any time of determination, the Consenting First Lien Creditors holding greater than two-thirds of the aggregate amount of Consenting First Lien Creditor Claims; provided that such determination shall be made without regard to any First Lien Creditor Claims held by (x) the Consenting Interest Holder or its affiliates or (y) funds and accounts advised by Capital Research and Management Company or its affiliates. The Consenting First Lien Creditor Claims, the Consenting Second Lien Creditor Claims and the Consenting Third Lien Creditor Claims are collectively referred to herein as the "**_Consenting Creditor Claims_**." The Consenting First Lien Creditors, the Consenting Second Lien Creditors and the Consenting Third Lien Creditors are collectively referred to herein as the "**_Consenting Creditors_**" and each such entity, a "**_Consenting Creditor_**." The Requisite Consenting First Lien Creditors and the Requisite Consenting Second and Third Lien Creditors are referred to herein collectively as the "**_Requisite Consenting Creditors_**;" and

(h)  each entity that becomes a Joining Party (as defined below) in accordance with Section 9 or 27 of this Agreement (each of the foregoing described in sub-clauses (a) through (h), a "**_Party_**" and, collectively, the "**_Parties_**"). Each Consenting Interest Holder, each Consenting Creditor and each Joining Party (if any) is a "**_Restructuring Support Party_**" and they are collectively referred to herein as the "**_Restructuring Support Parties_**."

## RECITALS

**WHEREAS**, the Debtors and the Restructuring Support Parties have agreed to enter into certain restructuring, recapitalization and related transactions that will have the effect of modifying the Debtors' capital structure, including the Debtors' respective obligations and the Restructuring Support Parties' respective claims and interests related to each of the following: (i) the First Lien Indebtedness, (ii) the Second Lien Notes, (iii) the Third Lien Notes, (iv) the 10.50% Senior Unsecured Notes, (v) the 12.00% Senior Unsecured Notes, (vi) the Senior Subordinated Notes, (vii) the PIK Notes, (viii) the Old Preferred Stock and (ix) the Old Common Stock, and will have the effect of reinstating the claims under the Existing First Lien Facility and the First Lien Notes;

**WHEREAS**, the Debtors intend to commence voluntary reorganization cases (the "**_Chapter 11 Cases_**") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (such court, or another court of competent jurisdiction with respect to the subject matter, the "**_Bankruptcy Court_**") to effect the restructuring and recapitalization transactions, including through a pre-negotiated chapter 11 plan of reorganization having the terms set forth in the Restructuring Term Sheet (as may be amended or supplemented from time to time in accordance with the terms of this Agreement, the "**_Chapter 11 Plan_**"), all of which shall be on the terms and conditions described in this Agreement (such transactions, the "**_Restructuring_**");

**WHEREAS**, certain Consenting Second and Third Lien Creditors identified on **Schedule 2** hereto are herein committing to provide debtor-in-possession financing on the terms specified in the debtor-in-possession financing agreement substantially in the form specified on **Exhibit B** hereto (such lenders, in their capacity as such, the "**_DIP Lenders_**," and such agreement (including the exhibits thereto), the "**_DIP Loan Agreement_**") not to exceed $90 million. The commitment amount for each DIP Lender is set forth on **Schedule 2** hereto; and

2

**WHEREAS**, the Parties have engaged in arm's length, good faith discussions with the objective of reaching an agreement regarding the Restructuring.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## AGREEMENT

### Section 1. Definitive Documentation.

(a)  The definitive documents and agreements governing the Restructuring (collectively, the "***Restructuring Documents***") shall consist of, among others, the following: (a) the amendment to the Existing First Lien Facility (the "***Existing First Lien Facility Amendment***") in the form attached hereto as **Exhibit C**; (b) the amendment to the First Lien Indenture (the "***Existing First Lien Indenture Amendment***"), in the form attached hereto as **Exhibit D**, and related consents for such amendment; (c) those motions and proposed court orders that the Debtors file on or after the Commencement Date and seek to have heard on an expedited basis at the "first day hearing"; (d) the DIP Loan Agreement and related documentation, including the motion pursuant to sections 363 and 364 of the Bankruptcy Code to authorize the Debtors to obtain postpetition secured financing (the "***DIP Financing Motion***") and the interim and final orders approving the DIP Financing Motion (respectively, the "***Interim DIP Order***" and the "***Final DIP Order***," and collectively, the "***DIP Order***"); (e) the motion to assume this Agreement pursuant to sections 105(a) and 365 of the Bankruptcy Code and to authorize the performance by the Debtors of their obligations hereunder, including the payments of the Professional Fees and the Fees and Expenses as provided herein (the "***RSA Assumption Motion***") and the order approving the RSA Assumption Motion (the "***RSA Assumption Order***"); (f) the Chapter 11 Plan (and all exhibits thereto, including the documentation in respect of the New Revolving Loan, consistent with the Restructuring Term Sheet), it being acknowledged and agreed that a condition precedent to consummation of the Chapter 11 Plan shall be that this Agreement remains in full force and effect; (g) the Disclosure Statement, the other solicitation materials in respect of the Chapter 11 Plan (such materials, collectively, the "***Solicitation Materials***"), the motion to approve the Disclosure Statement (the "***Disclosure Statement Motion***"), and the order entered by the Bankruptcy Court approving the Disclosure Statement and Solicitation Materials as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code (the "***Disclosure Statement Order***"); (h) the order entered by the Bankruptcy Court confirming the Chapter 11 Plan (the "***Confirmation Order***") and pleadings in support of entry of the Confirmation Order; and (i) such other documents, pleadings, or agreements as may be reasonably necessary or advisable to implement the Restructuring contemplated by this Agreement and the Restructuring Term Sheet.

(b)  Each of the Restructuring Documents, other than the Existing First Lien Facility Amendment and the Existing First Lien Indenture Amendment (together, the "***First Lien Debt Amendments***"), remains subject to negotiation and completion and shall, upon completion, contain terms, conditions, representations, warranties, and covenants materially consistent with this Agreement, and shall otherwise be in form and substance reasonably acceptable to each of the Debtors, the Requisite Consenting First Lien Creditors and Requisite Consenting Second and Third Lien Creditors.

(c)  The Restructuring Documents in the foregoing forms, with the foregoing required approvals or as otherwise modified pursuant to the terms of this Agreement are collectively referred to herein as the "***Approved Transaction Documents***."

3

(d)  Each of the exhibits and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits and schedules. The terms of this Agreement and the exhibits and schedules shall whenever possible be read in a complementary manner; provided, that, to the extent there is a conflict between this Agreement and the exhibits and schedules, the conflicting term of this Agreement (excluding the exhibits and schedules) shall control and govern; provided, further, that notwithstanding anything herein to the contrary, to the extent there is a conflict between this Agreement and the First Lien Debt Amendments, the conflicting term of the First Lien Debt Amendments shall control and govern.

**Section 2.  Representations of the Restructuring Support Parties and the Debtors.** Each of the Restructuring Support Parties, severally and not jointly, and each of the Debtors, jointly and severally, hereby represents and warrants that, as of the Execution Date (as defined below), the following statements are true, correct and complete:

(a)  It has all requisite corporate, partnership, limited liability company or similar authority to execute this Agreement and carry out the transactions contemplated by, and perform its obligations contemplated under this Agreement and the execution and delivery of this Agreement and the performance of such Party's obligations under this Agreement have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(b)  The execution, delivery and performance by such Party of this Agreement does not violate (i) any provision of law, rule or regulation applicable to it or any of its subsidiaries or (ii) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries.

(c)  This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms.

(d)  If such Party is a Restructuring Support Party, such Restructuring Support Party (i) either (A) is the sole legal and beneficial owner of the aggregate principal amount of Consenting Creditor Claims set forth on its signature page (or the Joinder (as defined below)), in each case free and clear of any pledge, lien, security interest, charge, claim, proxy, voting restriction, right of first refusal or other limitation on disposition of any kind, in each case that would adversely affect in any material way such Restructuring Support Party's performance of its obligations contained in this Agreement at the time such obligations are required to be performed, or (B) has sole investment and voting discretion or control with respect to discretionary accounts for the holders or beneficial owners of the aggregate principal amount of Consenting Creditor Claims set forth on its signature page (or the Joinder (as defined below)) and has the power and authority to bind the beneficial owner(s) of such Consenting Creditor Claims in respect of matters relating to the Restructuring contemplated by this Agreement and (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Consenting Creditor Claims in respect of matters relating to the Restructuring contemplated by this Agreement and dispose of, exchange, assign and transfer such Consenting Creditor Claims (with respect to a Restructuring Support Party, all Consenting Creditor Claims under clauses (A) and (B) and any additional Consenting Creditor Claims it owns or has such control over from time to time or acquires after the Execution Date, collectively, its "***Participating Claims***").  Further, such Restructuring Support Party has made no prior assignment, sale or other transfer of, and has not entered into any other agreement to assign, sell or otherwise transfer, in whole or in part, any portion of its rights, title, or interests in such Participating Claims.

(e)  If such Party is a Restructuring Support Party, such Restructuring Support Party (i) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Debtors that it considers

4

sufficient and reasonable for purposes of entering into this Agreement, and (ii) is either (x) a "Qualified Institutional Buyer" as defined in Rule 144A under the Securities Act of 1933, as amended (the "*Securities Act*") or (y) an "Institutional Accredited Investor" (as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act) with respect to the securities held in connection with its Participating Claims.

(f)  If such Party is a Consenting Interest Holder, such Consenting Interest Holder is the sole legal and beneficial owner of the Old Common Stock and the Old Preferred Stock set forth next to its name below, free and clear of all claims, liens and encumbrances.

|  | Old Common Stock | Old Preferred Stock |
|---|---|---|
| Providence Equity Partners VI L.P. | 17,786,314 shares | 18,601.025 shares |
| Providence Equity Partners VI-A L.P. | 6,118,707 shares | 6,398.975 shares |

(g)  Each of the Debtors hereby acknowledges as of the Execution Date that it has reviewed this Agreement and has elected to enter into this Agreement in the exercise of its fiduciary duties.

**Section 3.  Agreements of the Consenting Creditors.**

(a)  During the period beginning on the Execution Date and ending on a Termination Event (such period, the "*Effective Period*"):

(i)  prior to the Commencement Date, each of the Consenting First Lien Term Loan Creditors agrees that it shall (a) enter into and deliver the Existing First Lien Facility Amendment and (b) instruct the Administrative Agent (as defined in the Existing First Lien Facility) to the extent reasonably necessary to effectuate execution and delivery of the Existing First Lien Facility Amendment; provided that in no instance shall any Consenting First Lien Term Loan Creditor be required to provide an indemnity or incur any liability whatsoever to the Administrative Agent or any other party in connection with such instruction;

(ii)  prior to the Commencement Date, each of the Consenting First Lien Notes Creditors agrees that it shall deliver (or shall cause to delivered), with respect to 100% of the aggregate principal amount of the First Lien Notes it beneficially owns, its consent in the consent solicitation seeking consents from the holders of the First Lien Notes to amend the First Lien Indenture by executing the Existing First Lien Indenture Amendment, in accordance with the applicable procedures set forth in the solicitation materials, and to not withdraw or revoke its consent in such consent solicitation; provided that in no instance shall any Consenting First Lien Notes Creditor be required to provide an indemnity or incur any liability whatsoever to the Trustee or any other party in connection with such consent;

(iii)  each Consenting Creditor that is entitled to accept or reject the Chapter 11 Plan pursuant to its terms agrees that it shall, subject to its receipt of the Disclosure Statement and the Solicitation Materials, in each case, approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code:

1. to the extent a class of claims is permitted to vote to accept or reject the Chapter 11 Plan, vote each of its Participating Claims to accept the Chapter 11 Plan by timely delivering its duly executed and completed ballot(s) accepting the Chapter 11 Plan following the commencement of the solicitation and its actual receipt of the Bankruptcy Court-approved Disclosure Statement, Solicitation Materials and ballot; and

5

2.  not change or withdraw (or cause to be changed or withdrawn) such vote;

provided, however, that notwithstanding anything herein to the contrary, (x) a Consenting Creditor may revoke its vote (and upon such revocation, such vote shall be deemed void *ab initio*) at any time following the termination of this Agreement with respect to such Consenting Creditor, and (y) if this Agreement (including the Restructuring Term Sheet) is amended in a manner that would adversely affect any Consenting Creditor Claim(s), the affected Consenting Creditor (1) shall no longer be obligated to vote hereunder in respect of any such Consenting Creditor Claim(s), and (2) to the extent such Consenting Creditor has voted such Consenting Creditor Claim(s) hereunder, shall be permitted to revoke its vote in respect of such Consenting Creditor Claim(s) (and upon such revocation, such vote shall be deemed void *ab initio*).

(iv)  each Consenting Creditor further agrees that it shall not directly or indirectly (A) object to or interfere with the acceptance, implementation or consummation of the Restructuring or (B) propose, file, support or vote for any restructuring, refinancing, workout, plan of arrangement, plan of reorganization or other recapitalization transaction for the Debtors other than the Restructuring; and

(v)  upon the commencement of the Chapter 11 Cases, and except as otherwise provided herein, the automatic stay is invoked and each Consenting Creditor agrees that, during the Effective Period, it will not exercise any right or remedy for the enforcement, collection or recovery of any of the Participating Claims, or any other claims against any direct or indirect subsidiaries of the Debtors that are not Debtors.

(b)  Notwithstanding the foregoing, this Agreement will not limit nor be deemed to limit any of the following Consenting Creditor rights, to the extent not inconsistent with this Agreement:

(i)  to appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement;

(ii)  to enforce any rights under this Agreement; or

(iii)  to take or direct any action relating to maintenance, protection or preservation of any collateral.

**Section 4.  Agreements of the Consenting Interest Holders.**

(a)  During the Effective Period, each of the Consenting Interest Holders agrees that it shall not, directly or indirectly, (i) object to, delay, impede or take any other action to interfere with the acceptance, implementation or consummation of the Restructuring or (ii) propose, file, support or vote for any restructuring, refinancing, workout, plan of arrangement, plan of reorganization or other recapitalization transaction for the Debtors other than the Restructuring.

(b)  Each of the Consenting Interest Holders agrees to (i) support and take all necessary steps to effectuate the Restructuring, including timely providing, and, to the extent applicable, using commercially reasonable efforts to cause the Debtors to timely provide, all requisite consents and approvals to the extent required in order for the Debtors to file for relief under chapter 11 of the Bankruptcy Code and (ii) (A) to the extent that each of the Consenting Interest Holders is entitled to accept or reject the Chapter 11 Plan pursuant to its terms, subject to the receipt by such Consenting Interest Holder of the Disclosure Statement and the Bankruptcy Court-approved Solicitation Materials, in each case, approved by the

6

Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code, vote to accept the Chapter 11 Plan by delivering its duly executed and completed ballot accepting the Chapter 11 Plan on a timely basis following the commencement of the solicitation and its actual receipt of the Solicitation Materials and ballot, and (B) not change or withdraw (or cause to be changed or withdrawn) such vote provided, however, that notwithstanding anything herein to the contrary, (x) a Consenting Interest Holder may revoke its vote (and upon such revocation, such vote shall be deemed void *ab initio*) at any time following the termination of this Agreement with respect to such Consenting Interest Holder, and (y) if this Agreement (including the Restructuring Term Sheet) is amended in a manner that would materially and adversely affect a Consenting Interest Holder, such Consenting Interest Holder (1) shall no longer be obligated to vote consistent with the terms herein, and (2) to the extent such Consenting Interest Holder has voted, shall be permitted to revoke its vote (and upon such revocation, such vote shall be deemed void *ab initio*).

(c)  The foregoing sub-clause (a) and sub-clause (b) of this Section 4 will not limit any of the Consenting Interest Holders' rights to (i) appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement, or (ii) enforce any rights under this Agreement.

### Section 5.  Agreements of the DIP Lenders.

(a)  In addition to their agreements as Consenting Creditors set forth in Section 3 above, during the Effective Period, each of the DIP Lenders hereby commits to provide its share (as set forth on **Schedule 2** hereto) of the Proposed DIP Facility on the terms and conditions contained in the DIP Loan Agreement substantially in the form attached hereto as**Exhibit B**, and on the terms and conditions hereof and thereof, and to support and take all necessary steps to effectuate the Restructuring.

(b)  No Consenting Creditor other than the DIP Lenders shall be obligated to fund or otherwise be committed to provide funding in connection with the Restructuring except pursuant to separate definitive documentation relating specifically to such funding, if any, (i) executed by such Consenting Creditor and (ii) approved by a final order of the Bankruptcy Court no longer subject to appeal (a *Final Order*"), if necessary, along with the satisfaction of any conditions precedent to such funding under the definitive documentation relating thereto.

### Section 6.  Releases of the Consenting Creditors and the Consenting Interest Holders

(a)  Effective as of the Execution Date, each of the Consenting Creditors and the Consenting Interest Holders, severally and not jointly, hereby fully and finally remises, releases, acquits and forever discharges all of the Consenting Creditors and the Consenting Interest Holders and all of their respective current and former direct and indirect equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents and other representatives), each solely in their capacities as such (collectively, the "*Released Parties*") from any and all actions, causes of action (whether class, derivative or individual in nature) for indemnity or otherwise, suits, debts, claims, counterclaims, demands, liens, commitments, contracts, agreements, promises, liabilities, demands, damages, losses, costs, expenses and compensation of any kind or nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, past, present or future, in law or in equity, arising on or before the Effective Date against the Released Parties, or any of them, from or related to the Debtors, the Restructuring or the Chapter 11

7

Cases; provided, however, (i) the foregoing release shall not apply to obligations arising under this Agreement or the Chapter 11 Plan, including the reinstated obligations and the obligations under the New Second Lien Notes; (ii) the foregoing release shall not be construed to prohibit a party in interest from seeking to enforce the terms of this Agreement or the Chapter 11 Plan; (iii) the foregoing release shall not apply to any indemnification or other surviving obligation or assumed contract as set forth in this Agreement or the Chapter 11 Plan and (iv) for purposes of the release set forth in this Section 6, the Released Parties shall not include any of the Debtors.  Notwithstanding anything to the contrary set forth in this Section 6(a), the Released Parties shall include any employees of or advisors to the Consenting Interest Holders who are or in the past have been officers or directors of the Debtors.

(b)  The release provided in Section 6(a) shall be null and void *ab initio* if this Agreement is terminated prior to the Effective Date, unless (i) the Consenting Interest Holders are not in breach of any of their obligations under this Agreement, and (ii) the Bankruptcy Court confirms a plan for the Debtors that (x) provides treatment for each of the Consenting Creditors  that is consistent with the Plan Term Sheet or at least as favorable as the treatment contemplated thereby and (y) imposes obligations on the Consenting Interest Holders that are consistent with their obligations set forth in this Agreement.

(c)  During the Effective Period, each of the Consenting Creditors and the Consenting Interest Holders agrees that it shall not object to or opt out of any release included in the Solicitation Materials or the Chapter 11 Plan, so long as such release is consistent with the Restructuring Term Sheet.

### Section 7.  Agreements of the Debtors.

(a)  During the Effective Period, the Debtors shall:  (i) support and take all steps necessary or desirable to obtain orders of the Bankruptcy Court in respect of the Restructuring, including entry of the DIP Order, RSA Assumption Order, Disclosure Statement Order and Confirmation Order within the time-frames contemplated herein; (ii) support and take all steps reasonably necessary or desirable to consummate the Restructuring in accordance with this Agreement, including the preparation, filing and execution within the time-frames provided herein of the Approved Transaction Documents; provided that each of the Existing First Lien Facility Amendment, Existing First Lien Indenture Amendment and DIP Order shall not be subject to any further negotiation or documentation as of the Commencement Date; (iii) execute and deliver any other required agreements to effectuate and consummate the Restructuring; (iv) obtain any and all required regulatory and/or third-party approvals for the Restructuring; (v) complete the Restructuring within the time-frame provided herein; (vi) use their commercially reasonable efforts to lift or otherwise reverse the effect of any injunction or other order or ruling of a court or regulatory body that would impede the consummation of the Restructuring; and (vii) operate their businesses in the ordinary course taking into account the commencement of the Chapter 11 Cases and the sales of (I) the assets of Kroll Factual Data, Inc. and (II) the equity of US Investigations Services, Professional Services Division, Inc. and Labat-Anderson Incorporated.

(b)  During the Effective Period, the Debtors shall promptly notify or update the Consenting Creditors upon becoming aware of any of the following occurrences:  (i) an additional person becomes a Consenting Creditor after the date of this Agreement; (ii) a Termination Event (as defined herein) has occurred; (iii) any person has challenged the validity or priority of, or has sought to avoid or alter, any Consenting Creditor Claim or any lien securing any Consenting Creditor Claim pursuant to a pleading filed with the Bankruptcy Court or another forum of competent jurisdiction; (iv) material developments, negotiations, or proposals relating to any pending case or controversy or any case or controversy that may be hereafter commenced against a Debtor in a court of competent jurisdiction or brought before a state or federal regulatory, licensing, or similar board, authority, or tribunal that would reasonably be expected to impede or prevent consummation of the Restructuring on the time-frame contemplated herein.

(c)  During the Effective Period, the Debtors shall use commercially reasonable efforts to provide counsel for the Consenting Creditors and counsel for the Consenting Interest Holders:  (i) drafts of all material motions, applications and other documents the Debtors intend to file with the Bankruptcy Court, no less than two (2) business days before the date when the Debtors intend to file any such document, unless such advance notice is impossible or impracticable under the circumstances, in which case the Debtors shall notify telephonically or by electronic mail counsel to the Consenting Creditors to advise them of the documents to be filed and the facts that make the provision of advance copies no less than two (2) business days before submission impossible or impracticable, and shall provide such copies as soon as reasonably possible thereafter; and (ii) copies of all pleadings actually filed by the Debtors with the Bankruptcy Court promptly but not later than one (1) day after such filing.

(d)  During the Effective Period, to the extent not otherwise paid in connection with the Restructuring, the Debtors shall promptly pay in cash:  (i) upon the execution of this Agreement by the Debtors, all accrued Fees and Expenses (as defined below) for which invoices or receipts are furnished by the Consenting First Lien Creditors' and the Consenting Second and Third Lien Creditors' Professionals (as defined below), and/or such Consenting Creditors, (ii) following the execution of this Agreement by the Debtors and prior to the Commencement Date, all Fees and Expenses for which invoices or receipts are furnished by the Professionals and/or such Consenting Creditors, and (iii) after the Commencement Date, subject to the Bankruptcy Court's approval of this Agreement and the Debtors' use of cash collateral, all unpaid Fees and Expenses incurred after the date of this Agreement from time to time, in any event within seven (7) days of delivery to the Debtors of any applicable invoice or receipt, which shall be in compliance with any order of the Bankruptcy Court.

(i) As used herein, "*Fees and Expenses*" shall mean (1) all reasonable and documented out-of-pocket expenses incurred by any of the initial Consenting First Lien Creditors and the Consenting Second and Third Lien Creditors relating to the Restructuring, plus (2) all reasonable and documented fees and expenses of the Professionals incurred in their representation of the initial Consenting Creditors from the date of such Professionals' respective retention by such holders through and including the termination of this Agreement (such fees as described in this Section 7(d)(i)(2), the "*Professional Fees*").

(ii) As used herein, "*Professionals*" shall mean Kirkland & Ellis LLP, Moelis & Company LLC, Womble Carlyle Sandridge & Rice, LLP, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey, Inc., and one local counsel engaged by the Consenting Second and Third Lien Creditors in connection with the Restructuring.

(iii) For the avoidance of doubt, the Debtors' obligations to pay the Professional Fees shall not be affected or reduced by the payment of any Professional Fees by any holder of claims under the First Lien Indebtedness, the Second Lien Notes or the Third Lien Notes, irrespective of whether such holder remains a holder of such claims as of the date of this Agreement or is a Consenting Creditor.

(e)  During the Effective Period, the Debtors shall not, and shall not cause any party to:  (i) object to, delay, impede, or take any other action that is inconsistent with, or is intended or is likely to interfere with acceptance or implementation of the Restructuring; (ii) seek to modify or otherwise oppose the imposition of the automatic stay under section 362 of the Bankruptcy Code with regard to any assets of the Debtors that have been pledged as collateral to the Consenting Creditors having an aggregate fair market value in excess of $5,000,000 without the written consent of the Requisite Consenting Creditors until the earlier of (1) the termination of this Agreement, and (2) the Effective Date; (iii) execute any agreements, instruments, or other documents that, in whole or in part, purport to modify the Existing First Lien Facility Amendment and Existing First Lien Indenture Amendment without the written consent of

9

the signatories party to such amendments; (iv) execute any agreements, instruments, or other documents that, in whole or in part, are not substantially consistent with this Agreement and are not otherwise reasonably acceptable to the Requisite Consenting First Lien Creditors, the Requisite Consenting Second and Third Lien Creditors and the Consenting Interest Holders; (v) redeem, purchase or acquire, or offer to acquire any shares of, or any options, warrants, conversion privileges, or rights of any kind to acquire any shares of, any of its capital stock or other equity interests, or issue, sell, pledge, dispose of, or grant or incur any encumbrance on, any shares of, or any options, warrants, conversion privileges, or rights of any kind to acquire any shares of, any of its capital stock or other equity interests (other than issuances of equity interests upon the exercise, exchange, or conversion of options, warrants, or other conversion privileges that are outstanding as of the date hereof and only in accordance with the terms of such options, warrants, or other conversion privileges as in effect on the date hereof); (vi) amend or propose to amend its respective certificate or articles of incorporation, bylaws, or comparable organizational documents; (vii) pay or make any payment, transfer, or other distribution (whether in cash, securities, or other property) of or in respect of principal of or interest on any funded indebtedness of the Debtors that is either (1) expressly subordinate in right of payment to the First Lien Indebtedness or (2) secured by an interest in collateral, which interest is subordinate in priority to that securing any of the First Lien Indebtedness, or any payment or other distribution (whether in cash, securities, or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation, or termination in respect of any such funded indebtedness that is not contemplated by the Restructuring Term Sheet; (viii) to the extent it would impair the rights of any of the Consenting Creditors, (1) split, combine or reclassify any outstanding shares of its capital stock or other equity interests, or (2) declare, set aside or pay any dividend or other distribution payable in cash, stock, property, a combination thereof, or otherwise with respect to any of its capital stock or other equity interests or any capital stock or other equity interests of any other person; or (ix) enter into any proposed settlement (other than as contemplated by this Agreement and the Restructuring or as previously disclosed to the Professionals prior to the date hereof) of any claim, litigation, dispute, controversy, cause of action, proceeding, appeal, determination, investigation, matter, or otherwise that will impair the Debtors' ability to consummate the Restructuring on the time-frame contemplated herein.

**Section 8.  Forbearance.**  During the Effective Period, each of the Consenting First Lien Notes Creditors, Consenting Second Lien Creditors and Consenting Third Lien Creditors, as applicable, agrees that, in the event that the applicable Issuer or Trustee (as such terms are defined in the First Lien Indenture, Second Lien Indenture or Third Lien Indenture, as applicable) receives a "notice of acceleration," the Consenting First Lien Notes Creditors, Consenting Second Lien Creditors or Consenting Third Lien Creditors, as applicable, shall provide written notice rescinding such acceleration and its consequences to the applicable Issuer or Trustee, in accordance with Section 602 of the applicable indenture.

**Section 9.  Transfers of Participating Claims and Old Equity Interests.**

(a)  Each Restructuring Support Party agrees that, as long as this Agreement has not terminated in accordance with its terms, it shall not sell, transfer, assign or otherwise dispose of any of its Participating Claims, or any option thereon or any right or interest (voting or otherwise) in any of its Participating Claims (including, without limitation, any participation therein), except to a party that (i) is a Restructuring Support Party; provided that any such Participating Claims shall automatically be deemed to be subject to the terms of this Agreement, or (ii) executes and delivers a Joinder (as defined below) to the Debtors on or prior to the date of the relevant transfer, in which case such transferee shall be deemed to be a Restructuring Support Party for purposes of this Agreement.  Any transfer of Participating Claims by a Restructuring Support Party that does not comply with the procedures set forth in this Agreement shall be deemed void without the need for further action.  Notwithstanding the foregoing, a Qualified

10

Marketmaker[3] that acquires any of the Participating Claims with the purpose and intent of acting as a Qualified Marketmaker for such Participating Claims, shall not be required to execute and deliver to counsel a Joinder or otherwise agree to be bound by the terms and conditions set forth in this Agreement if such Qualified Marketmaker transfers such Participating Claims (by purchase, sale, assignment, participation, or otherwise) to a Restructuring Support Party in accordance with subclause (i) above or to a Joining Party (as defined below) in accordance with clause (c) below within ten (10) business days of the Qualified Marketmakers' acquisition of such Participating Claim, and in either case such that the acquiring Restructuring Support Party or Joining Party, as applicable, may validly and timely vote such Participating Claim to accept the Chapter 11 Plan consistent with this Agreement.

(b)  This Agreement shall in no way be construed to preclude any Restructuring Support Party from acquiring additional claims; provided that any such additional claims shall automatically be deemed to be Participating Claims of such Restructuring Support Party and shall be subject to all of the terms of this Agreement.  Each Restructuring Support Party agrees to provide to counsel for the Debtors a notice of the acquisition of any additional claims within three(3) business days of the consummation of the acquisition transaction.

(c)  Any person that receives or acquires a portion of the Participating Claims pursuant to a sale or other transfer by a Restructuring Support Party hereby agrees to be bound by all of the terms of this Agreement (as the same may be hereafter modified from time to time) (a "*Joining Party*") by executing and delivering to counsel for the Debtors a joinder in the form of **Exhibit E** hereto (the "*Joinder*"), which Joinder may also be used by holders of claims that are not Participating Claims who wish to become a party to this Agreement as set forth in Section 27 of this Agreement.  The Joining Party shall thereafter be deemed to be a "Restructuring Support Party" and a Party for all purposes under this Agreement.  Each Joining Party shall indicate, on the appropriate schedule of its Joinder, the number and amount of claims held by such Joining Party, which shall be deemed to be Participating Claims of such Joining Party and shall be subject to all of the terms of this Agreement.  Upon consummation of the transfer of such Participating Claims to the Joining Party, the Joining Party hereby makes the representations and warranties of the Restructuring Support Parties set forth in Section 2 of this Agreement to the other Parties and shall be deemed to have granted the releases set forth in Section 6 of this Agreement.

(d)  Each Consenting Interest Holder agrees that, as long as this Agreement has not terminated in accordance with its terms, it shall not sell, transfer, assign or otherwise dispose of any of its Old Equity Interests.

**Section 10.  Termination.**

(a)  No Party may exercise any of its respective termination rights as set forth in Section 11, Section 12 or Section 13 hereof, as applicable, if such Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions), with such failure to perform or comply causing, or resulting in, the occurrence of the Termination Event (as defined below) specified herein.

---

[3]  For these purposes, a "*Qualified Marketmaker*" means an entity that (a) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Company and its affiliates (including debt securities or other debt) or enter with customers into long and short positions in claims against the Company and its affiliates (including debt securities or other debt), in its capacity as a dealer or market maker in such claims against the Company and its affiliates and (b) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

11

(b)  Except as provided in Section 24 of this Agreement, upon the termination of this Agreement, all Parties not in breach of this Agreement shall be released from their commitments, undertakings, and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any such Party.

(c)  Notwithstanding Section 10(b) hereof, in no event shall any termination of this Agreement relieve a Party from (i) liability for its breach or non-performance of its obligations hereunder prior to the Termination Event, including but not limited to the Debtors' obligations to timely pay the Fees and Expenses, and (ii) obligations under this Agreement which by their terms expressly survive a Termination Event.

(d)  Upon a Termination Event, other than a Termination Event arising by operation of Section 14(b), unless otherwise agreed to in writing by such Consenting Creditor, any and all votes, approvals, or consents delivered by such Consenting Creditor and, as applicable, its affiliates, subsidiaries, managed funds, representatives, agents, and employees in connection with the Restructuring prior to such Termination Event shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Debtors.

(e)  Upon a Termination Event, other than a Termination Event arising by operation of Section 14(b), the Parties shall, promptly upon the Request of the Consenting First Lien Creditors that are signatories to the Existing First Lien Facility Amendment and/or the Existing First Lien Indenture Amendment, execute further amendments to the First Lien Debt Amendments to render the First Lien Debt Amendments void *ab initio*; provided, that, for the avoidance of doubt, nothing in this Section 10(e) shall be in any way construed to mean that the terms and conditions of the First Lien Debt Amendments may be enforced against any holder of claims against the Debtors under the First Lien Term Loan or the First Lien Notes if the Effective Date does not occur.

**Section 11.  Creditor Termination Events.**  The Requisite Consenting First Lien Creditors and the Requisite Consenting Second and Third Lien Creditors, as applicable, may terminate this Agreement upon delivery by the Requisite Consenting First Lien Creditors or the Requisite Consenting Second and Third Lien Creditors, as applicable, of written notice to the Debtors in accordance with Section 20 hereof at any time after the occurrence, and subject in each case to the specific terms, of (x) any of the following with respect to the Requisite Consenting Second and Third Lien Creditors and (y) Section 11(a), Section 11(c), Section 11(d), Section 11(e), Section 11(i), Section 11(j), Section 11(k), Section 11(l) or Section 11(n) with respect to the Requisite Consenting First Lien Creditors (each of the following events, a "***Creditor Termination Event***"):

(a)  the breach by the Consenting First Lien Creditors, Consenting Third Lien Creditors, Consenting Interest Holders, or any of the Debtors of any of their obligations, representations, warranties, or covenants set forth in this Agreement which breach remains uncured for a period of five (5) consecutive business days after the receipt by such breaching Party and the Debtors of written notice of such breach from the Requisite Consenting Second and Third Lien Creditors provided, however, that the Requisite Consenting Second and Third Lien Creditors shall consult with the Debtors prior to sending any such notice of breach and provided further that the Requisite Consenting First Lien Creditors and the Requisite Consenting Second and Third Lien Creditors may not terminate this agreement on account of a Creditor Termination Event arising from a breach of any of their own obligations, representations, warranties, or covenants set forth in this Agreement; provided further that the Consenting First Lien Creditors may terminate this Agreement pursuant to this Section 11(a) only if they are materially and adversely affected by such breach (it being acknowledged and agreed that any material modification to the Chapter 11 Plan, the First Lien Debt Amendments, the Confirmation Order, or the DIP Order without

12

the applicable consents required from the Consenting First Lien Creditors shall constitute such a material adverse effect);

(b)  the issuance, promulgation, or enactment by any governmental entity, including any regulatory or licensing authority or court of competent jurisdiction, of any statute, regulation, ruling or order declaring this Agreement or any material portion hereof to be unenforceable or enjoining or otherwise restricting the consummation of a material portion of the Restructuring (including with respect to the regulatory approvals or tax treatment contemplated by the Restructuring), which action remains uncured for a period of five (5) consecutive business days after the receipt by the Debtors or the Consenting Creditors of written notice of such event;

(c)  a trustee under section 1104 of the Bankruptcy Code or an examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall have been appointed in one or more of the Chapter 11 Cases; provided, however, that this Section 11(c) shall not apply to any trustee appointed in any of the Liquidating Debtors' Chapter 11 Cases;;

(d)  the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; provided that this Section 11(d) shall not apply to the conversion of any of the Liquidating Debtors' Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(e)  without limiting Section 7(e)(iii) or 7(e)(iv) hereof, if any of the Approved Transaction Documents necessary to effectuate the Restructuring (including any amendment or modification thereof) filed with the Bankruptcy Court or otherwise finalized or effective, shall contain terms and conditions that are not materially consistent with this Agreement or shall otherwise not be on terms reasonably acceptable to the Requisite Consenting Second and Third Lien Creditors, and such material inconsistency remains uncured for a period of five (5) consecutive business days after the receipt by the Debtors of written notice or the Debtors' knowledge of such material inconsistency; provided that a Creditor Termination Event shall also occur if any of the following Approved Transaction Documents filed with the Bankruptcy Court or otherwise finalized or effective, shall not be on terms reasonably acceptable to the Requisite Consenting First Lien Creditors:

(i)  the Chapter 11 Plan, with respect to those terms and conditions, reasonably construed, that affect the rights and obligations of the Consenting First Lien Creditors thereunder;

(ii)  the First Lien Debt Amendments;

(iii)  the Confirmation Order, with respect to those terms and conditions, reasonably construed, that affect the rights and obligations of the Consenting First Lien Creditors thereunder; and

(iv)  the DIP Order, with respect to (x) those terms and conditions which, reasonably construed, affect the rights and obligations of the Consenting First Lien Creditors and (y) the Debtors' use of cash collateral.

(f)  one of the Debtors or a non-Debtor affiliate of the Debtors files any motion or pleading with the Bankruptcy Court that is materially inconsistent with this Agreement and such motion or pleading has not been withdrawn within two (2) business days of each of the Debtors' and the applicable filing party's receiving written notice from the Requisite Consenting Second and Third Lien Creditors that such motion or pleading is materially inconsistent with this Agreement;

13

(g)  the Debtors execute a letter of intent (or similar document) or publicly announce their intention to pursue a transaction or transactions other than the Restructuring;

(h)  the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any assets of the Debtors having an aggregate fair market value in excess of $5,000,000 without the written consent of the Requisite Consenting Second and Third Lien Creditors;

(i)  the Debtors cause cash to be transferred from the segregated account holding cash proceeds from the sale of assets of Kroll Factual Data, Inc. without the prior written consent of the Requisite Consenting First Lien Creditors and such cash has not been returned to such segregated account within five (5) consecutive business days after the initial transfer from such segregated account; provided that the Debtors may transfer the cash from the segregated account on the Effective Date in connection with the Debtors' repurchase of First Lien Indebtedness in accordance with the Restructuring Term Sheet;

(j)  the Debtors commence an action to challenge the validity or priority of, or to avoid, the Consenting First Lien Claims or any liens securing the First Lien Indebtedness;

(k)  upon the occurrence of (i) an event of default under the DIP Loan Agreement, subject to all applicable notice, waiver and cure provisions of the DIP Loan Agreement, or (ii) an event of default under the DIP Order, unless waived by all parties entitled to waive such event of default.;

(l)  The Debtors fail to timely pay the Fees and Expenses as provided herein, which such failure remains uncured for a period of five (5) consecutive business days after the receipt by the Debtors of written notice of such event from the Requisite Consenting First Lien Creditors and the Requisite Consenting Second and Third Lien Creditors;

(m)  the Debtors' exclusive right to file a chapter 11 plan and solicit votes thereon as provided in section 1121 of the Bankruptcy Code expires without extension by the Bankruptcy Court in a Final Order;

(n)  upon the occurrence of (x) any of the following with respect to the Requisite Consenting Second and Third Lien Creditors and (y) Section 11(n)(i), Section 11(n)(vi), Section 11(n)(x) or Section 11(n)(xi) with respect to the Requisite Consenting First Lien Creditors:

(i)  the Debtors shall not have commenced the Chapter 11 Cases on or before February 9, 2015;

(ii)  the Debtors shall not have filed the DIP Financing Motion with the Bankruptcy Court on the Commencement Date;

(iii)  the Bankruptcy Court shall not have entered the Interim DIP Order on or before the date that is 5 days from the Commencement Date;

(iv)  the Debtors shall not have filed the RSA Assumption Motion with the Bankruptcy Court on or before the date that is 5 days from the Commencement Date;

(v)  the Debtors shall not have filed the Plan, Disclosure Statement, and Disclosure Statement Motion with the Bankruptcy Court on or before the date that is 40 days from the Commencement Date;

14

(vi)  the Bankruptcy Court shall not have entered the Final DIP Order on or before the date that is 35 days from the Commencement Date;

(vii)  the Bankruptcy Court shall not have entered the RSA Assumption Order on or before the date that is 45 days from the Commencement Date;

(viii)  the Bankruptcy Court shall not have entered the Disclosure Statement Order on or before the date that is 80 days from the Commencement Date;

(ix)  the Bankruptcy Court shall not have entered the Confirmation Order on or before the date that is 140 days from the Commencement Date;

(x)  the Effective Date shall not have occurred on or before the date that is 150 days after the Commencement Date (the "*Outside Date*"); provided, that (i) the Requisite Consenting Second and Third Lien Creditors may extend the Outside Date one time for an additional 30 days in their reasonable discretion or (ii) the Debtors may extend the Outside Date one time for an additional 30 days, without duplication of any extension pursuant to Section 11(n)(x)(i), if they determine in their reasonable discretion in consultation with the Consenting First Lien Creditors and the Consenting Second and Third Lien Creditors that such extension is needed in order to provide adequate time to secure commitments to put in place the New Revolving Credit Facility; provided, however, that any extension of the Outside Date further than an additional 30 days shall require the consent of the Requisite Consenting First Lien Creditors in their sole discretion;

(xi)  the Confirmation Order shall have been reversed, vacated or otherwise materially modified in a manner inconsistent with this Agreement and the Restructuring;

**Section 12. Consenting Interest Holder Termination Events.**  This Agreement may be terminated by the Consenting Interest Holders solely as to their own rights and obligations hereunder by delivery to the other Parties of a written notice, delivered in accordance with Section 20 of this Agreement, by the Consenting Interest Holders upon the occurrence of any of the following events (each a "*Consenting Interest Holder Termination Event*"):

(a)  the breach by the Consenting First Lien Creditors, Consenting Second and Third Lien Creditors or any of the Debtors of any of their obligations, representations, warranties or covenants set forth in this Agreement which breach remains uncured for a period of five (5) consecutive business days after the receipt by such breaching Party  and the Debtors of written notice of such breach from the Consenting Interest Holders; provided, however, that the Consenting Interest Holders may not exercise the right to terminate their obligations on account of a Consenting Interest Holder Termination Event arising from a breach of any of their own obligations, representations, warranties, or covenants set forth in this Agreement; or

(b)  the issuance, promulgation, or enactment by any governmental entity, including any regulatory or licensing authority or court of competent jurisdiction, of any statute, regulation, ruling or order declaring this Agreement or any material portion hereof to be unenforceable or enjoining or otherwise restricting the consummation of a material portion of the Restructuring (including with respect to the regulatory approvals or tax treatment contemplated by the Restructuring), which action remains uncured for a period of five (5) consecutive business days after the receipt by the Debtors and the Consenting Interest Holders of written notice of such event;

15

provided that, for the avoidance of doubt, in the absence of a termination by the Consenting Creditors or the Debtors, this Agreement shall remain in full force and effect for each of such parties following any Consenting Interest Holder Termination Event.

**Section 13. Debtor Termination Events.** This Agreement may be terminated by delivery to the other Parties of a written notice, delivered in accordance with Section 21 of this Agreement, by the Debtors upon the occurrence of any of the following events (each a "*Debtor Termination Event*"):

(a)  the breach by any of the Restructuring Support Parties of any of their obligations, representations, warranties or covenants set forth in this Agreement which breach would have a material adverse effect on the Restructuring and remains uncured for a period of five (5) consecutive business days after the receipt of written notice of such breach from the Debtors, unless waived by the Debtors; provided, however, that the Debtors may not terminate this Agreement on account of a Debtor Termination Event arising from a breach of any of their own obligations, representations, warranties, or covenants set forth in this Agreement;

(b)  the issuance, promulgation, or enactment by any governmental entity, including any regulatory or licensing authority or court of competent jurisdiction, of any statute, regulation, ruling or order declaring this Agreement or any material portion hereof to be unenforceable or enjoining or otherwise restricting the consummation of a material portion of the Restructuring (including with respect to the regulatory approvals or tax treatment contemplated by the Restructuring), which action remains uncured for a period of five (5) consecutive business days after the receipt by the Debtors and the Consenting Creditors of written notice of such event; provided, that the Debtors have used commercially reasonable efforts to lift or otherwise reverse the effect of the governmental action giving rise to such Debtor Termination Event;

(c)  in the reasonable exercise of their fiduciary duties.

**Section 14. Additional Termination Events.**  This Agreement may be terminated upon the occurrence of any of the following events (each an "*Additional Termination Event*," and together with the Creditor Termination Events and the Debtor Termination Events, the "*Termination Events*"):

(a)  This Agreement may be terminated by the mutual written consent of each of the Debtors, the Requisite Consenting First Lien Creditors, the Requisite Consenting Second and Third Lien Creditors and the Consenting Interest Holders, provided that the Debtors provide notice of such termination within one (1) business day to the persons and entities listed on Schedule 1 annexed hereto, in accordance with Section 21 hereof.

(b)  This Agreement shall terminate immediately upon the occurrence of the Effective Date without any further action.

**Section 15. Good Faith Cooperation; Further Assurances; Transaction Documents.** The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Restructuring. Furthermore, each of the Parties shall take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary, or as may be required by order of the Bankruptcy Court, to carry out the purposes and intent of this Agreement.  Each of the Debtors and the Restructuring Support Parties, as applicable, hereby covenants and agrees (a) to negotiate in good faith the Approved Transaction Documents, each of which shall, except as otherwise provided for herein, (i) contain the same terms as, and otherwise be consistent in all respects with, the terms set forth in the Restructuring Term Sheet and each of the other exhibits

16

attached hereto (each as amended, supplemented or otherwise modified as provided herein), (ii) otherwise be in form and substance reasonably acceptable in all respects to the Parties (to the extent such Parties are specifically provided with consent rights over such documents pursuant to this Agreement), and (iii) be consistent with this Agreement in all respects, and (b) subject to the satisfaction of the terms and conditions set forth herein, to execute the Approved Transaction Documents (in each case to the extent such Party is contemplated to be a party thereto).

**Section 16. Specific Performance, Remedies Cumulative.** It is understood and agreed by the Parties that money damages may not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy for any such breach, including, without limitation, any order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply with any of its obligations hereunder; provided, however, that each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy and provided, further, that all rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

**Section 17. Amendments and Waivers.** This Agreement may be amended only upon written approval of each of the Debtors and the Requisite Consenting Creditors; provided, however, that: (i) any amendment to the defined terms "Consenting First Lien Creditors," "Consenting Second Lien Creditors," "Consenting Third Lien Creditors," "Requisite Consenting First Lien Creditors," "Requisite Consenting Second and Third Lien Creditors," or to Section 9 hereof or this Section 17 shall require the written consent of each of the Debtors and each of the respective Consenting Creditors included in such defined term; (ii) any amendment that would materially and adversely affect any Consenting Creditor, solely in its capacity as such, in a manner that is disproportionate to any other Consenting Creditor, solely in its capacity as such, shall require the prior written consent of such adversely affected Consenting Creditor; (iii) any amendment that would materially and adversely affect any Consenting Interest Holder shall require the prior written consent of such Consenting Interest Holder; (iv) any waiver of any condition, term or provision to this Agreement must be in writing signed by the Parties entitled to waive such condition, term or provision; and (v) any amendment to the Existing First Lien Facility Amendment and Existing First Lien Indenture Amendment shall require the written consent of each of the signatories party to such amendments.

**Section 18. Representation by Counsel.** Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

**Section 19. Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.** This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State and County of New York (the "**Chosen Courts**"). By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits itself to the exclusive jurisdiction of the Chosen Courts, generally and

17

unconditionally, with respect to any such action, suit or proceeding; provided, however, that if the Debtors commence the Chapter 11 Cases, then the Bankruptcy Court (or court of proper appellate jurisdiction) shall be the exclusive Chosen Court.  EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

**Section 20. Execution Date.**  This Agreement shall become effective, and each Party hereto shall be bound to the terms of this Agreement, as of the date the Debtors, the Consenting Interest Holders and each of the Consenting Creditors, which such Consenting Creditors shall hold (i) at least an amount of outstanding term loans and letter of credit claims under the Existing First Lien Facility sufficient to represent the Required Lenders (as defined in the Existing First Lien Facility), which such amount shall be adequate to agree to the Existing First Lien Facility Amendment pursuant to and in accordance with Section 9.08(b) of the Existing First Lien Facility, (ii) at least 66-⅔% in principal amount of Outstanding (as defined in the First Lien Indenture) Existing First Lien Notes, which such amount shall be adequate to consent to the execution and delivery of the Existing First Lien Indenture Amendment pursuant to and in accordance with Section 902(a) and Section 902(e) of the First Lien Indenture, (iii) at least 75% in outstanding principal of the Second Lien Notes, and (iv) at least 75% in outstanding principal of the Third Lien Notes, have executed and delivered a signature page to this Agreement (the "*Execution Date*"), provided that the Execution Date for any Joining Party shall be the date that such Joining Party executes its Joinder.

**Section 21. Notices.**  All demands, notices, requests, consents and other communications under this Agreement shall be in writing, sent contemporaneously to all of the Restructuring Support Parties and the Debtors, and deemed given when delivered, if delivered by hand, or upon confirmation of transmission, if delivered by email or facsimile, at the addresses and facsimile numbers set forth on **Schedule 1** hereto.

**Section 22. Reservation of Rights.**  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each Party to protect and preserve its rights, remedies and interests, including its Participating Claims and any other claims against or interests in the Debtors or other parties.  Without limiting the foregoing sentence in any way, after a Termination Event, the Parties hereto each fully reserve any and all of their respective rights, remedies, claims and interests in the case of any claim for breach of this Agreement.

**Section 23. Rule of Interpretation.**  This Agreement shall be interpreted in accordance with section 102 of the Bankruptcy Code.

**Section 24. Survival.**  Notwithstanding (i) any transfer of Participating Claims in accordance with Section 9 or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Sections 6, 7(d), 18, 19, 22, 23, 27, 28, 29, 30, 31 and 32 shall survive such sale and/or termination and shall continue in full force and effect for the benefit of the Restructuring Support Parties and the Debtors in accordance with the terms hereof; provided however that the Debtors' obligation to pay Professional Fees in Section 7(d) shall survive only with respect to those Professional Fees incurred through and including the date this Agreement is terminated.  Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible restructuring of the Debtors and in contemplation of possible filings by the Debtors under chapter 11 of the Bankruptcy Code, and (a) the exercise of the rights granted in this Agreement (including giving of notice of termination) shall not be a violation of the automatic stay provisions of section 362 of the Bankruptcy Code and (b) the Debtors hereby waive their right to assert a contrary position in the Chapter 11 Cases, if any, with respect to the foregoing.

18

**Section 25.  Successors and Assigns; Severability.**  This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators and representatives.  The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof or the continuing validity and enforceability of such provision in any other jurisdiction.

**Section 26.  Third-Party Beneficiary.**  This Agreement is intended for the benefit of the Parties hereto and no other person or entity shall be a third party beneficiary hereof or have any rights hereunder.

**Section 27.  Counterparts; Additional Support Parties.**  This Agreement may be executed in several identical counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by facsimile, electronic mail or otherwise, each of which shall be deemed to be an original for the purposes of this paragraph.  Any holder of claims that is not already an existing Restructuring Support Party hereto may execute the Joinder and, in doing so, shall become a Joining Party and shall thereafter be deemed to be a "Restructuring Support Party" and a Party for all purposes under this Agreement.  With respect to the Participating Claims held by such Joining Party, such Joining Party hereby makes the representations and warranties of the Restructuring Support Parties set forth in  Section  2  of this Agreement to the other Parties and shall be deemed to have granted the releases set forth in  Section  6  of this Agreement.

**Section 28.  Entire Agreement.**  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations but shall not supersede the Approved Transaction Documents; provided however, that the Parties acknowledge and agree that any confidentiality agreements heretofore executed between the Debtors and any Restructuring Support Party shall continue in full force and effect as provided therein.

**Section 29.  Headings.**  The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement and shall not affect the interpretation of this Agreement.

**Section 30.  Settlement Discussions.**  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the parties hereto.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

**Section 31.  Publicity.**  During the Effective Period:

(a)  Any press release to be issued by the Debtors concerning this Agreement or the transactions described herein shall require the consent of the Requisite Consenting Creditors, which consent shall not be unreasonably withheld; provided, however, that the Debtors shall not, without receiving the prior written consent of any applicable Restructuring Support Party, (i) use the name of any Restructuring Support Party or the name of any such parties' affiliates in any press release or (ii) disclose to any person, other than the Debtors' counsel, the principal amount or percentage of any Consenting Creditor Claims held by any Restructuring Support Party or any of its respective subsidiaries.

19

(b)  The Restructuring Support Parties shall not (i) use the name of any of the Debtors in any press release or (ii) disseminate to any news media any press releases, public filings, public announcements or other communications relating to this Agreement or the transactions contemplated hereby and any amendments thereof without first (I) submitting such press releases, public filings, public announcements or other communications to counsel for the Debtors for review and (II) receiving the prior written consent of the Debtors.

(c)  The Debtors shall cause the signature pages attached to this Agreement to be redacted so as to exclude the amount of each Restructuring Support Party's Consenting Creditor Claims to the extent this Agreement is filed on the docket maintained in the Chapter 11 Cases, posted on the Debtors' website(s), or otherwise made publicly available.

Notwithstanding any of the foregoing in this Section 31, the Debtors shall be permitted to disclose at any time the execution, terms and contents of this Agreement, names of the Restructuring Support Parties, and the aggregate principal amount of, and aggregate percentage of, any class of claims held by the Restructuring Support Parties or any of their respective subsidiaries as a group and nothing contained herein shall be deemed to waive, amend or modify the terms of any confidentiality or non-disclosure agreement between the Debtors and any Restructuring Support Party.

**Section 32.  Relationship Among Parties.**  Notwithstanding anything herein to the contrary, the duties and obligations of the Restructuring Support Parties under this Agreement shall be several, not joint.  No Restructuring Support Party shall, as a result of its entering into and performing its obligations under this Agreement, be deemed to be part of a "group" (as that term is used in section 13(d) of the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder) with any of the other Restructuring Support Parties.  It is understood and agreed that no Consenting Creditor has any duty of trust or confidence in any kind or form with any other Consenting Creditor, and, except as expressly provided in this Agreement, there are no commitments among or between them.  In this regard, it is understood and agreed that any Consenting Creditor may trade in the claims or other debt or equity securities of the Debtors without the consent of the Debtors or any other Consenting Creditor, subject to applicable securities laws, the terms of this Agreement, and the terms of the documents governing the First Lien Indebtedness, the Second Lien Notes, and the Third Lien Notes; provided, however, that no Consenting Creditor shall have any responsibility for any such trading to any other entity by virtue of this Agreement.  No prior history, pattern, or practice of sharing confidences among or between the Consenting Creditors shall in any way affect or negate this understanding and agreement.

**Section 33.  Access.**  The Debtors will promptly provide the Professionals reasonable access, upon reasonable notice, during normal business hours to relevant properties, books, contracts (including any executory contracts and unexpired leases), commitments, records management and executive personnel, and advisors of the Debtors (other than with respect to materials subject to attorney-client privilege or where granting such access is prohibited by law); provided, however, that the Debtors' obligations hereunder shall be conditioned upon such Professional being party to an appropriate confidentiality agreement or undertaking; provided, further, however that any existing confidentiality agreements entered into between the Debtors and the applicable Professional shall be deemed to be appropriate.

**Section 34.  No Solicitation.**  This Agreement is not and shall not be deemed to be a solicitation for votes for the acceptance of the Chapter 11 Plan (or any other plan of reorganization) for the purposes of section 1125 and 1126 of the Bankruptcy Code or otherwise.

[*Remainder of page intentionally left blank*]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

ALTEGRITY HOLDING CORP.

By: _____

Name:    Jeffrey S. Campbell
Title:      Senior Vice President and Chief
             Financial Officer

ALTEGRITY ACQUISITION CORP.

By: _____

Name:    Jeffrey S. Campbell
Title:      Senior Vice President and Chief
             Financial Officer

ALTEGRITY, INC.

By: _____

Name:    Jeffrey S. Campbell
Title:      President and Chief Financial Officer

ALTEGRITY SECURITY CONSULTING, INC.
CVM SOLUTIONS, LLC
D, D & C, INC.
ENGENIUM CORPORATION
FDC ACQUISITION, INC.
HIRERIGHT RECORDS SERVICES, INC. (F/K/A USIS
RECORDS SERVICES, INC.)
HIRERIGHT SOLUTIONS, INC. (F/K/A USIS
COMMERCIAL SERVICES, INC.)
HIRERIGHT, INC.
HIRERIGHT TECHNOLOGIES GROUP, INC.
JOHN D. COHEN, INC.
KCMS, INC.
KROLL ASSOCIATES, INC.
KROLL BACKGROUND AMERICA, INC.
KROLL CRISIS MANAGEMENT GROUP, INC.
KROLL CYBER SECURITY, INC.
KROLL FACTUAL DATA, INC.
KROLL HOLDINGS, INC.
KROLL INC.
KROLL INFORMATION ASSURANCE, INC.
KROLL INFORMATION SERVICES, INC.
KROLL INTERNATIONAL, INC.
KROLL ONTRACK INC.
KROLL SECURITY GROUP, INC.
NATIONAL DIAGNOSTICS, INC.
ONTRACK DATA RECOVERY, INC.
THE OFFICIAL INFORMATION COMPANY
USIS INTERNATIONAL, INC.
USIS WORLDWIDE, INC.


By: _____
    Name:    Donald I. Buzinkai
    Title:     Senior Vice President, Finance and Treasurer

[Signature Page to Restructuring Support Agreement]

KIA HOLDING, LLC
KROLL RECOVERY, LLC
ALTEGRITY RISK INTERNATIONAL LLC (F/K/A
ALTEGRITY RISK CONSULTING AND SOLUTIONS, INC.)
US INVESTIGATIONS SERVICES, LLC

By: _____

    Name:    Donald I. Buzinkai
    Title:     Senior Vice President, Finance and Treasurer


ALBATROSS HOLDING COMPANY, LLC

By:  Kroll Associates, Inc., its Sole Member


By: _____

    Name:    Donald I. Buzinkai
    Title:     Senior Vice President, Finance and Treasurer


ALBATROSS MARKETING & TRADING, LLC

By: Albatross Holding Company, LLC
By: Kroll Associates, Inc., its Sole Member


By: _____

    Name:    Donald I. Buzinkai
    Title:     Senior Vice President, Finance and Treasurer


PERSONNEL RECORDS INTERNATIONAL, LLC

By: National Diagnostics, Inc., its Sole Member


By: _____

    Name:    Donald I. Buzinkai
    Title:     Senior Vice President, Finance and Treasurer

[The signature pages of the Restructuring Support Parties have been redacted.]

**SCHEDULE 1**

NOTICE ADDRESSES

---

**If to the Debtors:**

Altegrity, Inc.
7799 Leesburg Pike, Suite 1100N
Falls Church, VA 22043
Attention: Jeffrey Campbell
Fax No. (212) 539-2631

with a copy to:

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
Attn: M. Natasha Labovitz, Esq.
      Craig A. Bruens, Esq.
nlabovitz@debevoise.com
cabruens@debevoise.com


**If to a Restructuring Support Party:**

To the Notice Party designated on each Restructuring Support Party's Signature Page or Joinder

with a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY, 10019
Attn: Andrew N. Rosenberg, Esq.
      Brian S. Hermann, Esq.
arosenberg@paulweiss.com
bhermann@paulweiss.com

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attn: Patrick J. Nash Jr., Esq.
      Ryan Preston Dahl, Esq.
      Justin Ryan Bernbrock, Esq.
patrick.nash@kirkland.com
rdahl@kirkland.com
justin.bernbrock@kirkland.com


Weil, Gotshal & Manges, LLP
757 Fifth Avenue
New York, NY 10153
Attn: Marcia Goldstein, Esq.
      Jacqueline Marcus, Esq.
marcia.goldstein@weil.com
jacqueline.marcus@weil.com

**EXHIBIT A**

RESTRUCTURING TERM SHEET

**ALTEGRITY**

**Restructuring Term Sheet**
**Summary of Terms and Conditions**

This term sheet (the "***Term Sheet***") summarizes certain principal terms and conditions of a proposed restructuring (the "***Restructuring***") of the debt obligations and equity ownership of the Company (as defined below). This Term Sheet is intended as a summary for discussion purposes only and does not constitute a commitment, obligation or agreement of or by the Company or any holder of the Company's debt obligations or equity interests, nor does it constitute an offer of securities or a solicitation of acceptances or rejections of any chapter 11 plan. Any commitment, obligation or agreement of such parties shall arise only upon execution by them of a definitive written agreement. This Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions and is entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408.

| Company | Altegrity Holding Corp., a Delaware corporation ("***Holdings***", and, together with its direct and indirect subsidiaries, the "***Company***"). |
| --- | --- |
| **Consenting First Lien Creditors** | "***Consenting First Lien Term Loan Lenders***" means those First Lien Lenders (defined below) that are signatories to the RSA (as defined below), in their capacities as such. <br><br> "***Consenting First Lien Note Creditors***" means those holders of First Lien Notes (defined below) that are signatories to the RSA, in their capacities as such. <br><br> "***Consenting First Lien Creditors***" means, collectively, the Consenting First Lien Term Loan Lenders and the Consenting First Lien Note Creditors. |
| **Consenting Junior Lien Creditors** | "***Consenting Second Lien Creditors***" means those holders of Second Lien Notes (defined below) that are signatories to the RSA, in their capacities as such. <br><br> "***Consenting Third Lien Creditors***" means those holders of Third Lien Notes (defined below) that are signatories to the RSA, in their capacities as such. <br><br> "***Consenting Junior Lien Creditors***" means, collectively, the Consenting Second Lien Creditors and Consenting Third Lien Creditors. |
| **DIP Lenders** | "***DIP Lenders***" means those Consenting Junior Lien Creditors that provide financing under the DIP Loan Agreement (as defined in and attached to the RSA), in their capacities as such, pursuant to interim and final orders (collectively, the "***DIP Order***") of the Bankruptcy Court (as defined below). |

| | |
|---|---|
| **Consenting Interest Holders** | "***Consenting Interest Holders***" means, collectively, Providence Equity Partners VI L.P. and Providence Equity Partners VI-A L.P. |
| **Restructuring Support Agreement** | The parties to this Term Sheet shall enter into a binding Restructuring Support Agreement (the "***RSA***") no later than February 2, 2015. |
| **Implementation of Restructuring** | The Restructuring will be accomplished through the amendment of the Existing First Lien Facility (as defined below), the amendment of the First Lien Indenture (as defined below) and then the filing by the entities set forth on **Exhibit A** (collectively, the "***Debtors***") of voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") commencing chapter 11 cases (the "***Chapter 11 Cases***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") to implement on a pre-arranged basis the chapter 11 plan of reorganization (or, as to the Liquidating Debtors[1], chapter 11 plan of liquidation) described herein and otherwise reasonably acceptable to the Company, the Consenting First Lien Creditors and the Consenting Junior Lien Creditors (the "***Chapter 11 Plan***").<br><br>The "***Petition Date***" shall be the date on which the Chapter 11 Cases are commenced.<br><br>The "***Effective Date***" shall be the effective date of the Chapter 11 Plan.  On the Effective Date, all Debtors except the Liquidating Debtors (the "***Reorganizing Debtors***") shall be reorganized pursuant to the Chapter 11 Plan.  Unless other treatment is agreed upon by the Consenting First Lien Creditors, the Consenting Junior Lien Creditors and the Company as provided in the RSA, on the Effective Date, the Liquidating Debtors shall be liquidated in accordance with the Chapter 11 Plan.  Reorganized Holdings shall serve as the Chapter 11 Plan administrator for the Liquidating Debtors. |
| **Current Capital Structure** | The current capital structure of the Company is as follows:<br><br>(a) Indebtedness under the Credit Agreement, dated as of July 3, 2014 (the "***Credit Agreement***"), among Altegrity Acquisition Corp., Altegrity, Inc., as the Borrower, the lenders party thereto (collectively, the "***First Lien Lenders***"), and Goldman Sachs Bank USA, as Administrative Agent and Collateral Agent, and Goldman Sachs Bank USA, Credit Suisse Securities (USA) LLC and Macquarie Capital (USA) Inc., as Joint Lead Arrangers and Joint Bookrunners, and Goldman Sachs Bank USA, as an Issuing Bank (as amended, supplemented, or modified from time to time, the "***Existing First Lien Facility***") comprised of the Term Loan (the "***First Lien Term Loan***") and the Revolving Loan (the "***Revolving Loan***," and the lenders party thereto from time to time, the "***Revolving Lenders***")).  As of January 30, 2015, the |

---

[1] The "***Liquidating Debtors***" are US Investigations Services, LLC, USIS International, Inc., USIS Worldwide, Inc. and John D. Cohen, Inc.

aggregate outstanding principal amount of the First Lien Term Loan was approximately $274 million and the aggregate outstanding principal amount of the Revolving Loan was $0, with letters of credit issued and outstanding totaling $20.6 million in face value;

(b) 9.50% Senior First Lien Secured Notes due 2019 (the "*First Lien Notes*" and together with the First Lien Term Loan and the Revolving Loan, the "*First Lien Indebtedness*") issued under the Indenture, dated as of July 3, 2014, among Altegrity, Inc. as Issuer and the Guarantors from time to time parties thereto and Wilmington Trust, National Association as Trustee and Note Collateral Agent (the "*First Lien Indenture*," and together with the Existing First Lien Facility, collectively, the "*Senior Priority Documents*"). As of January 30, 2015, the aggregate outstanding principal amount of the First Lien Notes was approximately $825 million;

(c) Series 1 Senior Second Lien Secured 12.00% Cash Pay and 2.00% Pay-in-Kind Notes due 2020 (the "*Series 1 Second Lien Notes*") and Series 2 Senior Second Lien Secured 10.50% Cash Pay and 2.50% Pay-in-Kind Notes due 2020 (the "*Series 2 Second Lien Notes*," and together with the Series 1 Second Lien Notes, the "*Second Lien Notes*") issued under the Indenture, dated as of July 3, 2014, among Altegrity, Inc. as Issuer and the Guarantors from time to time parties thereto and Wilmington Trust, National Association as Trustee and Note Collateral Agent (the "*Second Lien Indenture*"). As of January 30, 2015, the aggregate outstanding principal amount of the Series 1 Second Lien Notes and Series 2 Second Lien Notes was approximately $202 million and $284 million, respectively;

(d) Senior Third Lien Secured 15.00% Pay-in-Kind Notes due 2021 (the "*Third Lien Notes*") issued under the Indenture, dated as of July 3, 2014, among Altegrity, Inc. as Issuer and the Guarantors from time to time parties thereto and Wilmington Trust, National Association as Trustee and Note Collateral Agent (the "*Third Lien Indenture*"). As of January 30, 2015, the aggregate outstanding principal amount of the Third Lien Notes was approximately $65 million.

(e) 10.50% Senior Notes due November 1, 2015 (the "*10.50% Senior Unsecured Notes*") issued under the Indenture, dated as of October 24, 2007 among US Investigations Services, Inc. and the Guarantors from time to time parties thereto and Wells Fargo Bank, N.A., as Trustee. As of January 30, 2015, the aggregate outstanding principal amount of the 10.50% Senior Unsecured Notes was approximately $11 million;

(f) 12.00% Senior Notes due November 1, 2015 (the "*12.00% Senior Unsecured Notes*" and together with the 10.50% Senior

<table>
<tr>
<td></td>
<td>

Unsecured Notes, the "*Senior Unsecured Notes*") issued under the Indenture, dated as of August 3, 2010 among Altegrity, Inc. (f/k/a US Investigations Services, Inc.) and the Guarantors from time to time parties thereto, and Wells Fargo Bank, National Association, as Trustee.  As of January 30, 2015, the aggregate outstanding principal amount of the 12.00% Senior Unsecured Notes was approximately $11 million;

(g) 11.75% Senior Subordinated Notes due May 1, 2016 (the "*Senior Subordinated Notes*," and together with the Senior Unsecured Notes, the "*Unsecured Notes*") issued under the Indenture, dated as of October 24, 2007, among US Investigations Services, Inc. and the Guarantors from time to time parties thereto and Wells Fargo Bank, N.A., as Trustee.  As of January 30, 2015, the aggregate outstanding principal amount of the Senior Subordinated Notes was approximately $29 million;

(h) 13.0% Shareholder PIK Notes due 2016 (the "*PIK Notes*") issued under the Note Purchase Agreement, dated as of August 3, 2010, among Altegrity, Inc. (f/k/a US Investigation Services, Inc.) and the purchasers party thereto.  As of January 30, 2015, the aggregate outstanding principal amount of the PIK Notes was approximately $83 million;

(i) Preferred equity interests of Holdings (the "*Old Preferred Stock*"); and

(j) Common equity interests of Holdings (the "*Old Common Stock*").

</td>
</tr>
<tr>
<td>**DIP Facility**</td>
<td>

On the Petition Date, the DIP Lenders will provide the Debtors with $90 million of a fully-funded secured multi-draw term loan debtor-in-possession financing, junior only in priority to the First Lien Indebtedness , on terms and conditions in the DIP Loan Agreement (as defined in and attached to the RSA).

Unless the obligations under the DIP Loan Agreement shall have matured prior to the Effective Date or shall have been accelerated following an Event of Default (in each of which case principal and interest due under the DIP Loan Agreement shall be payable in full in cash) or as otherwise agreed among the DIP Lenders and the Debtors, upon the Effective Date the DIP Lenders shall receive the New Second Lien Notes (as defined below) in a principal amount equal to the amount outstanding under the DIP Loan Agreement after it is fully drawn.

For the avoidance of doubt, the DIP Order shall be reasonably acceptable to the Requisite Consenting First Lien Creditors (as such term is defined in the RSA).

</td>
</tr>
</table>

| | |
|---|---|
| **New Revolving Loan; L/C Capacity** | On or prior to the Effective Date, the Company shall put in place a new revolving credit facility in an amount up to $60 million, with capacity for the issuance of letters of credit (the "*New Revolving Credit Facility*"); letters of credit issued under the Existing First Lien Facility shall be reissued under the New Revolving Credit Facility. The Existing First Lien Facility Amendment shall include an amendment that permits the liens securing the amounts outstanding under the New Revolving Credit Facility to be senior to the liens securing (x) funded First Lien Indebtedness otherwise outstanding as of the Effective Date (y) exposure with respect to letters of credit issued and outstanding under the Existing First Lien Facility as of the Effective Date, and (z) the New Second Lien Notes. |
| | The terms of the New Revolving Credit Facility, including intercreditor agreement terms, shall be on market terms, reasonably acceptable to the Requisite Consenting First Lien Creditors and Requisite Consenting Junior Lien Creditors (as such terms are defined in the RSA), in which the intercreditor agreement will, among other things, provide for a repurchase right at par solely for the benefit of the First Lien Lenders if there is an event of default under the New Revolving Credit Facility. |
| | The New Revolving Credit Facility shall be in form and substance reasonably acceptable to the Company, the Requisite Consenting First Lien Creditors and the Requisite Consenting Junior Lien Creditors. |
| **Asset Sale Proceeds** | On the next business day after the signing of the Restructuring Support Agreement, $110 million of net cash proceeds from the sales of (i) the equity of US Investigations Services, Professional Services Division, Inc. and Labat-Anderson Incorporated and (ii) the assets of Kroll Factual Data, Inc. shall be held in a segregated, interest-bearing account to be used to make par offers to ratably repurchase $110 million of First Lien Indebtedness, which repurchases shall be consummated on the Effective Date. |
| | Remaining sale proceeds shall be available to fund capital expenditures, pay the amendment fees described herein and for other permitted purposes under the Existing First Lien Facility (as amended pursuant to the Existing First Lien Facility Amendment) and the First Lien Notes (as amended pursuant to the Existing First Lien Indenture Amendment). |
| **Existing First Lien Facility Amendment** | Prior to the Petition Date, the Consenting First Lien Term Loan Lenders and the Company will deliver the Existing First Lien Facility Amendment (as defined in and attached to the RSA). |
| | In consideration for the Existing First Lien Facility Amendment, each First Lien Lender that is entitled to vote on the Existing First Lien Facility Amendment and (i) consents to the Existing First Lien Facility Amendment and (ii) is a party to the RSA, shall receive a cash fee equal to 350 bps to the extent of such lender's aggregate |

5

| | |
|---|---|
| | outstanding amount of First Lien Term Loans and participations in outstanding letters of credit (the "***Amendment Fee***"), which Amendment Fee shall be paid in full, in cash prior to the Petition Date and shall not be subject to recharacterization or avoidance regardless of whether the Effective Date occurs, provided, however, that the Amendment Fee shall be subject to disgorgement from any Consenting First Lien Creditor that has breached the RSA to the extent the RSA actually terminates and such termination is attributable to such breach.  Notwithstanding the foregoing, for the avoidance of doubt, the Consenting Interest Holders and their affiliates shall not be entitled to receive a fee in connection with the Existing First Lien Facility Amendment.<br><br>The Existing First Lien Facility Amendment shall be executed, delivered and become effective before the Petition Date.<br><br>All claims outstanding on the Effective Date under the Existing First Lien Facility (as amended pursuant to the Existing First Lien Facility Amendment) shall remain outstanding and unmodified. |
| **Existing First Lien Indenture Amendment** | Prior to the Petition Date, the Consenting First Lien Note Creditors, the Indenture Trustee under the First Lien Notes and the Company will deliver the Existing First Lien Indenture Amendment (as defined in and attached to the RSA).<br><br>There shall be no amendment fee paid in consideration of the Existing First Lien Indenture Amendment.<br><br>The Existing First Lien Indenture Amendment shall be executed, delivered and become effective before the Petition Date.<br><br>All claims outstanding on the Effective Date under the First Lien Notes (as amended pursuant to the Existing First Lien Indenture Amendment) shall remain outstanding and unmodified. |
| **Tax Attributes** | To the extent reasonably practicable and consistent with the Chapter 11 Case timing described herein and in the RSA, (i) the Chapter 11 Plan shall be structured in a manner which minimizes any current cash taxes payable as a result of the consummation of the Restructuring, and (ii) the terms of the Chapter 11 Plan and the Restructuring contemplated by this Term Sheet shall be structured to maximize the favorable tax attributes of the Reorganized Company going forward, including potentially structuring the Chapter 11 Plan as a sale of assets for tax purposes; provided that any such structuring shall not adversely affect the terms of the Restructuring contemplated herein with respect to the Company or the holders of First Lien Indebtedness, Second Lien Notes or Third Lien Notes. |

| Corporate Governance | The initial Board of Directors of reorganized Holdings will consist of five (5) members consisting of the CEO and four (4) individuals designated by the holders of a majority of the new common equity of reorganized Holdings (the "**New Common Stock**"). The Reorganized Debtors' corporate charters' bylaws and any similar documents will be acceptable to each Consenting Second Lien Creditor. |
|---|---|
| **Chapter 11 Plan Treatment of Claims and Interests** | The Chapter 11 Plan will provide for the following treatment of the following claims against and interests in the Debtors: |

<div style="padding-left:2em">

(i)   On account of their claims under the DIP Facility, the DIP Lenders shall receive a new series of Second Lien Notes (the "**New Second Lien Notes**") to be issued under the Second Lien Indenture in a principal amount equal to the amount outstanding under the DIP Facility after it is fully drawn and distributed to the DIP Lenders in accordance with this Term Sheet.  The Chapter 11 Plan shall provide that the interest rate of the New Second Lien Notes shall be 13.5% PIK, which shall become 11.5% cash pay once the Company's total leverage ratio reaches 5.0x; provided that the New Second Lien Notes (x) shall have a stated maturity that is no earlier than 6 months after the Existing First Lien Notes' maturity, and (y) shall be subject to lien subordination with respect to the Existing First Lien Facility and the First Lien Notes.

(ii)   All claims outstanding under the Existing First Lien Facility (as amended pursuant to the Existing First Lien Facility Amendment) after the receipt by the holders of such claims of par paydowns on account of the asset sales described above in accordance with the Existing First Lien Facility (as amended pursuant to the Existing First Lien Facility Amendment) shall be reinstated under section 1124 of the Bankruptcy Code.

(iii)   All claims outstanding under the First Lien Notes (as amended pursuant to the Existing First Lien Indenture Amendment) after the receipt by the holders of such claims of par paydowns on account of the asset sales described above in accordance with the Existing First Lien Indenture (as amended pursuant to the Existing First Lien Indenture Amendment) shall be reinstated under section 1124 of the Bankruptcy Code.

(iv)   On account of their allowed claims under the Second Lien Indenture, holders of Second Lien Notes (each, a "**Second Lien Noteholder**") shall receive on the Effective Date their pro rata share of 98% of the New Common Stock;

(v)   On account of their allowed claims under the Third Lien Indenture, holders of Third Lien Notes (each, a "**Third**

</div>

|  | ***Lien Noteholder***") shall receive on the Effective Date their pro rata share of 2% of the New Common Stock. |
|---|---|
|  | (vi) On account of their allowed claims, holders of general unsecured claims against the Reorganizing Debtors (including holders of Second Lien Notes and Third Lien Notes, to the extent of any unsecured deficiency claims) shall receive on the Effective Date their pro rata share of the value of any unencumbered assets, provided that the holders of Second Lien Notes and Third Lien Notes will waive any recovery on account of their unsecured deficiency claims if the class of general unsecured creditors votes in favor of the Chapter 11 Plan. |
|  | (vii) On account of their allowed claims, holders of all other unsecured claims against the Liquidating Debtors shall receive no distribution on account of their claims. |
|  | (viii) Holders of PIK Notes will receive no distribution on account thereof and such PIK Notes shall be canceled on the Effective Date. |
|  | (ix) Holders of Old Common Stock will receive no distribution on account thereof and such Old Common Stock shall be canceled on the Effective Date. |
|  | (x) Holders of Old Preferred Stock will receive no distribution on account thereof and such Old Preferred Stock shall be canceled on the Effective Date. |
| **Management Incentive Plan** | The Company shall allocate up to 10% of the common equity of the Company to be distributed under a MIP that shall provide for grants to certain members of the Company's management on terms that shall be agreed upon between the Company and the parties hereto. The common equity issued in connection with the MIP shall dilute any New Common Stock issued in the Restructuring. |

8

| | |
|---|---|
| **Executory Contracts and Unexpired Leases** | To the extent necessary, the Company will file motions to assume or reject, pursuant to section 365 of the Bankruptcy Code, certain agreements and contracts as may be mutually agreed upon by the Company and the Consenting Junior Lien Creditors, after consulting with the Consenting First Lien Creditors. The Plan will provide for the Company to assume or reject, as the case may be, executory contracts and unexpired leases identified in a Plan Supplement, as may be mutually agreed upon by the Company and the Consenting Junior Lien Creditors, after consulting with the Consenting First Lien Creditors, to the extent that any such executory contracts and unexpired leases have not been otherwise assumed or rejected. For the avoidance of doubt, and without limiting the foregoing, the Company agrees that it shall not assume any employment contract or incentive plan that includes provisions requiring payments or benefits upon a change of control as a result of the consummation of the Chapter 11 Plan unless (a) the Company obtains an advance waiver of such payments or benefits or (b) the Consenting Junior Lien Creditors consent to the assumption. |
| **Restructuring Transactions** | The Bankruptcy Court's order confirming the Chapter 11 Plan shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Chapter 11 Plan, including any mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Consenting Junior Lien Creditors, after consulting with the Consenting First Lien Creditors, reasonably determine necessary to implement the Chapter 11 Plan. |
| **Confirmation of All Cases** | If prior to confirmation of the Chapter 11 Plan, the Reorganizing Debtors determine, with the consent of the Consenting Junior Lien Creditors, after consulting with the Consenting First Lien Creditors, to seek confirmation of the Chapter 11 Plan with respect to the Reorganizing Debtors only, then each of the applicable Liquidating Debtors shall be severed from the Chapter 11 Plan, and the Chapter 11 Plan shall not apply to such Liquidating Debtors. |
| **Conditions Precedent to Closing** | The occurrence of the Effective Date shall be subject to the entry into the New Revolving Credit Facility and the satisfaction of other ordinary and customary conditions precedent as set forth in the RSA and otherwise reasonably acceptable to the Company, the Consenting First Lien Creditors and the Consenting Junior Lien Creditors. |

| | |
|---|---|
| **Releases** | To the fullest extent permitted by applicable law, the Restructuring and the Chapter 11 Plan shall include a full release from liability of the Company, the Consenting Interest Holders, the Consenting First Lien Term Loan Lenders, the Consenting First Lien Note Creditors, the Consenting Second Lien Creditors, the Consenting Third Lien Creditors, and all of their respective current and former direct and indirect equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents and other representatives) by the Company, all of its creditors and all of its interest holders, from any claims and causes of action arising from or related to the Company, the Restructuring or the Chapter 11 Cases arising on or before the Effective Date; <u>provided</u>, <u>however</u>, (i) the foregoing release shall not apply to obligations arising under the RSA or the Chapter 11 Plan, including the reinstated obligations and the obligations under the New Second Lien Notes; (ii) the foregoing release shall not be construed to prohibit a party in interest from seeking to enforce the terms of the RSA or the Chapter 11 Plan; and (iii) the foregoing release shall not apply to any indemnification or other surviving obligation or assumed contract as set forth in the RSA or the Chapter 11 Plan. |
| **Governing Law and Forum** | The law governing this Term Sheet, the RSA and other Restructuring transactions shall be that of New York and, to the extent applicable, the Bankruptcy Code. |
| **Additional Plan Provisions** | The Chapter Plan will contain other customary provisions for chapter 11 plans of this type including, without limitation, provisions dealing with retention of jurisdiction, claims allowance, exculpation, injunctions, discharge and issuance of new securities that are exempt from registration pursuant to section 1145 of the Bankruptcy Code. |

EXHIBIT A

DEBTORS

Altegrity Acquisition Corp.
Albatross Holding Company, LLC
Altegrity Holding Corp.
Albatross Marketing and Trading, LLC
Altegrity, Inc.
Altegrity Risk International LLC
Altegrity Security Consulting, Inc.
CVM Solutions, LLC
D, D & C, Inc.
Engenium Corporation
FDC Acquisition, Inc.
HireRight Records Services, Inc.
HireRight Solutions, Inc.
HireRight Technologies Group, Inc.
HireRight, Inc.
John D. Cohen, Inc.
KCMS, Inc.
KIA Holding, LLC
Kroll Associates, Inc.
Kroll Background America, Inc.
Kroll Crisis Management Group, Inc.
Kroll Cyber Security, Inc.
Kroll Factual Data, Inc.
Kroll Holdings, Inc.
Kroll Inc.
Kroll Information Assurance, Inc.
Kroll Information Services, Inc.
Kroll International, Inc.
Kroll Ontrack Inc.
Kroll Recovery LLC
Kroll Security Group, Inc.
National Diagnostics, Inc.
Ontrack Data Recovery, Inc.
Personnel Records International, LLC
The Official Information Company
US Investigations Services, LLC
USIS International, Inc.
USIS Worldwide, Inc.

**EXHIBIT B**

DIP LOAN AGREEMENT

SUPERPRIORITY DEBTOR-IN-POSSESSION
CREDIT AND GUARANTY AGREEMENT,

dated as of

February __, 2015,

among

ALTEGRITY, INC.,
as Borrower,

ALTEGRITY ACQUISTION CORP.,
as Holdings,

ALTEGRITY HOLDING CORP.,
as Parent,

THE SUBSIDIARY GUARANTORS PARTY HERETO,

each of the foregoing a Debtor and Debtor-in-Possession under Chapter 11 of the
Bankruptcy Code,

THE LENDERS PARTY HERETO,

and

Cantor Fitzgerald Securities,
as DIP Agent

# TABLE OF CONTENTS

**Page**

ARTICLE I Definitions ........................................................................................1

Section 1.01    Defined Terms ..............................................................................1

Section 1.02    Terms Generally ...........................................................................30

Section 1.03    [Reserved]....................................................................................30

Section 1.04    Rounding......................................................................................30

Section 1.05    References to Agreements and Laws...................................................30

Section 1.06    Times of Day ................................................................................30

Section 1.07    Timing of Payment or Performance ....................................................30

ARTICLE II The Credits ......................................................................................31

Section 2.01    Commitments................................................................................31

Section 2.02    Loans; Drawing ............................................................................31

Section 2.03    Drawing Procedure ........................................................................32

Section 2.04    Evidence of Debt; Repayment of Loans ...............................................32

Section 2.05    Fees ...........................................................................................33

Section 2.06    Interest on Loans...........................................................................33

Section 2.07    Default Interest ............................................................................33

Section 2.08    Repayment of Term Borrowings ........................................................34

Section 2.09    Optional Prepayment ......................................................................34

Section 2.10    Mandatory Prepayments ..................................................................34

Section 2.11    Change in Circumstances .................................................................35

Section 2.12    Pro Rata Treatment ........................................................................36

Section 2.13    Sharing of Setoffs..........................................................................36

Section 2.14    Payments.....................................................................................36

Section 2.15    Taxes..........................................................................................37

Section 2.16    Assignment of Commitments under Certain Circumstances;
                Duty to Mitigate............................................................................39

ARTICLE III Representations and Warranties.............................................................40

Section 3.01    Organization; Powers......................................................................40

Section 3.02    Authorization ...............................................................................40

Section 3.03    Enforceability ...............................................................................41

Section 3.04    Governmental Approvals..................................................................41

Section 3.05    Financial Statements.......................................................................41

(i)

# TABLE OF CONTENTS
## Cont'd

**Page**

Section 3.06    No Material Adverse Change ................................................................41

Section 3.07    Title to Properties ........................................................................41

Section 3.08    Subsidiaries................................................................................42

Section 3.09    Litigation; Compliance with Laws ........................................................42

Section 3.10    Federal Reserve Regulations ..............................................................42

Section 3.11    Investment Company Act ....................................................................43

Section 3.12    Taxes......................................................................................43

Section 3.13    No Material Misstatements..................................................................43

Section 3.14    Employee Benefit Plans ....................................................................43

Section 3.15    Environmental Matters .....................................................................44

Section 3.16    Security Documents........................................................................44

Section 3.17    Location of Real Property and Leased Premises .............................................44

Section 3.18    Labor Matters.............................................................................45

Section 3.19    Intellectual Property.....................................................................45

Section 3.20    Use of Proceeds...........................................................................45

Section 3.21    No Default................................................................................45

ARTICLE IV Conditions of Lending ........................................................................45

Section 4.01    All Credit Events ........................................................................46

Section 4.02    First Credit Event........................................................................46

Section 4.03    Conditions Precedent to the Second and Final Draw .........................................48

Section 4.04    Determinations Under Article IV ..........................................................48

ARTICLE V Affirmative Covenants .........................................................................49

Section 5.01    Existence; Compliance with Laws; Businesses and Properties ................................49

Section 5.02    Insurance.................................................................................49

Section 5.03    Taxes.....................................................................................50

Section 5.04    Reports, etc. ............................................................................50

Section 5.05    Notices ..................................................................................51

Section 5.06    Information Regarding Collateral..........................................................51

Section 5.07    Maintaining Records; Access to Properties and Inspections; Maintenance of Ratings .........51

Section 5.08    Informational Budget; Liquidity..........................................................52

Section 5.09    Further Assurances .......................................................................52

Section 5.10    Bankruptcy Related Matters ...............................................................53

(ii)

# TABLE OF CONTENTS
## Cont'd

**Page**

ARTICLE VI Negative Covenants ............................................................................53

Section 6.01    Limitation on Incurrence of Indebtedness and Issuance of
Disqualified Stock and Preferred Stock .................................................53

Section 6.02    Liens ........................................................................................57

Section 6.03    Restricted Payments ..............................................................57

Section 6.04    Fundamental Changes ............................................................58

Section 6.05    Asset Sales ..............................................................................58

Section 6.06    Transactions with Affiliates ...................................................60

Section 6.07    Restrictive Agreements .........................................................62

Section 6.08    Business of the Borrower and its Subsidiaries .....................63

Section 6.09    Prepayments, Etc., of Debt ...................................................64

Section 6.10    Certain Bankruptcy Matters ..................................................64

Section 6.11    Accounting Changes .............................................................64

Section 6.12    Activities of Holdings and Parent .........................................65

ARTICLE VII Events of Default ..............................................................................66

Section 7.01    Events of Default ..................................................................66

ARTICLE VIII The DIP Agent .................................................................................70

Section 8.01    Appointment ...........................................................................70

Section 8.02    DIP Agent Individually ..........................................................70

Section 8.03    Reliance ..................................................................................71

Section 8.04    Sub-Agents .............................................................................71

Section 8.05    Resignation .............................................................................72

Section 8.06    No Representation or Reliance ...............................................73

Section 8.07    Withholding ............................................................................73

Section 8.08    Proceedings ............................................................................74

Section 8.09    Releases ..................................................................................74

ARTICLE IX Guaranty ............................................................................................74

Section 9.01    Guaranty; Limitation of Liability .........................................74

Section 9.02    Guaranty Absolute .................................................................75

Section 9.03    Waivers and Acknowledgments .............................................76

Section 9.04    Subrogation ............................................................................77

Section 9.05    Guaranty Supplements ...........................................................78

Section 9.06    Subordination .........................................................................78

Section 9.07    Continuing Guaranty; Assignments .......................................78

(iii)

# TABLE OF CONTENTS
## Cont'd

**Page**

ARTICLE X Collateral ....................................................................................78

    Section 10.01    Grant of Security Interest ...................................................78

    Section 10.02    Perfection and Priority of Security Interests .......................79

ARTICLE XI Miscellaneous ..........................................................................79

    Section 11.01    Notices ..............................................................................79

    Section 11.02    Survival of Agreement .......................................................81

    Section 11.03    Binding Effect ...................................................................81

    Section 11.04    Successors and Assigns ......................................................81

    Section 11.05    Expenses; Indemnity ..........................................................86

    Section 11.06    Right of Setoff; Payments Set Aside ..................................87

    Section 11.07    Applicable Law ..................................................................88

    Section 11.08    Waivers; Amendment .........................................................88

    Section 11.09    Interest Rate Limitation ......................................................89

    Section 11.10    Entire Agreement ...............................................................90

    Section 11.11    WAIVER OF JURY TRIAL ...............................................90

    Section 11.12    Severability ........................................................................90

    Section 11.13    Counterparts .......................................................................90

    Section 11.14    Headings .............................................................................90

    Section 11.15    Jurisdiction; Consent to Service of Process ........................91

    Section 11.16    Confidentiality ...................................................................91

    Section 11.17    Release of Collateral ..........................................................92

    Section 11.18    USA PATRIOT Act Notice ................................................92

    Section 11.19    Lender Action .....................................................................93

**Error! Unknown document property name.**

SCHEDULES

| | | |
|---|---|---|
| Schedule 1.01(a) | – | Subsidiary Guarantors |
| Schedule 1.01(b) | – | Disqualified Institutions |
| Schedule 2.01 | – | Lenders and Commitments |
| Schedule 3.04 | – | Government Approvals |
| Schedule 3.08 | – | Subsidiaries |

EXHIBITS

| | | |
|---|---|---|
| Exhibit A | – | Form of Assignment and Assumption |
| Exhibit B | – | Form of Drawing Request |
| Exhibit C | – | Form of Interim Order |
| Exhibit D | – | Form of U.S. Tax Compliance Certificate |

**Error! Unknown document property name.**

SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT dated as of February __, 2015 (as amended, waived, supplemented or otherwise modified from time to time, this "Agreement"), among ALTEGRITY, INC., a Delaware corporation (and any successor in interest thereto, the "Borrower"), ALTEGRITY ACQUISTION CORP., a Delaware corporation ("Holdings"), ALTEGRITY HOLDING CORP., a Delaware corporation ("Parent"), THE SUBSIDIARY GUARANTORS PARTY HERETO, each of the foregoing is a debtor and debtor-in-possession, THE LENDERS PARTY HERETO, and CANTOR FITZGERALD SECURITIES, as agent for the Lenders (in such capacity, "DIP Agent").  Capitalized terms used herein shall have the meanings set forth in Article I.

## RECITALS

A.    On February _, 2015 (the "Filing Date"), the Borrower and certain of its Subsidiaries and Affiliates (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (such court, together with any other court having competent jurisdiction over the cases from time to time, the "Bankruptcy Court") commencing their cases (collectively, the "Cases" and each, a "Case") and have continued in the possession and operation of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

B.    The Borrower has requested that the Lenders extend credit in the form of Loans in an aggregate principal amount not to exceed $90,000,000 and the Lenders are willing to extend such credit to the Borrower on the terms and subject to the conditions set forth herein.

Accordingly, the parties hereto agree as follows:

## ARTICLE I

## Definitions

*Section 1.01    Defined Terms.*  As used in this Agreement, the following terms shall have the meanings specified below:

"Acceptable Plan" shall mean a "Chapter 11 Plan" as defined in the Restructuring Support Agreement.

"Acquired Indebtedness" shall mean, with respect to any specified Person,

(a)    Indebtedness of any other Person existing at the time such other Person is merged with or into or became a Subsidiary of such specified Person, including Indebtedness incurred in connection with, or in contemplation of, such other Person merging with or into or becoming a Subsidiary of such specified Person, and

(b)    Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

1

"<u>Additional Guarantor</u>" shall have the meaning assigned to such term in <u>Section 9.05</u>.

"<u>Administrative Questionnaire</u>" shall mean an administrative questionnaire in a form supplied from time to time by the DIP Agent.

"<u>Affiliate</u>" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with the Person specified; <u>provided, howeve</u>r, that no Lender (nor any of its Affiliates) shall be deemed to be an Affiliate of the Borrower or any of its subsidiaries by virtue of its capacity as a Lender hereunder.

"<u>Affiliated Person</u>" shall mean any Person that is the Sponsor or an Affiliate of the Sponsor (other than Holdings, any Borrower or any of their respective Subsidiaries).

"<u>Agency Fee Letter</u>" means the Fee Letter, dated as of the date hereof, between the Borrower and the DIP Agent with respect to fees to be paid to the DIP Agent from time to time in connection with this Agreement.

"<u>Agent-Related Person</u>" shall mean the DIP Agent, together with its Affiliates, and the officers, directors, employees, agents, attorney-in-fact, partners, trustees and advisors of such Person and of such Person's Affiliates.

"<u>Agreement</u>" shall have the meaning assigned to such term in the preamble.

"<u>Anti-Corruption Laws</u>" means the United States Foreign Corrupt Practices Act of 1977 (Pub. L. No. 95 213, §§101 104), as amended, the UK Bribery Act of 2010 and any similar laws, rules or regulations issued, administered or enforced by any Governmental Authority having jurisdiction over any of Parent Holding Company, Holdings, any Loan Party or any of their respective Subsidiaries.

"<u>Anti-Money Laundering Laws</u>" means all applicable financial recordkeeping and reporting requirements and the money laundering statutes and the rules and regulations thereunder and any related or similar rules, regulations or guidelines, which in each case are issued, administered or enforced by any Governmental Authority having jurisdiction over any of Parent Holding Company, Holdings, any Loan Party or any Subsidiary thereof, or to which any Parent Holding Company, Holdings, any Loan Party or any of their respective Subsidiaries is subject.

"<u>Approved Budget</u>" shall have the meaning ascribed to such term in <u>Section 5.08</u>.

"<u>Asset Sale</u>" shall mean:

(a)    the sale, conveyance, transfer or other disposition, whether in a single transaction or a series of related transactions, of property or assets (including by

2

way of a Sale and Lease-Back Transaction) of the Borrower or any of its Subsidiaries (each referred to in this definition as a "<u>disposition</u>") other than an intercompany sale, conveyance, transfer or other disposition of property or assets between the Borrower and any of its Subsidiaries, or

(b)    the issuance or sale of Equity Interests of any Subsidiary, whether in a single transaction or a series of related transactions (other than the issuance or sale of Equity Interests of any Subsidiary to the Borrower or any of its Subsidiary Guarantors).

"<u>Assignment and Assumption</u>" shall mean an assignment and acceptance entered into by a Lender and an assignee, and accepted by the DIP Agent and, to the extent required by <u>Section 11.04(b)</u>, consented to by the Borrower, substantially in the form of Exhibit A or such other form as shall be reasonably approved by the DIP Agent.

"<u>Assignment of Claims Act of 1940</u>": 31 U.S.C. § 3727.

"<u>Bankruptcy Code</u>" has the meaning specified in the recitals to this Agreement.

"<u>Bankruptcy Court</u>" has the meaning specified in the recitals to this Agreement.

"<u>Bankruptcy Law</u>" means the Bankruptcy Code, or any similar foreign, federal or state law for the relief of debtors.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure and local rules of the Bankruptcy Court, each as amended, and applicable to the Cases.

"<u>Board</u>" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"<u>Borrower</u>" shall have the meaning assigned to such term in the preamble.

"<u>Borrowing</u>" shall mean Loans made on the same date.

"<u>Business Day</u>" shall mean any day other than a Saturday, Sunday or day on which banks in New York City are generally authorized or required by law to close.

"<u>Capital Expenditures</u>" shall mean, as to any Person for any period, the additions to property, plant and equipment and other capital expenditures of such Person and its subsidiaries that are (or should be) set forth in a consolidated statement of cash flows of the such Person.

"<u>Capital Stock</u>" shall mean:

(a)    in the case of a corporation, corporate stock;

3

(b)        in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(c)        in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(d)        any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into equity.

"Capitalized Lease Obligations" shall mean, as to any Person, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) of such Person in accordance with GAAP; provided that that any change in GAAP after the Closing Date will not cause any obligation that was not or would not have been a Capitalized Lease Obligation prior to such change to be deemed a Capitalized Lease Obligation following such change.

"Carve-Out" shall have the meaning assigned to such term in the DIP Order.

"Case" or "Cases" has the meaning specified in the recitals to this Agreement.

"Cash Equivalents" shall mean:

(a)        dollars;

(b)        (i) euro, or any national currency of any participating member state of the EMU; or

(ii)        in the case of the Borrower or a Subsidiary, such local currencies held by them from time to time in the ordinary course of business;

(c)        securities issued or directly and fully and unconditionally guaranteed or insured by the U.S. government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 24 months or less from the date of acquisition;

(d)        certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus of not less than $500,000,000 in the case of U.S. banks and $100,000,000 (or the U.S. dollar equivalent as of the date of determination) in the case of non-U.S. banks;

Error! Unknown document property name.

(e)    repurchase obligations for underlying securities of the types described in clauses (c) and (d) entered into with any financial institution meeting the qualifications specified in clause (d) above;

(f)    commercial paper rated at least P-1 by Moody's or at least A-1 by S&P and in each case maturing within 24 months after the date of creation thereof;

(g)    marketable short-term money market and similar securities having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another Rating Agency) and in each case maturing within 24 months after the date of creation thereof;

(h)    investment funds investing 95% of their assets in securities of the types described in clauses (a) through (g) above;

(i)    readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having an Investment Grade Rating from either Moody's or S&P with maturities of 24 months or less from the date of acquisition;

(j)    Indebtedness or Preferred Stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of 24 months or less from the date of acquisition; and

(k)    Investments with average maturities of 24 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clauses (a) and (b) above, provided that such amounts are converted into any currency listed in clauses (a) and (b) as promptly as practicable and in any event within ten Business Days following the receipt of such amounts.

"Change in Law" shall mean (a) the adoption of any law, rule or regulation after the date of this Agreement or, in the case of an assignee, an adoption after the date such Person became a party to this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or, in the case of an assignee, a change after the date such Person became a party to this Agreement, or (c) compliance by any Lender with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date the relevant Lender becomes a party to this Agreement; provided, however, that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and each request, rule, guideline or directive thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank of International Settlements, the Basel Committee on Banking Supervision (or any successor or similar

5

authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Chapter 11 Order" means any order entered in the Cases.

"Charges" shall have the meaning assigned to such term in Section 11.09.

"Closing Date" shall mean the date on or after the Interim Order Entry Date, but no later than three (3) Business Days after the Interim Order Entry Date, on which the conditions precedent set forth in Sections 4.01 and 4.02 shall have been satisfied or waived as provided herein.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, or any legislation successor thereto.

"Collateral" shall have the meaning assigned to such term in Section 10.01.

"Commitment" shall mean the commitment of a Lender to make Loans hereunder as set forth on Schedule 2.01 or in the applicable Assignment and Acceptance, subject to adjustments on the terms set forth herein.  The aggregate amount of the Commitments of all the Lenders as of the Closing Date is $90,000,000.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Confirmation Order" shall have the meaning assigned to such term in Section 4.01.

"Consolidated" or "consolidated" with respect to any Person, unless otherwise specifically indicated, refers to such Person consolidated with the Borrower and its consolidated Subsidiaries.

"Contingent Obligations" shall mean, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that, in each case, do not constitute Indebtedness ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent,

(a)    to purchase any such primary obligation or any property constituting direct or indirect security therefor,

(b)    to advance or supply funds

(i)    for the purchase of payment of any such primary obligation, or

Error! Unknown document property name.

(ii)      to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, or

(c)      to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled" shall have meanings correlative thereto.

"Credit Event" shall have the meaning assigned to such term in Section 4.01.

"Credit Party" shall have the meaning assigned to such term in the definition of "Excluded Taxes".

"Debtors" shall have the meaning assigned to such term in the recitals to this Agreement.

"Default" shall mean any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would constitute an Event of Default.

"Defaulting Lender" shall mean any Lender that (a) has failed (which failure has not been cured) to fund any portion of any Loans required to be funded by it hereunder on the date required to be funded by it hereunder, (b) has otherwise failed (which failure has not been cured) to pay to the DIP Agent or any other Lender any other amount required to be paid by it hereunder on the date when due, unless the subject of a good faith dispute, (c) has notified the DIP Agent and/or the Borrower that it does not intend to comply with its obligations under Sections 2.01 and 2.02 or (d) that has admitted in writing that it is insolvent or is the subject of a Lender-Related Distress Event.

"Designated Person" means a person or entity:  (a) listed in the annex to, or otherwise subject to the provisions of, the Executive Order; (b) named as a "Specially Designated National and Blocked Person" ("SDN") on the most current list published by OFAC at its official website or any replacement website or other replacement official publication of such list; or (c) in which an entity on the SDN list has 50% or greater ownership interest or that is otherwise controlled by an SDN.

"DIP Agent" has the meaning specified in the preamble to this Agreement, together with any successors and assigns in such capacity.

"DIP Liens" shall mean the Liens granted hereunder and under the other Loan Documents to secure the Obligations.

Error! Unknown document property name.

"DIP Order" shall mean the Interim Order or the Final Order or both, as the context may require.

"Disqualified Institutions" shall mean those institutions set forth on Schedule 1.01(b) hereto or any Persons who are competitors of the Borrower and its Subsidiaries as identified to the DIP Agent prior to the Closing Date and, in each case, their respective Affiliates that are readily identifiable as such by name; provided that a competitor or an Affiliate of a competitor shall not include any bona fide debt fund or investment vehicle (other than a Person that is separately identified on such list) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of business which is managed, sponsored or advised by any Person controlling, controlled by or under common control with such competitor or Affiliate thereof, as applicable, for which no personnel involved with the investment in such competitor or affiliate thereof, as applicable (a) makes (or has the right to make or participate with others in making) any investment decisions or (b) has access to any information (other than information that is publically available) relating to Parent Holding Company or any entity that forms a part of Parent Holding Company's business (including Holdings, the Borrower or any Subsidiaries thereof).

"Disqualified Stock" shall mean, with respect to any Person, any Capital Stock of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is puttable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely for Capital Stock which is not Disqualified Stock) pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (in each case, other than solely as a result of a change of control or asset sale, so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale shall be subject to the occurrence of the Termination Date or such repurchase or redemption is otherwise permitted by this Agreement (including as a result of a waiver or amendment hereunder)), in whole or in part, in each case prior to the date 91 days after the latest maturity date of the then outstanding Loans; provided, however, that if such Capital Stock is issued under any plan for the benefit of employees of the Borrower or its subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased in order to satisfy applicable statutory or regulatory obligations.

"dollars" or "$" shall mean lawful money of the United States of America.

"Domestic Subsidiaries" shall mean all subsidiaries incorporated or organized under the laws of the United States of America, any State thereof or the District of Columbia.

"Drawing" shall have the meaning assigned to such term in Section 2.01.

"Drawing Request" shall mean a request, in substantially the form of Exhibit B or such other form as shall be approved by the DIP Agent, by the Borrower to withdraw Escrow Funds in accordance with the terms of Section 2.03.

Error! Unknown document property name.

"Effective Date" shall mean the date an Acceptable Plan shall become effective.

"Eligible Assignee" shall have the meaning assigned to such term in Section 11.04(b).

"EMU" shall mean the economic and monetary union as contemplated in the Treaty on European Union.

"Environmental Laws" shall mean all applicable Federal, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives and orders (including consent orders), having the force and effect of law, in each case, relating to protection of the environment, natural resources, or to human health and safety as it relates to environmental protection or the exposure to toxic or hazardous materials.

"Equity Interests" shall mean Capital Stock and all warrants, options or other rights to acquire Capital Stock, but excluding any debt security that is convertible into, or exchangeable for, Capital Stock.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that is under common control with any Loan Party under Section 414 of the Code or Section 4001 of ERISA.

"ERISA Event" shall mean (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, but excluding any event for which the 30-day notice period is waived, with respect to a Pension Plan, (b) any "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived, or the failure to satisfy any statutory funding requirement that results in a Lien, with respect to a Pension Plan, (c) the incurrence by any Loan Party or an ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Pension Plan or the withdrawal or partial withdrawal of any Loan Party or an ERISA Affiliate from any Pension Plan or Multiemployer Plan, (d) the filing or a notice of intent to terminate, the treatment of a Pension Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the receipt by any Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice of intent to terminate any Pension Plan or Multiemployer Plan or to appoint a trustee to administer any Pension Plan, (e) the adoption of any amendment to a Pension Plan that would require the provision of security pursuant to the Code, ERISA or other applicable law, (f) the receipt by any Loan Party or any ERISA Affiliate of any notice concerning statutory liability arising from the withdrawal or partial withdrawal of any Loan Party or any ERISA Affiliate from a Multiemployer Plan or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA, (g) the occurrence of a "prohibited transaction" (within

9

the meaning of Section 4975 of the Code) with respect to which the Borrower or any Subsidiary is a "disqualified person" (within the meaning of Section 4975 of the Code) or with respect to which the Borrower or any Subsidiary could reasonably be expected to have any liability, (h) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of any Pension Plan or Multiemployer Plan or the appointment of a trustee to administer any Pension Plan or (i) any other extraordinary event or condition with respect to a Pension Plan or Multiemployer Plan which could reasonably be expected to result in a Lien or any acceleration of any statutory requirement to fund all or a substantial portion of the unfunded accrued benefit liabilities of such plan.

"Escrow Account" shall have the meaning assigned to such term in Section 2.02(b).

"Escrow Funds" shall have the meaning assigned to such term in Section 2.01.

"euro" shall mean the single currency of participating member states of the EMU.

"Event of Default" shall have the meaning assigned to such term in Article VII.

"Excluded Collateral" shall mean: (a) Equity Interests representing more than 65% of the total combined voting power of any Foreign Subsidiary; and (b) any general intangibles or other rights arising under contracts or other documents, in each case, solely to the extent that a grant of a security interest therein would either (i) require any government approval (unless such approval has been received or is excused by operation of the Bankruptcy Code) or (ii) violate any law; provided that if any of the foregoing is or becomes subject to a Lien to secure the First Lien Indebtedness, then any such assets or property shall constitute Collateral hereunder and under the DIP Order.

"Excluded Subsidiary" shall mean (a) any Subsidiary that is prohibited by applicable law, regulation or contractual obligations from guaranteeing the Obligations, or would require governmental (including regulatory) consent, approval, license or authorization to provide such guarantee, unless such consent, approval, license or authorization has been received, (b) any Foreign Subsidiary and (c) any direct or indirect Domestic Subsidiary of a direct or indirect Foreign Subsidiary.

"Excluded Taxes" shall mean, with respect to the DIP Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder (any of the foregoing, a "Credit Party"), (a) income Taxes imposed on (or measured by) such Credit Party's income and franchise (and similar) Taxes imposed on it in lieu of income Taxes pursuant to the laws of the jurisdiction in which such Credit Party is organized or in which the principal office or applicable lending office of such Credit Party is located (or any political subdivision thereof); (b) any branch profits Taxes imposed by the United States of America or any similar Tax

Error! Unknown document property name.

imposed by any other jurisdiction described in clause (a) above; (c) income Taxes imposed by reason of any connection between the jurisdiction imposing such Tax and such Credit Party, or its applicable lending office, or any branch or affiliate thereof, other than a connection arising solely from such Credit Party's having executed, delivered or performed its obligations under, or received payment under or enforced, this Agreement; (d) in the case of a recipient (other than an assignee pursuant to a request by the Borrower under Section 2.16(b)), any withholding Tax that (i) is imposed on amounts payable to such recipient at the time such recipient becomes a party to this Agreement (or designates a new lending office) or (ii) is attributable to such recipient's failure to comply with Section 2.15(e) or (f), as applicable, except in the case of clause (i) to the extent that such recipient (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.15(a); and (e) any U.S. federal withholding Taxes imposed under FATCA.

"Exclusivity Periods" shall have the meaning assigned to such term in Section 6.10(c).

"Existing Debt" means Debt of each Loan Party outstanding immediately before the occurrence of the Closing Date and with respect to any Existing Debt of $1,000,000 or more, disclosed on Schedule 6.01 of the First Lien Credit Agreement or otherwise disclosed to the Lenders prior to the Closing Date.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement entered into in connection with any of the foregoing and any fiscal or regulatory legislation, rules or practices adopted pursuant to any such intergovernmental agreement.

"Federal Funds Rate" means, for any period, a fluctuating interest rate *per annum* equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by the DIP Agent from three Federal funds brokers of recognized standing selected by it.

"Filing Date" shall have the meaning assigned to such term in the recitals to this Agreement.

"Final Draw" shall have the meaning assigned to such term in Section 2.01.

"Final Order" shall mean a final order entered by the Bankruptcy Court in substantially the same form as the Interim Order (with such changes as are approved by the DIP Agent and the Required Lenders, and which are reasonably acceptable to the DIP Agent and Required Lenders), which order shall not have been (i) vacated, reversed, or stayed or subject to a stay pending appeal, or (ii) amended or modified except as otherwise agreed to in writing by the DIP Agent and the Required Lenders in their sole discretion, and which order shall be in full force and effect.

"Final Order Entry Date" shall mean the date on which the Final Order is entered by the Bankruptcy Court.

"Financial Officer" of any Person shall mean the chief executive officer, chief financial officer, any vice president, principal accounting officer, treasurer, assistant treasurer or controller of such Person.

"First Day Orders" shall mean all orders entered or to be entered by the Bankruptcy Court granting the relief requested in the motions filed with the Bankruptcy Court on the Filing Date or within 5 days of the Filing Date or based on motions filed on or about the Filing Date, which shall be in form and substance reasonably satisfactory to the Required Lenders.

"First Lien Credit Facility" shall mean that certain Credit Agreement, dated as of July 3, 2014 (as amended to date or as hereinafter amended, waived, supplemented or otherwise modified in accordance with Section 4.02(o)), among the Borrower, the lenders party thereto, Goldman Sachs Bank U.S.A., as administrative and collateral agent, and the other parties thereto.

"First Lien Indebtedness" shall mean all Indebtedness evidenced by the First Lien Notes and all amounts outstanding under the First Lien Credit Facility.

"First Lien Indenture" shall mean that certain Indenture referenced in the definition of "First Lien Notes".

"First Lien Notes" shall mean the Borrower's 9.50% Senior Secured First Lien Notes due 2019 issued pursuant to an Indenture, dated as of the date July 3, 2014 (as amended to date or as hereinafter amended, waived, supplemented or otherwise modified in accordance with Section 4.02(o)), among the Borrower, the Subsidiaries of the Borrower named as guarantors on the signature pages thereto and Wilmington Trust, National Association, as trustee.

"Foreign Lender" shall mean any Lender or Agent that is not a United States Person within the meaning of Section 7701(a)(30) of the Code.

"Foreign Plan" shall mean any pension plan, fund or other similar program (other than a government-sponsored plan) that (a) primarily covers employees of any Loan Party and/or any of its Subsidiaries who are employed outside of the United States and (b) is subject to any statutory funding requirement as to which the failure to satisfy results in a Lien or other statutory requirement permitting any governmental authority to

Error! Unknown document property name.

accelerate the obligation of the Borrower or any Subsidiary to fund all or a substantial portion of the unfunded, accrued benefit liabilities of such plan.

"Foreign Subsidiary" shall mean any Subsidiary that (a) is not a Domestic Subsidiary or (b) is a Foreign Subsidiary Holdco.

"Foreign Subsidiary Holdco" shall mean any Subsidiary so long as such Subsidiary has no material assets other than securities of one or more Foreign Subsidiaries and Indebtedness issued by such Foreign Subsidiaries (or Subsidiaries thereof), and other assets relating to an ownership in such securities, Indebtedness or Subsidiaries.

"Foreign Subsidiary Total Assets" shall mean the total assets of Foreign Subsidiaries of the Borrower, determined on a consolidated basis in accordance with GAAP, as of the most recent balance sheet of the Borrower.

"GAAP" shall mean United States generally accepted accounting principles.

"Government Contract" shall mean any contract or subcontract to which a Loan Party or any of its Subsidiaries is a party and a counterparty is a Governmental Authority and such contract involves in part the performance of services or delivery of goods by or on behalf of a Loan Party or any of its Subsidiaries.

"Government Securities" shall mean securities that are:

(a)    direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged; or

(b)    obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America, which, in either case, are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act), as custodian with respect to any such Government Securities or a specific payment of principal of or interest on any such Government Securities held by such custodian for the account of the holder of such depository receipt; provided that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the Government Securities or the specific payment of principal of or interest on the Government Securities evidenced by such depository receipt.

"Governmental Authority" shall mean the government of the United States of America or any other nation, any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

Error! Unknown document property name.

"Guaranteed Obligations" shall have the meaning assigned to such term in Section 9.01.

"Guarantors" shall mean Holdings, Parent and the Subsidiary Guarantors.

"Guaranty" means the guaranty provided for in Article IX of this Agreement.

"Guaranty Supplement" shall have the meaning assigned to such term in Section 9.05.

"Hazardous Materials" shall mean any material, substance or waste classified, characterized or regulated as "hazardous," "toxic," "pollutant" or "contaminant" under any Environmental Laws.

"Hedging Obligations" shall mean, with respect to any Person, the obligations of such Person under any interest rate swap agreement (whether from fixed to floating or from floating to fixed), interest rate cap agreement, interest rate collar agreement, commodity swap agreement, commodity cap agreement, commodity collar agreement, foreign exchange contract, currency swap agreement or similar agreement providing for the transfer of mitigation of interest rate or currency risks either generally or under specific contingencies.

"Holdings" shall have the meaning assigned to such term in the preamble and shall include any successors to such Person or assigns.

"incur" shall have the meaning assigned to such term in Section 6.01(a).

"incurrence" shall have the meaning assigned to such term in Section 6.01(a).

"Indebtedness" shall mean, with respect to any Person, without duplication:

(a)    any indebtedness (including principal and premium) of such Person, whether or not contingent

(i)    in respect of borrowed money;

(ii)    evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof);

(iii)    representing the balance deferred and unpaid of the purchase price of any property (including Capitalized Lease Obligations), except (A) any such balance that constitutes a trade payable or similar obligation to a trade creditor, in each case accrued in the ordinary course of business and (B) liabilities accrued in the ordinary course of business; or

14

(iv)    representing any Hedging Obligations; if and to the extent that any of the foregoing Indebtedness (other than letters of credit, bankers' acceptances and Hedging Obligations) would appear as a liability upon a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(b)    to the extent not otherwise included, any obligation by such Person to be liable for, or to pay, as obligor, guarantor or otherwise, on the obligations of the type referred to in <u>clause (a)</u> of a third Person (whether or not such items would appear upon the balance sheet of such obligor or guarantor), other than by endorsement of negotiable instruments for collection in the ordinary course of business; and

(c)    to the extent not otherwise included, the obligations of the type referred to in clause (a) of a third Person secured by a Lien on any asset owned by such first Person, whether or not such Indebtedness is assumed by such first Person; <u>provide</u>d, <u>however</u>, that notwithstanding the foregoing, Indebtedness shall be deemed not to include Contingent Obligations incurred in the ordinary course of business.  The amount of Indebtedness of any person under <u>clause (c)</u> above shall be deemed to equal the lesser of (x) the aggregate unpaid amount of such Indebtedness secured by such Lien and (y) the fair market value of the property encumbered thereby as determined by such person in good faith.

"<u>Indemnified Taxes</u>" shall mean Taxes other than Excluded Taxes and Other Taxes.

"<u>Indemnitee</u>" shall have the meaning assigned to such term in <u>Section 11.05(b)</u>.

"<u>Information</u>" shall have the meaning assigned to such term in <u>Section 11.16</u>.

"<u>Initial Budget</u>" shall have the meaning assigned to such term in <u>Section 4.02(q)</u>.

"<u>Initial Draw</u>" shall have the meaning assigned to such term in <u>Section 2.01</u>.

"<u>Interim Order</u>" shall mean an interim order, substantially in the form of <u>Exhibit C</u>, with such changes as are acceptable to the Required Lenders and DIP Agent, (I) authorizing Debtors (A) to obtain post-petition financing hereunder and (B) to utilize cash collateral, (II) granting adequate protection to prepetition secured parties and (III) scheduling a final hearing, to be entered by the Bankruptcy Court on or about the date hereof.

"<u>Interim Order Entry Date</u>" shall mean the date on which the Interim Order is entered by the Bankruptcy Court.

Error! Unknown document property name.

"<u>Investment Grade Rating</u>" shall mean a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency.

"<u>Investment Grade Securities</u>" shall mean:

(a)    securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (other than Cash Equivalents);

(b)    debt securities or debt instruments with an Investment Grade Rating, but excluding any debt securities or instruments constituting loans or advances among the Borrower and its Subsidiaries;

(c)    investments in any fund that invests exclusively in investments of the type described in <u>clauses (a)</u> and <u>(b)</u> which fund may also hold immaterial amounts of cash pending investment or distribution; and

(d)    corresponding instruments in countries other than the United States customarily utilized for high quality investments.

"<u>Investments</u>" shall mean, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances, issuances of letters of credit or similar financial accommodations or capital contributions (excluding accounts receivable, trade credit, advances to customers, commission, travel and similar advances to directors, officers and employees, in each case made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet (excluding the footnotes) of such Person in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property.

"<u>IRS</u>" shall have the meaning assigned to such term in <u>Section 2.15(e)</u>.

"<u>Lender-Related Distress Event</u>" shall mean, respect to any Lender (each, a "<u>Distressed Person</u>"), a voluntary or involuntary case with respect to such Distressed Person under any debt relief law, or a custodian, conservator, receiver or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, or such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Person to be, insolvent or bankrupt; <u>provided</u> that a Lender-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any equity interests in any Agent or Lender or any person that directly or indirectly controls such Lender by a Governmental Authority or an instrumentality thereof.

Error! Unknown document property name.

"Lenders" shall mean (a) the Persons listed on Schedule 2.01 (other than any such Person that has ceased to be a party hereto pursuant to an Assignment and Assumption or pursuant to Section 2.16(a)) and (b) any Person that has become a party hereto pursuant to an Assignment and Assumption.

"Lien" shall mean, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest, preference, priority or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the UCC (or equivalent statutes) of any jurisdiction; provided that in no event shall an operating lease be deemed to constitute a Lien.

"Limited Non-Guarantor Debt Exceptions" shall have the meaning assigned to such term in Section 6.01(g).

"Loan Documents" shall mean this Agreement, the Security Documents and the promissory notes, if any, executed and delivered pursuant to Section 2.04(e).

"Loan Parties" shall mean the Borrower and the Guarantors.

"Loans" shall mean the loans made by the Lenders to the Borrower under Section 2.02 hereof.

"Margin Stock" shall have the meaning assigned to such term in Regulation U.

"Material Adverse Effect" shall mean a material adverse effect (i) on the business, operations, assets, financial condition or results of operations of Holdings, the Borrower and its Subsidiaries, taken as a whole (other than as a result of the commencement of the Cases and the continuation thereof) or (ii) on any material rights and remedies available to the DIP Agent and the Lenders under any Loan Document, taken as a whole.

"Maturity Date" shall mean the earliest to occur of (a) the date that is 180 days from the Filing Date, (b) the date that is forty-five (45) days following the Interim Order Entry Date if the Final Order Entry Date  (or such later date as the Required Lenders may agree) shall not have occurred by such date, (c) the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of a confirmed plan of reorganization or liquidation in any of the Cases, including the Effective Date, (d) the date the Bankruptcy Court dismisses any of the Cases or orders the conversion of any of the Cases to a chapter 7 liquidation, unless the enforcement of such order has been stayed and then only for the period such stay remains effective, (e) the closing of any sale of all or substantially all of the Debtors' assets, or (f) the date the Bankruptcy Court appoints a trustee or examiner with expanded powers, or a receiver.

**Error! Unknown document property name.**

"Maximum Rate" shall have the meaning assigned to such term in Section 11.09.

"Moody's" shall mean Moody's Investors Service, Inc., or any successor thereto.

"Multiemployer Plan" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA under which the Borrower, any Subsidiary or any of their respective ERISA Affiliates has any obligation or liability (contingent or otherwise).

"Net Cash Proceeds" shall mean, but in all respects subject to the DIP Order, (a) with respect to any Asset Sale or Property Loss Event, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds subsequently received (as and when received) in respect of deferred payments or noncash consideration initially received, net of any costs relating to the disposition thereof), net of (i) out-of-pocket expenses incurred (including reasonable and customary broker's fees or commissions, professional expenses directly related to such Asset Sale or Property Loss Event required by an order of the Bankruptcy Court to paid from such proceeds, survey costs, title insurance premiums, and related search and recording charges, transfer, deed, recording and similar taxes incurred by the Borrower and its Subsidiaries in connection therewith), and the Borrower's good faith estimate of Taxes paid or payable in connection with such Asset Sale (including, in the case of any Asset Sale in respect of property of any Foreign Subsidiary, Taxes payable upon the repatriation of any such proceeds), (ii) amounts provided as a reserve, in accordance with GAAP, against any liabilities under any indemnification obligations or purchase price adjustment associated with such Asset Sale, (iii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness or other obligation which is secured by a Lien on the asset sold that has priority over the Lien securing the Obligations and which is repaid at or about the closing of such Asset Sale (other than Indebtedness secured by such asset with a Lien ranking *pari passu* or junior to the Lien securing the Obligations) and (iv) in the case of any Asset Sale or Property Loss Event by a non-Wholly-Owned Subsidiary, the pro rata portion of the Net Cash Proceeds thereof (calculated without regard to this clause (iv)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a Wholly-Owned Subsidiary as a result thereof.

"Non-Consenting Lender" shall have the meaning assigned to such term in Section 2.16(a).

"Obligations" shall mean the unpaid principal of and interest on the Loans and all other obligations and liabilities of the Borrower or any other Loan Party to the DIP Agent or any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement or any other Loan Document and whether on account of principal, interest, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the DIP Agent or any Lender that are required to be paid pursuant hereto or any other Loan Document) and including interest accruing after the maturity of the Loans or otherwise.  Obligations of any Loan Party under the Loan

Error! Unknown document property name.

Documents include the obligation of such Loan Party to reimburse any amount that any Secured Party, in its sole discretion, may elect to pay or advance on behalf of such Loan Party.

"OFAC" shall have the meaning assigned in the definition of "Sanctions Laws and Regulations".

"Officer" of any Person shall mean the Chairman of the Board, the Chief Executive Officer, the President, any Executive Vice President, the Chief Financial Officer, the Senior Vice President or Vice President, the Treasurer or the Secretary of such Person.

"Officer's Certificate" shall mean a certificate signed on behalf of the Borrower by an Officer of the Borrower, who must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Borrower, that meets the requirements set forth in this Agreement.

"Other Taxes" shall mean any and all present or future stamp or documentary taxes arising from the execution, delivery or enforcement of any Loan Document.

"Parent" shall have the meaning assigned to such term in the preamble.

"Parent Holding Company" shall mean (a) Parent, (b) Holdings, (c) any other Person that is a Subsidiary of Parent and of which the Borrower is or becomes a Subsidiary and (d) any other Person of which the Borrower becomes a Subsidiary provided that immediately after the Borrower first becomes a Subsidiary of such Person, more than 50% of the Voting Stock of such Person shall be held by one or more Persons that held more than 50% of the Voting Stock of a Parent Holding Company of the Borrower immediately prior to the Borrower first becoming such a Subsidiary.

"Participant Register" shall have the meaning assigned to such term in Section 11.04(f).

"PBGC" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"Pension Plan" shall mean any employee pension benefit plan as defined in Section 3(2) of ERISA (other than a Multiemployer Plan or Foreign Plan) that is subject to Title IV of ERISA and/or Section 412 of the Code or Section 302 of ERISA and is sponsored or maintained by any Loan Party or any ERISA Affiliate or to which any Loan Party or any ERISA Affiliate contributes or has any obligation or liability (contingent or otherwise).

"Permitted Adequate Protection Provisions" shall mean the adequate protection provisions provided for in the DIP Order with respect to the First Lien Indebtedness, the Second Lien Notes and Third Lien Notes.

19

"Permitted Investments" shall mean:

(a)    any Investment in the Borrower or any Subsidiaries of the Borrower not otherwise prohibited hereunder;

(b)    any Investment in cash and Cash Equivalents or Investment Grade Securities;

(c)    [Reserved]

(d)    any Investment in securities or other assets not constituting cash, Cash Equivalents or Investment Grade Securities and received in connection with an Asset Sale made pursuant to Section 6.05 or any other disposition of assets not constituting an Asset Sale;

(e)    any Investment existing on the Filing Date or made pursuant to binding commitments in effect on the Filing Date, or an Investment consisting of any extension, modification or renewal of any Investment existing on the Filing Date; provided, that the amount of any such Investment may be increased as required by the terms of such Investment as in existence on the Filing Date;

(f)    any Investment acquired by the Borrower or any of its Subsidiaries:

(i)    in exchange for any other Investment or accounts receivable held by the Borrower or any such Subsidiary in connection with or as a result of a bankruptcy workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable; or

(ii)    as a result of a foreclosure by the Borrower or any of its Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(g)    Hedging Obligations permitted under Section 6.01(b)(ix);

(h)    [Reserved];

(i)    [Reserved];

(j)    Indebtedness (including guarantees) permitted under Section 6.01;

(k)    [Reserved];

(l)    Investments consisting of, or to finance, purchases and acquisitions of inventory, supplies, material, services or equipment or purchases of contract rights or licenses or leases of intellectual property in the ordinary course of business;

Error! Unknown document property name.

(m)      additional Investments having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (m) that are at the time outstanding, not to exceed $5,000,000 at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(n)      [Reserved];

(o)      Loans or advances to directors, employees, officers and consultants not in excess of $250,000 outstanding at any one time in the aggregate;

(p)      loans and advances to officers, directors and employees for business related travel expenses, moving expenses and other similar expenses, in each case incurred in the ordinary course of business or consistent with past practices or to fund such Person's purchase of Equity Interests of the Borrower or any direct or indirect parent company thereof;

(q)      Investments in the ordinary course of business consisting of endorsements for collection or deposit;

(r)      receivables owing to the Borrower or any Subsidiary, if created or acquired in the ordinary course of business;

(s)      pledges or deposits (x) with respect to leases or utilities provided to third parties in the ordinary course of business or (y) otherwise described in the definition of "Permitted Liens" or made in connection with Liens permitted under Section 6.02;

(t)      any Investment in any Subsidiary or any joint venture in connection with intercompany cash management arrangements or related activities arising in the ordinary course of business; and

(u)      Investments in joint ventures outstanding as of the Filing Date;

provided, that the fair market value of all Investments in any Subsidiary that is not a Subsidiary Guarantor made pursuant to clause (a) on and after the Filing Date shall not exceed $5,000,000 in the aggregate (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value).

"Permitted Liens" shall mean, with respect to any Person:

(a)      pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for

21

contested taxes or import duties or for the payment of rent, in each case incurred in the ordinary course of business;

(b)     Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet overdue for a period of more than 30 days or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(c)     Liens for taxes, assessments or other governmental charges not yet overdue for a period of more than 30 days or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(d)     Liens in favor of the issuer of stay, customs, appeal, performance and surety bonds or bid bonds or with respect to other regulatory requirements or letters of credit issued pursuant to the request of and for the account of such Person in the ordinary course of its business;

(e)     minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(f)     Liens securing Indebtedness permitted to be incurred pursuant to Section 6.01(b)(iv), or (xvii); provided, that Liens securing Indebtedness permitted to be incurred pursuant to clause (xvii) extend only to the assets of Foreign Subsidiaries and Liens securing Indebtedness permitted to be incurred pursuant to clause (b)(iv) are solely on the assets financed, purchased, constructed, improved or acquired, as the case may be;

(g)     Liens existing on the Closing Date and either set forth on Schedule 6.02 of the First Lien Credit Agreement or otherwise disclosed to the Lenders prior to the Closing Date;

(h)     [Reserved];

(i)     Liens on property or shares of stock of a Person at the time such Person becomes a Subsidiary; provided, however, such Liens are not created or incurred in connection with, or in contemplation of, such other Person becoming such a Subsidiary; provided, further, that such Liens may not extend to any other property owned by the Borrower or any of its other Subsidiaries;

22

(j)     Liens on property at the time the Borrower or a Subsidiary acquired the property, including any acquisition by means of a merger or consolidation with or into the Borrower or any of its Subsidiaries; provided, however, that such Liens are not created or incurred in connection with, or in contemplation of, such acquisition; provided, further, that the Liens may not extend to any other property owned by the Borrower or any of its other Subsidiaries;

(k)     Liens securing Indebtedness or other obligations of the Borrower or a Subsidiary owing to the Borrower or another Subsidiary permitted to be incurred in accordance with Section 6.01(b)(vii);

(l)     Liens securing Hedging Obligations in existence on the Filing Date so long as, in the case of Hedging Obligations related to interest, the related Indebtedness is permitted to be under this Agreement and is secured by a Lien on the same property securing such Hedging Obligations;

(m)     Liens on specific items of inventory of other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(n)     leases, subleases, licenses or sublicenses granted to others in the ordinary course of business which do not materially interfere with the ordinary conduct of the business of the Borrower or any of its Subsidiaries and do not secure any Indebtedness;

(o)     Liens arising from UCC financing statement filings regarding operating leases entered into by the Borrower and its Subsidiaries in the ordinary course of business;

(p)     Liens in favor of the Borrower or any Subsidiary;

(q)     Liens on equipment of the Borrower or any of its Subsidiaries granted in the ordinary course of business;

(r)     [Reserved];

(s)     [Reserved];

(t)     deposits made in the ordinary course of business to secure liability to insurance carriers;

(u)     other Liens securing obligations which obligations do not exceed $5,000,000 at any one time outstanding;

(v)     Liens securing judgments for the payment of money not constituting an Event of Default so long as such Liens are adequately bonded and any appropriate legal proceedings that may have been duly initiated for the review of such

Error! Unknown document property name.

judgment have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(w)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(x)     Liens (i) of a collection bank arising under Section 4-210 of the UCC on items in the course of collection, (ii) attaching to securities accounts, commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business, (iii) in favor of banking institutions arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry, and (iv) in respect of set-off or similar rights granted pursuant to a contract or other instrument;

(y)     Liens deemed to exist in connection with Investments in repurchase agreements permitted under Section 6.01; provided, that such Liens do not extend to any assets other than those that are the subject of such repurchase agreement;

(z)     Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(aa)     Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and its Subsidiaries, or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(bb)     Liens securing the Obligations;

(cc)     Liens securing the First Lien Indebtedness, the Second Lien Notes and the Third Lien Notes as of the Closing Date or as otherwise provided under the DIP Order; and

(dd)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale or purchase of goods, including government furnished equipment, entered into by the Borrower or any Subsidiary in the ordinary course of business.

"Person" shall mean any natural person, corporation, business trust, joint venture, association, company, limited liability company, partnership, Governmental Authority or other entity.

Error! Unknown document property name.

"Postpetition" shall mean, when used with respect to any agreement or instrument, any claim or proceeding or any other matter, shall refer to an agreement or instrument that was entered into or became effective, a claim or proceeding that first arose or was first instituted, or another matter that first occurred, after the commencement of the Cases.

"Preferred Stock" shall mean any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution, or winding up.

"Prepayment Asset Sale" shall mean any Asset Sale pursuant to Section 6.05(u) to the extent that (a) the aggregate Net Cash Proceeds realized in a single transaction or series of related transactions exceed $1,000,000 and (b) the aggregate Net Cash Proceeds of all such Asset Sales during any fiscal year exceed $3,000,000.

"Prepetition" shall mean, when used with respect to any agreement or instrument, any claim or proceeding or any other matter, shall refer to an agreement or instrument that was entered into or became effective, a claim or proceeding that first arose or was first instituted, or another matter that first occurred, prior the commencement of the Cases.

"Prepetition Payment" shall mean a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any (i) Prepetition Indebtedness, (ii) "critical vendor payments" or (iii) trade payables (including, without limitation, in respect of reclamation claims) or any other Prepetition claims against a Debtor.

"Prepetition Primed Liens" shall mean the Liens securing the Second Lien Notes and the Third Lien Notes.

"Professional Expenses" shall mean professional fees and expenses of the Debtors and any official creditors' committee (if any) appointed by the Bankruptcy Court in the Cases.

"Projections" shall have the meaning assigned to such term in Section 3.13.

"Property Loss Event" shall mean any event that gives rise to the receipt by the Borrower or any of its Subsidiaries of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property to the extent that the aggregate Net Cash Proceeds (a) realized as a result of a single event or a series of related events exceed $1,000,000 and (b) of all such events during any fiscal year exceed $3,000,000.

"Purchase Money Obligations" means any Indebtedness incurred to finance or refinance the acquisition, leasing, construction or improvement of property (real or personal) or assets (other than Capital Stock), and whether acquired through the direct acquisition of such property or assets, or otherwise.

25

"Rating Agencies" shall mean Moody's and S&P or another nationally recognized statistical rating agency or agencies, as the case may be, selected by the Borrower which shall be substituted for Moody's or S&P or both, as the case may be.

"Register" shall have the meaning assigned to such term in Section 11.04(d).

"Regulation D" shall mean Regulation D of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation U" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation X" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Related Fund" shall mean, with respect to any Lender that is a fund or commingled investment vehicle that invests in bank loans or similar extensions of credit, any other fund that invests in bank loans or similar extensions of credit and is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"Related Parties" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, trustees, agents and advisors of such Person and such Person's Affiliates.

"Release" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment.

"Required Lenders" shall mean, at any time, Lenders having Loans and Commitments representing more than 50% of the sum of all Loans and unused Commitments at such time; provided that any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Responsible Officer" of any Person shall mean any executive officer or Financial Officer of such Person and any other officer or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement and, as to any document delivered on the Closing Date, any secretary or assistant secretary of such Person.

"Restricted Cash" shall mean, as of any date of determination, any cash proceeds from the sales of (i) the equity of US Investigations Services, Professional Services Division, Inc. and Labat-Anderson Incorporated and (ii) substantially all of the assets of Kroll Factual Data, Inc. that are then being held in a segregated account by either of the Prepetition First Lien Agents (as defined in the DIP Order) for specified purposes.

Error! Unknown document property name.

"Restricted Investment" shall mean an Investment other than a Permitted Investment.

"Restricted Payment" shall mean:

(a)    the declaration or payment of any dividend or the making of any payment or distribution on account of the Borrower's or any Subsidiary's Equity Interests (including any dividend or distribution payable in connection with any merger or consolidation) other than:

(i)    dividends or distributions payable solely in Equity Interests (other than Disqualified Stock) of the Borrower; or

(ii)    dividends or distributions by a Subsidiary so long as, in the case of any dividend or distribution payable on or in respect of any class or series of securities issued by a Subsidiary other than a Wholly-Owned Subsidiary, the Borrower or a Subsidiary receives at least its pro rata share of such dividend or distribution in accordance with its Equity Interests in such class or series of securities;

(b)    the purchase, redemption, defeasance or other acquisition or retirement for value of any Equity Interests of the Borrower or any Parent Holding Company;

(c)    the making of any principal payment on, or redemption, repurchase, defeasance or other acquisition or retirement for value in each case, prior to any scheduled repayment, sinking fund payment or maturity, of the principal amount of any Subordinated Indebtedness; and

(d)    the making of any Restricted Investment.

"Restructuring Support Agreement" shall mean the Restructuring Support Agreement, dated as of February 2, 2015 (as amended, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof), by and among the Borrower, certain holders of Second Lien Notes and the Third Lien Notes in such capacity and the other parties thereto.

"S&P" shall mean Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"Sale and Lease-Back Transaction" shall mean any arrangement providing for the leasing by the Borrower or any of its Subsidiaries of any real or tangible personal property, which property has been or is to be sold or transferred by the Borrower or such Subsidiary to a third Person in contemplation of such leasing.

"Sanctions Laws and Regulations" means (i) any sanctions or requirements imposed by, or based upon the obligations or authorities set forth in, the Executive Order No. 13224 of September 23, 2001, entitled Blocking Property and

Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, the USA PATRIOT Act, the U.S. International Emergency Economic Powers Act (50 U.S.C. §§ 1701 et seq.), the U.S. Trading with the Enemy Act (50 U.S.C. App. §§ 1 et seq.), the U.S. Syria Accountability and Lebanese Sovereignty Act, the U.S. Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 or the Iran Sanctions Act, Section 1245 of the National Defense Authorization Act of 2012, all as amended, or any of the foreign assets control regulations (including but not limited to 31 C.F.R., Subtitle B, Chapter V, as amended)  or any other law or executive order relating thereto administered by the U.S. Department of the Treasury Office of Foreign Assets Control ("OFAC"), and any similar law, regulation, or Executive Order enacted in the United States after the date of this Agreement, (ii) any sanctions or requirements imposed under similar laws or regulations enacted by the European Union or the United Kingdom and (iii) any similar Law of any jurisdiction other than the United States,  the European Union or the United Kingdom, in each case, applicable to Parent Holding Company, Holdings, any Loan Party or any their respective Subsidiaries.

"SEC" shall mean the U.S. Securities and Exchange Commission.

"Second Draw" shall have the meaning assigned to such term in Section 2.01.

"Second Lien Notes" shall mean (i) the Borrower's Series 1 Senior Second Lien Secured 12.00% Cash Pay and 2.00% Pay-in-Kind Notes due 2020 and (ii) the Borrower's Series 2 Senior Second Lien Secured 10.50% Cash Pay and 2.50% Pay-in-Kind Notes due 2020.

"Section 5.04 Financials" shall mean the financial statements delivered, or required to be delivered, pursuant to Section 5.04(a) or (b).

"Secured Indebtedness" shall mean any Indebtedness of the Borrower or any of its Subsidiaries secured by a Lien.

"Secured Parties" shall mean the DIP Agent and the Lenders.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Security Documents" shall mean the DIP Order and each of the other instruments and documents executed and delivered with respect to the Collateral pursuant to Article X, Section 5.09 or otherwise.

"Similar Business" shall mean any business conducted or proposed to be conducted by the Borrower and its Subsidiaries on the Filing Date or any business that is similar, reasonably related, incidental or ancillary thereto.

"SND" shall have meaning assigned to such term in the definition of "Designated Person".

Error! Unknown document property name.

"Sponsor" shall mean Providence Partners Inc. and its Affiliates and any investment funds advised or managed by the foregoing but not including, however, any operating portfolio companies of the foregoing.

"Subsidiary" shall mean, with respect to any Person (herein referred to as the "parent"), any corporation, partnership, limited liability company, association or other business entity of which securities or other ownership interests representing more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, owned or held by the parent, one or more subsidiaries of the parent or a combination thereof.  Unless otherwise specified, "Subsidiary" shall mean any Subsidiary of the Borrower.

"Subsidiary Guarantor" shall mean each Subsidiary listed on Schedule 1.01(a) and each other Subsidiary that is or becomes an Additional Guarantor pursuant to Article IX or otherwise, excluding any Excluded Subsidiary, and any Subsidiary that is released from all of its obligations hereunder in accordance with the terms and provisions hereof.

"Super-priority Claim" shall mean a claim against any Debtor in the Cases that is a superpriority administrative expense claim having priority over any or all administrative expenses and other Postpetition claims of the kind specified in, or otherwise arising or ordered under, any section of the Bankruptcy Code (including, without limitation, Sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c), 726, 1113 and/or 1114 thereof), whether or not such claim or expenses may become secured by a judgment lien or other non-consensual Lien, levy or attachment.

"Taxes" shall mean any and all present or future taxes, levies, imposts, duties, deductions, charges, liabilities or withholdings imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Third Lien Notes" shall mean the Borrower's Senior Third Lien Secured 15.00% Pay-in-Kind Notes due 2021.

"Total Liquidity" shall mean, at any time of determination, all cash and Cash Equivalents of the Debtors and their Domestic Subsidiaries, including all amounts held in the Escrow Account that are, on the date of determination, available to be drawn upon by the Borrower under the terms of the DIP Documents, but excluding any Restricted Cash.

"Uniform Commercial Code" or "UCC" means the Uniform Commercial Code as in effect in any applicable jurisdiction from time to time.

"USA PATRIOT Act" shall mean The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"Wholly-Owned Subsidiary" of any Person shall mean a subsidiary of such Person, 100% of the Equity Interests of which (other than directors' qualifying

Error! Unknown document property name.

shares) shall be owned by such Person or by one or more Wholly-Owned Subsidiaries of such Person.

**Section 1.02    Terms Generally**.  The definitions in <u>Section 1.01</u> shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  Unless otherwise specified, the words "fair market value" shall mean the fair market value as determined in good faith by the Borrower.  The word "will" shall be construed to have the same meaning and effect as the word "shall"; and the words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  The words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision of this Agreement unless the context shall otherwise require.  All references herein to Articles, Sections, paragraphs, clauses, subclauses, Exhibits and Schedules shall be deemed references to Articles, Sections, paragraphs, clauses and subclauses of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.

**Section 1.03    [Reserved]**.

**Section 1.04    Rounding**.  The calculation of any financial ratios under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-down if there is no nearest number).

**Section 1.05    References to Agreements and Laws**.  Unless otherwise expressly provided herein, (a) all references to documents, instruments and other agreements (including the Loan Documents and organizational documents) shall be deemed to include all subsequent amendments, restatements, amendments and restatements, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendments and restatements, supplements and other modifications are not prohibited by any Loan Document and (b) references to any law, statute, rule or regulation shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law.

**Section 1.06    Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**Section 1.07    Timing of Payment or Performance**.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day and such extension of time shall be reflected in computing interest or fees, as the case may

30

be; _provided_ that with respect to any payment of interest on or principal of Eurodollar Loans, if such extension would cause any such payment to be made in the next succeeding calendar month, such payment shall be made on the immediately preceding Business Day.

## ARTICLE II

### The Credits

      *Section 2.01   Commitments*.  Subject to the terms and conditions herein set forth, each Lender agrees, severally and not jointly, to make a Loan to the Borrower on the Closing Date in a principal amount equal to such Lender's Commitment (or such lesser amount as may be provided in the Interim Order); _provided_ that such funds (the "Escrow Funds") will be held by the DIP Agent in a segregated account pending withdrawals (each a "Drawing") by the Borrower as provided herein.  Upon the funding of the Loans on the Closing Date, the Commitments shall terminate immediately and without further action; _provided_ that if any portion of the Commitments are unavailable pursuant to the terms of the Interim Order, then the unused Commitments shall remain outstanding and available until the Second Draw, subject to entry of, and the terms of, the Final Order.  Subject to any limitations in the Interim Order, immediately following the Closing Date, the Borrower may make a single Drawing of up to, but not exceeding, $22,500,000 (such amount drawn, the "Initial Draw") of the Escrow Funds for use during the Cases as provided or permitted hereunder.  Following the Final Order Entry Date, the Borrower may make one or more Drawings of up to, but not exceeding, $45,000,000 in the aggregate less the Initial Draw (such amount drawn, the "Second Draw") of the Escrow Funds for use during the Cases as provided or permitted hereunder.  Following the Confirmation Date and immediately prior to the occurrence of the Effective Date, the Borrower may make a single Drawing for the remaining Escrow Funds (such amount drawn, the "Final Draw") to pay amounts due under, and as contemplated by, the subject Acceptable Plan upon the effectiveness thereof and for the working capital needs of the Debtors following the Effective Date.  Amounts paid or prepaid in respect of Loans may not be reborrowed.

      *Section 2.02   Loans; Drawing*.

      (a)     Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their applicable Commitments; _provided_, _however_, that the failure of any Lender to make any Loan shall not relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender).

      (b)     Subject to Section 2.03, each Lender shall make the Loans to be made by it hereunder on the proposed funding date thereof by wire transfer of immediately available funds to the account designated by the DIP Agent for such purpose (the "Escrow Account") by not later than 12:00 p.m. and, with respect to any Drawing referred to in Section 2.01, the DIP Agent shall promptly credit the applicable Drawing

Error! Unknown document property name.

amount to an account designated by the Borrower in the applicable Drawing Request. If a Borrowing or Drawing shall not occur on the proposed date because any condition precedent herein specified shall not have been met, then the amounts so received shall be returned forthwith to the respective Lenders or the Escrow Account, as applicable.

(c)    Unless the DIP Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the DIP Agent such Lender's portion of such Borrowing, the DIP Agent may assume that such Lender has made such portion available to the DIP Agent on the date of such Borrowing in accordance with paragraph (b) above and the DIP Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If the DIP Agent shall have so made funds available then, to the extent that such Lender shall not have made such portion available to the DIP Agent, such Lender and the Borrower severally agree to repay to the DIP Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower to but excluding the date such amount is repaid to the DIP Agent at a rate per annum equal to the interest rate applicable to the Loans comprising such Borrowing at the time. If such Lender shall repay to the DIP Agent such corresponding amount, such amount shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement and (x) the Borrower's obligation to repay the DIP Agent such corresponding amount pursuant to this Section 2.02(c) shall cease and (y) if the Borrower pays such amount to the DIP Agent, the amount so paid shall constitute a repayment of such Borrowing by such amount.

**Section 2.03    Drawing Procedure**. In order to request a Loan or Drawing, the Borrower shall notify the DIP Agent of such request by telephone not later than 12:00 p.m. 1 Business Day before the proposed Loan or Drawing. Each such telephonic request shall be irrevocable, shall be confirmed promptly by hand delivery, email or fax to the DIP Agent of a written notice of Borrowing or Drawing Request and shall specify the following information, as appropriate: (i) the date of such Loan or Drawing (which shall be a Business Day); (ii) the number and location of the account to which funds are to be disbursed; and (iii) the amount of such Loan or Drawing; provided, however, that notwithstanding any contrary specification in any notice or Drawing Request, each requested Loan or Drawing shall comply with the requirements set forth in Sections 2.01 and 2.02, as applicable. The DIP Agent shall promptly advise the applicable Lenders of any notice given pursuant to this Section 2.03 (and the contents thereof).

**Section 2.04    Evidence of Debt; Repayment of Loans**.

(a)    The Borrower hereby unconditionally promises to pay to the DIP Agent for the account of each Lender the principal amount of each Loan of such Lender as provided in Section 2.08.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the

32

amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

        (c)      The DIP Agent shall maintain accounts in which it will record (i) the amount of each Loan and Drawing made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the DIP Agent hereunder from the Borrower or any Guarantor and each Lender's share thereof.

        (d)      The entries made in the accounts maintained pursuant to paragraphs (b) and (c) above shall be prima facie evidence of the existence and amounts of the obligations therein recorded; provided, however, that the failure of any Lender or the DIP Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans in accordance with the terms of this Agreement.

        (e)      Any Lender may request that Loans made by it hereunder be evidenced by a promissory note. In such event, the Borrower shall (in the case of an assignment, following surrender of the assigning Lender of all such notes representing its assigned interests) execute and deliver to such Lender a promissory note payable to such Lender and its permitted registered assigns in form and substance reasonably acceptable to the DIP Agent and the Borrower. Notwithstanding any other provision of this Agreement, in the event any Lender shall request and receive such a promissory note, the interests represented by such note shall at all times (including after any assignment of all or part of such interests pursuant to Section 11.04) be represented by one or more promissory notes payable to the payee named therein or its registered assigns.

      **Section 2.05**   **Fees**. The Borrower agrees to pay to the DIP Agent, for its own account, the administrative fees set forth in the Agency Fee Letter at the times and in the amounts specified therein.

      **Section 2.06**   **Interest on Loans**.

        (a)      Subject to the provisions of Sections 2.07 and 2.08, the Loans shall accrue interest at a rate per annum equal to the 12%.

        (b)      Interest, including interest payable pursuant to Section 2.07, shall be computed on the basis of the actual number of days elapsed over a year of 360 days and shall be calculated from and including the date of the relevant Borrowing to, but excluding, the date of repayment thereof. Subject to Section 2.08, interest on each Loan shall be payable on the Maturity Date.

      **Section 2.07**   **Default Interest**. If the Borrower shall default in the payment when due of any principal of or interest on any Loan or payment of any fee or other amount due hereunder (and such fee or other amount shall remain unpaid for 30 days following the due date thereof), by acceleration or otherwise, then, until such defaulted amount shall have been paid in full, to the extent permitted by law, such overdue amount shall bear interest (after as well as before judgment), payable in cash on

Error! Unknown document property name.

demand, at the rate otherwise applicable to the Loans pursuant to Section 2.06 plus 2.00% per annum.

### Section 2.08    Repayment of Term Borrowings.

(a)    To the extent not previously paid, all Loans shall be due and payable in full and in cash on the Maturity Date, together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment; provided that if on or prior to the Maturity Date, the Effective Date of an Acceptable Plan shall have occurred, then the Loans, all interest accrued thereon and any amounts payable under Section 2.11, shall be satisfied and discharged in full by the issuance of second lien notes in an aggregate principal amount equal to such outstanding Obligations as contemplated by the Restructuring Support Agreement and such Acceptable Plan.

(b)    All repayments pursuant to this Section 2.08 shall be subject to Section 2.13 and 2.16.

### Section 2.09    Optional Prepayment.  The Borrower shall have the right at any time and from time to time to prepay the Loans, in whole or in part, together with any accrued interest thereon, upon at least 1 Business Day's prior written or fax notice by the Borrower (or telephone notice promptly confirmed by written or fax notice); provided, however, that each partial prepayment shall be in an amount that is an integral multiple of $250,000 and not less than $1,000,000.

### Section 2.10    Mandatory Prepayments.

(a)    Not later than the fifth Business Day following the receipt by the Borrower or any of its Subsidiaries of Net Cash Proceeds in respect of any Prepayment Asset Sale or Property Loss Event, the Borrower shall apply an amount equal to 100% of the Net Cash Proceeds received by the Borrower or any of its Subsidiaries with respect thereto (subject to the restrictions set forth herein) to prepay outstanding Loans, together with any accrued interest thereon (provided that the Borrower may use a portion of the Net Cash Proceeds received to prepay, repay or purchase (including an offer to purchase) First Lien Indebtedness to the extent required under the DIP Order or the documents governing such Indebtedness and, in such case, the Net Cash Proceeds available to prepay the Loans will be reduced by the portion so applied).

(b)    All prepayments required pursuant to this Section 2.10 shall be applied to the repayment of the outstanding principal balance of the Loans on a pro rata basis.

(c)    Notwithstanding any of the foregoing provisions in this Section 2.10, if the Borrower reasonably determines in good faith that any amounts attributable to Foreign Subsidiaries that are required to be applied to prepay Loans pursuant to this Section 2.10 would result in material adverse tax consequences to the Borrower or any of its Subsidiaries as set forth in a certificate delivered by a Responsible Officer of the Borrower to the DIP Agent, then the Borrower shall not be required to prepay such amounts as required hereunder; provided that the Borrower shall take

34

commercially reasonable actions to permit repatriation of the proceeds subject to such prepayments in order to effect such prepayments without incurring material adverse tax consequences.

### Section 2.11    Change in Circumstances.

(a)    If any Lender shall have determined that any Change in Law regarding capital adequacy has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made pursuant hereto to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy) by an amount deemed by such Lender to be material, then the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(b)    A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as applicable, as specified in paragraph (a) above shall be delivered to the Borrower, shall describe the applicable Change in Law, the resulting costs incurred or reduction suffered (including a calculation thereof), certifying that such Lender is generally charging such amounts to similarly situated borrowers and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate delivered by it by the later of (x) 30 days after its receipt of the same and (y) the Maturity Date (unless the Effective Date shall have occurred prior thereto).

(c)    Failure or delay on the part of any Lender or any Issuing Bank to demand compensation for any increased costs or reduction in amounts received or receivable or reduction in return on capital shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be under any obligation to compensate any Lender under paragraph (a) above with respect to increased costs or reductions with respect to any period prior to the date that is 180 days prior to such request; provided further, that the foregoing limitation shall not apply to any increased costs or reductions arising out of the retroactive application of any Change in Law within such 180-day period.  The protection of this Section shall be available to each Lender regardless of any possible contention of the invalidity or inapplicability of the Change in Law that shall have occurred or been imposed; provided that if, after the payment of any amounts by the Borrower under this Section, any Change in Law in respect of which a payment was made is thereafter determined to be invalid or inapplicable to the relevant Lender, then such Lender shall, within 30 days after such determination, repay any amounts paid to it by the Borrower hereunder in respect of such Change in Law.

(d)    Notwithstanding anything in this Section 2.11 to the contrary, this Section 2.11 shall not apply to any Change in Law with respect to Taxes, which shall be governed exclusively by Section 2.15.

(e)    Notwithstanding anything in this Section 2.11 to the contrary, the Borrower shall be relieved of any obligation to pay amounts due under this Section 2.11 in cash if the Effective Date shall have occurred as contemplated by the proviso to Section 2.08(a).

Section 2.12    *Pro Rata Treatment*.  Except as otherwise expressly set forth herein, including under Sections 2.11, 2.15 and 2.16, each Borrowing, each payment or prepayment of principal of the Loans and each payment of interest on the Loans shall be allocated pro rata among the Lenders in accordance with their respective applicable Commitments (or, if such Commitments shall have expired or been terminated, in accordance with the respective principal amounts of their respective applicable outstanding Loans).

Section 2.13    *Sharing of Setoffs*.  Each Lender agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against Borrower or any other Loan Party, or pursuant to a secured claim under Section 506 of Title 11 of the United States Code or other security or interest arising from, or in lieu of, such secured claim received by such Lender under any applicable bankruptcy, insolvency or other similar law or otherwise, or by any other means, obtain payment (voluntary or involuntary) in respect of any Loan as a result of which the unpaid principal portion of its Loans shall be proportionately less than the unpaid principal portion of the Loans of any other Lender, it shall be deemed simultaneously to have purchased from such other Lender at face value, and shall promptly pay to such other Lender the purchase price for, a participation in the Loans of such other Lender, so that the aggregate unpaid principal amount of the Loans and participations in Loans held by each Lender shall be in the same proportion to the aggregate unpaid principal amount of all Loans then outstanding as the principal amount of its Loans and prior to such exercise of banker's lien, setoff or counterclaim or other event was to the principal amount of all Loans outstanding prior to such exercise of banker's lien, setoff or counterclaim or other event; provided, however, that (i) if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.13 and the payment giving rise thereto shall thereafter be recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored without interest and (ii) the provisions of this Section 2.13 shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant.  The Borrower expressly consents to the foregoing arrangements and agrees that any Lender holding a participation in a Loan deemed to have been so purchased may exercise any and all rights of banker's lien, setoff or counterclaim with respect to any and all moneys owing by the Borrower to such Lender by reason thereof as fully as if such Lender had made a Loan directly to the Borrower in the amount of such participation.

Section 2.14    *Payments*.  The Borrower shall make each payment (including principal of or interest on any Borrowing or any fees or other amounts) hereunder and under any other Loan Document not later than 2:00 p.m. on the date when due in immediately available dollars, without setoff (except as otherwise provided

36

herein), defense or counterclaim.  Each such payment shall be paid directly to the DIP Agent at its offices in New York, New York as noted in Section 11.01 hereof, or as otherwise directed by the DIP Agent.  All payments hereunder and under the other Loan Documents shall be made in dollars.  The DIP Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.

### Section 2.15    Taxes.

(a)      Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; provided, that if any Indemnified Taxes or Other Taxes are required to be withheld or deducted from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions or withholdings (including deductions or withholdings applicable to additional sums payable under this Section) the DIP Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) such Loan Party or applicable withholding agent shall make such deductions or withholdings and (iii) such Loan Party or applicable withholding agent shall pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law.

(b)      In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)      The Borrower shall indemnify the DIP Agent and each Lender, within 30 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid or payable by the DIP Agent or such Lender, as the case may be, on or with respect to any payment by or on account of any obligation of a Loan Party hereunder or under any other Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, in each case, whether or not such Indemnified Taxes (but not Other Taxes) were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender or by the DIP Agent on behalf of itself or a Lender, shall be conclusive absent manifest error.

(d)      As soon as practicable after any payment of Indemnified Taxes or Other Taxes by any Loan Party to a Governmental Authority, the Borrower shall deliver to the DIP Agent the original or a copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the DIP Agent.

(e)      Each Foreign Lender shall (a) furnish to the Borrower (with a copy to the DIP Agent) on or before the date it becomes a party to the Agreement either (i) 2 accurate and complete originally executed copies of U.S. Internal Revenue Service

37

("IRS") Form W-8BEN or Form W-8BEN-E (or successor form), (ii) 2 accurate and complete originally executed copies of IRS Form W-8ECI (or successor form) or (iii) 2 accurate and complete originally executed copies of IRS Form W-8IMY (or successor form) together with any required attachments, certifying, in any case, to such Foreign Lender's legal entitlement to an exemption or reduction from U.S. federal withholding tax with respect to all payments hereunder and (b) provide to the Borrower (with a copy to the DIP Agent) a new Form W-8BEN or Form W-8BEN-E (or successor form), Form W-8ECI (or successor form) or Form W-8IMY (or successor form) together with any required attachments upon (i) the expiration or obsolescence of any previously delivered form to reconfirm any complete exemption from, or any entitlement to a reduction in, U.S. federal withholding tax with respect to any payment hereunder, (ii) the occurrence of any event requiring a change in the most recent form previously delivered by it and (iii) from time to time if reasonably requested by the Borrower or the DIP Agent; provided that any Foreign Lender that is relying on the so-called "portfolio interest exemption" shall also furnish a "U.S. Tax Compliance Certificate" in the form of Exhibit D together with a Form W-8BEN or Form W-8BEN-E. Notwithstanding any other provision of this paragraph, a Foreign Lender shall not be required to deliver any form pursuant to this paragraph that such Foreign Lender is not legally able to deliver.

(f)     Any Lender that is a United States Person, as defined in Section 7701(a)(30) of the Code, and the DIP Agent shall deliver to the Borrower (with a copy to the DIP Agent), at the times specified in Section 2.15(e), 2 accurate and complete original signed copies of IRS Form W-9, or any successor form that such Person is entitled to provide at such time, in order to qualify for an exemption from United States withholding requirements. Each Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide any certificate previously delivered pursuant to Section 2.15(e) or (f) to the Borrower (or any other form of certification adopted by the applicable taxing authorities for such purpose).

(g)     If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the DIP Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the DIP Agent such document prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the DIP Agent as may be necessary for the Borrower and the DIP Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for the purposes of this clause (g), "FATCA" shall include any amendments made to FATCA after the date of this Agreement, and the term "applicable law" includes FATCA.

(h)     If the DIP Agent or a Lender determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by Borrower or with respect to which a Loan Party has paid additional

amounts pursuant to this Section, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by a Loan Party under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the DIP Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that (i) the Borrower, upon the request of the DIP Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the DIP Agent or such Lender in the event the DIP Agent or such Lender is required to repay such refund to such Governmental Authority and (ii) nothing herein contained shall interfere with the right of a Lender or DIP Agent to arrange its tax affairs in whatever manner it thinks fit nor oblige any Lender or Agent to claim any tax refund or to make available its tax returns or disclose any information relating to its tax affairs or any computations in respect thereof or require any Lender or DIP Agent to do anything that would prejudice its ability to benefit from any other refunds, credits, reliefs, remissions or repayments to which it may be entitled. Notwithstanding anything to the contrary in this paragraph (h), in no event will the DIP Agent or a Lender be required to pay any amount to a Loan Party pursuant to this paragraph (h) to the extent such payment would place the DIP Agent or such Lender in a less favorable net after-Tax position than the DIP Agent or such Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.

**Section 2.16    Assignment of Commitments under Certain Circumstances; Duty to Mitigate.**

(a)    In the event (i) any Lender requests compensation pursuant to Section 2.11, (ii) [reserved], (iii) the Borrower is required to pay any amount to any Lender or any Governmental Authority on account of any Lender pursuant to Section 2.15, (iv) any Lender shall become a Defaulting Lender or (v) any Lender refuses to consent to any amendment, waiver or other modification of any Loan Document requested by the Borrower that requires the consent of all affected Lenders in accordance with the terms of Section 11.08 and such amendment, waiver or other modification is consented to by the Required Lenders (any such Lender, a "Non-Consenting Lender"), the Borrower may, at its sole cost and expense, upon notice to such Lender and the DIP Agent, replace such Lender by causing such Lender to (and such Lender shall be obligated to) assign 100% of its relevant Commitments and the principal of its relevant outstanding Loans plus any accrued and unpaid interest and fees pursuant to Section 11.04 (with the assignment fee to be waived in such instance) and all of its relevant rights and obligations under this Agreement to one or more Persons (which Persons shall otherwise be subject to the approval rights set forth in Section 11.04(b)); provided that (A) if applicable, the replacement Lender shall agree to the consent, waiver or amendment to which the Non-Consenting Lender did not agree, (B) neither the DIP Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such Person and (C) in the case of any such assignment resulting from a claim for compensation under Section 2.11 or payments required to be made pursuant to

39

Section 2.15, such assignment will result in a reduction in such compensation or payments.

Each Lender hereby grants to the DIP Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender as assignor, any Assignment and Assumption necessary to effectuate any assignment of such Lender's interests hereunder in respect of the circumstances contemplated by this Section 2.16.

(b)    If (i) any Lender requests compensation under Section 2.11, or (ii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority on account of any Lender, pursuant to Section 2.15, then, at the request of the Borrower, such Lender shall use reasonable efforts (which shall not require such Lender to take any action inconsistent with its internal policies or legal or regulatory restrictions or suffer any disadvantage or burden deemed by it to be material) (x) to file any certificate or document reasonably requested by the Borrower or (y) to assign its rights and delegate and transfer its obligations hereunder to another of its offices, branches or affiliates, if such filing or assignment would reduce its claims for compensation under Section 2.11 or would reduce amounts payable pursuant to Section 2.15, as the case may be, in the future.

## ARTICLE III

### Representations and Warranties

Each of Parent, Holdings and the Borrower represents and warrants to the DIP Agent and each of the Lenders that:

**Section 3.01    Organization; Powers**.  Parent, Holdings, the Borrower and each of their respective Subsidiaries (a) is duly organized or formed, validly existing and in good standing (where relevant) under the laws of the jurisdiction of its organization, except where the failure to exist (other than in the case of the Borrower) or be in good standing could not reasonably be expected to result in a Material Adverse Effect, (b) has all requisite power and authority to own its property and assets and to carry on its business as now conducted, except where the failure to have such power and authority could not reasonably be expected to result in a Material Adverse Effect, (c) is qualified to do business in, and is in good standing (where relevant) in, every jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except where the failure to so qualify could not reasonably be expected to result in a Material Adverse Effect, and (d) has the requisite power and authority to execute, deliver and perform its obligations under each of the Loan Documents and each other agreement or instrument contemplated thereby to which it is a party.

**Section 3.02    Authorization**.  Subject to the entry of the DIP Order, the execution, delivery and performance of the Loan Documents (a) have been duly authorized by all requisite corporate or other organizational and, if required, stockholder or member action and (b) will not (i) violate (A) any provision of (x) any applicable law,

statute, rule or regulation, or (y) of the certificate or articles of incorporation, bylaws or other constitutive documents of any Loan Party, or (B) any applicable order of any Governmental Authority or (ii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by Parent, Holdings, the Borrower or any Subsidiary (other than Liens created or permitted hereunder or under the Security Documents); except with respect to clauses (b)(i) and (b)(ii) (other than in the case of the Borrower clause (b)(i)(A)(y)), to the extent that such violation, conflict, breach, default, or creation or imposition of Lien could not reasonably be expected to result in a Material Adverse Effect.

Section 3.03   **Enforceability**.  This Agreement and each other Loan Document (when delivered) have been duly executed and delivered by each Loan Party thereto.  Subject to the entry of the DIP Order, this Agreement and each other Loan Document delivered on the Closing Date constitutes, and each other Loan Document when executed and delivered by each Loan Party thereto will constitute, a legal, valid and binding obligation of such Loan Party enforceable against such Loan Party in accordance with its terms.

Section 3.04   **Governmental Approvals**.  Except to the extent the failure to obtain or make the same could not reasonably be expected to result in a Material Adverse Effect, subject to the entry of the DIP Order, no action, consent or approval of, registration or filing with or any other action by any Governmental Authority is necessary or will be required in connection with the Loan Documents, except for such as have been made or obtained and are in full force and effect and are set forth on Schedule 3.04.

Section 3.05   **Financial Statements**.  The Borrower's unaudited consolidated balance sheets and related statements of income, stockholder's equity and cash flows as at June 30, 2014 for the period covered thereby, present fairly in all material respects the financial condition and results of operations and cash flows of the Borrower and its consolidated Subsidiaries as at such date for the period covered thereby (subject to absence of footnotes and normal year-end audit adjustments).  Such financial statements were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise noted therein.

Section 3.06   **No Material Adverse Change**.  Since the Closing Date, no event, change or condition has occurred that (individually or in the aggregate) has had, or could reasonably be expected to have, a Material Adverse Effect.

Section 3.07   **Title to Properties**.  Each of Parent, Holdings, the Borrower and its Subsidiaries has good and indefeasible title in fee simple to, or valid leasehold interests in, all its material properties and assets other than (i) minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and (ii) except where the failure to have such title or other property interests described above could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and all such material properties and assets are free and clear of Liens, other than Liens permitted by Section 6.02.

Error! Unknown document property name.

**Section 3.08    Subsidiaries**.  Schedule 3.08 of the First Lien Credit Agreement sets forth in all material respects as of the Closing Date all subsidiaries, the jurisdiction of their formation or organization, as the case may be, and the percentage ownership interest of such subsidiary's parent company therein, except as otherwise disclosed to the Lenders prior to the Closing Date.

**Section 3.09    Litigation; Compliance with Laws**.

(a)    Except as set forth on Schedule 3.09 of the First Lien Credit Agreement or as otherwise disclosed to the Lenders prior to the Closing Date, there are no actions, suits or proceedings at law or in equity or by or before any Governmental Authority now pending or, to the knowledge of the Borrower, threatened in writing against Parent, Holdings, the Borrower or any of their respective Subsidiaries or any business, property or rights of any such Person that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)    None of Parent, Holdings, the Borrower or any of their respective Subsidiaries or any of their respective material properties is in violation of any applicable law, rule or regulation, or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where any such violation or default could reasonably be expected to result in a Material Adverse Effect.

(c)    Each of Parent, Holdings, the Borrower or any of their respective Subsidiaries is in compliance in all material respects with all Anti-Money Laundering Laws, Anti-Corruption Laws and Sanction Laws and Regulations and all orders, writs, injunctions and decrees related thereto.

(d)    None of Parent, Holdings, the Borrower or any of their respective Subsidiaries, nor, to the knowledge of Parent, Holdings, the Borrower or any of their respective Subsidiaries any director, officer, agent or employee of Parent, Holdings, the Borrower or any of their respective Subsidiaries, (i) is a Designated Person or (ii) is currently subject to any U.S. sanctions administered by OFAC.  No part of the proceeds of the Loans will be used, directly or indirectly, in violation of any U.S. sanctions administered by OFAC.

(e)    No part of the proceeds of the Loans will be directly or, to the knowledge of Parent, Holdings, the Borrower or any of their respective Subsidiaries, indirectly used (i) for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977 (Pub. L. No. 95 213, §§101 104), as amended or (ii) in violation of Anti-Money Laundering Laws or Anti-Corruption Laws.

**Section 3.10    Federal Reserve Regulations**.

(a)    None of Parent, Holdings, the Borrower or any of their respective Subsidiaries is engaged principally, or as one of its important activities, in the

42

business of purchasing or carrying Margin Stock or extending credit for the purpose of purchasing or carrying Margin Stock.

(b)    No part of the proceeds of any Loan will be used (i) to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or (ii) for a purpose in violation of Regulation U or X issued by the Board.

**Section 3.11    *Investment Company Act*.**  None of Parent, Holdings, the Borrower or any of their respective Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

**Section 3.12    *Taxes*.**  Each of Parent, Holdings, the Borrower and their respective Subsidiaries has, except where the failure to so file or pay could not be reasonably expected to have a Material Adverse Effect, filed or caused to be filed all Federal, state and other Tax returns required to have been filed by or with respect to it and has paid, caused to be paid, or made provisions for the payment of all post-petition Taxes due and payable by or with respect to it and all material assessments received by or with respect to it, except such Taxes and assessments that are not overdue by more than 30 days or the amount or validity of which are being contested in good faith by appropriate proceedings and for which Parent, Holdings, the Borrower or such Subsidiary, as applicable, shall have set aside on its books adequate reserves in accordance with GAAP.

**Section 3.13    *No Material Misstatements*.**  To the knowledge of the Borrower, unless otherwise disclosed to the Lenders prior to the relevant Credit Event, all written information, reports, financial statements, exhibits and schedules furnished by or on behalf of the Borrower to the DIP Agent or the Lenders (other than projections, forecasts, pro forma data, budgets, estimates (collectively, the "Projections") and other forward looking information and information of a general economic or industry specific nature) on or prior to any Credit Event in connection with the transactions contemplated hereby (taken as a whole) does not and will not contain any material misstatement of fact or omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading.  As of the Closing Date, the Initial Budget and the Projections furnished by or on behalf of the Borrower to the DIP Agent or the Lenders were prepared in good faith on the basis of reasonable assumptions in light of the conditions existing at the time of delivery of such projections, and represented, at the time of delivery thereof, a reasonable good faith estimate of future financial performance by the Borrower (it being understood that such projections are subject to significant uncertainties and contingencies, many of which are beyond the control of the Borrower, that actual results may vary from projected results and such variances may be material and that the Borrower make no representation as to the attainability of such projections or as to whether such projections will be achieved or will materialize).

**Section 3.14    *Employee Benefit Plans*.**  No ERISA Event has occurred or could reasonably be expected to occur, that could reasonably be expected to result in a

Error! Unknown document property name.

Material Adverse Effect.  Each Pension Plan is in compliance with the applicable provisions of ERISA, the Code and/or applicable law, except for such non-compliance that could not reasonably be expected to have a Material Adverse Effect.

**Section 3.15    *Environmental Matters*.**  Except with respect to any matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, (i) Parent, Holdings, the Borrower and each of their Subsidiaries are in compliance with all applicable Environmental Laws, and have obtained, and are in compliance with, all permits required of them under applicable Environmental Laws, (ii) there are no claims, proceedings, investigations or actions by any Governmental Authority or other Person pending, or to the knowledge of the Borrower, threatened against Parent, Holdings, the Borrower or any of their Subsidiaries under any Environmental Law, (iii) neither Parent, Holdings, the Borrower nor any of their Subsidiaries has agreed to assume or accept responsibility, by contract, for any liability of any other Person under Environmental Laws and (iv) there are no facts, circumstances or conditions relating to the past or present business or operations of Parent, Holdings, the Borrower, any of their Subsidiaries, or any of their respective predecessors (including the disposal of any wastes, hazardous substances or other materials), or to any past or present assets of Parent, Holdings, the Borrower or any of their respective Subsidiaries, that could reasonably be expected to result in the Borrower or any Subsidiary incurring any claim or liability under any Environmental Law.

**Section 3.16    *Security Documents*.**  Subject to entry of the DIP Order and the terms thereof, this Agreement and the Security Documents create in favor of the Collateral Agent, for the benefit of the Secured Parties, a valid, and together with such filings and other actions (to the extent such actions are required to perfect), perfected Lien in the Collateral securing the payment of the Obligations.  All filings and other actions necessary to perfect the Liens on the Collateral created under, and in the manner contemplated by, the Security Documents have been duly made or taken or otherwise provided for in the manner reasonably requested by the Collateral Agent or to the extent required by the terms hereof or of such Security Documents.

**Section 3.17    *Location of Real Property and Leased Premises*.**

(a)    Except as otherwise disclosed to the Lenders prior to the Closing Date, <u>Schedule 3.17(a)</u> of the First Lien Credit Agreement (as updated from time to time) lists completely and correctly (in all material respects) as of the Closing Date all real property owned by Parent, Holdings, the Borrower and its Subsidiaries and the addresses thereof, to the extent reasonably available.  Except as otherwise provided in <u>Schedule 3.17(a)</u> of the First Lien Credit Agreement (as may be updated from time to time), the Borrower and its Subsidiaries own in fee all the real property set forth on such schedule, except to the extent the failure to have such title could not reasonably be expected to result in a Material Adverse Effect.

(b)    Except as otherwise disclosed to the Lenders prior to the Closing Date, <u>Schedule 3.17(b)</u> of the First Lien Credit Agreement (as updated from time to time) lists completely and correctly (in all material respects) as of the Closing Date all

Error! Unknown document property name.

real property leased by Parent, Holdings, the Borrower and its Subsidiaries and the addresses thereof.  Except as otherwise provided on Schedule 3.17(b) or otherwise disclosed to the Lenders prior to the Closing Date, of the First Lien Credit Agreement (as updated from time to time), Parent, Holdings, the Borrower and its Subsidiaries have valid leasehold interests in all the real property set forth on such schedule, except to the extent the failure to have such valid leasehold interest could not reasonably be expected to have a Material Adverse Effect.

Section 3.18    *Labor Matters*.  Except in the aggregate to the extent the same has not had and could not be reasonably expected to have a Material Adverse Effect, (a) there are no strikes, lockouts, slowdowns or other labor disputes against Parent, Holdings, the Borrower or any Subsidiary pending or, to the knowledge of the Borrower, threatened in writing, and (b) the hours worked by and payments made to employees of Parent, Holdings, the Borrower and its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters.

Section 3.19    *Intellectual Property*.  The Borrower and each of its Subsidiaries own, license or possess the right to use all intellectual property with respect to owned intellectual property, free from all Liens other than Permitted Liens, that is necessary for the operation of their respective businesses as currently conducted and as proposed to be conducted, except where the failure to have or obtain any such rights would not reasonably be expected to have a Material Adverse Effect.

Section 3.20    *Use of Proceeds*.  The proceeds of the Loans shall be used as provided in Section 5.08.  The Borrower will not request any Loan, and the Borrower will not use, and will procure that its Subsidiaries and its or their respective directors, officers, and employees shall not use, the proceeds of any Loan (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (B) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Designated Person, or in any sanctioned country, or (C) in any manner that would result in the violation of any Sanctions Laws and Regulations applicable to any party hereto.

Section 3.21    *No Default*.  No Default or Event of Default has occurred and is continuing.

## ARTICLE IV

### Conditions of Lending

The obligations of the Lenders to make Loans hereunder and the Borrower's ability to request Drawings hereunder are subject to the satisfaction of the following conditions:

**Error! Unknown document property name.**

        ***Section 4.01    All Credit Events***.  On the date of the making of each Loan or Drawing hereunder (each such event being called a "Credit Event"):

        (a)      The DIP Agent shall have received a notice of such Loan or Drawing as required by Section 2.03.

        (b)      The representations and warranties set forth in Article III and in each other Loan Document shall be true and correct in all material respects on and as of the date of such Credit Event and after giving effect thereto with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date.

        (c)      At the time of and immediately after such Credit Event, no Default or Event of Default shall have occurred and be continuing.

        (d)      The DIP Order and the Restructuring Support Agreement shall be in full force and effect, and the amount of any Loan or Drawing shall not exceed the amount authorized by the DIP Order.

        Each Credit Event shall be deemed to constitute a representation and warranty by the Borrower to the Lenders on the date of such Credit Event as to the matters specified in Sections 4.01(b) and (c).

        ***Section 4.02    First Credit Event***.  On the Closing Date:

        (a)      This Agreement and the Agency Fee Letter shall have been duly executed and delivered by the Borrower, Holdings and the other Loan Parties party hereto or thereto.

        (b)      The DIP Agent shall have received a copy of the certificate or articles of incorporation or organization, including all amendments thereto, of the Borrower, Holdings, Parent and, if reasonably requested by the DIP Agent, any material Domestic Subsidiaries, certified as of a recent date by the Secretary of State of the state of its organization, and a certificate as to the good standing of each such Loan Party as of a recent date, from such Secretary of State or similar Governmental Authority and (ii) a certificate of the Secretary or Assistant Secretary of each such Loan Party dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of the by-laws or operating (or limited liability company) agreement of such Loan Party as in effect on the Closing Date, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors (or equivalent body) of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such Person is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (C) that the certificate or articles of incorporation or organization of such Loan Party have not been amended since the date of the last amendment thereto shown on the certificate of good standing furnished pursuant to clause (i) above, and (D) as to the incumbency and specimen signature of each officer executing any Loan

Error! Unknown document property name.

Document on behalf of such Loan Party and countersigned by another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary executing the certificate pursuant to clause (ii) above.

(c)    The DIP Agent shall have received a certificate, dated the Closing Date and signed by a Responsible Officer of the Borrower, certifying compliance with the conditions precedent set forth in Sections 4.01(b) and (c).

(d)    The DIP Agent shall have received all fees and other amounts due and payable to it and the Lenders by the Borrower hereunder on or prior to the Closing Date, including, to the extent invoiced at least 1 Business Day prior to the Closing Date, reimbursement or payment of all out-of-pocket expenses and legal fees required to be reimbursed or paid by the Company hereunder or under any other Loan Document.

(e)    The DIP Agent shall have received a notice of Borrowing and a Drawing Request in accordance with Article II.

(f)    The Borrower shall have used commercially reasonable efforts to provide the DIP Agent certificates as to coverage under the insurance policies required by Section 5.02, and the DIP Agent shall have received evidence that none of the debtors' fee owned property is in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

(g)    The Lenders shall have received from the Loan Parties, to the extent requested in writing at least five Business Days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(h)    All of the First Day Orders entered by the Bankruptcy Court and all related motions submitted to the Bankruptcy Court for approval (as applicable) at or about the time of the commencement of the Cases shall be in form and substance reasonably satisfactory to the Required Lenders.

(i)    The Bankruptcy Court shall have entered the Interim Order with such changes, if any, as approved by the Required Lenders and such order shall be in full force and effect and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal.

(j)    The Loan Parties shall be in compliance in all respects with the Interim Order.

(k)    All orders entered by the Bankruptcy Court and arrangements pertaining to cash management and adequate protection shall, and all motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to the DIP Agent and the Required Lenders in their reasonable discretion.

Error! Unknown document property name.

(l)     The Loan Parties and the other parties hereto shall have executed and delivered promissory notes (if requested by any Lender) evidencing the Loans made and to be made under this Agreement.

(m)     The DIP Agent shall have received a 13-week cash budget and forecast, in form and substance reasonably acceptable to the Required Lenders, covering the period commencing with the week during which the Filing Date occurs (the "Initial Budget").

(n)     The DIP Agent shall have received fully executed copies of all amendments to the First Lien Credit Agreement, the First Lien Indenture and certain related agreements as contemplated by the Restructuring Support Agreement, including the First Lien Debt Amendments (as defined in the Restructuring Support Agreement, and such amendments shall have been approved by lenders or holders thereunder having the requisite amount of Indebtedness for such amendments to be effective. The requisite lenders or holders with respect to the First Lien Indebtedness shall not have objected to this Agreement and entry of the Interim DIP Order.

**Section 4.03   Conditions Precedent to the Second and Final Draw**.  The Borrower's ability to withdraw Escrow Funds pursuant to the Second and Final Draws shall be subject to the satisfaction or waiver by the Required Lenders of the following conditions precedent:

(a)     the Final Order in form and substance satisfactory to the Required Lenders shall have been entered within 45 days (or such later date as the Required Lenders may agree) following the Interim Order Entry Date, which order shall not have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal;

(b)     the Debtors shall be in compliance with the Final Order in all respects;

(c)     an Acceptable Plan shall have been filed with the Bankruptcy Court; and

(d)     as to the Final Draw only, the Confirmation Order shall have been entered, which order shall not have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal, and the effectiveness of the subject Acceptable Plan shall be imminent (not more than one (1) Business Day), subject to the payment of amounts due thereunder with the proceeds of the Final Draw.

**Section 4.04   Determinations Under Article IV**.  For purposes of determining compliance with the conditions specified in Article IV, each Lender shall be deemed to have consented to, approved or accepted or to be satisfied with each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the Lender unless an officer of the DIP Agent responsible for the transactions contemplated by this Agreement shall have received notice from such Lender prior to the Credit Event specifying its objection thereto and, to the extent

applicable, such Lender shall not have made available to the DIP Agent its ratable share of the applicable Borrowing.

## ARTICLE V

### Affirmative Covenants

Each of Parent, Holdings and the Borrower covenants and agrees with each Lender and the DIP Agent that it will, and will cause each of its Subsidiaries to:

**Section 5.01    Existence; Compliance with Laws; Businesses and Properties**.

(a)    Do or cause to be done all things reasonably necessary to preserve, renew and keep in full force and effect its legal existence under the laws of its jurisdiction of organization, except (i) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect or (ii) as otherwise expressly permitted under Section 6.04 or Section 6.05.

(b)    Other than as could not reasonably be expected to have a Material Adverse Effect, (i) do or cause to be done all things reasonably necessary to obtain, preserve, renew, extend and keep in full force and effect the material rights, licenses, permits, franchises, authorizations, patents, copyrights, trademarks and trade names necessary or desirable to the conduct of its business, (ii) comply in all material respects with applicable laws, rules, regulations and decrees and orders of any Governmental Authority (including Environmental Laws and ERISA), whether now in effect or hereafter enacted, and (iii) maintain and preserve all property necessary or desirable to the conduct of such business and keep such property in good repair, working order and condition and from time to time make, or cause to be made, all needed repairs, renewals, additions, improvements and replacements thereto necessary or desirable to the conduct of its business.

(c)    Comply in all material respects with the requirements of all Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions Laws and Regulations and all orders, writs, injunctions and decrees of any Governmental Authority related thereto applicable to it or its business or property.

**Section 5.02    Insurance**.

(a)    Keep its material insurable properties adequately insured in all material respects at all times by financially sound and reputable insurers to such extent and against such risks, including fire and other risks insured against by extended coverage, as is customary with companies in the same or similar businesses operating in the same or similar locations.

(b)    Use commercially reasonable efforts to cause all such policies covering any Collateral to be endorsed or otherwise amended to include a customary lender's loss payable endorsement and, to the extent available on

49

commercially reasonable terms, cause each such policy to provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium unless not less than 10 days' prior written notice thereof is given by the insurer to the DIP Agent (giving the DIP Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason unless not less than 30 days' prior written notice thereof is given by the insurer to the DIP Agent.

**Section 5.03    Taxes**.  Pay and discharge when due all post-petition Taxes imposed upon or with respect to it or upon or with respect to its income or profits or in respect of its property, before the same shall become overdue by more than 30 days; provided, however, that such payment and discharge shall not be required with respect to any such Tax (i) so long as the validity or amount thereof is being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves in accordance with GAAP have been established or (ii) with respect to which the failure to pay or discharge could not reasonably be expected to have a Material Adverse Effect.

**Section 5.04    Reports, etc.**  Furnish to the DIP Agent (who will distribute to each Lender):

(a)    [Reserved];

(b)    within 45 days (or such later date as shall be acceptable to the Required Lenders) after the end of each fiscal quarter of each fiscal year (except that the Debtors shall have 60 days from the Closing Date to deliver such financial statements for the fiscal quarter ended December 31, 2014), its consolidated balance sheet and related statements of income, stockholders' equity and cash flows showing the financial condition of the Borrower and its consolidated Subsidiaries as of the close of such fiscal quarter and the results of its operations and the operations of such Persons during such fiscal quarter and the then elapsed portion of the fiscal year, all certified by one of its Financial Officers as fairly presenting in all material respects the financial condition and results of operations of the Borrower and its consolidated subsidiaries on a consolidated basis in accordance with GAAP, subject to normal year-end audit adjustments and the absence of footnotes and such other updates as are necessary after the finalization of financial statements for prior periods;

(c)    concurrently with any delivery of each set of financial statements referred to in clause (b) above, a certificate of a Financial Officer of the Borrower certifying that to such Financial Officer's knowledge, no Event of Default or Default has occurred during such period and is continuing or, if such an Event of Default or Default has occurred and is continuing, reasonably specifying the nature thereof;

(d)    [Reserved];

(e)    after the request by any Lender, all documentation and other information that such Lender reasonably requests in order to comply with its

Error! Unknown document property name.

ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

(f)  promptly, from time to time, such other information regarding the operations, business, legal or corporate affairs and financial condition of the Borrower or any Subsidiary, or compliance with the terms of any Loan Document, as the DIP Agent or any Lender (through the DIP Agent) may reasonably request;

(g)  [Reserved]; and

(h)  information required to be delivered pursuant to this Section 5.04 shall be deemed to have been delivered if such information, or one or more annual or quarterly reports containing such information, shall have been posted by the DIP Agent on a SyndTrak, IntraLinks or similar site to which the Lenders have been granted access or on the website of the Borrower.  Information required to be delivered pursuant to this Section may also be delivered by electronic communications pursuant to procedures approved by the DIP Agent.  Each Lender shall be solely responsible for timely accessing posted documents and maintaining its copies of such documents.

**Section 5.05   Notices**.  Promptly upon any Responsible Officer of the Borrower or any Subsidiary becoming aware thereof, furnish to the DIP Agent notice of the following:

(a)  the occurrence of any Event of Default or Default; and

(b)  the occurrence of any event that has had, or could reasonably be expected to have, a Material Adverse Effect.

**Section 5.06   Information Regarding Collateral**.  Furnish to the DIP Agent concurrently with the delivery of the financial statements referred to in Section 5.04(b) notice of any change since Closing Date (or in any of the schedules referred to herein) (i) in any Loan Party's legal name, (ii) in the jurisdiction of organization or formation of any Loan Party or (iii) in any Loan Party's identity or corporate structure.

**Section 5.07   Maintaining Records; Access to Properties and Inspections; Maintenance of Ratings**.  Keep proper books of record and account in which full, true and correct entries in conformity with GAAP are made.  Permit any representatives designated by the DIP Agent (or any Lender if accompanying the DIP Agent) to visit and inspect during normal business hours the financial records and the properties of Parent, Holdings, the Borrower or any Subsidiaries upon reasonable advance notice and at the Borrower's expense, and to make extracts from and copies of such financial records, and permit any such representatives to discuss the affairs, finances and condition of such Person with the officers thereof and independent accountants therefor; provided that the DIP Agent shall give the Borrower an opportunity to participate in any discussions with its accountants.

Error! Unknown document property name.

**Section 5.08    Informational Budget; Liquidity.**

(a)    Following delivery of the Initial Budget, the Borrower shall furnish to the DIP Agent, on the first Business Day of the fourth full week following the Closing Date and on the first Business Day of each successive four weeks thereafter, an updated "rolling" budget (such budget then in effect, including the Initial Budget, the "Budget") for the following thirteen-week period after the date such Budget is delivered.

(b)    The proceeds of the First and Second Draws shall be used solely (i) to pay (a) all fees and expenses including professional expenses due to the DIP Agent and the Lenders as provided under this Agreement and the other Loan Documents, (ii) to provide working capital to the Borrower and the Subsidiaries Guarantors during the Cases generally in accordance with the Budget in the ordinary course of the Debtors' business and generally consistent with the Debtors' business plan and not prohibited by this Agreement or the DIP Order; provided that no proceeds of the Loans shall be received by, or paid on behalf of, any Person that is not a Debtor and a Loan Party unless consented to by the Required Lenders in their reasonable discretion and approved by the Bankruptcy Court, (iii) to pay administration costs of the Cases generally in accordance with the Budget in the ordinary course of the Debtors' business and generally consistent with the Debtors' business plan and not prohibited by this Agreement or the DIP Order, (iv) to pay Professional Expenses, subject to any limitations in the DIP Order, of the Debtors or any official creditors' committee, if any, and (v) to make payments required under the Permitted Adequate Protection Provisions.  The proceeds of the Final Draw shall be used solely to fund payments required to be made under an Acceptable Plan as of the effectiveness thereof and to fund the Debtors' working capital needs for periods on and after the Effective Date.  Notwithstanding anything to the contrary herein, the Budget shall not act as a limitation or cap on the Debtors' expenditures.

(c)    The Debtors shall have no less than $25,000,000 of Total Liquidity as of the close of business on the Monday of each week beginning on February 16, 2015.  The Borrower shall furnish to the DIP Agent a certificate from a Responsible Officer on the Wednesday of each week certifying the amount of Total Liquidity as of the close of business on the preceding Monday.

**Section 5.09    Further Assurances.**

(a)    From time to time duly authorize, execute and deliver, or cause to be duly authorized, executed and delivered, such additional instruments, certificates, financing statements, agreements or documents, and take all reasonable actions (including filing UCC and other financing statements but subject to the limitations set forth in the DIP Order), as the DIP Agent may reasonably request, for the purposes of perfecting the rights of the DIP Agent and the Secured Parties with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds or products thereof or with respect to any other property or assets hereafter acquired by Holdings, the Borrower or any other Loan Party which may be deemed to be part of the Collateral) pursuant hereto or thereto.

Error! Unknown document property name.

(b)    In no event shall (a) control agreements or control or similar arrangements be required with respect to deposit or securities accounts, (b) notices be required to be sent to account debtors or other contractual third-parties, (c) perfection (except to the extent perfected through the filing of Uniform Commercial Code financing statements) be required with respect to letter of credit rights and commercial tort claims, or (d) security documents governed by the laws of a jurisdiction other than the United States or any state thereof be required.

### Section 5.10    Bankruptcy Related Matters.

(a)    Comply with the DIP Order and the Restructuring Support Agreement.

(b)    Comply in all material respects with each Chapter 11 Order (other than the DIP Order) except where failure to comply could not reasonably be expected to have a Material Adverse Effect.

(c)    Provide the DIP Agent and the Lenders with reasonable access to non-privileged information (including historical information) and relevant personnel regarding strategic planning, cash and liquidity management, operational and restructuring activities, in each case subject to customary confidentiality restrictions.

(d)    If not otherwise provided through the Bankruptcy Court's electronic docketing system, delivery to the DIP Agent and counsel to the DIP Agent promptly after the same is available, copies of all pleadings, motions, applications, financial information and other documents filed by or on behalf of the Debtors or any other Loan Party with the Bankruptcy Court in the Cases, or distributed by or on behalf of the Debtors or any other Loan Party to any official committee appointed in the Cases.

## ARTICLE VI

## Negative Covenants

Each of Holdings and the Borrower covenants and agrees that, (x) except with respect to Section 6.12, the Borrower will not, and will not cause or permit any of the Subsidiaries to, and (y) solely with respect to Section 6.12, Holdings and Parent will not:

### Section 6.01    Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock.

(a)    Directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise (collectively, "incur" and collectively, an "incurrence") with respect to any Indebtedness (including Acquired Indebtedness) and Parent, Holdings, the Borrower and their Subsidiaries will not issue any shares of Disqualified Stock or Preferred Stock; provided, however, that the Borrower and its Subsidiaries may incur Indebtedness or issue shares of Disqualified Stock or Preferred Stock as set forth in clause (b) below;

53

(b)    The limitations set forth in clause (a) will not apply to the following items:

(i)    the Obligations;

(ii)    Existing Debt, including the First Lien Indebtedness, the Second Lien Notes and the Third Lien Notes;

(iii)    Indebtedness the incurrence of which has been consented to by the Required Lenders in writing;

(iv)    Indebtedness (including Capitalized Lease Obligations and Purchase Money Obligations) incurred by the Borrower or any of its Subsidiaries, to finance the purchase, lease or improvement of property (real or personal) or equipment that is used or useful in a Similar Business, together with any Refinancing Indebtedness in respect thereof, and all other Indebtedness incurred and outstanding under this clause (iv), not to exceed $15,000,000 at any time outstanding, so long as such Indebtedness exists at the date of such purchase, lease or improvement, or is created within 270 days thereafter;

(v)    Indebtedness incurred by the Borrower or any Subsidiary constituting reimbursement obligations with respect to bankers' acceptances and letters of credit issued in the ordinary course of business, including letters of credit in respect of workers' compensation claims, health, disability or other employee benefits, or property, casualty or liability insurance, or other Indebtedness with respect to reimbursement type obligations regarding workers' compensation claims; provided, however, that upon the drawing of such bankers' acceptances and letters of credit or the incurrence of such Indebtedness, such obligations are reimbursed within 30 days following such drawing or incurrence;

(vi)    Indebtedness arising from agreements of the Borrower or a Subsidiary providing for indemnification, adjustment of purchase price, earnouts or similar obligations, in each case, incurred or assumed in connection with the disposition of any business, assets or a Subsidiary permitted hereunder, other than guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or a Subsidiary for the purpose of financing such acquisition; provided, however, that such Indebtedness is not reflected on the balance sheet of the Borrower or any Subsidiary (contingent obligations referred to in a footnote to financial statements and not otherwise reflected on the balance sheet will not be deemed to be reflected on such balance sheet for purposes of this clause (vi));

(vii)    Indebtedness of (A) the Borrower to a Subsidiary and (B) any Subsidiary to the Borrower or to another Subsidiary; provided that any such Indebtedness owing by the Borrower or a Guarantor to a Subsidiary that is not a Guarantor is expressly subordinated in right of payment to the

Error! Unknown document property name.

Obligations; provided, further, that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Subsidiary ceasing to be a Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Borrower or a Subsidiary Guarantor) shall be deemed, in each case, to be an incurrence of such Indebtedness not permitted by this clause (vii);

(viii)    shares of Preferred Stock of a Subsidiary issued to the Borrower or Subsidiary Guarantor, provided, that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such Subsidiary ceasing to be a Subsidiary or any other subsequent transfer of any such shares of Preferred Stock (except to the Borrower or a Subsidiary Guarantor) shall be deemed in each case to be an issuance of such shares of Preferred Stock not permitted by this clause (viii);

(ix)    Hedging Obligations (excluding Hedging Obligations entered into for speculative purposes) under agreements in existence as of the Filing Date for the purpose of limiting interest rate risk with respect to any Indebtedness permitted under this Section 6.01, exchange rate risk or commodity pricing risk;

(x)    obligations in respect of customs, stay, performance, bid, appeal and surety bonds and completion guarantees and other obligations of a like nature provided by the Borrower or any of its Subsidiaries in the ordinary course of business;

(xi)    other Indebtedness of the Borrower or any Subsidiary Guarantor not otherwise permitted hereunder in an aggregate principal amount, which when aggregated with the principal amount of all other Indebtedness then outstanding and incurred pursuant to this clause (xi), does not at any one time outstanding exceed $7,500,000;

(xii)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, provided, that such Indebtedness is extinguished within five Business Days of its incurrence;

(xiii)    (A) any guarantee by the Borrower or a Subsidiary of Indebtedness or other obligations of any Subsidiary so long as such Indebtedness is otherwise permitted under this Agreement; or

(B)    any guarantee by a Subsidiary of Indebtedness of the Borrower;

provided that, in each case, (x) such Subsidiary shall comply with its obligations under Section 5.09 and (y) in the case of any guarantee of Indebtedness of the Borrower or any Subsidiary Guarantor by any Subsidiary that is not a Subsidiary Guarantor, such Subsidiary shall become a Subsidiary Guarantor under this Agreement;

55

(xiv)    Indebtedness of any Foreign Subsidiary in an amount not to exceed at any one time outstanding, together with any other Indebtedness incurred under this clause (xiv), 5.0% of the Foreign Subsidiary Total Assets; provided, that any incurrence of Indebtedness by a Foreign Subsidiary that is not a Guarantor is subject to the limitations of paragraph (g) below;

(xv)    cash management obligations and Indebtedness in respect of netting services, employee credit card programs and similar arrangements in connection with cash management and deposit accounts;

(xvi)    Indebtedness of the Borrower or any Subsidiary consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business; and

(xvii)   Indebtedness incurred by a Subsidiary in connection with bankers' acceptances, discounted bills of exchange or the discounting or factoring of receivables for credit management purposes, in each case incurred or undertaken in the ordinary course of business on arm's length commercial terms on a recourse basis.

(c)    For purposes of determining compliance with this Section 6.01:

(i)    in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof), as applicable, meets the criteria of more than one of the categories of permitted Indebtedness, Disqualified Stock or Preferred Stock described in Section 6.01(b), the Borrower, in its sole discretion, may classify or reclassify such item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof), as applicable, and will only be required to include the amount and type of such Indebtedness, Disqualified Stock or Preferred Stock in one of the above permitted clauses;

(ii)    at the time of incurrence or permitted reclassification, the Borrower will be entitled to divide and classify an item of Indebtedness in one or more types of Indebtedness, Disqualified Stock or Preferred Stock described in Section 6.01(b); and

(iii)   the amount of any Indebtedness that is issued at a price that is less than the principal amount thereof shall be equal to the amount of liability in respect thereof determined in accordance with GAAP.

(d)    The accrual of interest, the accretion of accreted value and the payment of interest or dividends in the form of additional Indebtedness, Disqualified Stock or Preferred Stock, as applicable, will not be deemed to be an incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this Section 6.01.

Error! Unknown document property name.

(e)     For purposes of determining compliance with any dollar-denominated restriction on the incurrence of Indebtedness, the dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; provided, that if such Indebtedness is incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced.

(f)     The principal amount of any Indebtedness incurred to refinance other Indebtedness, if incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

(g)     Notwithstanding anything to the contrary contained in Section 6.01(b), no Subsidiary of the Borrower that is not a Subsidiary Guarantor shall incur any Indebtedness or issue any Disqualified Stock or Preferred Stock in reliance on Section 6.01(b)(xiv) (except Indebtedness under any working capital facility or otherwise incurred in the ordinary course of business to finance the operations of such Subsidiary) (the "Limited Non-Guarantor Debt Exceptions") if the amount of such Indebtedness, Disqualified Stock or Preferred Stock, when aggregated with the amount of all other Indebtedness, Disqualified Stock or Preferred Stock outstanding under such Limited Non-Guarantor Debt Exceptions, together with any Refinancing Indebtedness in respect thereof, would exceed $7,500,000; provided, that in no event shall any Indebtedness, Disqualified Stock or Preferred Stock of any Subsidiary that is not a Subsidiary Guarantor (i) existing at the time it became a Subsidiary or (ii) assumed in connection with any acquisition, merger or acquisition of minority interests of a non-Wholly-Owned Subsidiary (and in the case of clauses (i) and (ii), not created in contemplation of such Person becoming a Subsidiary or such acquisition, merger or acquisition of minority interests) be deemed to be Indebtedness outstanding under the Limited Non- Guarantor Debt Exceptions for purposes of this Section 6.01(g).

**Section 6.02   Liens**.  Directly or indirectly, create, incur, assume or suffer to exist any Lien (except Permitted Liens) on any asset or property of Parent, Holdings, the Borrower or any Subsidiary, or any income or profits therefrom, or assign or convey any right to receive income therefrom.

**Section 6.03   Restricted Payments**.

(a)     Directly or indirectly, make any Restricted Payment, other than Restricted Payments permitted under clause (b).

Error! Unknown document property name.

(b)     The limitations set forth in clause (a) will not prohibit the declaration and payment of dividends or the payment of other distributions by the Borrower or a Subsidiary to, or the making of loans or advances to, any Parent Holding Company in amounts required for any Parent Holding Company to pay, in each case without duplication and subject to any Chapter 11 Orders:

     (i)     franchise and excise Taxes and other fees, taxes and expenses required to maintain their corporate existence;

     (ii)     federal, foreign, state and local income or franchise Taxes; provided, that, in each taxable period, the amount of such payments shall be up to the amount that the Borrower and its Subsidiaries would be required to pay in respect of federal, foreign, state and local income or franchise Taxes if such entities were corporations paying Taxes separately from any parent entity at the highest combined applicable federal, foreign, state, local or franchise tax rate for such taxable period; provided further, that such amount will be actually used to pay for such Taxes;

     (iii)     Taxes arising out of the receipt of, or entitlement to, any payment permitted to be made under this Section 6.03;

     (iv)     [reserved];

     (v)     customary salary, bonus and other benefits payable to officers and employees of any Parent Holding Company to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Borrower and its Subsidiaries;

     (vi)     general corporate operating and overhead costs and expenses of any Parent Holding Company to the extent such costs and expenses are attributable to the ownership or operation of the Borrower and its Subsidiaries;

provided, however that payments made under this clause (b) shall not exceed $2,000,000 in the aggregate in any twelve month period.

**Section 6.04   Fundamental Changes.**  The Borrower may not consolidate or merge with or into or wind up into (whether or not the Borrower is the surviving corporation), and neither Parent, Holdings nor Borrower may sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of the properties or assets of the Borrower and its Subsidiaries, taken as a whole, in one or more related transactions, to any Person.

**Section 6.05   Asset Sales.**  Cause, consummate, directly or indirectly an Asset Sale, other than:

(a)     any disposition of Cash Equivalents or Investment Grade Securities or obsolete or worn out property or equipment in the ordinary course of business or any disposition of inventory or goods (or other assets) held for sale in the

58

ordinary course of business and any disposition of Property or equipment no longer used or useful in the conduct of the business of the Borrower and its Subsidiaries;

(b)      Asset Sales consented to by the Required Lenders in writing;

(c)      the making of any Restricted Payment or Permitted Investment that is permitted to be made, and is made, under Section 6.03 or the granting of a Lien permitted under Section 6.02;

(d)      any disposition of assets in any transaction or series of transactions with an aggregate fair market value (as determined in good faith by the Borrower) of less than $1,000,000 or $3,000,000 in the aggregate during any twelve-month period;

(e)      any disposition of property or assets or issuance of securities (A) by a Subsidiary of the Borrower to the Borrower or (B) by the Borrower or a Subsidiary of the Borrower to a Subsidiary Guarantor;

(f)      to the extent allowable under Section 1031 of the Code, any exchange of like property for use in a Similar Business;

(g)      the sale, lease, assignment, sublease license or sublicense of any real or personal property in the ordinary course of business;

(h)      [reserved];

(i)      [reserved];

(j)      any disposition arising from foreclosure, condemnation or similar action with respect to any property or other assets, or exercise of termination rights under any lease, license, concession or other agreement, or pursuant to buy/sell arrangements under any joint venture or similar agreement or arrangement;

(k)      [reserved];

(l)      the grant in the ordinary course of business of any non-exclusive licenses of patents, trademarks, know-how and any other intellectual property;

(m)      any financing transaction with respect to property built or acquired by the Borrower or any Subsidiary after the Closing Date (other than a Sale and Lease-Back Transaction or asset securitizations) permitted under this Agreement;

(n)      sales of accounts receivable in connection with the collection or compromise thereof;

Error! Unknown document property name.

(o)    the discount of inventory, accounts receivable or notes receivable in the ordinary course of business or the conversion of accounts receivable to notes receivable;

(p)    any surrender or waiver of contract rights or the settlement, release or surrender of contract rights or other litigation claims in the ordinary course of business;

(q)    dispositions in connection with the outsourcing of services;

(r)    transfers of property subject to casualty or condemnation proceedings (including in lieu thereof) upon the receipt of the net cash proceeds therefor; provided such transfer shall constitute a Property Loss Event;

(s)    the abandonment of intellectual property rights in the ordinary course of business, which in the reasonable good faith determination of the Borrower or a Subsidiary are not material to the conduct of the business of the Borrower and its Subsidiaries taken as a whole;

(t)    terminations of Hedging Obligations; and

(u)    other Asset Sales in an aggregate amount not to exceed $5,000,000 during any twelve-month period; provided, however, that (I) not less than 75% of the consideration received in connection with any such Asset Sale is in the form of cash or Cash Equivalents and (II) the consideration payable in connection with any such Asset Sale is equal to the fair market value of the property sold (as determined in good faith by the Borrower on the date a legally binding commitment for such Asset Sale was entered into, which determination shall be conclusive (including as to the value of all non-cash consideration)).

To the extent any Collateral is disposed of as expressly permitted by this Section 6.05 to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, and the DIP Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

**Section 6.06    Transactions with Affiliates.** Except for transactions by and among the Borrower and the Subsidiary Guarantors in the ordinary course of business, sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, in each case, involving aggregate payments or consideration in excess of $250,000 unless:

(a)    such transaction is on terms that are not materially less favorable to the Borrower or the relevant Subsidiary than those that would have been obtained in a comparable transaction by the Borrower or such Subsidiary with an unrelated Person on an arm's-length basis; and

(b)    the Borrower delivers to the DIP Agent with respect to any such transaction or series of related transactions involving aggregate payments or

Error! Unknown document property name.

consideration in excess of $1,000,000, a resolution adopted by the majority of the board of directors of the Borrower approving such transaction and set forth in an Officer's Certificate certifying that such transaction complies with clause (a) above.

     (c)     The foregoing provisions will not apply to the following:

     (i)     transactions between or among the Borrower or any of its Subsidiaries;

     (ii)     to the extent approved by the Bankruptcy Court, reasonable and customary fees payable to any directors of the Borrower and its Subsidiaries (or any direct or indirect parent of the Borrower) and reimbursement of reasonable out-of-pocket costs of the directors of the Borrower and its subsidiaries (or any direct or indirect parent of the Borrower) in the ordinary course of business, in the case of any direct or indirect parent to the extent attributable to the operations of the Borrower and its Subsidiaries);

     (iii)     expense reimbursement and employment, severance and compensation arrangements entered into by the Borrower and its Subsidiaries with their officers, employees and consultants in the ordinary course of business and approved by the Bankruptcy Court;

     (iv)     payments by the Borrower and its Subsidiaries to each other pursuant to tax sharing agreements or arrangements among any Parent Holding Company and its subsidiaries on customary terms;

     (v)     subject to Bankruptcy Court approval, the payment of reasonable and customary indemnities to directors, officers and employees of the Borrower and its Subsidiaries (or any direct or Parent Holding Companies) in the ordinary course of business, in the case of any Parent Holding Companies to the extent attributable to the operations of the Borrower and its Subsidiaries;

     (vi)     Restricted Payments permitted under Section 6.03;

     (vii)     transactions with customers, clients, suppliers, or purchasers or sellers of goods or services, in each case in the ordinary course of business which are fair to the Borrower and its Subsidiaries, in the reasonable determination of the board of directors of the Borrower or the senior management thereof, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

     (viii)     any contribution to the capital of the Borrower; and

     (ix)     transactions between the Borrower or any Subsidiary and any Person, a director of which is also a director of the Borrower or any Parent Holding Company and such director is the sole cause for such Person to be deemed an Affiliate of the Borrower or any Subsidiary; provided, however, that such director abstains from voting as director of the Borrower or

Error! Unknown document property name.

such Parent Holding Company, as the case may be, on any matter involving such other Person.

        **Section 6.07   *Restrictive Agreements*.**  Enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon:

        (a)     the ability of the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets to secure the Obligations;

        (b)     the ability of any Subsidiary to pay dividends or other distributions with respect to any of its Equity Interests or with respect to any other interest or participation in, or measured by, its profits or to make or repay loans or advances to the Borrower or any Subsidiary Guarantor or to guarantee Indebtedness of the Borrower or any Subsidiary Guarantor; or

        (c)     the ability of any Subsidiary to sell, lease or transfer any of its properties or assets to the Borrower or any Subsidiary Guarantor.

        (d)     Notwithstanding the foregoing, the foregoing shall not apply to:

        (i)     restrictions and conditions imposed by law or any applicable rule, regulation or order, including the DIP Order, or by any Loan Document or by any other agreement evidencing Prepetition Indebtedness that exists as of the Closing Date;

        (ii)     contracts for the sale of assets permitted under Section 6.05 that impose customary restrictions on the assets to be sold;

        (iii)     restrictions and conditions on any Foreign Subsidiary by the terms of any Indebtedness of such Foreign Subsidiary existing as of the Closing Date or as provided in clause (x) below permitted to be incurred hereunder;

        (iv)     contractual obligations binding on a Subsidiary at the time such Subsidiary first becomes a Subsidiary, so long as such contractual obligations were not entered into solely in contemplation of such Person becoming a Subsidiary, which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its subsidiaries, or the property or assets of the Person and its subsidiaries, so acquired;

        (v)     restrictions and conditions imposed as of the Closing Date by the terms of the documentation governing any Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of the Borrower that is not a

Error! Unknown document property name.

Loan Party, which Indebtedness, Disqualified Stock or Preferred Stock is permitted by <u>Section 6.01</u>;

(vi)    provisions limiting the disposition or distribution of assets or property in joint venture agreements, asset sale agreements, sale-leaseback agreements, stock sale agreements and other similar agreements existing on the Closing Date or entered into with the approval of the Bankruptcy Court, which limitation is applicable only to the assets that are the subject of such agreement;

(vii)    negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under <u>Section 6.01</u> but only if such negative pledge or restriction, to the extent arising Post Petition, expressly permits Liens on the Collateral for the benefit of the DIP Agent and the Lenders on a senior basis;

(viii)    restrictions on cash, other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(ix)    Purchase Money Obligations for property acquired in the ordinary course of business that impose restrictions on the property so acquired; and

(x)    any encumbrances or restrictions of the type referred to in clauses (a) and (b) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (i) through (ix) above; <u>provided</u> that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings were entered into in the ordinary course of business and are, in the good faith judgment of the Borrower, no more restrictive with respect to such encumbrances and other restrictions taken as a whole than those prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing but only if such existing encumbrances and other restrictions were otherwise enforceable notwithstanding the commencement of the Chapter 11 Cases and the entry of the DIP Order.

(e)    <u>clause (a)</u> of the foregoing shall not apply to customary provisions (including non- assignment provisions) contained in leases, subleases, licenses, asset sale agreements and other contracts, in each case entered into in the ordinary course of business.

**Section 6.08    *Business of the Borrower and its Subsidiaries*.** Engage in any material line of business substantially different from (a) those lines of business conducted by the Borrower or any Subsidiary on the date hereof or (b) any line of business similar, reasonably related, incidental or ancillary thereto.

Error! Unknown document property name.

**Section 6.09    Prepayments, Etc., of Debt**.  Make any Prepetition Payment or a payment of principal or interest or otherwise on account of any Prepetition Indebtedness, other than (a) as contemplated by the DIP Order (including the Permitted Adequate Protection Provisions), (b) lease payments in the ordinary course of business (including capital leases)), (c) in respect of accrued payroll and related expenses and employee benefits, (d) payments agreed to in writing by the Required Lenders and authorized by the Bankruptcy Court, and (e) with respect to the Final Draw, amounts required to be paid under an Acceptable Plan.

**Section 6.10    Certain Bankruptcy Matters**.  Will not at any time:

(a)    except as otherwise permitted or provided hereunder or under the DIP Order or agreed to by the Required Lenders, create or permit to exist (i) any administrative expense, unsecured claim, or Super-priority Claim (except for the Carve-Out and the Permitted Adequate Protection Provisions) or a Lien that is *pari passu* with or senior to the Obligations and/or the DIP Liens (other than in respect of the Carve-Out, the Permitted Adequate Protection Provisions and the First Lien Indebtedness), or apply to the Bankruptcy Court for authority to do so, or (ii) any obligation to make adequate protection payments, or otherwise provide adequate protection, other than as provided in the DIP Order;

(b)    make or permit to be made any change, amendment or modification, or make an application or motion for any change, amendment or modification, to any Chapter 11 Order which could reasonably be expected to have a Material Adverse Effect in each case, without the prior written consent of the Required Lenders;

(c)    except as otherwise permitted under the Restructuring Support Agreement or an Acceptable Plan or consented to by the Required Lenders, (i) assume any executory contract or unexpired lease or reject any executory contract or unexpired lease, (ii) pursue a sale of all or substantially all of the Debtors' assets, (iii) consent to termination or reduction of the Debtors' exclusive plan filing and plan solicitation periods under section 1121 of the Bankruptcy Code (the "Exclusivity Periods") or fail to object to any motion by a party-in-interest (other than a Lender or the DIP Agent) seeking to terminate or reduce the Exclusivity Periods, in each case other than a motion filed by or with the consent of the Required Lenders or (iv) file a chapter 11 plan of reorganization without the consent of the Required Lenders, other than an Acceptable Plan; and

(d)    assert any right of subrogation or contribution against any other Loan Party until all Obligations are paid or satisfied in full as provided herein.

**Section 6.11    Accounting Changes**.  Make any change in its fiscal year; provided, however, that the Borrower may, upon written notice to the DIP Agent, change its fiscal year to any other fiscal year reasonably acceptable to the DIP Agent, in which case, the Borrower and the DIP Agent will, and are hereby authorized by Lenders to,

Error! Unknown document property name.

make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

> **Section 6.12   Activities of Holdings and Parent**.  In the case of Holdings and Parent, notwithstanding anything to the contrary in this Agreement or any other Loan Document, each of Holdings and Parent covenants and agrees that it will not (a) conduct, transact or otherwise engage in, or commit to conduct, transact or otherwise engage in, any business or operations other than (i) transactions contemplated by the Loan Documents or the provision of administrative, legal, accounting and management services to, or on behalf of, any of its Subsidiaries, (ii) the entry into, and exercise of rights and performance of obligations in respect of (A) this Agreement and any other Loan Documents to which it is a party; any other agreement to which it is a party on the Closing Date and set forth on Schedule 6.12 of the First Lien Credit Agreement (as updated from time to time) or as otherwise disclosed to the Lenders prior to the Closing Date; and any guarantee of Indebtedness or other obligations of any of its Subsidiaries to the extent permitted pursuant to the Loan Documents; in each case as amended, supplemented, waived or otherwise modified from time to time, and any refinancings, refundings, renewals or extensions thereof provided such amendment, supplement, waiver or other modification or such refinancing, refunding, renewal or extension is not materially adverse to the Secured Parties, (B) contracts and agreements with officers, directors and employees of it or any Subsidiary thereof relating to their employment or directorships, and (C) insurance policies and related contracts and agreements, (iii) the filing of registration statements, and compliance with applicable reporting and other obligations, under federal, state or other securities laws, (iv) the listing of its equity securities and compliance with applicable reporting and other obligations in connection therewith, (v) the performance of obligations under and compliance with its certificate of incorporation and by-laws, or any applicable law, ordinance, regulation, rule, order, judgment, decree or permit, including, without limitation, as a result of or in connection with the activities of its Subsidiaries, (vi) the incurrence and payment of its taxes for which it may be liable, (vii) making common equity Investments in the Borrower, and (viii) other activities incidental or related to the foregoing, (b) incur, create, assume or suffer to exist any Indebtedness or other liabilities or financial obligations, except (i) nonconsensual obligations imposed by operation of law, (ii) pursuant to the Loan Documents to which it is a party, (iii) obligations with respect to its Capital Stock and (iv) guarantees as contemplated by clause (a)(ii)(A) above, (c) own, lease, manage or otherwise operate any properties or assets (including cash (other than cash received in connection with dividends made by the Borrower in accordance with Section 6.03 pending application in the manner contemplated by said Section) and cash equivalents) other than the ownership of shares of Capital Stock of the Borrower or (d) create, incur, assume or suffer to exist any Liens (other than Permitted Liens) on any asset or property of Holdings or Parent, as applicable, whether now owned or hereafter acquired.

**Error! Unknown document property name.**

# ARTICLE VII

## Events of Default

*Section 7.01    Events of Default.*  In case of the happening of any of the following events ("Events of Default"):

(a)    any material representation or warranty made or deemed made in any Loan Document or any material representation, warranty, statement or information contained in any material document required to be furnished pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(b)    [Reserved];

(c)    default shall be made in the payment of any principal of or interest on any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for mandatory prepayment thereof or by acceleration thereof or otherwise;

(d)    the Maturity Date shall have occurred prior to the Effective Date;

(e)    a material default shall be made in the due observance or performance by any Loan Party of any covenant, condition or agreement contained in Section 5.01(a) (with respect to the Borrower), 5.05(a) or in Article VI;

(f)    default shall be made in the due observance or performance by any Loan Party or its Subsidiaries of any covenant, condition or agreement contained in any Loan Document (other than those specified in clauses (a), (b), (c) or (d) above) and such default shall continue unremedied for a period of 20 days after written notice thereof from the DIP Agent to the Borrower; provided that if any such default is capable of being cured and which is not reasonably likely to have a Material Adverse Effect, at the Borrower's request, the cure period shall be extended for an additional 15 days;

(g)    the Termination Date (as defined in the DIP Order) shall have occurred;

(h)    certain bankruptcy events:

(i)    any of the Cases shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code or any of the Debtors shall file a motion or other pleading seeking the dismissal or conversion of any of the Cases under Sections 305 or 1112 of the Bankruptcy Code or otherwise without the consent of the Required Lenders; a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in

66

Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Cases;

(ii)    any Loan Party shall file a motion in any of the Cases to obtain additional financing or to use cash collateral under section 363(c) of the Bankruptcy Code, unless consented to by the Required Lenders and other than the DIP Order;

(iii)    (A) an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying for a period of five (5) days or more, vacating or otherwise amending, supplementing, or modifying the DIP Order, or any Loan Party shall apply for authority to do so, without, in each case, the prior written consent of the Required Lenders, (B) the DIP Order shall cease to create valid and perfected Liens on the Collateral, or to be in full force and effect or (C) any Loan Party shall fail to comply with the DIP Order in any material respect and such failure is not cured within three (3) days of the earlier of (i) any Loan Party's knowledge of such failure to comply or (ii) notice thereof from the DIP Agent;

(iv)    any Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any holder of any security interest (other than the DIP Agent and the Lenders) to permit foreclosure on assets having a book value in excess of $200,000 in the aggregate or to permit other actions that would have a Material Adverse Effect, or (ii) approving any settlement or other stipulation, without the consent of the Required Lenders, with any secured creditor of any Debtor (other than as contemplated by the Restructuring Support Agreement) providing for cash payments as adequate protection or other condition which is not contemplated by the DIP Order or the Restructuring Support Agreement;

(v)    any Loan Party shall fail to comply with the terms and conditions of any Chapter 11 Order and such failure could reasonably be expected to have a Material Adverse Effect;

(vi)    entry of an order by the Bankruptcy Court terminating or modifying the Exclusivity Periods without prior written consent of the Required Lenders;

(vii)    (A) any Loan Party shall seek to or shall support any other Person's motion to, (x) disallow in whole or in part the Obligations, or (y) challenge the validity and enforceability of the DIP Liens, (B) the DIP Liens or Super-priority Claims granted hereunder or under the other Loan Documents shall otherwise cease to be valid, perfected and enforceable in all respects, or (C) an order is entered by the Bankruptcy Court providing for any of the above and such order shall not have been modified, reversed, amended, appealed, stayed subject to appeal or otherwise challenged;

Error! Unknown document property name.

(viii)    unless consented to by the Required Lenders, any Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order authorizing the sale of all or substantially all of the Borrower's or the Loan Parties' assets (taken as a whole);

(ix)    (A) except as permitted under this Agreement or consented to by the Required Lenders, the Loan Parties shall file any pleading or proceeding seeking relief which could reasonably be expected to result in a material impairment of the rights or interests of the Secured Parties hereunder or under any other Loan Documents or (B) the Bankruptcy Court shall enter an order with respect to any pleading or proceeding brought by any other person which results in such a material impairment of the rights or interests of the Secured Parties hereunder or under any other Loan Documents;

(x)    the filing or execution of any binding agreement by any of the Loan Parties evidencing an intention to file, or to support any other person's filing of, any plan of reorganization other than an Acceptable Plan; or

(xi)    any plan under chapter 11 of the Bankruptcy Code shall be filed with the Bankruptcy Court that is not an Acceptable Plan.

(i)    one or more judgments for the payment of money in an aggregate amount exceeding $7,500,000 (to the extent not covered by insurance as to which an insurance company has not denied coverage or an indemnity) shall be rendered against the Borrower and/or any Subsidiary and the same shall remain undischarged for a period of 60 consecutive days during which execution shall not be effectively stayed;

(j)    an ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in a Material Adverse Effect.

(k)    any Loan Party contests in writing the validity or enforceability of any material provision of any Loan Document; or any Loan Party denies in writing that it has any or further liability thereunder (other than as a result of the discharge of such Loan Party in accordance with the terms of the Loan Documents);

(l)    other than with respect to *de minimis* items of Collateral not exceeding $1,000,000 in the aggregate, any Lien purported to be created by any Security Document shall cease to be, or shall be asserted in writing by any Loan Party not to be, a valid, perfected Lien having the priority contemplated thereby (except as otherwise expressly provided in this Agreement or such Security Document) on the securities, assets or properties purported to be covered thereby, except to the extent that any lack of validity, perfection or priority results from any act of the Collateral Agent, the Administrative Agent, or any Lender (so long as such act does not result from the breach or non-compliance by a Loan Party with the Loan Documents); or

Error! Unknown document property name.

(m)    the Restructuring Support Agreement shall have been terminated, other than as a result of a breach or default by the Consenting Second and Third Lien Creditors (as defined in the Restructuring Support Agreement);

then the DIP Agent may, and at the request of the Required Lenders shall, take any of the following actions, at the same or different times: (i) terminate forthwith the Commitments and the Borrowers' ability to request any further Drawings from the Escrow Account, (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any other liabilities of the Loan Party accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, other than as required by the DIP Order, all of which are hereby expressly waived by the Loan Parties, anything contained herein or in any other Loan Document to the contrary notwithstanding and (iii) freeze monies held by or on behalf of the DIP Agent or any Lender in any accounts (including the Escrow Account) and/or immediately set-off any and all amounts in any such accounts against the Obligations.  In addition, but subject to any notice and other limitations provided for in the DIP Order, the DIP Agent may, and at the request of the Required Lenders shall, exercise all other rights and remedies available to the DIP Agent and/or the Lenders under the DIP Order to effect the repayment of the Obligations. Each Loan Party shall remain liable to the DIP Agent and Lenders for the payment of any deficiency with interest at the highest rate provided for herein and all costs and expenses of collection or enforcement, including attorneys' fees and expenses.

No Loan Party shall seek to enjoin, hinder, delay or object to the DIP Agent's exercise of rights and remedies in accordance with the DIP Order in any jurisdiction, and, at any proceeding with respect to the DIP Agent's exercise of rights and remedies, no Loan Party shall raise any substantive objections, other than to challenge the occurrence of the relevant Event of Default.

For the purpose of enabling the DIP Agent to exercise the rights and remedies hereunder, each Loan Party hereby grants to the DIP Agent, to the extent assignable, an irrevocable, non-exclusive license (exercisable at any time an Event of Default shall exist or have occurred and for so long as the same is continuing) without payment of royalty or other compensation to such Loan Party, to use, assign, license or sublicense any of the trademarks, service-marks, trade names, business names, trade styles, designs, logos and other source of business identifiers and other intellectual property and general intangibles now owned or hereafter acquired by such Loan Party, wherever the same maybe located, including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout thereof.

In addition, to the extent provided above and in the DIP Order, the automatic stay provided in section 362 of the Bankruptcy Code shall, as provided in the DIP Order, be deemed automatically vacated to enable the DIP Agent and the Lenders to exercise their respective rights and remedies hereunder and thereunder without further action or order of the Bankruptcy Court.

**Error! Unknown document property name.**

# ARTICLE VIII

## The DIP Agent

**Section 8.01   *Appointment*.**  Each of the Lenders hereby irrevocably appoints the DIP Agent as its agent and authorizes the DIP Agent to take such actions on its behalf and to exercise such powers as are delegated to such DIP Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.  Without limiting the generality of the foregoing, the DIP Agent is hereby expressly authorized to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents.  The provisions of this Article VIII are exclusively between, and for the benefit of, the DIP Agent and the Lenders, and no Loan Party shall have any rights as a third party beneficiary under this Article VIII (except as expressly set forth in this Article VIII) and no Loan Party shall have any obligations under this Article VIII (except as expressly set forth in this Article VIII).  In performing its functions and duties hereunder, the DIP Agent shall act solely as agent of the Lenders and does not assume and shall not be deemed to have assumed any obligations towards or relationships of agency or trust with or for Holdings or any of its Subsidiaries.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the DIP Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

**Section 8.02   *DIP Agent Individually*.**  (a)  The institution serving as the DIP Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any subsidiary or other Affiliate thereof as if it were not an Agent hereunder.

(b)    The DIP Agent shall have no duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) the DIP Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, (b) the DIP Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the DIP Agent is instructed in writing to exercise by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 11.08), (c) the DIP Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the relevant Required Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the relevant Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action and (d) except as expressly set

Error! Unknown document property name.

forth in the Loan Documents, the DIP Agent shall not have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to Holdings, the Borrower or any of the subsidiaries thereof that is communicated to or obtained by the bank serving as DIP Agent or any of its Affiliates in any capacity.  Neither DIP Agent nor any of its officers, directors, employees, agents, attorneys in fact or Affiliates shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 11.08) or in the absence of its own gross negligence, bad faith or willful misconduct or material breach of the Loan Documents (as determined by a court of competent jurisdiction in a final and non-appealable judgment). DIP Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to the DIP Agent by the Borrower or a Lender, and DIP Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the perfection or priority of any Lien or security interest created or purported to be created under the Security Documents or (vi) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the DIP Agent.

**Section 8.03   Reliance**.  (a)  The DIP Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person.  DIP Agent may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  DIP Agent may consult with legal counsel (who may be counsel for the Borrower or any Affiliate thereof), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in good faith and in accordance with the advice of any such counsel, accountants or experts.

(b)     For purposes of determining compliance with the conditions specified in Article IV, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the DIP Agent shall have received notice from such Lender prior to the proposed Credit Event specifying its objection thereto.

**Section 8.04   Sub-Agents**.  DIP Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it.  DIP Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  Notwithstanding anything to the contrary herein, with respect to each sub-agent appointed by the DIP

71

Agent and the Related Parties of such DIP Agent, (a) each sub-agent and the Related Parties of the DIP Agent shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges including the exculpatory provisions of the preceding paragraphs and shall have all the rights and benefits of a third party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and indemnification rights) directly, without the consent or joinder of any other Person, against any or all of the Loan Parties and the Lenders (b) such rights, benefits and privileges (including exculpatory rights and indemnification rights) shall not be modified or amended without the consent of such sub-agent or Related Parties and (c) such sub-agent or Related Parties shall only have obligations to such Agent and not to any Loan Party, Lender or any other Person and no Loan Party, Lender or any other Person shall have any rights, directly or indirectly, as a third party beneficiary or otherwise, against such sub-agent or Related Party.

**Section 8.05   Resignation.** (a) Subject to the appointment and acceptance of a successor DIP Agent as provided below, the DIP Agent may resign at any time by notifying in writing the Lenders and the Borrower.  Upon receipt of any such notice of resignation of the DIP Agent, the Required Lenders shall have the right, with the consent of the Borrower (such consent not to be unreasonably withheld, and provided that no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing under paragraph (b), of Article VII), to appoint a successor (other than a Disqualified Institution) which shall be a commercial banking institution organized under the laws of the United States or any State or a United States branch or agency of a commercial banking institution, in each case having a combined capital and surplus of at least $500,000,000.

(b)   If no successor agent is appointed prior to the effective date of resignation of DIP Agent specified by the DIP Agent in its notice, the resigning DIP Agent may appoint, after consulting with the relevant Lenders and the Borrower, a successor agent from among the relevant Lenders.  If no successor agent has accepted appointment as the successor agent by the date which is 30 days following the retiring DIP Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the relevant Lenders shall perform all of the duties of the DIP Agent hereunder until such time, if any, as the Required  Lenders, appoint a successor agent as provided for above.  Upon the acceptance of any appointment as DIP Agent hereunder by a successor and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Security Documents and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to (a) continue the perfection of the Liens granted or purported to be granted by the Security Documents or (b) otherwise ensure that the obligations under Section 5.09 are satisfied, the successor DIP Agent shall thereupon succeed to and become vested with all the rights, powers, discretion, privileges, and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under the Loan Documents.  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the Agent's resignation hereunder, the provisions of this Article VIII and Section 11.05 shall

Error! Unknown document property name.

continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as Agent.  None of Lenders or other Persons identified on the cover page or signature pages of this Agreement as a "bookrunner" or "arranger" shall have any right, power, obligation, liability, responsibility or duty under this Agreement other than those applicable to all Lenders as such but shall have be entitled to all of the benefits of this Article VIII.  Without limiting the foregoing, none of the Lenders or other Persons so identified shall have or be deemed to have any fiduciary relationship with any Lender.

Section 8.06    *No Representation or Reliance*.  Each Lender expressly acknowledges that neither the DIP Agent nor any of its officers, directors, employees, agents, attorneys in fact or Affiliates have made any representations or warranties to it and that no act by the Agents hereafter taken, including any review of the affairs of a Loan Party or any Affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender.  Each Lender acknowledges that it has, independently and without reliance upon the DIP Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the DIP Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the DIP Agent hereunder, the DIP Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any Affiliate of a Loan Party that may come into the possession of the DIP Agent or any of its officers, directors, employees, agents, attorneys in fact or affiliates.

Section 8.07    *Withholding*.  To the extent required by any applicable law, the DIP Agent may withhold from any interest payment to any Lender an amount equivalent to any applicable withholding Tax.  If the IRS or any other Governmental Authority asserts a claim that the DIP Agent did not properly withhold tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the DIP Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding tax ineffective or for any other reason, such Lender shall indemnify the DIP Agent fully for all amounts paid, directly or indirectly, by the DIP Agent as Tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.  Each Lender hereby authorizes the DIP Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the DIP Agent under this paragraph.  The agreements in this paragraph shall survive the resignation and/or replacement of the DIP Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

Error! Unknown document property name.

**Section 8.08    Proceedings**.  (a)  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, including the Cases, the DIP Agent (irrespective of whether the Obligations shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the DIP Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise; (a) to file and prove a claim for the whole amount of the Obligations and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the DIP Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of such Lenders and the DIP Agent and their respective agents and counsel and all other amounts due such Lenders and the DIP Agent under Sections 2.05 and 11.05) allowed in such judicial proceeding; and (b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the DIP Agent and, in the event the DIP Agent shall consent to the making of such payments directly to the Lenders, to pay to the DIP Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the DIP Agent and its agents and counsel, and any other amounts due the DIP Agent under Sections 2.05 and 11.05.

(b)    Nothing contained herein shall be deemed to authorize the DIP Agent to authorize or consent to or accept or adopt on behalf of any relevant Lender any plan or reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any relevant Lender to authorize such DIP Agent to vote in respect of the claim of any such Lender in any such proceeding.

**Section 8.09    Releases**.  The DIP Agent is hereby irrevocably authorized by each of the Lenders to effect any release of Liens or guarantee obligations contemplated by Section 11.17.

## ARTICLE IX

## Guaranty

**Section 9.01    Guaranty; Limitation of Liability**.  (a)  Each Guarantor, jointly and severally, hereby absolutely, unconditionally and irrevocably guarantees the punctual payment when due, whether at scheduled maturity or on any date of a required prepayment or by acceleration, demand or otherwise, of all Obligations of each other Loan Party now or hereafter existing under or in respect of the Loan Documents (including, without limitation, any extensions, modifications, substitutions, amendments or renewals of any or all of the foregoing Obligations), whether direct or indirect, absolute or contingent, and whether for principal, interest, premiums, fees, indemnities, contract causes of action, costs, expenses or otherwise (such Obligations being the "Guaranteed Obligations"), and agrees to pay reasonable expenses (including, without

74

limitation, fees and expenses of counsel) incurred by the DIP Agent or any Lender in enforcing any rights under this Guaranty or any other Loan Documents.

(b)       Each Guarantor hereby unconditionally and irrevocably agrees that in the event any payment shall be required to be made to any Secured Party under this Guaranty or any other guaranty, such Guarantor will contribute, to the maximum extent permitted by law, such amounts to each other Guarantor and each other guarantor so as to maximize the aggregate amount paid to the Secured Parties under or in respect of the Loan Documents.

**Section 9.02    Guaranty Absolute**.  Each Guarantor guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of any Secured Party with respect thereto.  The Guaranteed Obligations of each Guarantor under or in respect of this Guaranty are independent of the Guaranteed Obligations or any other Obligations of any other Loan Party under or in respect of the Loan Documents, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce this Guaranty, irrespective of whether any action is brought against the Borrower or any other Loan Party or whether the Borrower or any other Loan Party is joined in any such action or actions.  The liability of each Guarantor under this Guaranty shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any or all of the following:

(a)       any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(b)       any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations or any other obligations of any other Loan Party under or in respect of the Loan Documents, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or any of its Subsidiaries or otherwise;

(c)       any taking, exchange, release or non-perfection of any Collateral or any other collateral, or any taking, release or amendment or waiver of, or consent to departure from, any other guaranty, for all or any of the Guaranteed Obligations;

(d)       any manner of application of Collateral or any other collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any Collateral or any other collateral for all or any of the Guaranteed Obligations or any other Obligations of any Loan Party under the Loan Documents or any other assets of any Loan Party or any of its Subsidiaries;

Error! Unknown document property name.

(e)    any change, restructuring or termination of the corporate structure or existence of any Loan Party or any of its Subsidiaries;

(f)    any failure of any Secured Party to disclose to any Loan Party any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party now or hereafter known to such Secured Party (each Guarantor waiving any duty on the part of the Secured Parties to disclose such information);

(g)    the failure of any other Person to execute or deliver this Agreement, any Guaranty Supplement or any other guaranty or agreement or the release or reduction of liability of any Guarantor or other guarantor or surety with respect to the Guaranteed Obligations; or

(h)    any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by any Lender Party that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety.

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by any Secured Party or any other Person.

**Section 9.03    Waivers and Acknowledgments**.  (a)  To the extent allowed under applicable law, but subject to the DIP Order, each Guarantor hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of nonperformance, default, acceleration, protest or dishonor and any other notice with respect to any of the Guaranteed Obligations and this Guaranty and any requirement that any Secured Party protect, secure, perfect or insure any Lien or any property subject thereto or exhaust any right or take any action against any Loan Party or any other Person or any Collateral.

(b)    Each Guarantor hereby unconditionally and irrevocably waives any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

(c)    Each Guarantor hereby unconditionally and irrevocably waives (i) any defense arising by reason of any claim or defense based upon an election of remedies by any Lender Party that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of such Guarantor or other rights of such Guarantor to proceed against any of the other Loan Parties, any other guarantor or any other Person or any Collateral and (ii) any defense based on any right of set-off or counterclaim against or in respect of the Guaranteed Obligations of such Guarantor hereunder.

(d)    Each Guarantor acknowledges that the DIP Agent may, without notice to or demand upon such Guarantor and without affecting the liability of

76

such Guarantor under this Guaranty, foreclose on any Collateral by nonjudicial sale, and each Guarantor hereby waives any defense to the recovery by DIP Agent and the other Secured Parties against such Guarantor of any deficiency after such nonjudicial sale and any defense or benefits that may be afforded by applicable law.

(e)    Each Guarantor hereby unconditionally and irrevocably waives any duty on the part of any Secured Party to disclose to such Guarantor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party or any of its Subsidiaries now or hereafter known by such Secured Party.

(f)    Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by the Loan Documents and that the waivers set forth in Section 9.02 and this Section 9.03 are knowingly made in contemplation of such benefits.

**Section 9.04    Subrogation**.  Each Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against the Borrower, any other Loan Party or any other insider guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's Guaranteed Obligations under or in respect of this Guaranty or any other Loan Document, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of any Secured Party against the Borrower, any other Loan Party or any other insider guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from the Borrower, any other Loan Party or any other insider guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations and all other amounts payable under this Guaranty shall have been paid in full in cash and the Commitments shall have expired or been terminated.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the latest of (a) the payment in full in cash of the Guaranteed Obligations and all other amounts payable under this Guaranty and (b) the Maturity Date, such amount shall be received and held in trust for the benefit of the Secured Parties, shall be segregated from other property and funds of such Guarantor and shall forthwith be paid or delivered to the DIP Agent in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Guaranty, whether matured or unmatured, in accordance with the terms of the Loan Documents, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Guaranty thereafter arising.  If (i) any Guarantor shall make payment to any Lender Party of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this Guaranty shall have been paid in full in cash, (iii) the Maturity Date and (iv) all Letters of Credit shall have expired or been terminated, the Secured Parties will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to

Error! Unknown document property name.

evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment made by such Guarantor pursuant to this Guaranty.

Section 9.05   *Guaranty Supplements*.  If any Loan Party creates or acquires a Subsidiary on or after the Closing Date, such Loan Party shall cause such Subsidiary to be a Guarantor hereunder by executing and delivering a guaranty supplement in form and substance satisfactory to the DIP Agent (each, a "Guaranty Supplement"), whereupon (a) such Person shall be referred to as an "Additional Guarantor" and shall become and be a Guarantor hereunder, and each reference in this Guaranty to a "Guarantor" shall also mean and be a reference to such Additional Guarantor, and each reference in any other Loan Document to a "Subsidiary Guarantor" shall also mean and be a reference to such Additional Guarantor, and (b) each reference herein to "this Guaranty," "hereunder," "hereof" or words of like import referring to this Guaranty, and each reference in any other Loan Document to the "Guaranty," "thereunder," "thereof" or words of like import referring to this Guaranty, shall mean and be a reference to this Guaranty as supplemented by such Guaranty Supplement.

Section 9.06   *Subordination*.  Each Guarantor hereby subordinates any and all debts, liabilities and other obligations owed to such Guarantor by any other Loan Party to the Guaranteed Obligations.

Section 9.07   *Continuing Guaranty; Assignments*.  This Guaranty is a continuing guaranty and shall (a) remain in full force and effect until the payment in full of the Guaranteed Obligations and all other amounts payable under this Guaranty including, for the avoidance of doubt, pursuant to Section 2.08(a), (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Secured Parties and their successors, transferees and assigns.  Without limiting the generality of clause (c) of the immediately preceding sentence, any Secured Party may assign or otherwise transfer all or any portion of its rights and obligations under this Agreement to any other Person as permitted hereunder, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to such Secured Party herein.  No Guarantor shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Secured Parties as provided herein.

## ARTICLE X

### Collateral

Section 10.01  **Grant of Security Interest**.  To secure payment and performance of all Obligations, each Loan Party hereby grants to the Collateral Agent, for itself and the benefit of the Secured Parties, a continuing security interest in, a lien upon, and a right of set-off against, and hereby assigns to the DIP Agent, for itself and the benefit of the Secured Parties, as security for the Obligations, all tangible and intangible property of such Loan Party, whether now owned or hereafter acquired or existing and wherever located, including, without limitation, all inventory, accounts receivable,

78

general intangibles, contracts, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, including the Escrow Account and the Escrow Funds, commercial tort claims, securities accounts, goods, instruments, investment property, letter-of-credit rights, payment intangibles, documents, all Books and Records, vehicles, intellectual property, securities, partnership or membership interests in limited liability companies and capital stock, including, without limitation, the products, proceeds and supporting obligations thereof, and subject to entry by the Bankruptcy Court of the Final Order, the proceeds of any causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code (collectively, the "Collateral"), but excluding any Excluded Collateral. Pursuant to the DIP Order, the Obligations are, pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to a Super-priority Claim against the Debtors, with priority over any and all other claims against the Debtors, other than the Carve-Out, the First Lien Indebtedness and the Permitted Adequate Protection Provision to the extent provided in the DIP Order, now existing or hereafter arising, of any kind whatsoever.

**Section 10.02 Perfection and Priority of Security Interests.** All Obligations shall at all times, subject to the Carve-Out, the First Lien Indebtedness and the Permitted Adequate Protection Provision to the extent provided in the DIP Order:

(a)     be entitled to a first priority, perfected security interest in, and Lien under Section 364(c)(2) of the Bankruptcy Code upon all of the Collateral of each Loan Party and each Loan Party's estate that, on or as of the Filing Date is not subject to valid, perfected and non-avoidable Liens and, for the avoidance of doubt, shall include the Escrow Account and the Escrow Funds;

(b)     be secured by a junior Lien, under Section 364(c)(3) of the Bankruptcy Code upon all of the Collateral of each Loan Party and of each Loan Party's estate that is, as of the Filing Date, subject to Liens securing the First Lien Indebtedness; and

(c)     have a first priority, perfected priming security interest in and Lien under Section 364(d)(1) of the Bankruptcy Code upon all Collateral subject to the Prepetition Primed Liens, in all cases senior to (i) the Prepetition Primed Liens and (ii) all other Liens and obligations secured by the Collateral that are junior to or *pari passu* with Prepetition Primed Liens.

**ARTICLE XI**

**Miscellaneous**

**Section 11.01 Notices.** Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax, as follows:

(a)     if to the Borrower, to:

79

c/o Altegrity, Inc.
7799 Leesburg Pike, Suite N1100
Falls Church, VA 22043
Attention: Jeffrey Campbell, Chief Financial Officer
Facsimile: 212-539-2631

with a copy to (which shall not constitute notice):

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
Attention: M. Natasha Labovitz
Facsimile: 212-909-6836;

(b)      if to the DIP Agent, to Cantor Fitzgerald Securities:

Cantor Fitzgerald Securities
110 East 59th Street
New York, NY 10022
Attention: Nils E. Horning
Telephone: 212-829-4889
Facsimile: 212-504-7954
E-mail: nhorning@cantor.com

with copies to (which shall not constitute notice):

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Attention: Brian S. Hermann
Telephone: (212) 373-3545
Facsimile: (212) 492-0545
E-mail: bhermann@paulweiss.com

and

Cantor Fitzgerald Securities
900 West Trade, Suite 725
Charlotte, NC 28202
Attention: Bobbie Young
Telephone: 704-374-0574
Facsimile: 646-390-1764
E-mail: BankLoansAgency@cantor.com

(c)      if to a Lender, to it at its address (or fax number) set forth
on Schedule 2.01 or in the Assignment and Assumption or joinder agreement pursuant to
which such Lender shall have become a party hereto.

80

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or on the date 3 Business Days after dispatch by certified or registered mail if mailed, in each case, delivered, sent or mailed (properly addressed) to such party as provided in this Section 11.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 11.01.  As agreed to among the Borrower, the DIP Agent and the applicable Lenders from time to time in writing, notices and other communications may also be delivered or furnished by e-mail; provided that approval of such procedures may be limited to particular notices or communications.  All such notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient.

Section 11.02  **Survival of Agreement**.  All covenants, agreements, representations and warranties made by Holdings and the Borrower herein or any other Loan Document, shall be considered to have been relied upon by the DIP Agent and the Lenders and shall survive the making by the Lenders of the Loans, regardless of any investigation made by the DIP Agent or the Lenders or on their behalf, and notwithstanding that the DIP Agent or any Lender may have had notice or actual knowledge of any Default at the time of any Credit Event shall continue in full force and effect until the Effective Date.  The provisions of Sections 2.08, 2.11, 2.15 and 11.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of or against the DIP Agent or any Lender.

Section 11.03  **Binding Effect**.  This Agreement shall become effective when it shall have been executed by Holdings, the Borrower, the DIP Agent and the Lenders.

Section 11.04  **Successors and Assigns**.

(a)    Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of Holdings and the Borrower, the DIP Agent or the Lenders that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.

(b)    Each Lender may assign to one or more assignees (other than to a natural person, Holdings, its Subsidiaries or an Affiliated Person) all or a portion of its interests, rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided, however, that

Error! Unknown document property name.

(i) each of the DIP Agent and the Borrower must give its prior written consent to such assignment (which consent shall not be unreasonably withheld or delayed); provided that no such consent shall be required for an assignment of a Loan to another Lender (other than a Defaulting Lender) or an Affiliate or Related Fund of a Lender subject to any requirements in the Restructuring Support Agreement (in each case, other than to Disqualified Institutions) (each, an "Eligible Assignee") and the consent of the Borrower shall not be required for any assignment during the continuance of any Event of Default, (ii) the amount of the Commitment or Loans, of the assigning Lender subject to each such assignment (determined as of the date of the Assignment and Assumption with respect to such assignment is delivered to the DIP Agent) shall not be less than $1,000,000 (or if less, the entire remaining amount of such Lender's Commitment or Loans) or such other minimum amount as may be agreed by the Borrower and the DIP Agent; provided, however, that simultaneous assignments to two or more Related Funds shall be combined for purposes of determining whether the minimum assignment requirement is met, and (B) in the case of any assignment to any Eligible Assignee, after giving effect to such assignment, the aggregate Commitments or Loan, of the assigning Lender and its Affiliates and Related Funds shall be zero or not less than $1,000,000 and the aggregate Commitments or Loan, of the assignee Lenders and their Affiliates and Related Funds shall be not less than $1,000,000, (iii) the parties to each such assignment shall execute and deliver to the DIP Agent an Assignment and Assumption (such Assignment and Assumption to be (A) electronically executed and delivered to the DIP Agent via an electronic settlement system then acceptable to the DIP Agent (or, if previously agreed with the DIP Agent, manually), and (B) delivered together with a processing and recordation fee of $3,500, unless waived or reduced by the DIP Agent in its sole discretion; provided that only one such fee shall be payable in connection with simultaneous assignments by or to two or more Related Funds, and (iv) the assignee, if it shall not already be a Lender immediately prior to the assignment, shall deliver to the DIP Agent an Administrative Questionnaire and the tax forms required under Section 2.15(e) or (f), as applicable.  Upon acceptance and recording pursuant to Section 11.04(e), from and after the effective date specified in each Assignment and Assumption, (A) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement and (B) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.11, 2.15 and 11.05 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Any assignment or transfer that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 11.04(f).

(c)     By executing and delivering an Assignment and Assumption, the assigning Lender thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows: (i) such assigning Lender warrants that it is the legal and beneficial owner of the interest

being assigned thereby free and clear of any adverse claim and that its Commitment and the outstanding balance of its Loan, in each case without giving effect to assignments thereof which have not become effective, are as set forth in such Assignment and Assumption, (ii) except as set forth in (i) above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of Holdings, the Borrower or any Subsidiary or the performance or observance by Holdings, the Borrower or any Subsidiary of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, (iii) such assignee represents and warrants that it is legally authorized to enter into such Assignment and Assumption, (iv) such assignee confirms that it has received a copy of this Agreement, together with copies of the most recent financial statements referred to in Section 3.05 or delivered pursuant to Section 5.04 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Assumption, (v) such assignee will independently and without reliance upon the DIP Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement, (vi) such assignee appoints and authorizes the DIP Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the DIP Agent by the terms hereof, together with such powers as are reasonably incidental thereto and (vii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)     The DIP Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders and any changes thereto, whether by assignment or otherwise, and the Commitment of, and principal amount of the Loans (and related interest amount and fees with respect to such Loan) owing and paid to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive and the Borrower, the DIP Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower at any reasonable time and from time to time upon reasonable prior notice.  Any assignment or transfer of all or part of a Loan evidenced by a note shall be registered on the Register only upon surrender for registration of assignment or transfer of the note evidencing such Loan, accompanied by a duly executed Assignment and Assumption; thereupon one or more new notes in the same aggregate principal amount shall be issued to the designated assignee, and the old notes shall be returned by the DIP Agent to the Borrower marked "canceled".

(e)     Upon its receipt of, and consent to, a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, an

Error! Unknown document property name.

Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) above, if applicable, and the written consent of the DIP Agent and the Borrower to such assignment (in each case to the extent required pursuant to paragraph (b) above) and any applicable tax forms required by Section 2.15(e) or (f), as applicable, the DIP Agent shall (i) accept such Assignment and Assumption and (ii) promptly record the information contained therein in the Register.  No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph (e).  On or prior to such effective date, the Borrower, at its own expense, upon request, shall execute and deliver to the DIP Agent (in exchange for the note of the assigning Lender) a new note to the order of such assignee in an amount equal to the Loan assumed or acquired by it pursuant to such Assignment and Assumption and, if the assignor has retained a Loan upon request, a new Loan note to the order of the assignor in an amount equal to the Loan retained by it hereunder.  Such new note shall be dated the date hereof and shall otherwise be in the form of the note replaced thereby.

(f)        Each Lender may without the consent of the Borrower or the DIP Agent sell participations to one or more banks or other Persons (other than to Disqualified Institutions, Holdings, its Subsidiaries or an Affiliated Person and other than to a natural person) in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided, however, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other Persons shall be entitled to the benefit of the cost protection provisions contained in Sections 2.11 and 2.15 to the same extent as if they were Lenders (but, with respect to any particular participant, to no greater extent than the Lender that sold the participation to such participant and in the case of Section 2.15, only if such participant shall have provided any form of information that it would have been required to provide under such Section if it were a Lender), (iv) to the extent permitted by applicable law, each participant also shall be entitled to the benefits of Section 11.06 as though it were a Lender, so long as such participant agrees to be subject to Section 2.13 as though it were a Lender and (v) the Borrower, the DIP Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right to enforce the obligations of the Borrower relating to the Loan and to approve any amendment, modification or waiver of any provision of this Agreement (other than amendments, modifications or waivers described in clauses (i), (ii) and (iii) of Section 11.08(b) as it pertains to the Loans or Commitments in which such participant has an interest).  Each Lender selling a participation to a participant shall keep a register (a "Participant Register") of each such participation, specifying such participant's entitlement to payments of principal and interest with respect to such participation; provided, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identify of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or any information relating to a participant's interest in any comments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent such disclosure is necessary to establish

Error! Unknown document property name.

that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.

(g)       Any Lender or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 11.04, disclose to the assignee or participant or proposed assignee or participant any non-public information relating to the Borrower furnished to such Lender by or on behalf of the Borrower; provided that prior to any such disclosure, each such assignee or participant or proposed assignee or participant shall execute an agreement whereby such assignee or participant shall agree (subject to customary exceptions) to preserve the confidentiality of such non-public information on terms no less restrictive than those applicable to the Lenders pursuant to Section 11.16.

(h)       Any Lender may, without the consent of the Borrower or the DIP Agent, at any time assign all or any portion of its rights under this Agreement to secure extensions of credit to such Lender or in support of obligations owed by such Lender; provided that no such assignment shall release a Lender from any of its obligations hereunder or substitute any such assignee for such Lender as a party hereto.

(i)       The Borrower shall not assign or delegate any of its rights or duties hereunder without the prior written consent of the DIP Agent and each Lender, and any attempted assignment without such consent shall be null and void.

(j)       Notwithstanding anything to the contrary contained herein, any Lender that is a fund may create a security interest in all or any portion of the Loans owing to it and the notes, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such fund as security for such obligations or securities, provided that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(k)       Notwithstanding anything to the contrary, the DIP Agent shall not have any responsibility or liability for monitoring the list of Disqualified Institutions or enforcing the Borrower's or any Lender's compliance with the terms of any provision set forth herein with respect to Disqualified Institutions or otherwise have any liability with respect to (i) any participation of a Disqualified Institution, (ii) any assignment to an affiliate of a financial institution, investor or competitor, (iii) assignment to a Disqualified Institution to which the Borrower has consented in writing or (iv) any other assignment to a Disqualified Institution except to the extent of any liability determined by a court of competent jurisdiction in a final and non-appealable decision to have resulted from the gross negligence or willful misconduct of the DIP Agent.  The DIP Agent is authorized, but not required to, publish the list of Disqualified Institutions on Intralinks®, Syndatrak® or similar electronic system and authorized to provide such list to any Lender.

85

### Section 11.05 Expenses; Indemnity.

(a)     The Borrower agrees to pay (i) all reasonable out- of-pocket expenses (including, as to legal fees and expenses, to those of Paul, Weiss, Rifkind, Wharton & Garrison LLP (or any replacement thereof), counsel for the DIP Agent and the Lenders taken as a whole, and, if necessary, of one local counsel and one regulatory counsel in any relevant jurisdiction) incurred by the DIP Agent and the Lenders in connection with the preparation and administration of this Agreement, the other Loan Documents and any other documents contemplated herein and prepared in connection herewith and therewith or in connection with the Cases and with respect to any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions hereby or thereby contemplated shall be consummated) and (ii) all reasonable out-of-pocket expenses (but limited, as to legal fees and expenses, to one counsel for the DIP Agent and, if necessary, one counsel for all the Lenders taken as a whole, and, if necessary, of one local counsel and one regulatory counsel to the DIP Agent and one of each for all the Lenders taken as a whole in any relevant jurisdiction) incurred by the DIP Agent or the Lenders in connection with the Cases and the enforcement or protection of its rights or remedies in connection with this Agreement, the other Loan Documents or any other documents contemplated herein and prepared in connection herewith and therewith or in connection with the Loans made hereunder.

(b)     The Borrower agrees to indemnify the DIP Agent, each Lender and each Related Party of any of the foregoing Persons and their successors and assigns (each such Person being called an "Indemnitee") against, and to hold each Indemnitee harmless from, any and all costs, expenses (including reasonable fees, out-of-pocket disbursements and other charges of one primary counsel, one regulatory counsel and one local counsel to the Indemnitees taken as a whole in each relevant jurisdiction; provided that if (i) one or more Indemnitees shall have reasonably concluded that there may be legal defenses available to it that are different from or in addition to those available to one or more other Indemnitees or (ii) the representation of the Indemnitees (or any portion thereof) by the same counsel would be inappropriate due to actual or potential differing interests between them, then such expenses shall include the reasonable fees, out-of-pocket disbursements and other charges of one separate counsel to such Indemnitees, taken as a whole, in each relevant jurisdiction), and liabilities of such Indemnitee arising out of or in connection with (w) the execution, delivery and enforcement of this Agreement or any other Loan Document or any agreement or instrument contemplated thereby, the performance by the parties thereto of their respective obligations thereunder, (x) the use of the proceeds of the Loans, (y) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (and regardless of whether such matter is initiated by a third party or by the Borrower, any other Loan Party or any of their respective Affiliates), or (z) any actual or alleged presence or Release of Hazardous Materials on any property currently or formerly owned or operated by Holdings, the Borrower or any of the subsidiaries, or any liability under Environmental Laws related in any way to Holdings, the Borrower or the subsidiaries; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such costs, expenses or liabilities (x) are found by a final and non- appealable decision of a court of

Error! Unknown document property name.

competent jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee (or its Related Parties) or material breach of its (or its Related Parties') obligations hereunder, (y) relate to the presence or Release of Hazardous Materials that first occur at any property owned by Holdings or the Borrower after such property is transferred to any Indemnitee or its successors or assigns by foreclosure, deed-in-lieu of foreclosure or similar transfer or (z) resulted from a dispute solely among Indemnitees.  Notwithstanding the foregoing, this Section 11.05 shall not apply to Tax matters, which shall be governed exclusively by Section 2.15.  Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower agrees not to assert and to cause its subsidiaries not to assert, and hereby waives and agrees to cause its subsidiaries so to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee.

(c)     To the extent that the Borrower fails to pay any amount required to be paid by it to the DIP Agent or any other Indemnitee related thereto under paragraph (a) or (b) of this Section (and without limiting its obligation to do so), each Lender severally agrees to pay to such Indemnitee, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, DIP Agent or any other Indemnitee related thereto under paragraph (a) or (b) of this Section 11.05, each Lender.  For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the outstanding Loans and unused Commitments at the time.

(d)     To the extent permitted by applicable law, no party hereto shall assert, and each party hereto hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof.

(e)     The provisions of this Section 11.05 shall survive the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the DIP Agent or any Lender.  All amounts due under this Section 11.05 shall be payable within 30 days after receipt of an invoice relating thereto setting forth such amounts in reasonable detail.

### Section 11.06 Right of Setoff; Payments Set Aside.

(a)     Subject to the DIP Order, if an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, except to the extent prohibited by law, without prior notice to the Borrower or

Error! Unknown document property name.

any other Loan Party, any such notice being waived by Borrower (on its own behalf and on behalf of each Loan Party and its subsidiaries) to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement and other Loan Documents held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although such obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or indebtedness. The rights of each Lender under this Section 11.06 are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.  Each Lender agrees promptly to notify the Borrower and the DIP Agent after any such set off and application made by such Lender; provided that the failure to give such notice shall not affect the validity of such set off and application.

(b)     To the extent that any payment by or on behalf of the Borrower is made to the DIP Agent or any Lender, or the DIP Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the DIP Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, then (i) to the extent of such recovery the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (ii) each Lender severally agrees to pay to the DIP Agent upon demand its applicable share of any amount so recovered from or repaid by the DIP Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.

**Section 11.07 Applicable Law**.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, EXCEPT TO THE EXTENT GOVERNED BY THE BANKRUPTCY CODE.

**Section 11.08 Waivers; Amendment**.

(a)     No failure or delay of the DIP Agent or any Lender in exercising any power or right hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the DIP Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by clause (b) below, and then such waiver or consent shall be effective only in the specific instance

Error! Unknown document property name.

and for the purpose for which given.  No notice or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

(b)    Except for those actions expressly permitted to be taken by the DIP Agent, neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Required Lenders and the Loan Parties that are party thereto and are affected by such waiver, amendment or modification; provided, however, that no such agreement shall except as contemplated by the Restructuring Support Agreement, (i) reduce the principal amount of, or extend or waive the final scheduled maturity date or date for the payment of any interest on, any Loan, forgive any such payment or any part thereof, or decrease the rate of interest on any Loan, without the prior written consent of each Lender directly and adversely affected thereby, (ii) increase or extend the Commitment or decrease or extend the date for payment of any fees of any Lender without the prior written consent of such Lender, (iii) amend or modify the pro rata requirements of Section 2.12, the provisions of Section 2.13, the provisions of this Section 11.08 (except as set forth below) or the release all or substantially all of the Guarantors or all or substantially all of the Collateral (except as permitted under Section 6.04 or contemplated by the Restructuring Support Agreement), without the prior written consent of each Lender, or (iv) reduce the percentage contained in the definition of the term "Required Lenders" without the prior written consent of each Lender; provided, further, that no such agreement shall amend (including any amendment of this Section 11.08(b)), modify or otherwise affect the rights or duties of the DIP Agent hereunder or under any other Loan Document without the prior written consent of the DIP Agent.

(c)    Each waiver, amendment, modification, supplement or consent made or given pursuant to this Section 11.08 shall be effective only in the specific instance and for the specific purpose for which given, and such waiver, amendment, modification or supplement shall apply equally to each of the Lenders and shall be binding on the Loan Parties, the Lenders, the DIP Agent and all future holders of the Loans and Commitments.

**Section 11.09 Interest Rate Limitation**.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section 11.09 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount shall have been received by such Lender.

Error! Unknown document property name.

**Section 11.10  Entire Agreement**.  This Agreement and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof.  Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents.  Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any Person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder and, to the extent expressly contemplated hereby, the Indemnitees, the Related Parties of each of the DIP Agent and the Lenders) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

**Section 11.11  WAIVER OF JURY TRIAL**.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.11.

**Section 11.12  Severability**.  In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

**Section 11.13  Counterparts**.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in Section 11.03.  Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

**Section 11.14  Headings**.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this

Error! Unknown document property name.

Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

### Section 11.15 Jurisdiction; Consent to Service of Process.

(a)        Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and any appellate court thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such court(s); provided that if the Bankruptcy Court does not have (or abstains from exercising) jurisdiction, then the courts of the State of New York sitting in New York County, and of the United States District Court of the Southern District of New York, and any appellate court from any thereof shall have exclusive jurisdiction with respect to any of the foregoing and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such Federal Court.  The Loan Parties waive, to the extent permitted under applicable law, any right each may have to assert the doctrine of *forum non conveniens* or to object to venue to the extent any proceeding is brought in accordance with this Section 11.15(a).  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)        Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 11.01.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

### Section 11.16 Confidentiality.  Each of the DIP Agent and the Lenders
agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' trustees, officers, directors, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential) in connection with the transactions contemplated or permitted hereby, (b) to the extent requested by any Governmental Authority having jurisdiction over such Person (including any Governmental Authority regulating any Lender or its Affiliates) or required to be disclosed in connection with the Cases, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process (provided, that the DIP Agent or such Lender that discloses any Information pursuant to this clause (c) shall provide the Borrower with prompt notice of such disclosure to the extent permitted by applicable law), (d) to the extent reasonably necessary in connection with the exercise of any remedies hereunder or under the other Loan Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder,

Error! Unknown document property name.

(e) subject to an agreement containing provisions substantially the same as those of this Section 11.16 (or as otherwise may be acceptable to the Borrower), to any actual or prospective assignee of or participant in any of its rights or obligations under this Agreement and the other Loan Documents, (f) with the written consent of the Borrower, (g) to any Rating Agency when required by it (it being understood that, prior to any such disclosure, such Rating Agency shall undertake to preserve the confidentiality of any Information relating to the Loan Parties received by it from such Person) or (h) to the extent such Information becomes publicly available other than as a result of a breach of this Section 11.16.  For the purposes of this Section, "Information" shall mean all information received from the Borrower or Holdings and related to the Borrower or its business, other than any such information that is publicly available to the DIP Agent or any Lender, other than by reason of disclosure by DIP Agent or any Lender in breach of this Section 11.16.

Section 11.17 Release of Collateral.  The Lenders irrevocably authorize the DIP Agent (and the DIP Agent agrees):

(i)    to release any Lien on any property granted to or held by the DIP Agent under any Loan Document (w) upon the Effective Date (and, concurrently therewith, to release all the Loan Parties from their obligations under the Loan Documents (other than those that specifically survive the Effective Date)), (x) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document to any Person other than a Loan Party, (y) subject to Section 11.01, if approved, authorized or ratified in writing by the Required Lenders, or (z) owned by a Subsidiary Guarantor upon release of such Guarantor from its obligations under its Guaranty pursuant to clause (ii) below;

(ii)    to release any Subsidiary Guarantor from its obligations under any Loan Document to which it is a party if such Person ceases to be a Subsidiary as a result of a transaction or designation permitted hereunder.

Upon request by the DIP Agent at any time, the Required Lenders will confirm in writing the DIP Agent's authority to release its interest in particular types or items of property, or to release any Subsidiary Guarantor from its obligations under the Loan Documents pursuant to this Section 11.17.  In each case as specified in this Section 11.17, the DIP Agent will, at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Loan Documents, or to release such Loan Party from its obligations under the Loan Documents, in each case, in accordance with the terms of the Loan Documents and this Section 11.17.

Section 11.18 USA PATRIOT Act Notice.  Each Lender and the DIP Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name

92

Error! Unknown document property name.

and address of the Borrower and other information that will allow such Lender or the DIP Agent, as applicable, to identify the Borrower in accordance with the USA PATRIOT Act.

       ***Section 11.19 Lender Action***.  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the DIP Agent.  The provision of this <u>Section 11.19</u> are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

**Error! Unknown document property name.**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized  officers as of the day and year first above written.

[INSERT]


By: _____
          Name:
          Title:

[Signature page to DIP Credit Agreement]

**EXHIBIT C**

FORM OF INTERIM ORDER

**CONFIDENTIAL – ATTORNEY WORK PRODUCT**
**Debevoise & Plimpton Draft February 5, 2015**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ALTEGRITY, INC., *et al.*,[1] | Case No. 15-_____ (___) |
| Debtors. | Joint Administration Pending |

**INTERIM ORDER (A) AUTHORIZING POSTPETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363 AND 364, (B) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (C) AUTHORIZING THE USE OF CASH COLLATERAL, (D) GRANTING ADEQUATE PROTECTION AND (E) SCHEDULING A FINAL HEARING**

Upon the motion (the "**Motion**")[2] of the debtors (the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), pursuant to sections 105(a), 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 and Local Rules 2002-1 and 4001-2 for an interim order (this "**Order**"), *inter alia*:

(a)     authorizing the Debtors to obtain postpetition secured debtor-in-possession financing (the "**DIP Facility**") up to an aggregate principal amount of $90,000,000 pursuant to the terms and conditions of that certain Superpriority Debtor-in-Possession Credit and Guaranty Agreement (substantially in the form attached to the Motion as **Exhibit 1**, and as hereafter

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Altegrity, Inc. (9985); Albatross Holding Company, LLC (2688); Albatross Marketing and Trading, LLC (8643); Altegrity Acquisition Corp. (1480); Altegrity Holding Corp. (1481); Altegrity Risk International LLC (6350); Altegrity Security Consulting, Inc. (5452); CVM Solutions, LLC (9526); D, D & C, Inc. (9552); Engenium Corporation (2269); FDC Acquisition, Inc. (2387); HireRight Records Services, Inc. (1944); HireRight Solutions, Inc. (8954); HireRight Technologies Group, Inc. (1660); HireRight, Inc. (5016); John D. Cohen, Inc. (1738); KCMS, Inc. (0085); KIA Holding, LLC (1333); Kroll Associates, Inc. (6880); Kroll Background America, Inc. (4830); Kroll Crisis Management Group, Inc. (3811); Kroll Cyber Security, Inc. (2393); Kroll Factual Data, Inc. (9911); Kroll Holdings, Inc. (4648); Kroll Inc. (1019); Kroll Information Assurance, Inc. (2283); Kroll Information Services, Inc. (2381); Kroll International, Inc. (1243); Kroll Ontrack Inc. (1650); Kroll Recovery LLC (7082); Kroll Security Group, Inc. (5514); National Diagnostics, Inc. (7132); Ontrack Data Recovery, Inc. (3148); Personnel Records International, LLC (0716); The Official Information Company (1805); US Investigations Services, LLC (9260); USIS International, Inc. (3617); and USIS Worldwide, Inc. (4258).  The location of the Debtors' corporate headquarters is 7799 Leesburg Pike, Suite 1100 North, Falls Church, VA 22043.

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "**DIP Loan Agreement**") by and among Altegrity, Inc. (the "**Borrower**"), the other Debtors as guarantors (the "**Guarantors**"), Cantor Fitzgerald Securities, as administrative agent and collateral agent (the "**DIP Agent**"), and the lenders named therein (the "**DIP Lenders**"), and incur the "Obligations" under the DIP Loan Agreement (such Obligations, as provided for, and defined in, the DIP Loan Agreement, shall be referred to herein as the "**DIP Obligations**") (the DIP Loan Agreement together with all agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "**DIP Documents**");

(b)    authorizing the Debtors to execute and deliver the DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection herewith and therewith;

(c)    subject to the terms of the DIP Loan Agreement and this Order, authorizing the Debtors to grant liens in favor of the DIP Agent (for the ratable benefit of the DIP Agent and the DIP Lenders) on all prepetition and postpetition property of the Debtors' estates and all proceeds thereof, junior and subordinate only to the First Priority Adequate Protection Liens, the Senior Priority Liens and the Carve-Out (each as defined below) pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and to accord the DIP Obligations superpriority administrative claim status on the terms set forth in this Order;

(d)    authorizing the Debtors to use cash collateral pursuant to sections 363(c) of the Bankruptcy Code and Rule 4001(b) of the Federal Rules of Bankruptcy Procedure

(the "**Bankruptcy Rules**") and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), including Local Rule 4001-2, on the terms and conditions set forth in this Order;

(e)     authorizing the Debtors to provide adequate protection to (i) Goldman Sachs Bank USA, in its capacity as Administrative Agent and Collateral Agent (the "**Prepetition First Lien Agent**") under, and to the lenders (including the Term Lenders, the Revolving Credit Lenders, the Swingline Lenders, and the Issuing Banks (in each case, as defined in the Prepetition Credit Agreement)) (the "**Prepetition First Lien Lenders**") party to, the Prepetition Credit Agreement (as defined below) on account of the Prepetition Term Loan (as defined below), and (ii) Wilmington Trust, National Association solely in its capacity as Trustee and Note Collateral Agent (the "**Prepetition First Lien Notes Agent**" and, together with the Prepetition First Lien Agent, the "**Prepetition First Lien Agents**") under, and to the holders (the "**Prepetition First Lien Holders**," and together with the Prepetition First Lien Lenders and the Prepetition First Lien Agents, collectively, the "**First Lien Secured Parties**") of notes (the "**Prepetition First Lien Notes**") issued pursuant to the First Lien Indenture (as defined below), to protect the First Lien Secured Parties from any diminution in value of their interests in the Prepetition Collateral (as defined below) resulting from (i) the Debtors' use of Cash Collateral (as defined below), (ii) the use, sale or lease of the Prepetition Collateral (other than Cash Collateral) and (iii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code;

(f)     authorizing the Debtors to immediately borrow under the DIP Facility, which shall be fully funded into escrow upon the entry of this Order, up to an aggregate principal or face amount of $90,000,000, with no more than $22,500,000 available for draws pending entry

of the Final Order (as defined below), with such draws being available to (i) fund expenses for working capital purposes of the Debtors and to otherwise fund the operations and administration of the Debtors during these Chapter 11 Cases, (ii) make Adequate Protection Payments (as defined below) and (iii) pay costs and expenses in connection with the DIP Documents and these Chapter 11 Cases, including, but not limited to, professional expenses; and

(g)    setting the date for the hearing (the "**Final Hearing**") to consider the entry of a final order (the "**Final Order**") authorizing and approving, on a final basis, the transactions described in the foregoing clauses.

The Court having considered the Motion, the First Day Declaration, the exhibits attached thereto, the DIP Documents, and the evidence submitted at the interim hearing held on February [●], 2015 (the "**Interim Hearing**"); and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and adequate notice of the Motion and the Interim Hearing and opportunity for objection having been given under the circumstances; and the Interim Hearing to consider the interim relief requested in the Motion having been held and concluded; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein and that such relief is in the best interests of the Debtors, their estates, their creditors and all parties in interest and is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing; and any objections to the Motion having been withdrawn or overruled on the merits; and upon all of

**CONFIDENTIAL – ATTORNEY WORK PRODUCT**
**Debevoise & Plimpton Draft February 5, 2015**

the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

A.     The Motion.  The Motion is granted on an interim basis as set forth herein.  Any objection to the Motion to the extent not withdrawn or resolved is hereby overruled.

B.     Debtor-in-Possession Operation.  On February **[8]**, 2015 (the "**Commencement Date**"), each of the Debtors commenced with this Court a voluntary case under the Bankruptcy Code.  Each Debtor is authorized to continue to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

C.     Jurisdiction.  This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware,* dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D), and the Debtors confirmed their consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with the Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection with the Motion consistent with Article III of the United States Constitution.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for relief requested herein are sections 105(a), 361, 362, 363 and 364 of the Bankruptcy Code, Rules 2002, 4001 and 9014 of the Bankruptcy Rules and Local Rules 2002-1 and 4001-2.

D.     Notice.  Notice of the Interim Hearing and the relief requested in the Motion was given [on the Commencement Date] [by electronic mail, facsimile and/or overnight delivery] to (i) the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"),

Error! Unknown document property name.
1000454709v14

**CONFIDENTIAL – ATTORNEY WORK PRODUCT**
**Debevoise & Plimpton Draft February 5, 2015**

(ii) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims, (iii) counsel to the Prepetition First Lien Agent (on behalf of itself and the Prepetition First Lien Lenders), (iv) counsel to the DIP Agent (on behalf of itself and the DIP Lenders), (v) the indenture trustee for each of the Debtors' outstanding bond issuances, (vi) counsel to the *ad hoc* group of prepetition first lien holders, (vii) counsel to the *ad hoc* group of second and third lien noteholders, (viii) the Internal Revenue Service, (ix) the United States attorney for the District of Delaware and (x) the United States Office of Personnel Management (the foregoing parties in clauses (i) through (x) of this Paragraph D, collectively, the "**Notice Parties**").  Such notice constitutes good and sufficient notice of the Motion and the Interim Hearing under the circumstances.

E.     <u>Debtors' Stipulations</u>.  On behalf of themselves and their estates, the Debtors admit, stipulate and agree that:

1.     <u>The Prepetition Debt</u>.

a.     Prior to the Commencement Date, the Borrower and the Guarantors were provided financing pursuant to (a) a first lien senior secured revolving credit facility (the "**Prepetition Revolving Credit Facility**") under the Prepetition Credit Agreement, (b) a first lien senior secured term loan facility (the "**Prepetition Term Loan**" and, together with the Prepetition Revolving Credit Facility, the "**Prepetition First Lien Credit Facility**") under that certain Credit Agreement, dated as of July 3, 2014, among Altegrity Acquisition Corp., Altegrity, Inc., as the borrower, the Prepetition First Lien Lenders, the Prepetition First Lien Agent, and other parties thereto from time to time (the "**Prepetition Credit Agreement**") and that the Debtors were unconditionally liable, without defense, counterclaim, offset or setoff of any kind with respect to obligations arising under the Prepetition First Lien Credit Facility in an

Error! Unknown document property name.
1000454709v14

**CONFIDENTIAL – ATTORNEY WORK PRODUCT**
**Debevoise & Plimpton Draft February 5, 2015**

aggregate principal amount of not less than $294,213,221[3] plus accrued but unpaid interest, fees, expense, including any reasonable attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable or reimbursable under the Loan Documents (as defined in the Prepetition Credit Agreement) (the "**Prepetition Credit Agreement Documents**") and other amounts due in accordance with the terms of the Prepetition Credit Agreement Documents, before giving effect to Senior Priority Obligations arising under Section 2.12 of the Prepetition Credit Agreement Documents, (c) the Prepetition First Lien Notes issued under that certain Indenture, dated as of July 3, 2014 (the "**First Lien Indenture**," and together with the Prepetition Credit Agreement Documents, including any ancillary documents related thereto or referenced thereby, collectively, the "**Senior Priority Documents**"), among the Borrower as Issuer, the other Debtors party thereto as guarantors, and the Prepetition First Lien Notes Agent (the obligations under such Prepetition First Lien Notes, the "**Prepetition First Lien Notes Obligations**" and, together with the obligations under the Prepetition First Lien Credit Facility, the "**Senior Priority Obligations**," and the holders of the Senior Priority Obligations, the "**Senior Priority Holders**"), and that the Debtors were unconditionally liable, without defense, counterclaim, offset or setoff of any kind with respect to the Prepetition First Lien Notes Obligations in the aggregate principal amount of not less than $825,000,000[4] plus accrued but unpaid interest, fees, and expenses in accordance with the terms of the First Lien Indenture, before giving effect to Senior Priority Obligations arising under Section 602 of the First Lien Indenture, (d) certain Senior Second Lien Secured 12.00% Cash Pay and 2.00% Pay-in-Kind

---

[3]    As of January 30, 2015.

[4]    As of January 30, 2015.

Error! Unknown document property name.
1000454709v14

**CONFIDENTIAL – ATTORNEY WORK PRODUCT**
**Debevoise & Plimpton Draft February 5, 2015**

Notes due 2020 and certain Senior Second Lien Secured 10.50% Cash Pay and 2.50% Pay-in-Kind Notes due 2020 (collectively, the "**Prepetition Second Lien Notes**," the holders of such Notes, the "**Prepetition Second Lien Holders**," and the obligations under such Notes, the "**Prepetition Second Lien Obligations**") issued under that certain Indenture, dated as of July 3, 2014 (the "**Second Lien Indenture**"), among the Borrower as Issuer, the Debtors party thereto as guarantors and Wilmington Trust, National Association as trustee and note collateral agent (the "**Prepetition Second Lien Notes Agent**"), (e) certain Senior Third Lien Secured 15.00% Pay-in-Kind Notes due 2021 (the "**Prepetition Third Lien Notes**," the obligations under such Notes, the "**Prepetition Third Lien Obligations**" and together with the Senior Priority Obligations and the Prepetition Second Lien Obligations, collectively, the "**Prepetition Secured Obligations**," and the holders of the Prepetition Third Lien Notes, the "**Prepetition Third Lien Holders**") issued under that certain Indenture, dated as of July 3, 2014 (the "**Third Lien Indenture**" and, together with the Second Lien Indenture and the Senior Priority Documents, the "**Prepetition Secured Loan Documents**"), the Borrower as Issuer, the Debtors party thereto as guarantors and Wilmington Trust, National Association as trustee and note collateral agent (the "**Prepetition Third Lien Notes Agent**," and together with the Prepetition Third Lien Holders, the Prepetition Second Lien Notes Agent, the Prepetition Second Lien Holders, and the First Lien Secured Parties, collectively, the "**Prepetition Secured Parties**"), (f) certain unsecured 12.00% Senior Notes due 2015, (g) certain unsecured 10.50% Senior Notes due 2015, (h) certain unsecured 11.75% Senior Subordinated Notes due 2016 and (i) certain unsecured zero coupon junior subordinated notes.

Error! Unknown document property name.
1000454709v14

b.      The Debtors' obligations under the Senior Priority Obligations are secured by duly perfected first priority security interests (the "**Senior Priority Liens**") in all "Collateral" (as defined in the Prepetition Credit Agreement) (the "**Prepetition Collateral**").

c.      The Debtors' obligations due and owing on account of the Prepetition Second Lien Notes and Prepetition Third Lien Notes are secured by duly perfected second and third priority security interests, respectively in all of the Prepetition Collateral (respectively, the "**Prepetition Second Priority Notes Liens**" and the "**Prepetition Third Priority Notes Liens**" and, collectively, the "**Primed Liens**").

d.      The Senior Priority Liens and the Primed Liens are valid, binding, enforceable, non-avoidable and perfected liens and the Prepetition Secured Obligations constitute legal, valid, binding, enforceable and non-avoidable obligations of the Debtors, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), the Senior Priority Liens and the Primed Liens were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value, and, subject to the Challenge Period referenced below, the Prepetition Secured Obligations are not subject to any challenge or defense, including (without limitation) avoidance, reduction, offset, attachment, disallowance, disgorgement, recharacterization, surcharge, recovery or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law.

e.      All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition First Lien Agent and the other First Lien Secured Parties.

CONFIDENTIAL – ATTORNEY WORK PRODUCT
Debevoise & Plimpton Draft February 5, 2015

2.     <u>Releases</u>.  Subject to entry of the Final Order, each of the Debtors on its own behalf (collectively, the "**Releasors**") shall unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the Prepetition Secured Parties and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, other than any Consenting Interest Holder (as defined in that certain Restructuring Support Agreement dated as of February 2, 2015, by and among the parties thereto (the "**RSA**")) or its affiliates (collectively, the "**Releasees**"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof relating to any of the Prepetition Secured Loan Documents, or the transactions contemplated under such documents, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under title 11 of the United States Code, (iii) any recharacterization, subordination, avoidance, disallowance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provision of applicable state law, federal law, or municipal law, and (iv) any right or basis to challenge or object to the amount, validity, or enforceability of the Prepetition Secured Obligations or any payments or other transfers made on

Error! Unknown document property name.
1000454709v14

account of the Prepetition Secured Obligations, or the validity, enforceability, priority, or non-avoidability of the Senior Priority Liens or the Primed Liens securing the Prepetition Secured Obligations, including any right or basis to seek any disgorgement or recovery of payments of cash or any other distributions or transfers previously received by any of the Releases.

3.      Effects of Stipulations on Third Parties.   The stipulations, admissions, findings, and releases contained in this Order, including in Paragraphs E-1 and E.2 hereof, shall be binding upon the Debtors, their estates, and any successor thereto, including any Successor Case (as defined below), in all circumstances upon entry of this Order, and the Debtors shall not assign or transfer standing upon any other party to pursue any Claims and Defenses (defined below).  The stipulations, admissions, findings, and releases contained in this Order, including in Paragraphs E-1 and E.2 hereof, shall be binding upon all other parties in interest, including any chapter 7 or chapter 11 trustee or other estate representative appointed or elected for any of the Debtors (a "**Trustee**") in the Chapter 11 Cases, upon the conversion of any Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or in any other proceedings related to any of the foregoing (each, a "**Successor Case**"), unless (a) any statutory committee (a "**Creditors' Committee**") or any other such party in interest (including any Trustee), in each case, with requisite standing, has duly first filed a contested matter, adversary proceeding or other challenge action or objection (1) challenging the stipulations, admissions, findings, or releases contained in this Order, including in Paragraphs E.1 and E.2 hereof, or (2) against any or all of the Prepetition Secured Parties in connection with or related to the Prepetition Secured Obligations, or the actions or inactions of any of the Prepetition Secured Parties arising out of or related to the Prepetition Secured Obligations or the Prepetition Credit Agreement Documents, as applicable,

Error! Unknown document property name.
1000454709v14

**CONFIDENTIAL – ATTORNEY WORK PRODUCT**
**Debevoise & Plimpton Draft February 5, 2015**

including any claim against any or all of the Prepetition Secured Parties in the nature of a "lender liability" cause of action, setoff, counterclaim, or defense to the Prepetition Secured Obligations (including those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code or by way of suit against any of the Prepetition First Lien Secured Parties) (collectively, the "**Claims and Defenses**") by no later than the later of (i) in the case of any such adversary proceeding filed by a party in interest with requisite standing other than the Creditors' Committee (if any), seventy-five (75) days after the date of entry of this Order, and (ii) in the case of any such adversary proceeding filed by the Creditors' Committee (if any), sixty (60) days after the appointment of the Creditors' Committee (if any) (the time period established by the later of the foregoing clauses (i)  and (ii), the "**Challenge Period**"), and the date that is the next calendar day after the termination of the Challenge Period in the event that either (i) no Claim or Defense is properly raised during the Challenge Period or (ii) with respect only to those parties who properly file a Claim or Defense, such Claim or Defense is fully and finally adjudicated, shall be referred to as the "**Challenge Period Termination Date**," and second, obtains a final, non-appealable order in favor of such party in interest sustaining any such Claim or Defense in any such timely-filed contested matter, adversary proceeding, or other action (any such Claim or Defense timely brought for which such a final and non-appealable order is so obtained, a "**Successful Challenge**").   Except as otherwise expressly provided herein, from and after the Challenge Period Termination Date and for all purposes in these Cases and any Successor Cases (and after the dismissal of these Cases or any Successor Cases), (v) the Prepetition Secured Obligations shall constitute allowed secured claims within the meaning of section 506 of the Bankruptcy Code, not subject to any Claims and Defenses (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack,

Error! Unknown document property name.
1000454709v14

objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, subordination or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law, for all purposes in these Chapter 11 Cases and any Successor Cases; (w) the Prepetition Secured Obligations, the Senior Priority Liens, the Primed Liens or the Prepetition Secured Parties shall not be subject to any other or further challenge and any party in interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including any successor thereto in any Successor Case (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period); (x) all payments made to or for the benefit of the Prepetition Secured Parties pursuant to, or otherwise authorized by, this Order or otherwise (whether made prior to, on, or after the Commencement Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery or avoidance; (y) any and all such Claims and Defenses by any party in interest shall be deemed to be forever released, waived, and barred; and (z) the Debtors' stipulations, admissions and releases contained in this Order, including in Paragraphs E-2 and E-1 and  hereof, shall be binding on all parties in interest in these Chapter 11 Cases or any Successor Cases, including any Creditors' Committee or Trustee.  If any such Claim or Defense is timely filed prior to the Challenge Period Termination Date, the stipulations, admissions, and releases contained in this Order, including in Paragraphs E-1 and E-2 hereof and the provisions in clauses (v) through (z) in the immediately preceding sentence, shall nonetheless remain binding and preclusive on any Creditors' Committee and any other Person (as defined in the Credit Agreement), including any Trustee in any Successor Case, except as to any such findings, stipulations, admissions, and releases or the other provisions in

clauses (v) through (z) of the immediately preceding sentence that were expressly challenged in such Claim or Defense and such Claim or Defense becomes a Successful Challenge.  Nothing in this Order vests or confers on any person, including a Creditors' Committee (if any) or Trustee, standing or authority to pursue any cause of action belonging to the Debtors or their estates.

4.    Each of the Prepetition Secured Parties is entitled to all of the rights and benefits of section 522(b) of the Bankruptcy Code, and, subject to the entry of the Final Order, the "equities of the case" exception shall not apply.

F.    <u>Findings Regarding the DIP Financing and Use of Cash Collateral</u>.

1.    Upon entry of this Order, the entire amount of the DIP Facility shall be funded into escrow, <u>provided</u> that the Debtors shall have the ability to draw only up to $22,500,000 of the DIP Facility (the "**Initial Draw**").  There exists an immediate need for the Debtors to access to the Initial Draw and to use Cash Collateral, in each case, to fund their ordinary course operations, to pay costs and expenses associated with the DIP Facility, meet payroll and other necessary and ordinary course business expenditures, satisfy the Adequate Protection Provisions (as defined below) and administer and preserve the value of their estates.  The ability of the Debtors to finance their operations during the Chapter 11 Cases requires the availability of additional working capital, the absence of which would immediately and irreparably harm the Debtors, their estates and their creditors.

2.    The DIP Obligations shall have the benefit of (a) a guaranty from the Guarantors and (b) the security interest and liens provided for in Article X of the DIP Loan Agreement and hereunder.

3.    Given their current financial condition, financing arrangements and capital structure, the Debtors are unable to obtain financing from sources other than the DIP Lenders on

terms more favorable than the DIP Facility.  The Debtors are unable to obtain unsecured credit allowable only as an administrative expense pursuant to section 503(b)(1) of the Bankruptcy Code.

      4.      The Debtors also are unable to obtain credit secured by a lien allowable only under sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code except under the terms and conditions provided in this Order and the DIP Documents.  The Debtors are unable to obtain credit for borrowed money without the Debtors granting to the DIP Agent (for the ratable benefit of the DIP Agent and the DIP Lenders) liens on various of the assets of the Debtors pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, subject to the terms of this Order and the DIP Loan Agreement.

      5.      The ability of the Debtors to finance their operations and the availability of sufficient working capital through the incurrence of indebtedness for borrowed money and other financial accommodations is vital to the Debtors' ability to preserve and maintain their going concern value.

      6.      The relief granted herein is necessary, essential and appropriate for the continued operation of the Debtors' businesses and the management and preservation of their properties.

      7.      It is in the best interest of Debtors' estates to be authorized to borrow under the DIP Facility contemplated by the DIP Loan Agreement and the other DIP Documents.

      8.      Prepetition First Lien Lenders holding more than [    ]% of the aggregate principal balance of the Loans and L/C Exposure (each as defined in the Prepetition Credit Agreement) (which Prepetition First Lien Lenders constitute "Required Lenders," as defined in the Prepetition Credit Agreement) have expressly consented to the entry of this Order and the

**CONFIDENTIAL – ATTORNEY WORK PRODUCT**
**Debevoise & Plimpton Draft February 5, 2015**

relief provided herein and pursuant to the terms of the Prepetition Credit Agreement Documents and the First Lien Indenture, the consents of such Prepetition First Lien Lenders are binding on all First Lien Secured Parties.

9.      The terms and conditions of the DIP Facility, including those which provide for the payment of interest to, and fees of, the DIP Agent (for the benefit of DIP Agent and the DIP Lenders, as applicable) at the times, and in the manner provided under the DIP Documents, are fair, reasonable, and the best available under the circumstances.

10.      The DIP Documents and this Order were negotiated in good faith and at arms' length among the Debtors, on the one hand, and the DIP Agent, DIP Lenders, and certain of the Prepetition Secured Parties, on the other hand.  Credit to be extended under the DIP Facility will be so extended in good faith, in consequence of which the DIP Agent and the DIP Lenders are entitled to the protection and benefits of section 364(e) of the Bankruptcy Code.

11.      The First Lien Secured Parties have agreed to permit the Debtors to use the Prepetition Collateral, including the Cash Collateral, subject to the terms and conditions set forth herein, including the protections afforded a party acting in "good faith" under section 364(e) of the Bankruptcy Code.  The Prepetition First Lien Agents, solely in their capacity as such and for the ratable benefit of the First Lien Secured Parties are entitled, pursuant to sections 361, 363(c), 363(e) and 364(d) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral from any diminution in value of such interests in the Prepetition Collateral, including, as applicable, from the use of Cash Collateral, the use, sale or lease of the Prepetition Collateral, and the modification of the automatic stay granted in this Order and the DIP Documents pursuant to section 364(d) of the Bankruptcy Code.  The Debtors have agreed, in their reasoned business judgment, to provide adequate protection to (i) the

Error! Unknown document property name.
1000454709v14

**CONFIDENTIAL – ATTORNEY WORK PRODUCT**
**Debevoise & Plimpton Draft February 5, 2015**

Prepetition First Lien Agent, solely in its capacity as such and for the ratable benefit of the Prepetition First Lien Lenders, (ii) the Prepetition First Lien Notes Agent, solely in its capacity as such and for the ratable benefit of the Prepetition First Lien Holders, (iii) the Prepetition Second Lien Notes Agent, solely in its capacity as such and for the ratable benefit of the Prepetition Second Lien Holders and (iv) the Prepetition Third Lien Notes Agent, solely in its capacity as such and for the ratable benefit of the Prepetition Third Lien Holders, in each case on the terms and conditions set forth in this Order. Based on the Motion and on the record presented to this Court at the Interim Hearing, the terms of the proposed adequate protection arrangements, use of the Cash Collateral, and the DIP Facility contemplated hereby, are fair and reasonable, reflect the Debtors' prudent exercise of business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration for the consent of the Prepetition Secured Parties.

12.     Good and sufficient cause has been shown for the entry of this Order. Among other things, entry of this Order will enable the Debtors to continue the operation of their business and avoid immediate and irreparable harm to the Debtors' estates and their properties, to meet payroll and other operating expenses, and to avoid disputes with the First Lien Secured Parties with respect to adequate protection. Entry of this Order is in the best interests of the Debtors, their estates and their creditors. Approval of the DIP Facility is vital to avoid immediate and irreparable harm to the Debtors' estates, and is therefore in the best interests of all stakeholders in the Debtors' estates.

NOW THEREFORE, it is hereby ORDERED that:

1.     On an interim basis, the Motion is granted.

2.     The Debtors are authorized to:

**CONFIDENTIAL – ATTORNEY WORK PRODUCT**
**Debevoise & Plimpton Draft February 5, 2015**

a.    enter into the DIP Facility;

b.    execute and deliver each of the DIP Documents to which any Debtor is a party;

c.    borrow up to the amount of the Initial Draw pending the Final Hearing;

d.    use proceeds for working capital purposes of the Debtors and to otherwise fund the operations of the Debtors during these Chapter 11 Cases as permitted herewith and under the DIP Documents;

e.    pay all fees and expenses required under or referred to in the DIP Facility as such become due, including, agent fees, and reasonable fees and expenses of attorneys, financial advisors, accountants and other professionals; and

f.    make the Adequate Protection Payments (as defined below).

3.    The Debtors hereby are authorized and directed to do and perform all acts and to make, execute, and deliver all instruments and documents which may be required or necessary for the performance by the Debtors under the DIP Documents and the creation and perfection of the DIP Liens (as defined below) granted by the Debtors, as described in and provided for by the DIP Documents.

4.    Each officer of the Debtors hereby is authorized to execute and deliver each of the DIP Documents, such execution and delivery to be conclusive of their respective authority to act in the name of and on behalf of the Debtors.

5.    The Debtors are further hereby authorized and directed to (i) make any payment due under the DIP Documents, including any reimbursement of indemnified obligations provided for in the DIP Documents and to pay for any reasonable costs and expenses as may be due from time to time herewith, including, without limitation, the reasonable fees and expenses

of the professionals retained as provided for in the DIP Documents, whether incurred pre- or post-petition, without the need to file retention motions or fee applications; and (ii) perform of all other acts required under or in connection with the DIP Documents, including the granting and perfection of the DIP Liens as provided herein and therein.

6.      The DIP Loan Agreement and each of the DIP Documents respectively shall constitute and evidence the valid and binding obligations of each of the Debtors, which DIP Obligations shall be enforceable against each of the Debtors in accordance with their terms and the terms of this Order.  No obligation, payment, transfer or grant of a security or other interest under the DIP Documents or this Order shall be stayed, restrained, voidable or recovereable under the Bankruptcy Code or any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, set-off, recoupment or counterclaim.

7.      <u>DIP Liens</u>.

a.      As security for the DIP Obligations, effective and perfected upon the date of this Order and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent or any DIP Lender of, or over, any DIP Collateral (as defined below), the Debtors hereby are authorized and directed to grant to the DIP Agent (for the ratable benefit of the DIP Agent and the DIP Lenders) and the DIP Agent is hereby granted (for the ratable benefit of the DIP Agent and the DIP Lenders) as collateral pursuant to the DIP Documents to secure all DIP Obligations:   (a) pursuant to section 364(c)(2) of the Bankruptcy Code, senior, valid, binding, enforceable and perfected security interests in, and liens upon, all of the assets (other than Excluded Collateral (as defined

CONFIDENTIAL – ATTORNEY WORK PRODUCT
Debevoise & Plimpton Draft February 5, 2015

below)) of the Debtors not otherwise subject to any prepetition lien at the time of the commencement of the Chapter 11 Cases, including the Senior Priority Liens; provided that for the avoidance of doubt any liens granted to secure the DIP Obligations shall be subject to the Adequate Protection Liens in all respects, (b) pursuant to section 364(c)(3) of the Bankruptcy Code, valid, binding, enforceable and perfected junior security interests in, and liens upon, all of the assets of the Debtors subject to a valid and enforceable lien as of the Commencement Date, including, for the avoidance of doubt, the Senior Priority Liens; provided that for the avoidance of doubt any liens granted to secure the DIP Obligations with respect to Cash Collateral (as defined herein) shall be junior to the Senior Priority Liens and the Adequate Protection Liens in all respects, and (c) pursuant to section 364(d) of the Bankruptcy Code, senior, valid, binding, enforceable and perfected security interests in, and senior priming liens upon, all of the assets of the Debtors subject to a lien securing the Prepetition Second Lien Obligations or the Prepetition Third Lien Obligations (all such liens and security interests granted to the DIP Agent, for its benefits and for the benefit of the DIP Lenders, pursuant to this Order and the DIP Documents, the "**DIP Liens**"); provided that, notwithstanding anything herein to the contrary, the DIP Liens shall be junior in all respects to the Senior Priority Liens and the Adequate Protection Liens.  The DIP Liens will extend to the Escrow Funds (as defined in the DIP Loan Agreement) on an exclusive basis.

b.    The property described in this Paragraph 7, and the collateral in which liens are granted pursuant to this Paragraph 7, including, all of the property and assets of the Debtors and their estates, real and personal, tangible and intangible, including all causes of action (except as provided below), whether owned as of the Commencement Date or thereafter acquired or arising, and regardless of where located or by whomsoever held (and as further set

Error! Unknown document property name.
1000454709v14

forth in Article X of the DIP Loan Agreement), and whether now owned or in which the Debtors have any interest or hereafter acquired or in which the Debtors obtain an interest are referred to in this Order as the "**DIP Collateral**"; provided that the DIP Collateral under this Order shall not include, and the DIP Agent shall not be granted a lien on, the following (the "**Excluded Collateral**"): (a) property consisting of voting equity interests of any Foreign Subsidiary (as defined in the DIP Loan Agreement) in excess of 65% of the equity interests representing the total combined voting power of all classes of equity interests of such Foreign Subsidiary entitled to vote, (b) any general intangibles or other rights arising under contracts or other documents to the extent that a grant of a security interest would require any government approval (unless such approval has been received or is excused by operation of the Bankruptcy Code) or violate any law or (c) actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 544, 545, 547, 548, 550, and 553 of the Bankruptcy Code (collectively, "**Avoidance Actions**"); provided, however, that the DIP Collateral shall include the proceeds of such Avoidance Actions; provided, further, that (x) the Adequate Protection Liens shall encumber proceeds of such Avoidance Actions on a first priority basis and (y) the Adequate Protection Claims shall have recourse to the proceeds of such Avoidance Actions.

c.      The DIP Liens are created and granted pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code.  Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Liens on the Prepetition Collateral (and the DIP Collateral) shall be junior in all respects to the Senior Priority Liens and other unavoidable liens in existence immediately prior to the Commencement Date, or to any other valid and unavoidable liens in existence immediately prior to the Commencement Date that are perfected subsequent to the

21

**CONFIDENTIAL – ATTORNEY WORK PRODUCT**
**Debevoise & Plimpton Draft February 5, 2015**

Commencement Date as permitted by section 546(b) of the Bankruptcy Code, to the extent such other unavoidable liens are senior to the Senior Priority Liens.

d.    Notwithstanding anything herein to the contrary, the DIP Liens shall be subordinate to the Carve-Out and the First Priority Adequate Protection Liens granted to the First Lien Secured Parties.  The DIP Liens will extend to the Escrow Funds on an exclusive basis.

e.    The DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code other than the Senior Priority Liens or (ii) unless otherwise provided for in the DIP Documents, any liens arising after the Commencement Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors.

8.    <u>Perfection of DIP Liens</u>.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby lifted, as necessary, to permit (i) the Debtors to grant the DIP Liens to the DIP Agent (for the benefit of the DIP Agent and the DIP Lenders), (ii) the Debtors to perform their obligations under the DIP Obligations and incur the DIP Obligations and (iii) any action of the DIP Agent or DIP Lenders to file and record financing statements, mortgages or other instruments to provide further notice of and evidence the grant and perfection of the DIP Liens granted to the DIP Agent and DIP Lenders, as the DIP Agent shall determine. The Debtors shall execute and deliver to the DIP Agent and the DIP Lenders all such financing statements, notices and other documents as the DIP Agent or any DIP Lender may reasonably request in connection therewith.  The DIP Agent, in its discretion, may file a copy of this Order as a mortgage, financing statement or similar perfection document with any recording officer

designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtors have real or personal property (but is not required to perfect any lien).

9.     <u>Application of Payments</u>.  All amounts applied to the payment of the DIP Obligations shall be applied thereto in the manner set forth in the DIP Documents and shall be subject to the priorities set forth in this Order, including with respect to the Carve-Out, the Senior Priority Obligations and the Adequate Protection Obligations.

10.     <u>Superpriority Claims</u>.

a.     Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative claims against the Debtors with priority over any and all administrative expenses, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (the "**Superpriority Claims**"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and their estates and all proceeds thereof to the extent required under the DIP Documents; <u>provided</u> that notwithstanding anything herein to the contrary, the Superpriority Claims shall be junior in all respects to the Adequate Protection Claims, the Senior Priority Obligations, and the Carve-Out, each to the extent specifically provided for herein.  Any payments, distributions or other proceeds received on account of such

CONFIDENTIAL – ATTORNEY WORK PRODUCT
**Debevoise & Plimpton Draft February 5, 2015**

Superpriority Claims shall be promptly delivered to the applicable DIP Agent to be applied or further distributed by the applicable DIP Agent on account of the applicable DIP Obligations in such order as is specified in this Order and the applicable DIP Documents.  The Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

b.    The DIP Obligations, the DIP Liens, the First Priority Adequate Protection Liens, the Adequate Protection Claims, the Senior Priority Liens, the Senior Priority Obligations, the Primed Liens, the Prepetition Second Lien Notes Obligations, and the Prepetition Third Lien Notes Obligations shall be subject to a carve-out (the "**Carve-Out**") which shall equal the sum total of:  (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) fees and expenses of up to $25,000 incurred by a trustee that would otherwise be entitled to priority under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by interim order, procedural order or otherwise, all fees, costs, and expenses (the "**Professional Fees**") incurred by persons or firms retained by the Debtors or the Creditors' Committee, if any, pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Professional Persons**") at any time before or on the first business day following the Termination Date, whether allowed by the Bankruptcy Court prior to or after the Termination Date (the "**Pre-Termination Date Fees**"); and (iv) after the first business day following the Termination Date, to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of (x) all Professional Fees of Professional Persons retained by the Debtors and (y) the payment of Professional Fees of Professional Persons

Error! Unknown document property name.
1000454709v14

**CONFIDENTIAL – ATTORNEY WORK PRODUCT**
**Debevoise & Plimpton Draft February 5, 2015**

incurred by the Creditors' Committee, if any, in an aggregate amount for clauses (x) and (y) not to exceed $2,000,000 incurred on and after the Termination Date (the amount set forth in this clause (iv) being the "**Post-Carve Out Termination Date Cap**"); <u>provided</u> that nothing in this Order shall be construed to impair the ability of any party to object to any fees, expenses, reimbursement or compensation described above in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Guidelines for Reviewing Applications for Compensation & Reimbursement of Expenses Filed Under Section 330 of the Bankruptcy Code and any applicable order of the Court; <u>provided that</u> in no instance shall any fees or expenses incurred by any statutory committee, if any, or any other party to (xx) investigate any Claims or Defenses against any of the Prepetition Secured Parties in excess of the Investigation Budget (as defined herein) or (yy) initiate or prosecute any Claims or Defenses against any of the Prepetition Secured Parties be subject to, or benefit from, the Carve-Out.

11.    <u>Use of Cash Collateral and DIP Facility Proceeds</u>.

a.    Provided that the Termination Date (as defined herein) has not occurred, the Debtors hereby are authorized pursuant to this Order to use the cash proceeds of the Prepetition Collateral that constitute "cash collateral" within the meaning of section 363 of the Bankruptcy Code (the "**Cash Collateral**") and other property in which the Prepetition First Lien Agents, solely in their respective capacities as such and for the ratable benefit of the First Lien Secured Parties, have an interest pursuant to sections 363(b) and 363(c) of the Bankruptcy Code in accordance with the terms and conditions of the DIP Loan Agreement and this Order; <u>provided that</u> such Cash Collateral may be used only as authorized by this Order.

b.    The Debtors' borrowings from the DIP Lenders under the DIP Facility and this Order will be used in a manner consistent with the terms and conditions of the applicable

Error! Unknown document property name.
1000454709v14

**CONFIDENTIAL – ATTORNEY WORK PRODUCT**
**Debevoise & Plimpton Draft February 5, 2015**

DIP Documents, solely for (a) working capital and other general corporate purposes, including to make Adequate Protection Payments (as defined below), (b) payment of costs of administration of these Chapter 11 Cases, (c) payment of such prepetition expenses as have been or hereafter are permitted under the DIP Loan Agreement and are approved by this Court; and (d) with respect to the Final Draw (as defined in the DIP Documents) only, providing liquidity to the Debtors to fund working capital needs after consummation of an Acceptable Plan (as defined in the DIP Documents).

c.    The Debtors hereby are authorized and directed to use proceeds of the DIP Facility and Cash Collateral to satisfy their working capital and operational needs subject to the terms of this Order and the DIP Documents.

12.    Budget.

a.    Attached as **Exhibit 2** hereto and incorporated by reference herein is the 13-week budget setting forth the Debtors' projected receipts and disbursements for the 13-week period after the date hereof (as amended from time to time or as provided herein and in the DIP Documents, the "**Budget**").  The Debtors shall operate generally in accordance with the Budget in the ordinary course of the Debtors' business and generally consistent with the Debtors' business plan; provided that the Budget shall not act as a limitation or cap on the Debtors' expenditures.  Notwithstanding anything herein to the contrary, the Debtors shall not be authorized to use Cash Collateral to pay fees or expenses, (x) in excess of $30,000 (the "**Investigation Budget**") for any statutory committee appointed in these chapter 11 cases to investigate Claims and Defenses against the Prepetition Secured Parties before the termination of the Challenge Period, or (y) to initiate or prosecute proceedings or actions on account of any Claims or Defenses against the Prepetition Secured Parties.

Error! Unknown document property name.
1000454709v14

CONFIDENTIAL – ATTORNEY WORK PRODUCT
Debevoise & Plimpton Draft February 5, 2015

b.      Commencing on the first Wednesday after the date on which this Court enters this Order (or the next business day if such day is not a business day), and continuing once every four weeks thereafter, the Debtors shall be authorized, but not directed, to deliver an updated "rolling" budget for the following 13-week period to the Consenting First Lien Creditors and the DIP Agent; provided that if the Debtors do deliver a Budget, it shall be delivered simultaneously to the Consenting First Lien Creditors, the Prepetition First Lien Agent and the DIP Agent.

13.     Adequate Protection Payments.  In consideration, and as a requirement, for obtaining the consent of the First Lien Secured Parties to the entry of this Order and for the use of the Prepetition Collateral (including Cash Collateral), but subject in all respects to Paragraph E-3 above, the Prepetition First Lien Agents, for the benefit of the First Lien Secured Parties, shall receive the following adequate protection:

a.      As adequate protection in accordance with sections 361 and 363 of the Bankruptcy Code, and without limiting any parties' rights under section 506 of the Bankruptcy Code, the Debtors hereby are authorized and directed, notwithstanding anything to the contrary set forth elsewhere in this Order, to pay to the Prepetition First Lien Agent (for application in accordance with the Prepetition Credit Agreement), solely in its capacity as such and for the ratable benefit of the Prepetition First Lien Lenders, in accordance with the Prepetition Credit Agreement, payment of regularly scheduled interest on the principal amount of the Prepetition Term Loan outstanding at the applicable non-default rate per the terms of the Prepetition Credit Agreement (the "**Credit Agreement Adequate Protection Payments**").

b.      As adequate protection in accordance with sections 361 and 363 of the Bankruptcy Code, and without limiting any parties' rights under section 506 of the Bankruptcy

27

Code, the Debtors hereby are authorized and directed, notwithstanding anything to the contrary set forth elsewhere in this Order, to pay to the Prepetition First Lien Notes Agent (for application in accordance with the First Lien Indenture) payment of regularly scheduled interest on the principal amount of the Prepetition First Lien Notes Obligations outstanding at the applicable non-default rate per the terms of the First Lien Indenture (the "**Prepetition First Lien Notes Adequate Protection Payments**"), and, upon entry of the Final Order, the Debtors shall be authorized and directed to pay that certain interest payment previously due on January 1, 2015 arising under the First Lien Indenture and not paid.

c.    As additional adequate protection in accordance with sections 361 and 363 of the Bankruptcy Code, but solely to the extent provided for the Senior Priority Documents and without limiting any parties' rights under section 506 of the Bankruptcy Code, the Debtors are authorized and directed to pay on an ongoing basis any reasonable and documented fees, costs, and expenses reasonably incurred by or payable to the Consenting First Lien Creditors and the Prepetition First Lien Agent, or to the applicable professional, as appropriate, in either case in accordance with the Prepetition Credit Agreement and First Lien Indenture, the Consenting First Lien Creditors' and the Prepetition First Lien Agent's reasonable and documented professional fees and expenses (collectively, the "**Professional Fees**," and payment of such Professional Fees, together with the Prepetition First Lien Notes Adequate Protection Payments, the Credit Agreement Adequate Protection Payments, collectively, the "**Adequate Protection Payments**") both pre- and post-petition including, without limitation, the fees and expenses of Kirkland & Ellis LLP, Womble Carlyle Sandridge & Rice, LLP as counsel to the Consenting First Lien Creditors, Moelis & Company LLC, as financial advisor to the Consenting First Lien Creditors, and Latham & Watkins LLP, as counsel to the Prepetition First Lien Agent (and any Delaware

counsel retained by the Prepetition First Lien Agent), on a regular monthly basis during these Chapter 11 Cases within ten (10) days of receipt.  Professionals for the Consenting First Lien Creditors and the Prepetition First Lien Agent (collectively, the "**Lender Professionals**") shall not be required to comply with the United States Trustee fee guidelines or submit invoices to this Court, United States Trustee, any Creditors' Committee or any other party in interest.  Copies of summary invoices (which may be redacted to preserve confidentiality, attorney-client privilege, and all other similar rules and privileges) submitted to the Debtors by such Lender Professionals shall be forwarded by the Debtors to the United States Trustee, counsel for any Creditors' Committee, and such other parties as this Court may direct.

14.    <u>Adequate Protection Liens & Claims and Other Provisions</u>.    In consideration, and as a requirement, for obtaining the consent of the First Lien Secured Parties to the entry of this Order and for the use of the Prepetition Collateral (including Cash Collateral), the Prepetition First Lien Agents, for the benefit of the First Lien Secured Parties, shall receive the following adequate protection:

a.    Pursuant to sections 361, 363(c)(2) and 363(e) of the Bankruptcy Code, the Debtors are authorized and directed to grant to the Prepetition First Lien Agents, in their capacity as such and for the ratable benefit of the First Lien Secured Parties, additional adequate protection in the form of replacement liens on the DIP Collateral (the "**First Priority Adequate Protection Liens**") to secure any diminution in value of their respective interests in the Prepetition Collateral from and after the Commencement Date, whether or not resulting from the use, sale, or lease by the Debtors of the applicable Prepetition Collateral (including Cash Collateral), or the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code ("**Diminution in Prepetition Collateral Value**").

Error! Unknown document property name.
1000454709v14

**CONFIDENTIAL – ATTORNEY WORK PRODUCT**
**Debevoise & Plimpton Draft February 5, 2015**

     b.     Pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, holders of Senior Priority Obligations shall have allowed superpriority administrative claims against each of the Debtors' estates with priority over any and all administrative expenses and priority or unsecured claims arising under sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (upon entry of the Final Order, to the extent therein approved), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provisions of the Bankruptcy Code or otherwise, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (the "**Senior Adequate Protection Claims**").  For the avoidance of doubt, the Senior Adequate Protection Claims shall be senior in all respects to the DIP Obligations but shall be junior to the Carve-Out.  The Adequate Protection Claims against each Debtor shall be allowed and enforceable against each Debtor and its estate on a joint and several basis.

     c.     The Adequate Protection Provisions (A) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, (C) shall be valid, binding, perfected and enforceable against any trustee or any other estate representative elected or appointed in the Chapter 11 Cases or any Successor Cases, and/or upon the dismissal of any of the Chapter 11 Cases, and (D) notwithstanding anything to the contrary in any "first day" orders of this Court in any of the Chapter 11 Cases, shall be senior to any administrative claims arising under any such "first day" orders.

Error! Unknown document property name.
1000454709v14

d.     The Debtors shall deliver to the First Lien Secured Parties all information, reports, documents and other material that the Debtors provide to the DIP Agent or DIP Lenders pursuant to the DIP Documents.

e.     Pursuant to sections 361, 363(c)(2) and 363(e) of the Bankruptcy Code, the Prepetition Second Lien Notes Agent, for the ratable benefit of the Prepetition Second Lien Holders, is hereby granted additional adequate protection in the form of junior replacement liens on the DIP Collateral to secure any diminution in value of its interest in the Prepetition Collateral (the "**Second Priority Adequate Protection Liens**").  Pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, the Prepetition Second Lien Notes Agent, for the ratable benefit of the Prepetition Second Lien Holders shall have allowed superpriority administrative claims against each of the Debtors' estates with priority over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (upon entry of the Final Order, to the extent therein approved), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provisions of the Bankruptcy Code or otherwise (the "**Second Priority Adequate Protection Claims**").  For the avoidance of doubt, the Second Priority Adequate Protection Liens and Second Priority Adequate Protection Claims shall be senior in all respects to the Third Priority Adequate Protection Liens, the Prepetition Third Priority Notes Liens and the Third Priority Adequate Protection Claims but shall be junior to the Carve-Out, the First Priority Adequate Protection Liens, the Senior Adequate Protection Claims, the Senior Priority Liens and the DIP Liens.

f.     Pursuant to sections 361, 363(c)(2) and 363(e) of the Bankruptcy Code, the Prepetition Third Lien Notes Agent, for the ratable benefit of the Prepetition Third Lien Holders, is hereby granted additional adequate protection in the form of junior replacement liens

on the DIP Collateral to secure any diminution in value of its interest in the Prepetition Collateral (the "**Third Priority Adequate Protection Liens**" and together with the Senior Adequate Protection Liens and the Second Priority Adequate Protection Liens, the "**Adequate Protection Liens**").  Pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, the Prepetition Third Lien Notes Agent, for the ratable benefit of the Prepetition Third Lien Holders shall have allowed superpriority administrative claims against each of the Debtors' estates with priority over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (upon entry of the Final Order, to the extent therein approved), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provisions of the Bankruptcy Code or otherwise (the "**Third Priority Adequate Protection Claims**" together with the Senior Adequate Protection Claims and the Second Priority Adequate Protection Claims, the "**Adequate Protection Claims**").  For the avoidance of doubt, the Third Priority Adequate Protection Liens shall be junior to the Carve-Out, the First Priority Adequate Protection Liens, the Senior Adequate Protection Claims, the Senior Priority Liens, the DIP Liens, the Second Priority Adequate Protection Liens, the Second Priority Adequate Protection Claims and the Prepetition Second Priority Notes Liens.  The Adequate Protection Claims, the Adequate Protection Liens and the Adequate Protection Payments are referred to herein as the "**Adequate Protection Provisions**").  The Adequate Protection Claims against each Debtor shall be allowed and enforceable against each Debtor and its respective estate on a joint and several basis.

> g.   This Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the Adequate Protection Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, or other instrument or document that may otherwise be required under the law of any jurisdiction, (b) obtaining

**CONFIDENTIAL – ATTORNEY WORK PRODUCT**
**Debevoise & Plimpton Draft February 5, 2015**

"control" (as defined in any applicable Uniform Commercial Code or other law) over any DIP Collateral (and the Prepetition First Lien Agent shall be deemed, without any further action, to have control over all the Debtors' deposit accounts, securities accounts and commodities accounts within the meaning of such Uniform Commercial Code and other law, other than the Escrow Account (as defined in the DIP Loan Agreement) over which the DIP Agent shall be deemed to have control) or (c) taking any other action to validate or perfect the Adequate Protection Liens or to entitle the Adequate Protection Liens to the priorities granted herein. Notwithstanding the foregoing, the Prepetition First Lien Agent may, each in its sole discretion, enter into and file, as applicable, financing statements, security agreements, notices of Liens, and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, security agreements, notices, and other agreements or documents shall be deemed to have been entered into, filed or recorded as of the Commencement Date.  The applicable Debtors shall execute and deliver to the Prepetition First Lien Agent, as applicable, all such financing statements, notices, and other documents as such parties may reasonably request to evidence and confirm the contemplated validity, perfection and priority of the First Priority Adequate Protection Liens, as applicable, granted pursuant hereto.  Without limiting the foregoing, the Prepetition First Lien Agent may, in its discretion, file a photocopy of this Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized and hereby is directed to file or record such copy of this Order.  Subject to the entry of the Final Order, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other

Error! Unknown document property name.
1000454709v14

**CONFIDENTIAL – ATTORNEY WORK PRODUCT**
**Debevoise & Plimpton Draft February 5, 2015**

instrument or agreement that requires the payment of any fees or other monetary obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the Prepetition Secured Parties in accordance with this Order.

15.     Consent to Adequate Protection; Right to Seek Additional Adequate Protection; No Admission.  The Prepetition First Lien Agent, on behalf of the First Lien Secured Parties, consents to the Adequate Protection Provisions and the use of Cash Collateral provided for herein; provided, however, that such consent of the Prepetition First Lien Agent to the use of Cash Collateral is expressly conditioned upon the entry of this Order, and such consent shall not be deemed to extend to any other Cash Collateral usage or other replacement financing or debtor-in-possession financing other than the DIP Facility provided under the DIP Documents; and provided, further, that such consent shall be of no force and effect in the event this Order is not entered or is entered and subsequently reversed, modified, stayed, or amended (unless such reversal, modification, stay, or amendment is acceptable to the Prepetition First Lien Agent) or the DIP Documents and DIP Facility as set forth herein are not approved.  This Order: (i) is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Secured Parties to request additional or alternative forms of adequate protection; and (ii) does not constitute an admission, acknowledgement, or stipulation and shall not be deemed an admission, acknowledgement, or stipulation by the Prepetition Secured Parties that the

Error! Unknown document property name.
1000454709v14

Prepetition Secured Parties, are in fact adequately protected by the terms and conditions of this Order or otherwise.

16.    <u>Cash Management</u>.  Unless otherwise agreed by the Consenting First Lien Lenders and the DIP Agent, the Debtors shall maintain their cash management arrangements in all material respects in a manner consistent with that described in the applicable "first-day" order and the related motion seeking authorization to continue the Debtors' cash management arrangements.

17.    <u>Credit Bidding</u>.  Subject to entry of the Final Order, the Prepetition First Lien Agent (subject to obtaining any required consents of the Prepetition First Lien Holders under the Prepetition Credit Agreement Documents and the First Lien Indenture and subject to any other terms and conditions in the Prepetition Credit Agreement Documents and the First Lien Indenture)  shall have the right to credit bid up to the full amount of any remaining Senior Priority Obligations in the sale of any of the Debtors' assets or pursuant to the exercise of remedies hereunder, including  pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code.

18.    <u>Section 552(b)</u>.  Each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code.  Subject to entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, or profits with respect to any of the Prepetition Collateral or assets subject to Adequate Protection Liens.

19.    <u>Limitation on Charging Expenses Against Collateral</u>.  Subject to entry of the Final Order, as a further condition of the DIP Facility and any obligation of the DIP Agent or

the DIP Lenders to make credit extensions pursuant to the DIP Documents, and as a further condition for the consensual use of the Cash Collateral as set forth in this Order, (a) no costs or expenses of administration of these Chapter 11 Cases, any Successor Cases or any other future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral, the Prepetition Collateral or the Cash Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law or equity without the prior written consent of the DIP Agent, the Prepetition First Lien Agent or the Prepetition First Lien Notes Agent, as applicable, (b) no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, or the First Lien Secured Parties, and (c) the exercise prior to the entry of the Final Order of any rights under section 506(c) of the Bankruptcy Code or otherwise to charge any costs or expense of administration of the Chapter 11 Cases or any Successor Cases from or against the DIP Collateral, the Prepetition Collateral or the Cash Collateral shall not impair and shall be subject to, and junior to, the DIP Liens on and the DIP Agent's and DIP Lenders' other interests in the DIP Collateral and the Senior Priority Liens and the Prepetition Secured Parties' other interests in the Prepetition Collateral and the Cash Collateral and the Adequate Protection Liens accorded the Prepetition Secured Parties.

20.    <u>Termination</u>.   Upon delivery (including delivery by electronic mail or facsimile) of notice of the occurrence of the Termination Date (as defined below) to the Debtors by the DIP Agent or any Prepetition First Lien Agent, as applicable, in accordance with this Order: (a) all DIP Obligations shall become immediately due and payable and (b) the Debtors' authority to use the proceeds of the DIP Facility and Cash Collateral as set forth in this Order shall cease, both on the earliest of (such date the "**Termination Date**"):

CONFIDENTIAL – ATTORNEY WORK PRODUCT
**Debevoise & Plimpton Draft February 5, 2015**

a.    the first business day that is 45 days after the Commencement Date (unless such period is extended by written agreement of the Requisite Consenting First Lien Creditors (as defined in the RSA), the Prepetition First Lien Agent, the DIP Agent, and the Debtors) if the Final Order has not been entered by this Court on or before such date;

b.    the Debtors fail to comply in any material respect with the terms and provisions of this Order after notice and an opportunity to cure, unless such failure to comply is waived by the affected party;

c.    termination of the RSA (other than a breach by the Consenting First Lien Creditors);

d.    an order shall be entered reversing, amending, supplementing, staying, vacating, or otherwise modifying this Order without the consent of the DIP Agent, the Requisite Consenting First Lien Creditors, and the Debtors;

e.    Total Liquidity (as defined below) shall be less than $25,000,000 as of the close of business on the Monday of each week beginning on February 16, 2015.  The Borrower shall furnish to the DIP Agent a certificate from a responsible offer on the Wednesday of each week certifying the amount of Total Liquidity as of the close of business on the preceding Monday.  For purposes hereof, "**Total Liquidity**" shall mean, at any time of determination, all cash and cash equivalents of the Debtors and their domestic subsidiaries, including all amounts then held in the Escrow Account that are, on the date of determination, available to be drawn upon by the Borrower under the terms of the DIP Documents, but excluding any Restricted Cash.  "**Restricted Cash**" shall mean, as of any date of determination, any cash proceeds from the sales of (i) the equity of US Investigations Services, Professional Services Division, Inc. and Labat-Anderson Incorporated and (ii) substantially all of the assets of Kroll Factual Data, Inc. that are

Error! Unknown document property name.
1000454709v14

CONFIDENTIAL – ATTORNEY WORK PRODUCT
**Debevoise & Plimpton Draft February 5, 2015**

then being held in a segregated account by either of the Prepetition First Lien Agents for specified purposes.

   f. the occurrence of the Maturity Date (as defined in the DIP Loan Agreement), unless extended in accordance with the DIP Documents;

   g. an Event of Default (as defined in the DIP Loan Agreement) shall have occurred and be continuing, unless waived in accordance with the DIP Documents.

   21. <u>Remedies</u>.

   a. On notice to the Debtors (with a copy to the counsel to the Prepetition First Lien Agents, any statutory committee appointed in these Chapter 11 Cases, and the U.S. Trustee), upon the occurrence of the Termination Date, the DIP Agent and DIP Lenders may, in their sole direction, terminate the use of proceeds from the DIP Facility and recover any undrawn proceeds from the Escrow Account.  Notwithstanding anything herein or in the DIP Loan Agreement to the contrary, upon the occurrence of the Termination Date, but subject to five (5) days' prior written notice to the Debtors (with a copy to the counsel to the Prepetition First Lien Agents, the Committee, and the U.S. Trustee), the DIP Agent and DIP Lenders may exercise any other remedies against the Collateral or otherwise seek to compel payment on account of the DIP Obligations upon the earliest of (x) the conversion of any of the Cases to cases under chapter 7 of the Bankruptcy Code, the dismissal of any of the Cases or the appointment of a trustee or examiner with expanded powers in any of the Cases, (y) confirmation of a chapter 11 plan confirmed for these chapter 11 cases and (z) 150 days after the occurrence of such Termination Event.

   b. Upon five (5) days' prior written notice to the Debtors (with a copy to the counsel to the Prepetition First Lien Agents, the Committee, and the U.S. Trustee), upon the

Error! Unknown document property name.
1000454709v14

CONFIDENTIAL – ATTORNEY WORK PRODUCT
**Debevoise & Plimpton Draft February 5, 2015**

occurrence of a Termination Date, Prepetition First Lien Agents may, in their sole discretion, exercise remedies in accordance with the Senior Priority Documents and this Order (including by collecting accounts receivable and applying the proceeds thereof to the Senior Priority Obligations, and by occupying the Debtors' premises to sell or otherwise dispose of the DIP Collateral or Prepetition Collateral), and the automatic stay shall be lifted accordingly to permit such exercise of remedies.

        c.    In any hearing regarding the exercise of rights or remedies, the only issue that may be raised by the Debtors shall be whether, in fact, the Termination Date has occurred (subject to any applicable cure period).

        22.    <u>Limitation of Liability</u>.  In permitting the use of the Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Order, the DIP Agent, the DIP Lenders and the First Lien Secured Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute), nor shall they owe any fiduciary duty to any of the Debtors, their creditors or estates, or shall constitute or be deemed to constitute a joint venture or partnership with any of the Debtors.  Furthermore, nothing in this Order shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Secured Parties of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

Error! Unknown document property name.
1000454709v14

**CONFIDENTIAL – ATTORNEY WORK PRODUCT**
**Debevoise & Plimpton Draft February 5, 2015**

23.    <u>Protection and Preservation of Rights Under the Order</u>.

a.    Unless and until the DIP Obligations and Adequate Protection Provisions are unconditionally and indefeasibly repaid in full in cash, the terms and provisions of this Order and the claims, liens, security interests and other protections granted to the DIP Agent, the DIP Lenders and the Prepetition Secured Parties pursuant to the DIP Documents and this Order, including any actions taken pursuant thereto and hereto, shall survive the entry of any order confirming a plan of reorganization or in any Successor Case.

b.    In no event shall the DIP Agent, the DIP Lenders and the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, Prepetition Collateral, or Cash Collateral, as applicable.

c.    The Debtors agree not to seek, and it shall constitute an Event of Default under the DIP Loan Agreement and a material breach of the terms and conditions of this Order, if any of the Debtors seek, or if there is entered, (i) any modifications or extensions of this Order or the use of Cash Collateral without the prior written consent of the DIP Agent, DIP Lenders, the Prepetition First Lien Agent and the Requisite Consenting First Lien Creditors, (ii) an order converting any of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (iii) an order dismissing any of these Chapter 11 Cases.  If an order dismissing any of these Chapter 11 Cases under section 1122 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code), to the fullest extent permitted by law, that (i) the DIP Liens and Adequate Protection Liens, pursuant to the DIP Documents and this Order, shall continue in full force and effect and maintain their priorities as provided in this Order until the DIP Obligations are indefeasibly paid in full in cash, and (ii) the Bankruptcy Court shall retain jurisdiction, notwithstanding such

CONFIDENTIAL – ATTORNEY WORK PRODUCT
**Debevoise & Plimpton Draft February 5, 2015**

dismissal, for the purposes of enforcing the claims, liens, priorities and security interests as provided in this Order.

d.    Except as otherwise contemplated by the RSA, the time and manner of payment of the DIP Obligations shall not be altered or impaired by any chapter 11 plan of reorganization, that may hereafter be confirmed or by any further order of the Bankruptcy Court which may hereafter be entered without the consent of the DIP Agent and the DIP Lenders.

e.    Nothing included in this Order shall prejudice, impair, or otherwise affect the rights of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors consistent with and subject to the provisions of this Order.

f.    If any provision of this Order is hereafter modified, amended, vacated, reversed or stayed in any respect by subsequent order of this or any other court for any reason, such modification, amendment, vacation, reversal or stay shall not affect the validity of any obligation, lien, or liability incurred pursuant to this Order.

24.    <u>Binding Effect; Successors and Assigns</u>.  The (a) DIP Liens granted to the DIP Agent under the DIP Facility under this Order, and the priority thereof, and any payments made pursuant to the DIP Facility and this Order, and (b) the Adequate Protection Liens and Adequate Protection Claims granted to the Prepetition Secured Parties under this Order, and the priority thereof, and any Adequate Protection Payments made pursuant to this Order shall be binding (subject to the terms of this Order) on the Debtors, any successor trustee or examiner, and all creditors of the Debtors in these Chapter 11 Cases and any Successor Cases, as provided in section 364(e) of the Bankruptcy Code.

CONFIDENTIAL – ATTORNEY WORK PRODUCT
**Debevoise & Plimpton Draft February 5, 2015**

25.    <u>No Standing Granted</u>.   Nothing in this Order vests or confers on any person (as defined in the Bankruptcy Code), including any statutory committee appointed in these Chapter 11 Cases, if any, standing or authority to pursue any Claim or Defense or other cause of action belonging to the Debtors or their estates with respect to the Prepetition Secured Loan Documents or the Prepetition Secured Obligations.

26.    <u>No Waiver</u>.   The Prepetition First Lien Agents', any Prepetition First Lien Lenders', any Prepetition First Lien Holders', the Prepetition Second Lien Notes Agent's, any Prepetition Second Lien Holder's, the Prepetition Third Lien Notes Agent's, any Prepetition Third Lien Holder's, the DIP Agent's or any DIP Lenders' failure to exercise its rights and remedies under the DIP Facility or this Order, as applicable, shall not constitute a waiver of any of such Agent's or Holder's rights hereunder or otherwise.

27.    <u>Subsequent Modifications to DIP Documents</u>.   Subject to the provisions of the DIP Loan Agreement, the Debtors, the DIP Agent and the requisite Lenders thereunder may amend or modify, and the DIP Agent and the DIP Lenders may waive, any provision of the DIP Documents, and any such amendment, modification or waiver shall not require the approval of the Bankruptcy Court; <u>provided</u> that such amendment or waiver, in the judgment of the Debtors and the DIP Agent, is either nonprejudicial to the rights of third parties or is not material, and that notice thereof shall be provided to the Prepetition First Lien Agents, the Prepetition Second Lien Notes Agent, the Prepetition Third Lien Notes Agent, counsel for any statutory committee appointed in these Chapter 11 Cases and the U.S. Trustee no less than 3 days prior to the effective date thereof (or such shorter period as to which such parties may agree); <u>provide</u>d, <u>further</u>, that it is acknowledged and agreed that such amendment shall be without prejudice to the

Error! Unknown document property name.
1000454709v14

**CONFIDENTIAL – ATTORNEY WORK PRODUCT**
**Debevoise & Plimpton Draft February 5, 2015**

Prepetition First Lien Agent's, Consenting First Lien Creditors' rights or any other parties' right under the RSA or this Order.

28.    <u>Proofs of Claim</u>.  The Prepetition First Lien Agents will not be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim allowed herein.  The Debtors' stipulations set forth in Paragraph E-1 hereof shall be deemed to constitute a timely filed proof of claim for the Prepetition First Lien Agents in respect of all Senior Priority Obligations.  In addition, the Prepetition First Lien Agents will not be required to file any request for allowance and/or payment of any administrative expenses, and this Order shall be deemed to constitute a timely filed request for allowance and/or payment of any Senior Priority Obligations constituting administrative expenses, as applicable.  Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or Successor Cases to the contrary, each of the Prepetition First Lien Agents, for the benefit of itself and the Prepetition First Lien Holders, is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, in its discretion) in each of the Chapter 11 Cases or Successor Cases (i) a proof of claim and/or aggregate proofs of claim in respect of any Senior Priority Obligations, and (ii) a request or aggregate requests for allowance and/or payment of any portion of the Senior Priority Obligations constituting administrative expenses.

29.    <u>State Laws; Government Agencies</u>.  Nothing in this Order or the DIP Loan Documents shall permit the Debtors to violate 28 U.S.C. § 959(b).  As to the United States, its agencies, departments or agents, nothing in this Order or the DIP Loan Documents shall discharge, release or otherwise preclude any valid right of setoff or recoupment that any such entity may have.

Error! Unknown document property name.
1000454709v14

CONFIDENTIAL – ATTORNEY WORK PRODUCT
Debevoise & Plimpton Draft February 5, 2015

30.     <u>Order Governs</u>.  In the event of any inconsistency between the terms and conditions of any DIP Document and of this Order, the provisions of this Order shall govern and control.

31.     <u>Effectiveness</u>.

a.     The requirements set forth in Bankruptcy Rule 6003(b) have been satisfied.

b.     Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon entry of this Order.

c.     The requirements of Bankruptcy Rule 6004(a) are waived.

d.     The Debtors are authorized and empowered to take such actions as may be necessary and appropriate to implement the terms of this Order.

32.     <u>Final Hearing; Objection Deadline</u>.  Notice of the Final Hearing and entry of this Order shall forthwith be given to the Notice Parties as well as to all parties who are known, after reasonable inquiry, to have asserted a lien, encumbrance, or claim in the Prepetition Collateral.  Any Objection to entry of a Final Order shall be filed with this Court and actually received by the Notice Parties by _____, 2015 at __:__ _.m. (ET) and a Final Hearing to resolve any such objections shall be scheduled for _____, 2015 at __:__ _.m. (ET).  If no Objections are timely filed, served and received in accordance with this Order, the Debtors shall submit to this Court a Final Order regarding the relief sought in the Motion which may be entered without a Final Hearing.

33.     <u>Retention of Jurisdiction</u>. This Court shall retain jurisdiction with respect to all matters arising from or any way related to this Order.

Dated: _____

      Wilmington, Delaware

_____

      UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT C**

EXISTING FIRST LIEN FACILITY AMENDMENT

**FIRST AMENDMENT AND CONSENT TO CREDIT AGREEMENT**

FIRST AMENDMENT AND CONSENT TO CREDIT AGREEMENT, dated as of February 6, 2015 (this "First Amendment"), to the Existing Credit Agreement referred to below among Holdings (as defined below), the Borrower (as defined below), the other Loan Parties and the Required Lenders referred to herein.

RECITALS

WHEREAS, pursuant to the Credit Agreement dated as of July 3, 2014 (the "Existing Credit Agreement"), among Altegrity Acquisition Corp., a Delaware corporation ("Holdings"), Altegrity, Inc., a Delaware corporation (the "Borrower"), the several banks, other financial institutions and institutional investors from time to time parties thereto (the "Lenders"), Goldman Sachs Bank USA, as administrative agent (in such capacity, the "Administrative Agent") and collateral agent (in such capacity, the "Collateral Agent") to the Lenders, the Lenders have agreed to make, and have made, certain loans and other extensions of credit to the Borrower; and

WHEREAS, pursuant to and in accordance with Section 9.08(b) of the Existing Credit Agreement, the Borrower has requested that the Required Lenders agree to certain amendments to the Existing Credit Agreement as described herein.

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, as well as other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

SECTION 1.  Defined Terms. Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Existing Credit Agreement.

SECTION 2.  Amendment of the Existing Credit Agreement.  On the First Amendment Effective Date, the Existing Credit Agreement is hereby amended as follows (without further act required of any Person):

(a)  Section 1.01 of the Existing Credit Agreement is hereby amended by adding the following new definitions, to appear in proper alphabetical order:

"Capital Research & Management" shall mean certain funds and accounts advised by Capital Research and Management Company and any of its affiliates.

"First Amendment" shall mean that certain First Amendment, dated as of February 6, 2015, by and among Holdings, the Borrower, the other Loan Parties and the Required Lenders.

"First Amendment Effective Date" shall have the meaning set forth in the First Amendment.

"GS&S Sale" shall mean the sale of all of the equity of US Investigations Services, Professional Services Division, Inc. and Labat-Anderson Incorporated to PAE Shield Acquisition Company, Inc. pursuant to a stock purchase agreement dated as of December 24, 2014.

"KFD Sale" shall mean the sale of substantially all of the assets of Kroll Factual Data, Inc. to FD Holdings, LLC pursuant to an asset purchase agreement dated as of December 12, 2014.

"Litespeed" shall mean Litespeed Master Fund, Ltd. and any other funds and accounts, as the case may be, advised by Litespeed Management LLC and any of its affiliates.

"New Common Stock" shall have the meaning set forth in the Restructuring Support Agreement.

"New Revolving Credit Facility" shall have the meaning set forth in the Restructuring Support Agreement and shall include any amendments, supplements, modifications, extensions, renewals, restatements or refundings thereof and any indentures or credit facilities or commercial paper facilities that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount permitted to be borrowed thereunder or alters the maturity thereof (provided that such increase in borrowings is permitted under Section 6.01) or adds Restricted Subsidiaries as additional borrowers or guarantors thereunder and whether by the same or any other agent, lender or group of lenders.

"Restructuring Support Agreement" shall mean that certain Restructuring Support Agreement (including all schedules and exhibits thereto), dated as of February 2, 2015, by and among the Borrower, Altegrity Holding Corp., Holdings, certain of the Borrower's direct and indirect subsidiaries, Providence Equity Partners VI L.P., Providence Equity Partners VI-A L.P., and certain creditors of Holdings and its Subsidiaries, as the same may be amended, waived, supplemented or otherwise modified from time to time in accordance with its terms.".

"Third Avenue" shall mean certain funds managed by Third Avenue Management LLC, including Third Avenue Trust, on behalf of Third Avenue Focused Credit Fund.

"Triggering Event" shall mean the substantial consummation of a plan of reorganization for the Debtors that is either (a) consistent with the Restructuring Support Agreement or (b) approved by each of the Consenting First Lien Term Loan Lenders (as defined in the Restructuring Support Agreement) that are parties to the First Amendment and Consent to Credit Agreement, dated as of February 6, from time to time."

- 2 -

(b)  The definition of "Affiliated Lender" set forth in Section 1.01 of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

"Affiliated Lender" shall mean any Lender that is any Debt Fund Affiliate, any Non-Debt Fund Affiliate (other than Holdings, any Borrower or any of their respective Subsidiaries or any natural person) or, prior to the Triggering Event, the Sponsor at such time."

(c)  The definition of "Change of Control," set forth in Section 1.01 of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

"A "Change of Control" shall be deemed to have occurred:

(a) prior to the occurrence of the Triggering Event, if:

(i)      the Permitted Investors cease to have the power, directly or indirectly, to vote or direct the voting of Equity Interests of the Relevant Parent Entity representing a majority of the ordinary voting power for the election of directors (or equivalent governing body) of the Relevant Parent Entity; provided that the occurrence of the foregoing event shall not be deemed a Change of Control if,

(A) any time prior to the consummation of a Qualified Public Offering, and for any reason whatsoever, (x) the Permitted Investors otherwise have the right, directly or indirectly, to designate (and do so designate) a majority of the board of directors of the Relevant Parent Entity or (y) the Permitted Investors own, directly or indirectly, of record and beneficially an amount of Equity Interests of the Relevant Parent Entity having ordinary voting power that is equal to or more than 50% of the amount of Equity Interests of the Relevant Parent Entity having ordinary voting power owned, directly or indirectly, by the Permitted Investors of record and beneficially as of the Closing Date (determined by taking into account any stock splits, stock dividends or other events subsequent to the Closing Date that changed the amount of Equity Interests, but not the percentage of Equity Interests, held by the Permitted Investors) and such ownership by the Permitted Investors represents the largest single block of Equity Interests of the Relevant Parent Entity having ordinary voting power held by any person or related group for purposes of Section 13(d) of the Securities Exchange Act of 1934, or

(B) at any time after the consummation of a Qualified Public Offering, and for any reason whatsoever, no "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934 as in effect on the date hereof, but excluding any employee benefit plan of such Person and its subsidiaries, and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan),

- 3 -

excluding the Permitted Investors, shall become the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under such Act), directly or indirectly, of more than the greater of (x) 35% of outstanding Equity Interests of the Relevant Parent Entity having ordinary voting power and (y) the percentage of the then outstanding Equity Interests of the Relevant Parent Entity having ordinary voting power owned, directly or indirectly, beneficially and of record by the Permitted Investors; or

(ii) any change in control (or similar event, however denominated) with respect to the Borrower or any Restricted Subsidiary shall occur under the documents governing any Material Indebtedness of the Borrower or any Restricted Subsidiary; or

(iii) at any time prior to the consummation of a Qualified Public Offering, Holdings shall directly own, beneficially and of record, less than 100% of the issued and outstanding Equity Interests of the Borrower; and

(b) from and after the occurrence of the Triggering Event, if:

(i) for any reason whatsoever, any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934 as in effect on the date hereof, but excluding any employee benefit plan of such Person and its subsidiaries, and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), excluding the Permitted Investors, shall become the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under such Act), directly or indirectly, of more than the greater of (x) 50% of outstanding Equity Interests of the Relevant Parent Entity having ordinary voting power and (y) the percentage of the then outstanding Equity Interests of the Relevant Parent Entity having ordinary voting power owned, directly or indirectly, beneficially and of record by the Permitted Investors;

(ii) any change in control (or similar event, however denominated) with respect to the Borrower or any Restricted Subsidiary shall occur under the documents governing any Material Indebtedness of the Borrower or any Restricted Subsidiary; or

(iii)at any time prior to the consummation of a Qualified Public Offering, Holdings shall directly own, beneficially and of record, less than 100% of the issued and outstanding Equity Interests of the Borrower."

(d)  The definition of "Debt Fund Affiliate" set forth in Section 1.01 of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

"Debt Fund Affiliate" shall mean an Affiliate of (i) prior to the occurrence of the Triggering Event, the Sponsor or (ii) on or after the occurrence of the Triggering Event, any Permitted Investor (in each case other than a Parent

Holding Company or a Subsidiary of a Parent Holding Company) that is a bona fide debt fund or an investment vehicle that is engaged in the making, purchasing, holding or otherwise investing in a diversified portfolio of commercial loans, bonds and similar extensions of credit in the ordinary course of business and which is not managed on a day to day basis by Persons responsible for the management of the Borrower on a day to day basis.

(e)  The definition of "Other Intercreditor Agreement" set forth in Section 1.01 of the Existing Credit Agreement is hereby amended by inserting the following language after the phrase "Collateral Agent":

", including from and after the occurrence of the Triggering Event, for the avoidance of doubt, any intercreditor agreement necessary or advisable in the good faith judgment of the Borrower to implement the New Revolving Credit Facility, which shall be on terms consistent with the Restructuring Support Agreement (as determined by the Borrower which determination shall be conclusive if made in good faith).".

(f)  The definition of "Permitted Investors" set forth in Section 1.01 of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

""Permitted Investors" means (i) prior to the occurrence of the Triggering Event, (a) Providence Equity Partners L.L.C. ("PEP") and its Affiliates but not including, however, any of its operating portfolio companies, and (b) any Person that acquired, directly or indirectly, Capital Stock of Altegrity Acquisition Corp. on or prior to the Issue Date and any Affiliate of such Person, and (ii) from and after the occurrence of the Triggering Event, Capital Research & Management, Litespeed and Third Avenue, and each of their respective Affiliates, and any Joining Party (as defined in the Restructuring Support Agreement) that holds at least 20% of the New Common Stock at the time of the Triggering Event."

(g)  The definition of "Permitted Liens," set forth in Section 1.01 of the Existing Credit Agreement is hereby amended by amending and restating clause (bb) thereof as follows:

"(bb)      prior to the occurrence of the Triggering Event, Liens securing the Obligations, the Secured Obligations, the First Lien Notes issued on the Closing Date, the Second Lien Notes issued on the Closing Date and the Third Lien Notes issued on the Closing Date; and from and after the occurrence of the Triggering Event, Liens securing the Obligations, the Secured Obligations, the New Revolving Credit Facility, Indebtedness permitted under Section 6.01(b)(ii)(C), Indebtedness permitted under Section 6.01(b)(ii)(D), Indebtedness permitted under Section 6.01(b)(ii)(E), Indebtedness permitted under Section 6.01(b)(ii)(F), or any Refinancing Indebtedness permitted under Section 6.01(b)(xii) in connection with any of the foregoing;"

- 5 -

(h)  The definition of "Second Lien Notes" set forth in Section 1.01 of the Existing Credit Agreement is hereby amended by inserting the following language after the phrase "as trustee":

", and, from and after the occurrence of the Triggering Event, the New Second Lien Notes (as defined in Exhibit A to the Restructuring Term Sheet).".

(i)  The definition of "Term Loan Maturity Date" set forth in Section 1.01 of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

"Term Loan Maturity Date" shall mean (a) prior to the occurrence of the Triggering Event, July 1, 2019, and (b) from and after the occurrence of the Triggering Event, July 5, 2018."

(j)  The definition of "Total Liquidity" set forth in Section 1.01 of the Existing Credit Agreement is hereby amended by adding the words "and, from and after the occurrence of the Triggering Event, unused amounts of any commitments under the New Revolving Credit Facility or any other revolving credit facility available to the Borrower or its Restricted Subsidiaries" after the words "Revolving Credit Commitments".

(k)  Section 2.13 of the Existing Credit Agreement is hereby amended by adding the words "In each case, subject to the Intercreditor Agreement or any Other Intercreditor Agreement," prior to the phrase "(a) the Borrower shall, in the date of termination of all Revolving Credit Commitments",

(l)  Section 2.13(e) of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

"(e)  Prior to the occurrence of the Triggering Event, all prepayments required pursuant to this Section 2.13 shall be applied to the repayment of the outstanding principal balance of the Term Loans (applied against the remaining scheduled installments of principal due in respect of the Term Loans as directed by the Borrower).  Mandatory prepayments may be waived by a Lender and, upon such waiver, the amount of such waived payment may be retained by the Borrower (the amount of such waived prepayment, the "Declined Amounts"); provided that, on or after the occurrence of the Triggering Event, Declined Amounts shall instead be applied to the repayment of the outstanding principal balance of the Term Loans (applied against the remaining scheduled installments of principal due in respect of such Term Loans as directed by the Borrower) of the Lenders that do not waive the mandatory prepayment for such mandatory prepayment.  Mandatory prepayments of Term Loans shall be applied ratably among the outstanding Term Loans of each Class; provided, that at the request of the Borrower, in lieu of such application on a pro rata basis among all Classes of Term Loans,

such prepayment may be applied to any Class of Term Loans so long as the maturity date of such Class of Term Loans precedes the maturity date of each other Class of Term Loans then outstanding or, in the event more than one Class of Term Loans shall have an identical maturity date that precedes the maturity date of each other Class of Term Loans then outstanding, to such Classes on a pro rata basis."

(m)  Section 2.13(b) of the Existing Credit Agreement is hereby amended by (i) inserting the following language into clause (y) of the second proviso thereof prior to the phrase "no Event of Default shall have occurred and be continuing at the time of such notice":

"unless the Triggering Event shall have occurred and such Net Cash Proceeds are in respect of the GS&S Sale or the KFD Sale,";

and (ii) inserting the following language before the period in last sentence in Section 2.13(b):

"and Net Cash Proceeds in respect of the GS&S Sale or the KFD Sale may be used to pay the 3.50% fee payable to certain Lenders in connection with the Amendment and the Net Cash Proceeds available to prepay the Term Loans will be reduced by the amount of such fee"

(n)  Section 3.06 of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

"SECTION 3.06  *No Material Adverse Change*' Since (i) until the occurrence of the Triggering Event, the Closing Date or (ii) from and after the occurrence of the Triggering Event, the date of such occurrence, no event, change or condition has occurred that (individually or in the aggregate) has had, or could reasonably be expected to have, a Material Adverse Effect."

(o)  Section 6.01 of the Existing Credit Agreement is hereby amended by replacing the word "and" immediately before Section 6.01(b)(ii)(E) with a comma and adding the following language at the end of Section 6.01(b)(ii):

"and (F) from and after the occurrence of a Triggering Event, Indebtedness in respect of the New Revolving Credit Facility up to an aggregate principal amount outstanding at any one time of $60,000,000, any guarantee thereof by any Guarantor, plus in the event of any refinancing of any such Indebtedness the aggregate amount of fees, including discounts, premiums and other costs and expenses incurred in connection with such refinancing".

(p)  Clause (vi) of Section 6.03(b) of the Existing Credit Agreement are hereby amended by inserting the phrase "prior to the occurrence of the Triggering Event" at the beginning of each such clause.

- 7 -

(q)  Clause (xi) of Section 6.03(b) of the Existing Credit Agreement is hereby amended and restated as follows:

"(xi)        other Restricted Payments in an aggregate amount taken together with all other Restricted Payments made pursuant to this clause (xi) not to exceed (I) prior to the occurrence of the Triggering Event, the greater of (x)(A) $15,000,000 at any time prior to the third anniversary of the Closing Date and (B) $25,000,000 at any time prior on or after the third anniversary of the Closing Date and (y) 1.00% of Total Assets at the time made and (II) on or after the occurrence of the Triggering Event, $10,000,000;

(r)  Clause (xx) of Section 6.03(b) of the Existing Credit Agreement is hereby amended by inserting the following language after the phrase "equal to 4.5 to 1.0":

"provided, further that, after the occurrence of the Triggering Event, no repurchase, redemption or other acquisition or retirement for value of any Junior Priority Obligations, unsecured Indebtedness or Subordinated Indebtedness (other than the Existing Junior Subordinated Notes) shall be permitted until the Financial Performance Covenant in Section 6.10 becomes effective;"

(s)  Section 6.10 of the Existing Credit Agreement is hereby amended by:

(i) amending and restating the introductory clause as follows:

"(a) Before the occurrence of the Triggering Event, permit the Consolidated First Lien Debt Ratio as of the last day of any Test Period ending with the last day of any fiscal quarter set forth below to exceed the ratio set forth below opposite such fiscal quarter:"

(ii) adding the following new Subsection (b) after the table in Subsection (a):

"(b) After the occurrence of the Triggering Event, permit the Consolidated First Lien Debt Ratio as of the last day of any Test Period ending with the last day of any fiscal quarter set forth below to exceed the ratio set forth below opposite such fiscal quarter:

| Fiscal Quarter | Consolidated First Lien Debt Ratio |
| --- | --- |
| December 31, 2017 | 7.50 to 1.00 |
| March 31, 2018 | 7.25 to 1.00 |

- 8 -

| June 30, 2018 | 7.00 to 1.00 |
| September 30, 2018 and each fiscal quarter thereafter | 6.50 to 1.00 |

provided that, notwithstanding the dates set forth above or anything else in this Agreement to the contrary, if the Triggering Event occurs, the requirements of this Section 6.10 shall not be effective until eight (8) full fiscal quarters of the Borrower have elapsed since the date of such occurrence; provided, further that, if the Triggering Event occurs, references to the "Financial Performance Covenant" in Section 5.11 or Section 6.04 hereof shall be deemed to refer to compliance with a Consolidated First Lien Leverage Ratio of 9.00 to 1.00 until the end of such eight (8) fiscal quarter period."

(t)  The Existing Credit Agreement is hereby amended by adding the following as a new Section 6.13:

"SECTION 6.13  **Minimum Liquidity.**  If the Triggering Event occurs, permit the total liquidity as of the last day of any fiscal quarter of the Borrower (starting with the last day of the fifth (5th) full quarter after the Triggering Event) to be less than $30,000,000, such total liquidity calculated as U.S. bank cash plus availability under the New Revolving Credit Facility or any other revolving credit facility available to the Borrower."

(u)  The Existing Credit Agreement is hereby amended by inserting the following as a new Section 7.03:

"SECTION 7.03.  **Liquidating Debtors and Reporting Waiver.**  After the occurrence of the Triggering Event, notwithstanding anything to the contrary in this Agreement, neither a Default nor an Event of Default shall be deemed to occur or have occurred as a result of or arising from (i) US Investigations Services, LLC, USIS International, Inc., USIS Worldwide, Inc. or John D. Cohen, Inc. (collectively, the "Liquidating Debtors") commencing, or remaining debtors under, a voluntary case or proceeding of the type referenced in Section 7.01(h), (ii) with respect to the Liquidating Debtors, any of the events identified in Section 7.01(h), including the reorganization or liquidation of any Liquidating Debtor and the appointment of a trustee in a chapter 7 liquidation of any Liquidating Debtor or (iii) any failure of the Issuer or any of its Subsidiaries to comply with its obligations under Sections 5.04 and 5.05 prior to the occurrence of the Triggering Event."

(v)  Section 9.04(m) of the Existing Credit Agreement is hereby amended by adding the phrase ", prior to the occurrence of the

Triggering Event," after the word "subject" and immediately before the words "to the following limitations" in the first sentence thereof.

(w)  The second paragraph of Section 9.17 of the Existing Credit Agreement is hereby amended and restated as follows:

"In addition, the Lenders irrevocably authorize the Agents (and the Agents may agree, each in its sole discretion) upon the request of the Borrower to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by clauses (f) (to the extent such Liens secure Indebtedness incurred pursuant to Section 6.01(b)(xvii)) or (u) of the definition of Permitted Liens, provided that, in the case of clause (u), after the occurrence of the Triggering Event no Lien on any property granted to or held by the Administrative Agent under any Loan Document may be subordinated pursuant to this Section; provided that Liens on any property granted to or held by the Administrative Agent under any Loan Document may be subordinated (or revised to provide for a pari passu Lien) in favor of a New Revolving Credit Facility incurred under Section 6.01(b)(ii)(F)."

SECTION 3.  Consent.  In reliance upon the representations and warranties of the Borrowers set forth in Section 5 below, and subject to the satisfaction of the applicable conditions set forth in Section 4 below, effective as of the date hereof, the Lenders party hereto, hereby consent to:

(a)  the extension of the date or dates for delivery of all reports due under Section 5.04 for the period ended September 30, 2014 and each subsequent full reporting period through the Triggering Event, until the later of the Triggering Event or the date that such reports would otherwise be due under the Existing Credit Agreement, as amended from time to time;

(b)  the waiver of receipt of any notices under Section 5.05 in connection with the Borrower's failure to deliver any of the documents referenced in Section 3(a) above;

(c)  after the Triggering Event, if applicable, the continuation of any chapter 11 case, chapter 7 case or other proceeding that would otherwise result in a violation of Section 7.01(g) or Section 7.01(h) of the Existing Credit Agreement, in each case in connection with the liquidation of the US Investigations Services, LLC, USIS International, Inc., USIS Worldwide, Inc. or John D. Cohen, Inc. (as defined in the Restructuring Support Agreement); and

(d)  the Borrower and the Administrative Agent entering into amendments to the Loan Documents, including without limitation the Existing Credit Agreement (as amended hereby) and the Security Documents, that are

reasonably necessary to implement the New Revolving Credit Facility (as defined in the Restructuring Support Agreement) on market terms.

SECTION 4. <u>Conditions to Effectiveness of the First Amendment</u>. The effectiveness of Section 2 of this First Amendment is subject to the satisfaction of the following conditions (the "<u>First Amendment Effective Date</u>"):

(a) This First Amendment shall have been duly executed and delivered by Holdings, the Borrower, the other Loan Parties and the Required Lenders;

(b) The Restructuring Support Agreement shall have been duly executed and delivered by the parties thereto and shall be in full force and effect;

(c) The representations and warranties set forth in Section 5 of this First Amendment shall be true and correct in all material respects on and as of the date hereof;

(d) The Borrower shall have paid to the Administrative Agent, in immediately available funds, for the account of each Lender that has executed and delivered on or prior to 10:00 a.m., New York City time, February 6, 2015 a counterpart signature page of this First Amendment and a signature page to the Restructuring Support Agreement, a fee of 3.50% of the sum of each such Lender's aggregate outstanding amount of Term Loans and participations in outstanding Letters of Credit as of the date hereof (provided that no such fee shall be payable to any Lender that is also a Consenting Interest Holder or an affiliate thereof); and

(e) Holdings, the Borrower and the other Loan Parties shall not be the subject of any proceeding or event identified in Sections 7.01(g) or 7.01(h) of the Existing Credit Agreement.

SECTION 5. <u>Representations and Warranties</u>. To induce the other parties hereto to enter into this First Amendment, Holdings and the Borrower hereby represent and warrant to the Administrative Agent, the Collateral Agent and the Lenders that, as of the date hereof:

(a) The execution, delivery and performance of this First Amendment (I) has been duly authorized by all requisite corporate or other organizational and, if required, stockholder or member action and (II) will not (i) violate (A) any provision of (x) any applicable law, statute, rule or regulation, or (y) the certificate or articles of incorporation, bylaws or other constitutive documents of any Loan Party, (B) any applicable order of any Governmental Authority or (C) any provision of any indenture, agreement or other instrument to which Holdings, the Borrower or any of its Restricted Subsidiaries is a party or by which any of them or any of their property is bound, (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under or give rise to any right to require the prepayment, repurchase or redemption of any obligation under any such indenture, agreement or other instrument or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned

- 11 -

or hereafter acquired by Holdings, the Borrower or any Restricted Subsidiary (other than Liens created or permitted under the Credit Agreement or under the Security Documents); except with respect to clauses (II)(i) through (II)(iii) (other than clause (II)(i)(A)(y)), to the extent that such violation, conflict, breach, default, or creation or imposition of Lien could not reasonably be expected to result in a Material Adverse Effect.

(b)  This First Amendment has been duly executed and delivered by Holdings, the Borrower and the other Loan Parties and constitutes a legal, valid and binding obligation of Holdings, the Borrower and the other Loan Parties enforceable against Holdings, the Borrower and the other Loan Parties in accordance with its terms, except as may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, receivership, moratorium or similar laws of general applicability relating to or limiting creditors' rights generally or by general equity principles.

(c)  Except to the extent the failure to obtain or make the same could not reasonably be expected to result in a Material Adverse Effect, no action, consent or approval of, registration or filing with or any other action by any Governmental Authority is necessary or will be required in connection with this First Amendment.

SECTION 6.  Effects on Loan Documents.

(a)  Except as specifically amended herein, all Loan Documents shall continue to be in full force and effect and are hereby in all respects ratified and confirmed.

(b)  Except as specifically provided herein, the execution, delivery and effectiveness of this First Amendment shall not operate as a waiver of any right, power or remedy of any Lender or the Administrative Agent under any of the Loan Documents, nor constitute a waiver of any provision of the Loan Documents or in any way limit, impair or otherwise affect the rights and remedies of the Administrative Agent or the Lenders under the Loan Documents.

(c)  The Borrower and the other parties hereto acknowledge and agree that, on and after the First Amendment Effective Date, this First Amendment, shall constitute a Loan Document for all purposes of the Amended Credit Agreement.  All references to the Credit Agreement in the Loan Documents shall be deemed to be references to the Credit Agreement as amended hereby.

SECTION 7.  Expenses.  The Borrower agrees to pay all reasonable out-of-pocket expenses incurred in connection with this First Amendment and any other documents prepared in connection herewith, in each case to the extent required by Section 9.05 of the Existing Credit Agreement.  The Borrower hereby confirms that the indemnification provisions set forth in Section 9.05 of the Existing Credit Agreement shall apply to this First Amendment and such fees, charges or liabilities (as more fully set forth therein as applicable) which may arise herefrom or in connection herewith.

SECTION 8.  Non-Reliance on Agents.    Each Lender acknowledges that it has, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it has deemed appropriate, made it own credit analysis and decision to enter into this First Amendment.  Each Lender also acknowledges that it will, without reliance upon the Agents or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own credit decisions in taking or not taking action under or based upon this First Amendment, the Amended Credit Agreement, any other Loan Document, any related agreement or any document furnished hereunder or thereunder.  The Required Lenders hereby authorize the Administrative Agent and the Collateral Agent to execute and deliver any Other Intercreditor Agreement.

SECTION 9.  Acknowledgment; Further Assurances; Other Agreements.  Each of Holdings, the Borrower and each other Loan Party (i) acknowledges and agrees that all of its obligations under the Guarantee and Collateral Agreement and the other Security Documents to which it is a party are reaffirmed and remain in full force and effect on a continuous basis, (ii) reaffirms each Lien granted by each Loan Party to the Collateral Agent for the benefit of the Secured Parties and reaffirms the guaranties made pursuant to the Guarantee and Collateral Agreement and (iii) acknowledges and agrees that the grants of security interests by and the guaranties of the Loan Parties contained in the Guarantee and Collateral Agreement and the other Security Documents are, and shall remain, in full force and effect after giving effect to this First Amendment.

SECTION 10.  APPLICABLE LAW.  THIS FIRST AMENDMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

SECTION 11.  Amendments;    Termination;    Execution    in    Counterparts; Severability.

(a)  This First Amendment shall not constitute an amendment of any other provision of the Existing Credit Agreement not referred to herein.  Except as expressly amended hereby, the provisions of the Existing Credit Agreement are and shall remain in full force and effect.

(b)  This First Amendment is binding and enforceable as of the date hereof against each party hereto and its successors and permitted assigns and may not be amended nor may any provision hereof be waived except pursuant to a writing signed by Holdings, the Borrower, the other Loan Parties and the Required Lenders.

(c)  This First Amendment may be executed in any number of counterparts and by the different parties hereto on separate counterparts, including by means of facsimile or electronic transmission, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

(d)  In the event any one or more of the provisions contained in this First Amendment should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

[Remainder of page intentionally left blank.]

1000446114v14

IN WITNESS WHEREOF, the parties hereto have caused this First Amendment to be duly executed and delivered by their respective proper and duly authorized officers as of the day and year first above written.

ALTEGRITY ACQUISITION CORP.

By: _____
Name:
Title:


ALTEGRITY, INC.

By: _____
Name:
Title:

ALTEGRITY RISK INTERNATIONAL LLC (F/K/A
ALTEGRITY RISK CONSULTING AND SOLUTIONS,
INC.)
ALTEGRITY SECURITY CONSULTING, INC.
ALBATROSS HOLDING COMPANY, LLC
ALBATROSS MARKETING AND TRADING, LLC
CVM SOLUTIONS, LLC
D, D & C, INC.
ENGENIUM CORPORATION
FDC ACQUISITION, INC.
HIRERIGHT RECORDS SERVICES, INC. (F/K/A USIS
RECORDS SERVICES, INC.)
HIRERIGHT SOLUTIONS, INC. (F/K/A USIS
COMMERCIAL SERVICES, INC.)
HIRERIGHT, INC.
HIRERIGHT TECHNOLOGIES GROUP, INC.
JOHN D. COHEN, INC.
KCMS, INC.
KIA HOLDING, LLC
KROLL ASSOCIATES, INC.
KROLL BACKGROUND AMERICA, INC.
KROLL CRISIS MANAGEMENT GROUP, INC.
KROLL CYBER SECURITY, INC.
KROLL FACTUAL DATA, INC.
KROLL HOLDINGS, INC.
KROLL INC.
KROLL INFORMATION ASSURANCE, INC.
KROLL INFORMATION SERVICES, INC.
KROLL INTERNATIONAL, INC.
KROLL ONTRACK INC.
KROLL RECOVERY LLC
KROLL SECURITY GROUP, INC.
NATIONAL DIAGNOSTICS, INC.
ONTRACK DATA RECOVERY, INC.
PERSONNEL RECORDS INTERNATIONAL, LLC
THE OFFICIAL INFORMATION COMPANY
US INVESTIGATIONS SERVICES, LLC
USIS INTERNATIONAL, INC.
USIS WORLDWIDE, INC.


By:_____

   Name:

[Signature Page to First Amendment]

Title:

[Signature Page to First Amendment]

Name of Lender:

_____

By: _____

     Name:

     Title:

For any Lender requiring a second signature block:

By: _____

     Name:

     Title:

[Signature Page to First Amendment]

**EXHIBIT D**

EXISTING FIRST LIEN NOTES INDENTURE AMENDMENT

ALTEGRITY, INC.
as Issuer


and


the Guarantors from time to time party to the Indenture


and


Wilmington Trust, National Association


as Trustee


\_\_\_\_


THIRD SUPPLEMENTAL INDENTURE



DATED AS OF FEBRUARY 6, 2015

1

THIRD SUPPLEMENTAL INDENTURE, dated as of February 6, 2015 (this "Supplemental Indenture"), among Altegrity, Inc. (the "Issuer"), as issuer, the Guarantors under the Indenture referred to below (the "Guarantors"), and Wilmington Trust, National Association, as trustee (the "Trustee") and as note collateral agent (the "Note Collateral Agent"), under the Indenture referred to below.

W I T N E S S E T H:

WHEREAS, the Issuer, the Guarantors, the Trustee and the Note Collateral Agent are party to an Indenture, dated as of July 3, 2014, relating to the issuance from time to time by the Issuer of senior first lien secured notes in series (the "Base Indenture"), as supplemented by the First Supplemental Indenture, dated as of July 3, 2014 (the "First Supplemental Indenture"), by and among the Issuer, the Guarantors party thereto and the Trustee and as further supplemented by the Second Supplemental Indenture, dated as of August 6, 2014 (the "Second Supplemental Indenture", such Base Indenture, as supplemented by the First Supplemental Indenture and the Second Supplemental Indenture, the "Indenture"), by and among the Issuer, the Guarantors party thereto and the Trustee, pursuant to which the Issuer issued its 9.50% Senior First Lien Secured Notes due 2019 (the "Notes");

WHEREAS, pursuant to Section 902(a) and Section 902(e) of the Indenture, the parties hereto are authorized to execute and deliver this Supplemental Indenture to amend the Indenture, with the consent of Holders of at least 66-⅔% in principal amount of outstanding Notes;

WHEREAS, pursuant to Section 613 of the Indenture, the Holders of at least a majority in principal amount of outstanding Notes are authorized to waive certain defaults under the Indenture as contemplated in this Supplemental Indenture;

WHEREAS, pursuant to Section 1509(j) of the Indenture, the Note Collateral Agent and the Trustee, as applicable, each agreed at the Issuer's expense to execute and deliver any amendment to, waiver of, or supplement to any Note Security Document (as defined in the Base Indenture) or Intercreditor Agreement (as defined in the Base Indenture) authorized pursuant to Article IX of the Base Indenture;

WHEREAS, Holders of at least 66-⅔% in principal amount of outstanding Notes (the "Consenting Holders") have consented to the execution of this Supplemental Indenture;

WHEREAS, the Issuer, the Guarantors and the Consenting Holders desire to amend the Indenture as set forth in Section 2 hereof;

WHEREAS the Issuer represents that all acts and things necessary have happened, been done, and been performed, to make this Supplemental Indenture a valid and binding instrument, in accordance with its terms; and

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Issuer, the Guarantors, the Trustee and the Note Collateral Agent mutually covenant and agree for the benefit of the Holders of the Notes as follows:

1.  <u>Defined Terms</u>. As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as so defined.  The words "herein," "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

2.  <u>Amendment of the Indenture</u>.

(a)  <u>Section 101</u> of the Indenture shall be amended by adding the following new definitions, to appear in proper alphabetical order:

""<u>Capital Research & Management</u>" shall mean certain funds and accounts advised by Capital Research and Management Company and any of its affiliates.

"<u>Litespeed</u>" shall mean Litespeed Master Fund, Ltd. and any other funds and accounts, as the case may be, advised by Litespeed Management LLC and any of its affiliates.

"<u>New Revolving Credit Facility</u>" shall have the meaning set forth in the Restructuring Support Agreement, and shall include any amendments, supplements, modifications, extensions, renewals, restatements or refundings thereof and any indentures or credit facilities or commercial paper facilities that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount permitted to be borrowed thereunder or alters the maturity thereof (*provided* that such increase in borrowings is permitted under <u>Section 408</u>) or adds Restricted Subsidiaries as additional borrowers or guarantors thereunder and whether by the same or any other agent, lender or group of lenders."

"<u>Restructuring Support Agreement</u>" shall mean that certain Restructuring Support Agreement (including all schedules and exhibits thereto), dated as of February 2, 2015, by and among the Issuer, Altegrity Holding Corp., Altegrity Acquisition Corp., certain of the Issuer's direct and indirect subsidiaries, Providence Equity Partners VI L.P., Providence Equity Partners VI-A L.P., and certain creditors of Altegrity Holding Corp. and its Subsidiaries, as the same may be amended, waived, supplemented or otherwise modified from time to time in accordance with its terms."

2

"Third Avenue" shall mean certain funds managed by Third Avenue Management LLC, including Third Avenue Trust, on behalf of Third Avenue Focused Credit Fund.

"Triggering Event" shall mean the substantial consummation of a plan of reorganization for the Debtors that is either (a) consistent with the Restructuring Support Agreement or (b) approved by each of the Consenting First Lien Notes Creditors (as defined in the Restructuring Support Agreement) that delivered (or caused to be delivered), with respect to 100% of the aggregate principal amount of the Notes it beneficially owns, its consent in the solicitation of consents from the holders of the Notes to amend the Indenture as set forth in the Third Supplemental Indenture dated as of February 6, 2015, and did not withdraw or revoke its consent in such solicitation.  The Issuer shall deliver prompt written notice to the Trustee of the occurrence of a Triggering Event upon such occurrence, and the Trustee shall be entitled to conclusively rely on such notice (and shall have no obligation to make an independent judgment as to the occurrence of a Triggering Event).

(b) The definition of "Investors" set forth in Section 101 of the Indenture shall be amended and restated in its entirety as follows:

""Investors" means (i) prior to the occurrence of the Triggering Event, (a) Providence Equity Partners L.L.C. ("PEP") and its Affiliates but not including, however, any of its operating portfolio companies, and (b) any Person that acquired, directly or indirectly, Capital Stock of Altegrity Acquisition Corp. on or prior to the Issue Date and any Affiliate of such Person, and (ii) from and after the occurrence of the Triggering Event, Capital Research & Management, Litespeed Third Avenue and their respective Affiliates, and any Joining Party (as defined in the Restructuring Support Agreement) that holds at least 20% of the New Common Stock at the time of the Triggering Event.".

(c) The definition of "Intercreditor Agreement" set forth in Section 101 of the Indenture shall be amended by inserting the following language after the phrase "Section 1511", and the Note Collateral Agent is hereby directed, at the Issuer's expense, to execute and deliver such intercreditor agreement:

", including from and after the occurrence of the Triggering Event, for the avoidance of doubt, any intercreditor agreement necessary or advisable in the good faith judgment of the Issuer to implement the New Revolving Credit Facility, which shall be on terms consistent with the Restructuring Support Agreement (as determined by the Issuer which determination shall be conclusive if made in good faith)"

(d) The definition of "Permitted Liens" set forth in Section 101 of the Indenture shall be amended by deleting the word "and" at the end of clause (26), replacing the period at the

3

end of clause (27) with the phrase "; and" and inserting a new clause (28) after clause (27) which shall read as follows:

"(28)    from and after the occurrence of the Triggering Event, Liens on Indebtedness permitted to be incurred pursuant to Section 408(b)(25)."

(e) The definition of "Senior Credit Facilities" set forth in Section 101 of the Indenture shall be amended by adding the following text after "as administrative agent,"

"and/or, from and after the occurrence of the Triggering Event, the New Revolving Credit Facility, in each case"

(f) Section 407(b)(18) of the Indenture is hereby amended by inserting the phrase "prior to the occurrence of the Triggering Event," at the beginning thereof.

(g) Section 408(b) of the Indenture shall be amended by deleting the word "and" at the end of clause (23), replacing the period at the end of clause (24) with the phrase "; and" and inserting a new clause (25) after clause (24) which shall read as follows:

"(25)    from and after the occurrence of the Triggering Event, the incurrence of Indebtedness represented by the New Revolving Credit Facility up to an aggregate principal amount outstanding at any one time of $80 million, any guarantee thereof by any Guarantor, plus in the event of any refinancing of any such Indebtedness, the aggregate amount of fees, including discounts, premiums and other costs and expenses incurred in connection with such refinancing."

(h) Section 411 of the Indenture shall be amended by adding the following text after "Issue Date" in the second clause (1):

"or, from and after the occurrence of the Triggering Event, the New Revolving Credit Facility and the related documentation and contractual encumbrances or restrictions"

(i)    Section 414(b) of the Indenture shall be amended by:

    i.  adding the following text after "Indenture" in clause (1)(B):

"or, on or after the occurrence of the Triggering Event, Indebtedness under the New Revolving Credit Facility,"

    ii.  deleting the word "or" at the end of clause (1)(D) and inserting new clause (E) after clause (D) which shall read as follows:

"(E) on or after the occurrence of the Triggering Event, Indebtedness under the New Revolving Credit Facility (and commitments thereunder) or letters of credit issued under the New Revolving Credit Facility (and commitments thereunder),

4

or to cash collateralize letters of credit issued under the New Revolving Credit Facility; or"

    iii.  adding the word "or" to the end of clause (2) and inserting a new clause (3) after clause (2) which shall read as follows:

"(3)    to pay any amendment fees payable to certain holders of Senior Priority Obligations in connection with the transactions set forth in the Restructuring Support Agreement."

    (j)    <u>Section 414(c)</u> of the Indenture shall be amended by:

    i.  adding the following text after the word "Transaction" in Clause (1)(A):

"or, on or after the occurrence of the Triggering Event, Indebtedness under the New Revolving Credit Facility, and to correspondingly reduce commitments with respect thereto"

    ii.  deleting the word "or" at the end of clause (1)(B), and inserting new clause (C) which shall read as follows:

"(C) on or after the occurrence of the Triggering Event, Indebtedness under the New Revolving Credit Facility (and commitments thereunder) or letters of credit issued under the New Revolving Credit Facility (and commitments thereunder), or to cash collateralize letters of credit issued under the New Revolving Credit Facility;"

    iii.  deleting the word "or" at the end of clause (1)(B), adding the word "or" to the end of clause (2) and inserting a new clause (3) after clause (2) which shall read as follows:

"(3)    to pay any amendment fees payable to certain holders of Senior Priority Obligations in connection with the transactions set forth in the Restructuring Support Agreement."

and by inserting the following language at the end of the final paragraph thereof:

"*provided further*, that, on or after the occurrence of the Triggering Event, in the case of clause (2) above, any assets or properties acquired with such Net Proceeds shall constitute Collateral, unless they otherwise qualify as Excluded Collateral (as defined in the Collateral Agreement).".

    (k)    The Indenture is hereby amended by inserting the following as a new <u>Section 616</u>:

5

"Section 616.  Liquidating Debtors and Reporting Waiver.  After the occurrence of the Triggering Event, notwithstanding anything to the contrary in this Indenture, neither a Default nor an Event of Default shall be deemed to occur or have occurred as a result of or arising from (i) US Investigations Services, LLC, USIS International, Inc., USIS Worldwide, Inc. or John D. Cohen, Inc. (collectively, the "Liquidating Debtors") commencing, or remaining debtors under, a voluntary case within the meaning of any Bankruptcy Law, (ii) with respect to the Liquidating Debtors, any of the events identified in Section 601(6) or Section 601(7), including the reorganization or liquidation of any Liquidating Debtor and the appointment of a trustee in a chapter 7 liquidation of any Liquidating Debtor or (iii) any failure of the Issuer or any of its Subsidiaries to comply with its obligations under Section 405 or Section 406 prior to the occurrence of the Triggering Event.".

3.  Governing Law.  THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.  THE TRUSTEE, THE NOTE COLLATERAL AGENT, THE ISSUER, ANY OTHER OBLIGOR IN RESPECT OF THE NOTES AND (BY THEIR ACCEPTANCE OF THE NOTES) THE HOLDERS AGREE TO SUBMIT TO THE JURISDICTION OF ANY UNITED STATES FEDERAL OR STATE COURT LOCATED IN THE BOROUGH OF MANHATTAN, IN THE CITY OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SUPPLEMENTAL INDENTURE.

4.  Ratification of Indenture; Supplemental Indentures Part of Indenture.  Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect.  This Supplemental Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.  The Trustee makes no representation or warranty as to the validity or sufficiency of this Supplemental Indenture or as to the accuracy of the recitals to this Supplemental Indenture.

5.  Counterparts.  The parties hereto may sign one or more copies of this Supplemental Indenture in counterparts, all of which together shall constitute one and the same agreement.

6.  Headings.  The section headings herein are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

6

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

ALTEGRITY, INC.

By: _____
    Name:
    Title:

[GUARANTORS:

[                         ]

By: _____
    Name:
    Title:]

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Trustee

By: _____
    Authorized Officer

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Note Collateral Agent

By: _____
    Authorized Officer

7

**EXHIBIT E**

JOINDER

The undersigned ("***Transferee***") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [_____] (the "***Agreement***"), by and among Altegrity, Inc. and each of its direct and indirect domestic subsidiaries that are party thereto, Altegrity Acquisition Corp. and Altegrity Holding Corp. (collectively, the "***Debtors***"), Providence Equity Partners VI L.P. and Providence Equity Partners VI-A L.P., and certain holders of claims against the Debtors signatory thereto, and agrees to be bound by the terms and conditions thereof, and shall be deemed a "***Joining Party***" under the terms of the Agreement.  The Transferee hereby makes the representations and warranties of the Restructuring Support Parties (as defined in the Agreement) set forth in Section 2 of the Agreement to the other Parties thereto.  This joinder shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction.

Date Executed: _____

<table>
<tr><td>**TRANSFEREE**</td><td>**CLAIMS**</td></tr>
</table>

Name: _____

_____
First Lien Term Loan

By: _____

_____
First Lien Notes

Name: _____

Title: _____

_____
Second Lien Notes

Notice Party: _____

Address: _____

_____
Third Lien Notes

_____

Telephone: _____

_____
Revolver Commitment

Facsimile: _____

Email: _____

_____
Other (_____)