## EXHIBIT A

**Plan**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ALTEGRITY, INC., *et al.*,[1] | Case No. 15-10226 (LSS) |
| Debtors. | Jointly Administered |

## AMENDED JOINT CHAPTER 11 PLAN OF ALTEGRITY, INC., *ET AL.*

> **THIS CHAPTER 11 PLAN IS BEING SUBMITTED FOR
> APPROVAL BY THE BANKRUPTCY COURT. THIS CHAPTER 11 PLAN
> HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. ACCORDINGLY, THIS IS
> NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE CHAPTER 11
> PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE,
> 11 U.S.C. § 1125. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL
> A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

**DEBEVOISE & PLIMPTON LLP**

M. Natasha Labovitz (admitted *pro hac vice* )
Jasmine Ball (admitted *pro hac vice* )
Craig A. Bruens (admitted *pro hac vice*)
919 Third Avenue
New York, New York 10022
Telephone: (212) 909-6000
Facsimile: (212) 909-6836

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Edmon L. Morton (No. 3856)
Joseph M. Barry (No. 4221)
Ryan M. Bartley (No. 4985)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Dated: August 14, 2015

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Altegrity, Inc. (9985); Albatross Holding Company, LLC (2688); Albatross Marketing and Trading, LLC (8643); Altegrity Acquisition Corp. (1480); Altegrity Holding Corp. (1481); Altegrity Risk International LLC (6350); Altegrity Security Consulting, Inc. (5452); CVM Solutions, LLC (9526); D, D & C, Inc. (9552); Engenium Corporation (2269); FDC Acquisition, Inc. (2387); HireRight Records Services, Inc. (1944); HireRight Solutions, Inc. (8954); HireRight Technologies Group, Inc. (1660); HireRight, Inc. (5016); John D. Cohen, Inc. (1738); KCMS, Inc. (0085); KIA Holding, LLC (1333); Kroll Associates, Inc. (6880); Kroll Background America, Inc. (4830); Kroll Crisis Management Group, Inc. (3811); Kroll Cyber Security, Inc. (2393); Kroll Factual Data, Inc. (9911); Kroll Holdings, Inc. (4648); Kroll Inc. (1019); Kroll Information Assurance, Inc. (2283); Kroll Information Services, Inc. (2381); Kroll International, Inc. (1243); Kroll Ontrack Inc. (1650); Kroll Recovery LLC (7082); Kroll Security Group, Inc. (5514); National Diagnostics, Inc. (7132); Ontrack Data Recovery, Inc. (3148); Personnel Records International, LLC (0716); The Official Information Company (1805); US Investigations Services, LLC (9260); USIS International, Inc. (3617); and USIS Worldwide, Inc. (4258). The location of the Debtors' corporate headquarters is 600 Third Avenue, 4th Floor, New York, NY 10016.

## TABLE OF CONTENTS

**ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME**
      **AND GOVERNING LAW** ............................................................................................................... 1
    1.1       **Defined Terms** ..................................................................................................................... 1
    1.2       **Rules of Interpretation** ................................................................................................... 17
    1.3       **Computation of Time** ...................................................................................................... 18
    1.4       **Governing Law** ................................................................................................................. 18
    1.5       **Reference to Monetary Figures** ..................................................................................... 18
    1.6       **Reference to the Debtors or the Reorganized Debtors** ............................................... 18
    1.7       **Controlling Document** ..................................................................................................... 18

**ARTICLE II ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, DIP CLAIMS AND**
      **STATUTORY FEES** ..................................................................................................................... 18
    2.1       **Administrative Claims** ..................................................................................................... 19
    2.2       **Priority Tax Claims** ......................................................................................................... 20
    2.3       **Priority Wage Claims** ...................................................................................................... 20
    2.4       **DIP Claims** ........................................................................................................................ 21
    2.5       **Statutory Fees** ................................................................................................................... 21

**ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ............................. 21
    3.1       **Classification of Claims and Interests; Elimination of Classes** ................................ 21
    3.2       **Summary of Classification** .............................................................................................. 22
    3.3       **Classification and Treatment of Claims and Interests** ............................................... 23
    3.4       **Subordinated Claims** ....................................................................................................... 33

**ARTICLE IV ACCEPTANCE REQUIREMENTS** ............................................................................................. 34
    4.1       **Acceptance or Rejection of the Plan** .............................................................................. 34
    4.2       **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code** .......... 34
    4.3       **Elimination of Vacant Classes** ....................................................................................... 34

**ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN** ................................................................... 34
    5.1       **Continued Corporate Existence and Vesting of Assets in Debtors** ............................ 34
    5.2       **General Settlement of Claims and Interests; Bankruptcy Rule 9019 Settlement** .................... 36
    5.3       **New Revolving Credit Facility Agreement/Incurrence of New Indebtedness and**
            **Agreed Pay-down on First Lien Indebtedness/New Second Lien Notes** ..................... 36
    5.4       **Sources of Consideration for Plan Distribution** .......................................................... 37
    5.5       **Restructuring Transactions** ........................................................................................... 37
    5.6       **Section 1145 Exemption** .................................................................................................. 38
    5.7       **Cancellation of Securities and Agreements** .................................................................. 38
    5.8       **Surrender of Existing Securities** .................................................................................... 39
    5.9       **Boards of Directors and Officers of the Operating Debtors** ...................................... 39
    5.10      **Employee Benefits** ........................................................................................................... 39
    5.11      **Retiree Benefits** ............................................................................................................... 40
    5.12      **Corporate Action** ............................................................................................................. 40
    5.13      **Effectuating Documents; Further Transactions** ......................................................... 40
    5.14      **Section 1146 Exemption from Certain Taxes and Fees** ............................................... 40
    5.15      **D&O Liability Insurance Policies** ................................................................................... 41
    5.16      **Preservation of Rights of Action** ................................................................................... 41
    5.17      **Single Satisfaction of Claims** ......................................................................................... 42
    5.18      **Oversight Committee for the Liquidating Debtors** ...................................................... 42
    5.19      **Claims Resolution Committee for the Operating Debtors** ......................................... 43
    5.20      **Specified Claims Oversight Committee for the Liquidating Debtors** ......................... 44

**ARTICLE VI TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ..................... 45

| 6.1 | Assumption and Rejection of Executory Contracts and Unexpired Leases | 45 |
| 6.2 | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 46 |
| 6.3 | Cure of Defaults for Executory Contracts and Unexpired Leases Assumed | 46 |
| 6.4 | Modifications, Amendments, Supplements, Restatements or Other Agreements | 47 |
| 6.5 | Reservation of Rights | 47 |
| 6.6 | Contracts and Leases Entered Into After the Petition Date | 48 |
| 6.7 | Assumption of Insurance Policies | 48 |
| 6.8 | Assumption of Employment Contracts or Incentive Plans | 48 |

**ARTICLE VII PROVISIONS GOVERNING DISTRIBUTIONS** .......................................................... 48
| 7.1 | Record Date for Distributions | 48 |
| 7.2 | Timing and Calculation of Amounts to Be Distributed | 48 |
| 7.3 | Disbursing Agent | 49 |
| 7.4 | Rights and Powers of Disbursing Agent | 49 |
| 7.5 | Distributions on Account of Claims Allowed After the Effective Date | 49 |
| 7.6 | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 50 |
| 7.7 | Compliance with Tax Requirements and Allocations | 51 |
| 7.8 | Setoff and Recoupment | 51 |
| 7.9 | Claims Paid or Payable by Third Parties | 51 |
| 7.10 | Transactions on Business Days | 52 |
| 7.11 | Class Proofs of Claim | 52 |

**ARTICLE VIII PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS** .......................................................... 52
| 8.1 | Prosecution of Objections to Claims on and after the Effective Date | 52 |
| 8.2 | Estimation of Claims | 53 |
| 8.3 | Allowance of Claims | 54 |
| 8.4 | Distributions After Allowance | 54 |
| 8.5 | Deadline to File Objections to Claims | 54 |
| 8.6 | Disallowed Claims | 54 |
| 8.7 | [RESERVED] | 55 |
| 8.8 | [RESERVED] | 55 |
| 8.9 | Operating Debtors General Unsecured Claims Pool | 55 |
| 8.10 | Distributions from Operating Debtors General Unsecured Claims Pool | 55 |
| 8.11 | Liquidating Debtors Unsecured Claims Distribution Pool | 55 |
| 8.12 | Distributions from Liquidating Debtors Unsecured Claims Distribution Pool | 55 |
| 8.13 | Withholding Related to Distributions from Liquidating Debtors Unsecured Claims Distribution Pool or Operating Debtors Unsecured Notes Claims New Common Stock Pool | 56 |
| 8.14 | Plan Administrator | 57 |

**ARTICLE IX SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS** .......................... 58
| 9.1 | Compromise and Settlement of Claims, Interests and Controversies | 58 |
| 9.2 | Releases by the Debtors | 58 |
| 9.3 | Releases by Holders of Claims and Interests | 59 |
| 9.4 | Exculpation | 59 |
| 9.5 | Discharge of Claims and Termination of Interests | 60 |
| 9.6 | Injunction | 60 |
| 9.7 | Term of Injunctions or Stays | 61 |
| 9.8 | Protection Against Discriminatory Treatment | 61 |
| 9.9 | Release of Liens | 62 |

**ARTICLE X CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE** .......................................................... 62
| 10.1 | Conditions Precedent to Confirmation | 62 |
| 10.2 | Conditions Precedent to the Effective Date | 62 |

|       |                                                                                     |      |
|-------|-------------------------------------------------------------------------------------|------|
| 10.3  | Waiver of Conditions.................................................................................................| 63 |
| 10.4  | Effect of Failure of Conditions..................................................................................| 63 |

**ARTICLE XI MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN**...............................64

| 11.1  | Modification and Amendments ..................................................................................| 64 |
| 11.2  | Effect of Confirmation on Modifications ..................................................................| 64 |
| 11.3  | Revocation or Withdrawal of the Plan......................................................................| 64 |

**ARTICLE XII RETENTION OF JURISDICTION.**...........................................................................64

| 12.1  | Jurisdiction of the Bankruptcy Court......................................................................| 64 |

**ARTICLE XIII MISCELLANEOUS PROVISIONS.**..........................................................................66

| 13.1  | Immediate Binding Effect ..........................................................................................| 66 |
| 13.2  | Additional Documents ................................................................................................| 66 |
| 13.3  | Dissolution of Creditors' Committee..........................................................................| 67 |
| 13.4  | Payment of Fees and Expenses of the Indenture Trustees and Collateral Agents ................| 67 |
| 13.5  | Waiver of Federal Rule of Civil Procedure 62(a)......................................................| 67 |
| 13.6  | Vacatur of Confirmation Order .................................................................................| 67 |
| 13.7  | Reservation of Rights..................................................................................................| 67 |
| 13.8  | Successors and Assigns...............................................................................................| 67 |
| 13.9  | Service of Documents.................................................................................................| 68 |
| 13.10 | Entire Agreement........................................................................................................| 68 |
| 13.11 | Severability of Plan Provisions .................................................................................| 68 |
| 13.12 | Exhibits.......................................................................................................................| 68 |
| 13.13 | Votes Solicited in Good Faith.....................................................................................| 69 |
| 13.14 | Closing of Chapter 11 Cases ......................................................................................| 69 |
| 13.15 | Conflicts.......................................................................................................................| 69 |

## INTRODUCTION

Altegrity, Inc. and its affiliated debtors and debtors in possession in the above-captioned Chapter 11 Cases respectfully propose the following joint chapter 11 plan of reorganization. Capitalized terms used in the Plan and not otherwise defined shall have the meanings ascribed to such terms in Section 1.1 hereof.

## ARTICLE I

### DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

## 1.1    Defined Terms

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form:

1.    "*2015 10.50% Senior Notes*" means the 10.50% Senior Notes due 2015 issued by Altegrity pursuant to the 2015 10.50% Senior Notes Indenture.

2.    "*2015 10.50% Senior Notes Claim*" means any Claim arising from or based upon the 2015 10.50% Senior Notes or the 2015 10.50% Senior Notes Indenture.

3.    "*2015 10.50% Senior Notes Indenture*" means the Indenture, dated as of October 24, 2007, among Altegrity, the subsidiaries of Altegrity named as guarantors on the signature pages thereto and the 2015 10.50% Senior Notes Indenture Trustee, as well as any guarantees and other documents entered into in connection therewith, and as amended, supplemented, or otherwise modified from time to time.

4.    "*2015 10.50% Senior Notes Indenture Trustee*" means Delaware Trust Company or its duly appointed successor, solely in its capacity as successor indenture trustee under the 2015 10.50% Senior Notes Indenture.

5.    "*2015 12.00% Senior Notes*" means 12.00% Senior Notes due 2015 issued by Altegrity pursuant to the 2015 12.00% Senior Notes Indenture.

6.    "*2015 12.00% Senior Notes Claim*" means any Claim arising from or based upon the 2015 12.00% Senior Notes or the 2015 12.00% Senior Notes Indenture.

7.    "*2015 12.00% Senior Notes Indenture*" means the Indenture, dated as of August 3, 2010, among Altegrity, the subsidiaries of Altegrity named as guarantors on the signature pages thereto and the 2015 12.00% Senior Notes Indenture Trustee, as well as any guarantees and other documents entered into in connection therewith, and as amended, supplemented, or otherwise modified from time to time.

8.    "*2015 12.00% Senior Notes Indenture Trustee*" means Delaware Trust Company or its duly appointed successor, solely in its capacity as successor indenture trustee under the 2015 12.00% Senior Notes Indenture.

9.    "*2015 Senior Notes*" means the 2015 10.50% Senior Notes and the 2015 12.00% Senior Notes.

10.    "*2015 Senior Notes Claims*" means the 2015 10.50% Senior Notes Claim and the 2015 12.00% Senior Notes Claim.

11.    "*2016 Senior Subordinated Notes*" means the 11.75% Senior Subordinated Notes due 2016, issued by Altegrity pursuant to the 2016 Senior Subordinated Notes Indenture.

12.     "*2016 Senior Subordinated Notes Claims*" means any Claim arising from or based upon the 2016 Senior Subordinated Notes or 2016 Senior Subordinated Notes Indenture.

13.     "*2016 Senior Subordinated Notes Indenture*" means the Indenture, dated as of October 24, 2007, among Altegrity, the subsidiaries of Altegrity named as guarantors on the signature pages thereto and the 2016 Senior Subordinated Notes Indenture Trustee, as well as any guarantees and other documents entered into in connection therewith, and as amended, supplemented, or otherwise modified from time to time.

14.     "*2016 Senior Subordinated Notes Indenture Trustee*" means BOKF, N.A. or its duly appointed successor, in its capacity as indenture trustee under the 2016 Senior Subordinated Notes Indenture.

15.     "*Accrued Professional Compensation*" means, at any given moment, all accrued, contingent or unpaid fees (including success fees) for legal, financial advisory, accounting and other services and obligations for reimbursement of expenses rendered or incurred before the Effective Date that are awardable or allowable under sections 328, 330(a) or 331 of the Bankruptcy Code to any retained Professional in the Chapter 11 Cases, or that are awardable or allowable under section 503 of the Bankruptcy Code, that have not been denied by a Final Order, all to the extent that any such fees and expenses have not been previously paid.  To the extent that the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.  For the avoidance of doubt, Accrued Professional Compensation shall not include any accrued, contingent or unpaid fees for services and obligations for reimbursement of expenses rendered or incurred before the Effective Date by any Entity retained pursuant to the Ordinary Course Professional Order and authorized to be compensated thereunder without filing a fee application.

16.     "*Ad Hoc Group of First Lien Creditors*" means that certain group of holders of First Lien Credit Agreement Claims and First Lien Notes Claims represented from time to time by Kirkland & Ellis LLP.

17.     "*Ad Hoc Group of Second and Third Lien Creditors*" means that certain group of holders of First Lien Notes Claims, Second Lien Notes Claims and Third Lien Notes Claims represented from time to time by Paul, Weiss, Rifkind, Wharton & Garrison LLP.

18.     "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases of a kind specified under section 503(b) and entitled to priority under section 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses Allowed pursuant to sections 328, 330(a), 331 or 363 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and through the Effective Date; (c) DIP Claims and claims entitled to administrative expense treatment under the Final DIP Order; (d) all fees and charges assessed against the Estates pursuant to chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1–4001; and (e) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code.

19.     "*AHC Common Stock*" means the common shares in the capital of Altegrity Holding Corp., authorized pursuant to the Plan, which shall be book entry and DTC eligible.  The number of shares of AHC Common Stock that shall be initially issued and outstanding pursuant to the Plan as of the Effective Date will be set forth in the Plan Supplement.

20.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

21.     "*Allowed*" means, (a) with respect to Claims: (i) any Claim, proof of which is timely filed by the applicable Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code or a Final Order of the Bankruptcy Court a Proof of Claim is not or shall not be required to be filed); (ii) any Claim that is listed in the Schedules as not contingent, not unliquidated and not disputed, and for which no Proof of Claim has been timely filed; (iii) any Claim that is allowed pursuant to a Final Order of the Bankruptcy Court (which may be the

Confirmation Order); or (iv) any Claim that is allowed pursuant to the Plan; *provided, however*, that with respect to any Claim described in clauses (i) and (ii) above, such Claim shall be considered Allowed only if and to the extent that no objection to the allowance of such Claim or any portion thereof has been filed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or such an objection is filed and the Claim shall have been Allowed by a Final Order, and (b) with respect to Interests: (i) any Interest that is allowed pursuant to the Plan; or (ii) any other Interest that has been allowed by a Final Order of the Bankruptcy Court. Except for any Claim that is expressly Allowed herein, any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim has been filed, is not considered Allowed and shall be deemed expunged upon entry of the Confirmation Order without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Unless specified under the Plan, under the Bankruptcy Code or by order of the Bankruptcy Court, Allowed Claims shall not, for any purpose under the Plan, include any interest, costs, fees or charges on such Claims from and after the Petition Date. "*Allow*" and "*Allowing*" shall have correlative meanings.

22.     "*Altegrity*" means Altegrity, Inc., a Delaware corporation.

23.     "*Applicable Committee*" has the meaning set forth in Section 8.1(c)(ii).

24.     "*Avoidance Action*" means any action commenced, or that may be commenced, before or after the Effective Date pursuant to Chapter 5 of the Bankruptcy Code, including section 510, 542, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code.

25.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

26.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases.

27.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under 28 U.S.C. § 2075, as well as the general and local rules of the Bankruptcy Court.

28.     "*Business Day*" means any day other than a Saturday, Sunday or "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

29.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

30.     "*Causes of Action*" means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. Causes of Action also include, without limitation: (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or Chapter 5 of the Bankruptcy Code (including any Avoidance Actions and Specified Avoidance Actions); (d) the Specified Litigation Claims; (e) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (f) any state law fraudulent transfer claim; and (g) any claim listed in the Plan Supplement.

31.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court under Case No. 15-10226 (LSS).

32.    "*Charging Lien*" means any Lien or other priority in payment to which an Indenture Trustee or a Collateral Agent is entitled under the terms of an Indenture to assert against distributions to be made to holders of Claims under such Indenture.

33.    "*Claim*" means any claim against a Debtor or, to the extent specifically referenced in the Plan, a Non-Debtor Affiliate, as defined in section 101(5) of the Bankruptcy Code.

34.    "*Claims and Noticing Agent*" means Prime Clerk, located at 830 Third Avenue, 9th Floor, New York, NY 10022, (855) 842-4125, retained as the Debtors' notice, claims and solicitation agent.

35.    "*Claims Bar Date*" means, as applicable, (a) April 30, 2015 or (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for the filing of certain Claims.

36.    "*Claims Objection Bar Date*" means, for each Claim, the first Business Day that is 180 days after the Effective Date, or such later date the Bankruptcy Court may establish upon a motion by the Reorganized Debtors, which motion may be approved without notice to any party or a hearing.

37.    "*Claims Resolution Committee*" means a committee pertaining to the Operating Debtors designated by the Creditors' Committee, the membership and operating procedures of which shall be specified in the Plan Supplement (which to the extent reasonably practicable shall maintain and preserve the attorney client privilege of the Reorganized Debtors) and established on the Effective Date, which shall have only the powers and rights explicitly set forth in this Plan.

38.    "*Class*" means a category of Claims or Interests as set forth in Article III.

39.    "*Collateral Agents*" means, collectively, the First Lien Notes Collateral Agent, the Second Lien Notes Collateral Agent, and the Third Lien Notes Collateral Agent.

40.    "*Collateral Agent Fees*" means any fees, costs, expenses, disbursements and advances incurred or made by the Collateral Agents pursuant to the Indentures, including, without limitation, (a) any reasonable fees, costs, expenses and disbursements incurred by the Collateral Agents with any of their attorneys, advisors (including, without limitation, financial advisors), agents and other professionals and (b) any fees, costs or expenses for services performed by the Collateral Agents in connection with distributions made pursuant to this Plan, in each case, whether prior to, on or after the Petition Date, or on or after the Effective Date.

41.    "*Committee Authorized Settlement Amount*" shall have the meaning ascribed to such term in Section 8.1(c)(ii) hereof.

42.    "*Company*" means, collectively, Altegrity Holding Corp. and all of its direct and indirect affiliates and subsidiaries, including Subsidiary Debtors and Non-Debtor Affiliates.

43.    "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

44.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

45.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

46.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

47.    "*Consenting First Lien Creditors*" means, collectively, the Consenting First Lien Term Loan Lenders and the Consenting First Lien Notes Creditors.

48.    *"Consenting First Lien Notes Creditors"* means those holders of the First Lien Notes that are signatories to the Restructuring Support Agreement.

49.    *"Consenting First Lien Term Loan Lenders"* means those lenders party to the First Lien Credit Agreement that are signatories to the Restructuring Support Agreement.

50.    *"Consenting Interest Holders"* means, collectively, Providence Equity Partners VI L.P. and Providence Equity Partners VI-A L.P.

51.    *"Consenting Junior Lien Creditors"* means, collectively, the Consenting Second Lien Creditors and the Consenting Third Lien Creditors.

52.    *"Consenting Second Lien Creditors"* means those holders of Second Lien Notes that are signatories to the Restructuring Support Agreement.

53.    *"Consenting Third Lien Creditors"* means those holders of Third Lien Notes that are signatories to the Restructuring Support Agreement.

54.    *"Consummation"* means the occurrence of the Effective Date.

55.    *"Corporate Governance Documents"* means, with respect to each Reorganized Debtor, the new by-laws and the new certificates of incorporation (or other similar corporate organizational and governance documents) of such Entity, the forms of which shall be included in the Plan Supplement, and which shall be reasonably acceptable to the Consenting First Lien Creditors and acceptable to each Consenting Junior Lien Creditor.

56.    *"Covered Expenses"* means any reasonable expenses incurred by any Debtor associated with the pursuit of any Specified Litigation Claims or Specified Avoidance Actions, including, but not limited to, discovery costs, legal fees, overhead, and any other expenses related to the burden imposed upon any Debtor by discovery or other demands of litigation. For the avoidance of doubt, Covered Expenses shall not include any fees or expenses of counsel to the holders of Phoenix Claims, holders of WARN Claims or the Specified Claims Oversight Committee.

57.    *"Creditors' Committee"* means the statutory committee of unsecured creditors of the Debtors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on February 24, 2015, as may be reconstituted from time to time.

58.    *"Cure Claim"* means a Claim based upon a monetary default, if any, by any Debtor of an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor pursuant to sections 365 or 1123 of the Bankruptcy Code.

59.    *"D&O Liability Insurance Policies"* means all insurance policies of any of the Debtors or Reorganized Debtors for directors', managers' and officers' (collectively, **"Executives"**) liability resulting from any act, error, omission, breach of duty or any matter claimed against such Executive by reason of his or her status as such.

60.    *"De Minimis Settlement Amount"* shall have the meaning ascribed to such term in <u>Section 8.1(c)(i)</u> hereof.

61.    *"Debtor"* means one of the Debtors, in its individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

62.    *"Debtors"* means, collectively: Altegrity, Inc.; Albatross Holding Company, LLC; Albatross Marketing and Trading, LLC; Altegrity Acquisition Corp.; Altegrity Holding Corp.; Altegrity Risk International LLC; Altegrity Security Consulting, Inc.; CVM Solutions, LLC; D, D & C, Inc.; Engenium Corporation; FDC Acquisition, Inc.; HireRight Records Services, Inc.; HireRight Solutions, Inc.; HireRight Technologies Group, Inc.;

HireRight, Inc.; John D. Cohen, Inc.; KCMS, Inc.; KIA Holding, LLC; Kroll Associates, Inc.; Kroll Background America, Inc.; Kroll Crisis Management Group, Inc.; Kroll Cyber Security, Inc.; Kroll Factual Data, Inc.; Kroll Holdings, Inc.; Kroll Inc.; Kroll Information Assurance, Inc.; Kroll Information Services, Inc.; Kroll International, Inc.; Kroll Ontrack Inc.; Kroll Recovery LLC; Kroll Security Group, Inc.; National Diagnostics, Inc.; Ontrack Data Recovery, Inc.; Personnel Records International, LLC; The Official Information Company; US Investigations Services, LLC; USIS International, Inc.; and USIS Worldwide, Inc.

63.     "*DIP Agent*" means Cantor Fitzgerald Securities or its duly appointed successor, in its capacity as administrative agent under the DIP Loan Agreement.

64.     "*DIP Claims*" means any Claim derived from or based upon the DIP Loan Agreement, including the DIP Term Claims.

65.     "*DIP Lenders*" means the lender parties to the DIP Loan Agreement from time to time, each in their capacity as such.

66.     "*DIP Loan Agreement*" means that Certain Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of February 11, 2015, among Altegrity Holding Corp., Altegrity Acquisition Corp., Altegrity, the other Debtors party thereto, the DIP Agent and the DIP Lenders.

67.     "*DIP Term Claims*" means any Claim derived from or based upon the DIP Term Loan, including Claims for DIP PIK Interest under the DIP Loan Agreement.

68.     "*DIP Term Loan*" means the superpriority secured term loan facility in an aggregate principal amount of up to $90 million made available to the Debtors under the DIP Loan Agreement.

69.     "*DIP PIK Interest*" means all accrued interest in respect of the DIP Term Loan.

70.     "*Disallowed*" means, with respect to any Claim or Interest, any Claim or Interest that has been disallowed by a Final Order of the Bankruptcy Court (which may be the Confirmation Order).

71.     "*Disbursing Agent*" means the Reorganized Debtors or the Entity or Entities chosen by the Reorganized Debtors to make or facilitate distributions pursuant to the Plan, including the DIP Agent and each of the Indenture Trustees.

72.     "*Disclosure Statement*" means the *Disclosure Statement for the Joint Chapter 11 Plan of Altegrity Inc., et al.*, dated May 15, 2015, including, without limitation, all exhibits and schedules thereto and references therein that relate to the Plan that is prepared, approved by order of the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and distributed in accordance with such order of approval.

73.     "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed and has not yet been disallowed by Final Order. For the avoidance of doubt, any Claim, in whole or in part, that is subject to a pending objection to the Allowance of such Claim shall be considered a Disputed Claim in its entirety until that objection has been resolved by Final Order of the Bankruptcy Court.

74.     "*Distribution Date*" means any of the Initial Distribution Date or the Periodic Distribution Dates.

75.     "*Distribution Record Date*" means (i) the date that the Confirmation Order is entered by the Bankruptcy Court or (ii) with respect to securities held by DTC, the Initial Distribution Date.

76.     "*DTC*" means The Depository Trust Company.

77.     "*Effective Date*" means the first Business Day after which all provisions, terms and conditions specified in Section 10.2 have been satisfied or waived pursuant to Section 10.3, and on which no stay of the Confirmation Order is in effect.

78.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

79.    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

80.    "*Exchange Act*" means the U.S. Exchange Act of 1934, as amended.

81.    "*Exculpated Claim*" means any claim related to any act or omission in connection with, relating to or arising out of the Debtors' in-court or out-of-court restructuring efforts, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement or the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Plan securities, or the distribution of property under the Plan or any other related agreement. For the avoidance of doubt, no Cause of Action, obligation or liability expressly preserved by the Plan or the Plan Supplement constitutes an Exculpated Claim.

82.    "*Exculpated Party*" means each of:    (a) the Debtors and the Reorganized Debtors; (b) the directors, officers and employees of the Debtors serving on or after the Petition Date; (c) the Professionals of the Debtors; and (d) the Creditors' Committee and the members thereof, solely in their capacity as such, and any Professionals retained by the Creditors' Committee.

83.    "*Exculpation*" means the exculpation provision set forth in Section 9.4 hereof.

84.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

85.    "*Final DIP Order*" means the *Final Order (A) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364, (B) Granting Liens and Superpriority Claims, (C) Authorizing the Use of Cash Collateral, and (D) Granting Adequate Protection* [Docket No. 207].

86.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, shall have resulted in no modification of such order or has otherwise been dismissed with prejudice.

87.    "*First Lien Arranger*" means an Arranger as the foregoing capitalized term is defined in the First Lien Credit Agreement.

88.    "*First Lien Credit Agreement*" means the Credit Agreement, dated as of July 3, 2014, among Altegrity Acquisition Corp., Altegrity, the lenders party thereto in their capacities as lenders thereunder, the First Lien Credit Agreement Agent, as well as any guarantees and other documents entered into in connection therewith, and as amended, supplemented, or otherwise modified from time to time (including, without limitation, by the First Lien Credit Agreement Amendment).

89.    "*First Lien Credit Agreement Agent*" means Goldman Sachs Bank USA or its duly appointed successor, in its capacity as administrative agent and collateral agent under the First Lien Credit Agreement.

90.    "*First Lien Credit Agreement Amendment*" means the First Amendment and Consent to Credit Agreement, dated as of February 6, 2015, among Altegrity Acquisition Corp., Altegrity, the lenders party thereto in their capacities as lenders thereunder, and the First Lien Credit Agreement Agent.

91.    *"First Lien Credit Agreement Claims"* means any Claim arising under the First Lien Credit Agreement.

92.    *"First Lien Debt Amendments"* means, collectively, the First Lien Credit Agreement Amendment and the First Lien Notes Third Supplemental Indenture.

93.    *"First Lien Indebtedness"* means, collectively, the First Lien Credit Agreement Claims, First Lien Notes Claims, and any other Claims arising under the Senior Priority Documents.

94.    *"First Lien Issuing Bank"* means an Issuing Bank as the foregoing capitalized term is defined in the First Lien Credit Agreement.

95.    *"First Lien Lender"* means a Lender as the foregoing capitalized term is defined in the First Lien Credit Agreement.

96.    *"First Lien Loan Documents"* means the Loan Documents as the foregoing capitalized term is defined in the First Lien Credit Agreement.

97.    *"First Lien Notes"* means the 9.50% Senior Secured First Lien Notes due 2019 issued by Altegrity pursuant to the First Lien Indenture.

98.    *"First Lien Notes Claims"* means any Claim arising under the First Lien Notes or the First Lien Notes Indenture other than any Claims for fees and expenses by the First Lien Notes Trustee as set forth in Section 13.4 of the Plan.

99.    *"First Lien Notes Collateral Agent"* means Wilmington Trust, National Association or its duly appointed successor, in its capacity as collateral agent under the First Lien Notes Indenture.

100.    *"First Lien Notes Indenture"* means the indenture providing for issuance of senior first lien secured notes in series, dated as of July 3, 2014, among Altegrity, the subsidiaries of Altegrity named as guarantors on the signature pages thereto and the First Lien Notes Trustee, as well as any guarantees and other documents entered into in connection therewith, and as amended, supplemented, or otherwise modified from time to time (including, without limitation, by the First Lien Notes Third Supplemental Indenture).

101.    *"First Lien Notes Third Supplemental Indenture"* means the Third Supplemental Indenture, dated as of February 6, 2015, among Altegrity, the subsidiaries of Altegrity named as guarantors on the signature pages thereto and the First Lien Notes Trustee.

102.    *"First Lien Notes Trustee"* means Wilmington Trust, National Association or its duly appointed successor, in its capacity as indenture trustee under the First Lien Notes Indenture.

103.    *"General Unsecured Claims"* means any Unsecured Claim, unless such Claim is: (a) a Second Lien Notes Deficiency Claim, (b) a Third Lien Notes Deficiency Claim, (c) a 2015 Senior Notes Claim, (d) a 2016 Senior Subordinated Notes Claim, (e) a Junior Subordinated Notes Claim, (f) an Intercompany Claim, (g) an Administrative Claim, (h) a Priority Tax Claim, (i) a Priority Wage Claim (j) an Other Priority Claim, (k) a Claim for Accrued Professional Compensation, (l) the portion of any Insured Claim that is not an Insured Deficiency Claim or (m) any Liquidating Debtors Unsecured Claim.

104.    *"Governmental Unit"* means (i) any domestic, foreign, provincial, federal, state, local or municipal (a) government or (b) governmental agency, commission, department, bureau, ministry or other governmental entity or (ii) any other governmental unit as defined in section 101(27) of the Bankruptcy Code.

105.    *"Impaired"* means any Claim or Interest in an Impaired Class.

106.    "*Impaired Class*" means a Class that is impaired within the meaning of section 1124 of the Bankruptcy Code. For the avoidance of doubt, Impaired Classes are A4, A5, A7-a, A7-b, A8, A9, A10, B4, B5, B6, and B7.

107.    "*Indenture Trustee Fees*" means any fees, costs, expenses, disbursements and advances incurred or made by the Indenture Trustees pursuant to the Indentures, including, without limitation, (a) any reasonable fees, costs, expenses and disbursements incurred by the Indenture Trustees with any of their attorneys, advisors (including, without limitation, financial advisors), agents and other professionals and (b) any fees, costs or expenses for services performed by the Indenture Trustees in connection with distributions made pursuant to this Plan, in each case, whether prior to, on or after the Petition Date, or on or after the Effective Date.

108.    "*Indenture Trustees*" means, collectively, the 2015 10.50% Senior Notes Indenture Trustee, the 2015 12.50% Senior Notes Indenture Trustee, the 2016 Senior Subordinated Notes Indenture Trustee, the First Lien Notes Trustee, the Second Lien Notes Trustee, the Third Lien Notes Trustee or their predecessors, if applicable.

109.    "*Indentures*" means, collectively, the 2015 10.50% Senior Notes Indenture, the 2015 12.50% Senior Notes Indenture, the 2016 Senior Subordinated Notes Indenture, the First Lien Notes Indenture, the Second Lien Notes Indenture and the Third Lien Notes Indenture.

110.    "*Initial Distribution Date*" means the Effective Date or the date occurring as soon as reasonably practicable after the Effective Date when distributions under the Plan shall commence.

111.    "*Insurance Coverage Action*" means any action brought before a court, arbitrator, or other tribunal seeking determination of one or more causes of action, including declaratory relief, indemnification, contribution, or an award of damages, arising out of or relating to any of the Insurance Policies.

112.    "*Insurance Policies*" means any insurance policies, insurance settlement agreements, coverage-in-place agreements or other agreements related to the provision of insurance entered into by or issued to or for the benefit of any of the Debtors or their predecessors.

113.    "*Insurance Proceeds*" means the insurance proceeds available to the Debtors or holders of Insured Claims under any of the Insurance Policies.

114.    "*Insured Claim*" means any Claim that is payable or subject to indemnification, in whole or in part, from Insurance Proceeds under one or more of the Insurance Policies.

115.    "*Insured Deficiency Claim*" means the unsecured balance, if any, of an Insured Claim that remains after deducting the amount of Insurance Proceeds available on account of such Insured Claim.

116.    "*Insurer*" means a counterparty to any Insurance Policy that is not one of the Debtors, their predecessors, or affiliates.

117.    "*Intercompany Claim*" means (a) any Claim held by a Debtor against another Debtor or (b) any Claim held against a Debtor by a Non-Debtor Affiliate that is a direct or indirect subsidiary of Altegrity Holding Corp.

118.    "*Interest*" means any share of common stock, preferred stock or other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant or other right, contractual or otherwise, to acquire any such interest in a Debtor that existed before the Effective Date, any phantom stock or other similar stock unit provided pursuant to the Debtors' prepetition employee compensation programs and any Claim related to the purchase of interests subject to subordination pursuant to section 510(b) of the Bankruptcy Code; *provided, however,* that to the extent an Interest is subject to the terms of a prepetition contract or other agreement, any recovery under the Plan on account of such Interest shall be subject to the terms of such contract or agreement.

9

119.    *"Interim Compensation Order"* means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 202].

120.    *"Junior Subordinated Notes"* means the zero coupon junior subordinated notes of Altegrity issued and sold pursuant to the Junior Subordinated Note Purchase Agreement.

121.    *"Junior Subordinated Notes Claims"* means any Claim arising under the Junior Subordinated Notes.

122.    *"Junior Subordinated Note Purchase Agreement"* means the Note Purchase Agreement dated as of August 3, 2010 among Altegrity and the purchasers party thereto, as amended, supplemented, or otherwise modified from time to time.

123.    *"Lien"* has the meaning set forth in section 101(37) of the Bankruptcy Code.

124.    *"Lien Claim"* means any Secured Claim that is not: (a) a DIP Claim; (b) a First Lien Credit Agreement Claim; (c) a First Lien Notes Claim; (d) a Second Lien Notes Claim; or (e) a Third Lien Notes Claim.

125.    *"Liquidating Debtor"* means any of US Investigation Services, LLC, USIS International, Inc., USIS Worldwide, Inc. and John D. Cohen, Inc.

126.    *"Liquidating Debtors Collateral"* means any and all assets of the Liquidating Debtors that are, as of the Confirmation Hearing, subject to perfected Liens securing First Lien Indebtedness, Second Lien Notes or Third Lien Notes.  For the avoidance of doubt "Liquidating Debtors Collateral" includes any and all proceeds (including, without limitation, proceeds arising from a claim for equitable adjustment) from remaining payments due to the Liquidating Debtors from the United States Office of Personnel Management or any other Governmental Unit.

127.    *"Liquidating Debtors Unsecured Claims"* means all unsecured Claims against any Liquidating Debtor including (a) General Unsecured Claims, (b) 2015 Senior Notes Claims, (c) 2016 Senior Subordinated Notes Claims, (d) Insured Deficiency Claims, (e) Second Lien Notes Deficiency Claims, (f) Third Lien Notes Deficiency Claims, and (g) prepetition Intercompany Claims held by any Operating Debtor.

128.    *"Liquidating Debtors Unsecured Claims Distribution Pool"* means the proceeds from any unencumbered assets of the Liquidating Debtors, including, without limiting the foregoing, the proceeds of the Specified Litigation Claims and, subject to the Second Lien Avoidance Action Liens and the Third Lien Avoidance Action Liens to the extent not waived in Section 3.3 hereof, the Specified Avoidance Actions.

129.    *"New Altegrity"* means a new holding company created prior to the Effective Date that will be the ultimate parent of the Operating Debtors (other than Altegrity Holding Corp.) after the Restructuring Transactions are completed.

130.    *"New Board"* means, with respect to each Reorganized Debtor, the initial board of directors of such Entity appointed as of the Effective Date, the members of which shall be determined in accordance with Section 5.9.

131.    *"New Common Stock"* means a certain number of common shares in the capital of New Altegrity authorized pursuant to the Plan, which shall be book entry and DTC eligible.  The number of shares of New Common Stock that shall be initially issued and outstanding pursuant to the Plan as of the Effective Date will be set forth in the Plan Supplement.

132.    *"New Employment Agreements"* means employment agreements between the Debtors and certain individuals in the Debtors' senior management, the terms of which shall be included in the Plan Supplement.

133.    *"New Incentive Plan"* means an equity incentive plan, option plan, unit plan, restricted equity incentive plan or other similar management incentive award plan that shall provide for grants of options and/or

restricted units/equity reserved for management, directors, and employees. The amount, form, exercise price, application and vesting of such equity-based awards, and any limitation thereon, shall be determined and approved by the New Board and implemented after the Effective Date; *provided* that the Reorganized Debtors shall allocate up to 10% of the New Common Stock to be distributed under such New Incentive Plan.

134.    *"New Revolving Credit Facility Agreement"* means one or more financing agreements to be executed by the Reorganized Debtors on or before the Effective Date, providing for a new senior secured revolving credit facility in an amount up to $60 million, with capacity for the issuance of letters of credit, all, after consultation with the First Lien Notes Trustee, the First Lien Notes Collateral Agent and the First Lien Credit Agreement Agent, in form and substance reasonably acceptable to the Consenting First Lien Creditors and Consenting Junior Lien Creditors, the substantially final form of which shall be filed as part of the Plan Supplement.

135.    *"New Revolving Credit Facility"* means a senior secured credit facility up to a principal amount of $60 million, with the capacity for the issuance of letters of credit, after consultation with the First Lien Notes Trustee, the First Lien Notes Collateral Agent and the First Lien Credit Agreement Agent, in form and substance reasonably acceptable to the Consenting First Lien Creditors and Consenting Junior Lien Creditors, entered into pursuant to the New Revolving Credit Facility Agreement.

136.    *"New Second Lien Notes"* means new second lien secured notes to be issued under the Second Lien Notes Indenture, as Additional Notes (as defined in the Second Lien Notes Indenture) pursuant to the New Second Lien Notes Documents, on the Effective Date in exchange for the DIP Claims, which shall be DTC eligible and the terms of which shall be consistent with the terms of the Second Lien Notes; *provided*, that (i) the interest rate of the New Second Lien Notes shall be 13.5% payment-in-kind, which shall become 11.5% cash pay once the consolidated total leverage ratio of the Reorganized Debtors reaches 5.0 to 1.0, (ii) the stated maturity of the New Second Lien Notes shall be no earlier than 6 months after the maturity of the First Lien Notes, (iii) the assets of the Liquidating Debtors shall not secure the New Second Lien Notes and (iv) the Liquidating Debtors shall not guarantee the New Second Lien Notes.

137.    *"New Second Lien Notes Documents"* means (i) the Second Lien Notes Indenture and the Notes Security Documents (as defined in the Second Lien Notes Indenture), in each case solely in connection with the New Second Lien Notes or other future series of notes issued under the Second Lien Notes Indenture, and not in connection with the Second Lien Notes), (ii) the Notes Supplemental Indenture (as defined in the Second Lien Notes Indenture) to be executed by the Reorganized Debtors and the Second Lien Notes Trustee on or before the Effective Date, providing for the issuance of the New Second Lien Notes, in form and substance reasonably acceptable to the Consenting First Lien Creditors, the Consenting Junior Lien Creditors, the Second Lien Notes Trustee and the Second Lien Notes Collateral Agent, the substantially final form of which shall be filed as part of the Plan Supplement, (iii) the Notes Supplemental Indenture (as defined in the Second Lien Notes Indenture) to be executed by the Reorganized Debtors and the Second Lien Notes Trustee on or before the Effective Date, providing for certain amendments to the Second Lien Notes Indenture, in form and substance reasonably acceptable to the Consenting First Lien Creditors, the Consenting Junior Lien Creditors, the Second Lien Notes Trustee and the Second Lien Notes Collateral Agent, the substantially final form of which shall be filed as part of the Plan Supplement, and (iv) the Note(s) (as defined in the Second Lien Notes Indenture) to be executed by the Reorganized Debtors and authenticated by the Second Lien Notes Trustee on or before the Effective Date, evidencing the New Second Lien Notes, which shall, after consultation with the First Lien Notes Trustee, the First Lien Notes Collateral Agent and the First Lien Credit Agreement Agent, be in form and substance reasonably acceptable to the Consenting First Lien Creditors, Consenting Junior Lien Creditors, the Second Lien Notes Trustee and the Second Lien Notes Collateral Agent, the substantially final form of which (other than the Second Lien Notes Indenture and Notes Security Documents (as defined in the Second Lien Notes Indenture)) shall be filed as part of the Plan Supplement.

138.    *"Non-Debtor Affiliate"* means any Entity that is either directly or indirectly a wholly-owned subsidiary of Altegrity Holding Corp. that is not, or does not become, before the Confirmation Date, a Debtor in the Chapter 11 Cases.

139.    *"Notes"* means, collectively, the 2015 Senior Notes, the 2016 Senior Subordinated Notes, the First Lien Notes, the Second Lien Notes and the Third Lien Notes.

140.    *"Notes Claims"* means, collectively, the 2015 10.50% Senior Notes Claim, the 2015 12.0% Senior Notes Claim, the 2016 Senior Subordinated Notes Claims, the First Lien Notes Claims, the Second Lien Notes Claims and the Third Lien Notes Claims.

141.    *"Operating Debtor"* means any Debtor other than the Liquidating Debtors.

142.    *"Operating Debtors General Unsecured Claims"* means all (a) General Unsecured Claims, (b) Insured Deficiency Claims and (c) prepetition Intercompany Claims held by any Liquidating Debtor, in each case, against any Operating Debtor.

143.    *"Operating Debtors General Unsecured Claims Pool"* means $1,250,000 in Cash, for purposes of disbursements to holders of Allowed Claims in Class A7-b.

144.    *"Operating Debtors Unsecured Notes Claims"* means all (a) 2015 Senior Notes Claims, (b) 2016 Senior Subordinated Notes Claims, (c) Second Lien Notes Deficiency Claims, (d) Third Lien Notes Deficiency Claims, and (e) Junior Subordinated Notes Claims, in each case, against any Operating Debtor.

145.    *"Operating Debtors Unsecured Notes Claims New Common Stock Pool"* means 1.11% of the New Common Stock issued as of the Effective Date, which shall be subject to dilution by any New Common Stock issued in connection with the New Incentive Plan, for purposes of disbursements to holders of Allowed Claims in Class A7-a.

146.    *"Ordinary Course Professional Order"* means the *Order Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business* [Docket No. 204].

147.    *"Other Priority Claim"* means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim, (b) a Priority Tax Claim or (c) a Priority Wage Claim.

148.    *"Oversight Committee"* means a committee pertaining to the Liquidating Debtors formed by the Ad Hoc Group of Second and Third Lien Creditors and the Creditors' Committee, the membership and operating procedures of which shall be specified in the Plan Supplement (which to the extent reasonably practicable shall maintain and preserve the attorney client privilege of the Reorganized Debtors) and be reasonably acceptable to each of the Ad Hoc Group of Second and Third Lien Creditors and the Creditors' Committee, which committee shall have only the powers and rights explicitly set forth in this Plan.

149.    *"Oversight Committee Professionals"* has the meaning set forth in section 5.18 of the Plan.

150.    *"Periodic Distribution Date"* means, unless otherwise ordered by the Bankruptcy Court, the first Business Day that is 120 days after the Initial Distribution Date and, for the first year thereafter, the first Business Day that is 120 days after the immediately preceding Periodic Distribution Date. After one year following the Initial Distribution Date, the Periodic Distribution Date will occur on the first Business Day that is 180 days after the immediately preceding Periodic Distribution Date.

151.    *"Person"* has the meaning set forth in section 101(41) of the Bankruptcy Code.

152.    *"Petition Date"* means February 8, 2015.

153.    *"Phoenix Claims"* means the 2015 Senior Notes Claims and the 2016 Senior Subordinated Notes Claims held by JLP Credit Opportunity Master Fund Ltd or its affiliates or any other private fund or managed account advised by Phoenix Investment Adviser LLC.

154.    *"Plan"* means this *Joint Chapter 11 Plan of Altegrity Inc., et al.,* including the Plan Supplement, which is incorporated herein by reference.

155.    "*Plan Administrator*" means, from and after the Effective Date, New Altegrity.

156.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules and exhibits to the Plan, which the Debtors shall use commercially reasonable efforts to cause to be filed seven (7) days prior to (but in no event later than) the deadline fixed for objecting to Confirmation or such later date as may be approved by the Bankruptcy Court, and additional documents filed with the Bankruptcy Court before the Effective Date as amendments, modifications or supplements to the Plan Supplement; *provided* that for the avoidance of doubt, the Plan Supplement shall include the New Revolving Credit Facility Agreement, the intercreditor agreements referred to in Section 5.3(a), the First Lien Credit Agreement Amendment, the First Lien Notes Third Supplemental Indenture and the New Second Lien Notes Documents (other than the Second Lien Notes Indenture and Notes Security Documents (as defined in the Second Lien Notes Indenture)). The Debtors shall have the right to amend the documents contained in the Plan Supplement (other than the First Lien Debt Amendments and the New Second Lien Notes Documents, which may only be amended in accordance with their terms) through and including the Effective Date in accordance with Article XI hereof. Each document that is included in the Plan Supplement, and any supplements, amendments, or modifications thereto, shall, after consultation with the First Lien Notes Trustee, the First Lien Notes Collateral Agent and the First Lien Credit Agreement Agent, be in form and substance reasonably satisfactory to the Debtors, the Consenting First Lien Creditors, the Consenting Junior Lien Creditors, the Consenting Interest Holders and the Creditors' Committee. The New Second Lien Notes Documents shall also be in form and substance reasonably satisfactory to the Second Lien Notes Trustee and the Second Lien Notes Collateral Agent.

157.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

158.    "*Priority Wage Claim*" means any Claim of an employee of any Debtor entitled to priority in payment pursuant to sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

159.    "*Pro Rata*" means, as applicable, the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that all Allowed Claims in a particular Class bears to the aggregate amount of Allowed Claims in such Class and other Classes entitled to share in the same recovery under the Plan.

160.    "*Professional*" means an Entity: (a) retained pursuant to a Final Order in accordance with sections 327, 363 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 363 and 331 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

161.    "*Professional Fee Escrow*" means an interest bearing escrow account to be funded on the Effective Date with Cash proceeds from the DIP Term Loan in an amount equal to all Accrued Professional Compensation Claims; *provided*, that the Professional Fee Escrow shall be increased to the extent fee applications are filed after the Effective Date in the amount thereof.

162.    "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

163.    "*Reinstated*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

164.    "*Rejection Claim*" means a Claim arising from the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

165.    "*Released Party*" means each of: (a) the Debtors and the Reorganized Debtors; (b) the current and former directors and officers of the Debtors; (c) the Indenture Trustees; (d) the First Lien Credit Agreement Agent; (e) the Consenting Interest Holders; (f) the First Lien Lenders (including the Consenting First Lien Term Loan Lenders); (g) the holders of First Lien Notes (including the Consenting First Lien Creditors); (h) the holders of Second Lien Notes (including the Consenting Second Lien Creditors); (i) the holders of Third Lien Notes (including

the Consenting Third Lien Creditors); (j) the members of the Ad Hoc Group of First Lien Creditors; (k) the members of the Ad Hoc Group of Second and Third Lien Creditors; (l) the members of the Creditors' Committee, each applicable holder of the 2015 Senior Notes and each applicable holder of the 2016 Senior Subordinated Notes, in each case to the extent that such members or holders do not opt out of the releases contained in Section 9.3 of the Plan and do not vote against, object to, or otherwise oppose, confirmation of the Plan; (m) the Disbursing Agents; (n) the Collateral Agents; (o) the First Lien Arrangers; (p) the First Lien Issuing Banks; (q) the Underwriters; and (r) with respect to each of the foregoing Entities in clauses (a) through (q), such Entities' subsidiaries, affiliates, members, officers, directors, agents, financial advisors, accountants, investment bankers, consultants, attorneys, employees, advisors, partners and representatives, in each case, only in their capacity as such.

166.    *"Releasing Parties"* means all Entities who have held, hold or may hold Claims or Interests that have been released pursuant to Sections 9.2 or 9.3, discharged pursuant to Section 9.5 or are subject to exculpation pursuant to Section 9.4.

167.    *"Reorganized"* means, with respect to the Debtors, any Debtor or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

168.    *"Restructuring Support Agreement"* means that restructuring support agreement dated as of February 2, 2015 (as amended, supplemented or otherwise modified from time to time, including, without limitation, any waivers thereto) entered into by the Consenting First Lien Notes Creditors, Consenting First Lien Term Loan Lenders, Consenting Interest Holders, Consenting Junior Lien Creditors and the Debtors and attached as Exhibit 1 to the *Order Authorizing the Debtors to Assume the Restructuring Support Agreement* [Docket No. 208].

169.    *"Restructuring Transactions"* means one or more transactions pursuant to section 1123(a)(5) of the Bankruptcy Code to occur on or before the Effective Date or as soon as reasonably practicable thereafter, that the Debtors or Reorganized Debtors, as applicable, after consultation with the First Lien Notes Trustee, the First Lien Notes Collateral Agent and the First Lien Credit Agreement Agent, with the consent of the Consenting Junior Lien Creditors and the Consenting First Lien Creditors, such consent not to be unreasonably withheld, determine may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (a) the execution and delivery of appropriate agreements or other documents of merger, sale, consolidation, equity issuance, certificates of incorporation, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of sale, transfer, equity issuance, assumption, or delegation of any property, right, liability, duty, or obligations on terms consistent with the terms of the Plan; and (c) all other actions that the Debtors or Reorganized Debtors, as applicable, with, after consultation with the First Lien Notes Trustee, the First Lien Notes Collateral Agent and the First Lien Credit Agreement Agent, the consent of the Consenting Junior Lien Creditors and the Consenting First Lien Creditors, such consent not to be unreasonably withheld, determine are necessary or appropriate to implement the Plan, including, without limitation, the liquidation and wind-down of the Liquidating Debtors. The Debtors, the Reorganized Debtors or the Liquidating Debtors, as the case may be, shall not affect any Restructuring Transactions without, after consultation with the First Lien Notes Trustee, the First Lien Notes Collateral Agent and the First Lien Credit Agreement Agent, the consent of the Consenting First Lien Creditors and Consenting Junior Lien Creditors, which consent shall not be unreasonably withheld.

170.    *"Schedules"* means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms.

171.    *"SEC"* means the U.S. Securities and Exchange Commission.

172.    *"Second Lien Avoidance Action Liens"* means all liens granted to the holders of Second Lien Notes on the proceeds of Avoidance Actions pursuant to, and to the extent provided in, the Final DIP Order.

173.    *"Second Lien Distribution"* means (i) 96.91% of the New Common Stock issued as of the Effective Date, which shall be subject to dilution by any New Common Stock issued in connection with the New Incentive Plan and (ii) 98.00% of the AHC Common Stock issued as of the Effective Date.

174.    "*Second Lien Notes*" means (i) the Senior Second Lien Secured 12.00% Cash Pay and 2.00% Pay-in-Kind Notes due 2020 and (ii) the Senior Second Lien Secured 10.50% Cash Pay and 2.50% Pay-in-Kind Notes due 2020, each issued by Altegrity pursuant to the Second Lien Notes Indenture.

175.    "*Second Lien Notes Claims*" means any Claim arising under the Second Lien Notes or the Second Lien Notes Indenture, other than any Claims for fees and expenses by the Second Lien Notes Trustee as set forth in Section 13.4 of the Plan.

176.    "*Second Lien Notes Collateral Agent*" means Wilmington Trust, National Association or its duly appointed successor, in its capacity as collateral agent under the Second Lien Notes Indenture and the Notes Security Documents (as defined in the Second Lien Notes Indenture).

177.    "*Second Lien Notes Deficiency Claims*" means Allowed Unsecured Claims representing the portion of Second Lien Notes Claims, other than any claims for fees and expenses by the Second Lien Notes Trustee as set forth in Section 13.4 of the Plan, that is not Secured.

178.    "*Second Lien Notes Indenture*" means the indenture providing for issuance of senior second lien secured notes in series, dated as of July 3, 2014, among Altegrity, the subsidiaries of Altegrity named as guarantors on the signature pages thereto and the Second Lien Notes Trustee, as well as any guarantees and other documents entered into in connection therewith, and as amended, supplemented, or otherwise modified from time to time.

179.    "*Second Lien Notes Supplemental Documents*" means (i) the Initial Notes (as defined in the Second Lien Notes Indenture) and related documents evidencing the Second Lien Notes and (ii) the Junior Lien Intercreditor Agreement (as defined in the Second Lien Notes Indenture).

180.    "*Second Lien Notes Trustee*" means U.S. Bank National Association or its duly appointed successor, solely in its capacity as successor indenture trustee under the Second Lien Notes Indenture.

181.    "*Secured*" means, when referring to a Claim:  (a) secured by a Lien on property in which the Estate of the Debtor against which the Claim is asserted has an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, to the extent of the value of the creditor's interest in the Estate's interest in such property as determined pursuant to section 506(a) of the Bankruptcy Code; (b) subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the property subject to setoff; or (c) otherwise Allowed pursuant to the Plan as a Secured Claim.

182.    "*Segregated Account*" means that certain account holding $110 million in proceeds from the sales of (a) the business of Debtor Kroll Factual Data, Inc. and (b) substantially all of the remaining Global Security & Solutions Division of Debtor US Investigation Services, LLC (including Labat-Anderson Incorporated and US Investigations Services, Professional Services Division, Inc.).

183.    "*Senior Priority Documents*" means the Term Documents, the First Lien Note Documents and any Additional Documents in respect of any Senior Priority Obligations, as each foregoing capitalized term is defined in that certain Senior Intercreditor Agreement, dated as of July 3, 2014, by and among Goldman Sachs Bank USA, as Term Agent, Wilmington Trust, National Association, as First Lien Note Agent, Wilmington Trust, National Association, as Second Lien Note Agent, and Wilmington Trust, National Association, as Third Lien Note Agent.

184.    "*Settlement Amount*" shall have the meaning ascribed to such term in Section 8.1(c)(i) hereof.

185.    "*Specified Avoidance Actions*" means any action commenced, or that may be commenced, before or after the Effective Date pursuant to sections 544, 547 and 548 (and 550 solely in connection with recoveries under sections 544, 547 and 548) of the Bankruptcy Code, held by the Liquidating Debtors, but excluding (a) any such Claims or Causes of Action to avoid the Liens securing, or to subordinate or disallow, all or any portion of the First Lien Indebtedness, the Second Lien Notes or the Third Lien Notes and (b) any Claims or Causes of Action against (i) post-Effective Date customers, vendors or employees of the Reorganized Debtors (with respect to such customers and vendors, solely to the extent more fully described in the Plan Supplement), (ii) Altegrity, Inc. or any

of its affiliates, (iii) Providence Equity Partners L.L.C. or any of its affiliates, (iv) any person who was an employee, officer or director of any Debtor as of the Petition Date, (v) any employee or board designee of Providence Equity Partners L.L.C. or one of its subsidiaries or affiliates (to the extent any such board member was designated prior to May 1, 2015 and to the extent disclosed to the counsel of the Creditor's Committee on or before May 7, 2015 (as amended by electronic mail to counsel of the Creditors' Committee on May 15, 2015)), (vi) any current or former holders of claims, or current or former trustees or agents, under the First Lien Notes, First Lien Credit Agreement, Second Lien Notes or Third Lien Notes, (vii) the First Lien Lenders, the First Lien Arrangers, the First Lien Issuing Banks and the Underwriters, or (viii) the employees or advisors of any of the foregoing (other than the Specified D&O Litigation Parties).

186.     *"Specified Claims Oversight Committee"* means a committee pertaining to the Liquidating Debtors formed by the Creditors' Committee, the membership and operating procedures of which shall be specified in the Plan Supplement (which to the extent reasonably practicable shall maintain and preserve the attorney client privilege of the Reorganized Debtors) and such operating procedures shall be reasonably acceptable to each of the Ad Hoc Group of Second and Third Lien Creditors and the Creditors' Committee, which committee shall have only the powers and rights explicitly set forth in this Plan.

187.     *"Specified Claims Oversight Committee Professionals"* has the meaning set forth in section 5.20 of the Plan.

188.     *"Specified D&O Litigation Parties"* means any individuals who were officers or directors of any of the Liquidating Debtors during the period from July 1, 2013 through February 7, 2015, other than any such individual who (i) remained as an employee, officer or director of such Liquidating Debtor as of the Petition Date or (ii) is an employee or board designee of Providence Equity Partners, L.L.C. or one of its subsidiaries or affiliates (to the extent any such board member was designated prior to May 1, 2015 and to the extent disclosed to the counsel of the Creditor's Committee on or before May 7, 2015 (as amended by electronic mail to counsel of the Creditors' Committee on May 15, 2015)).

189.     *"Specified Litigation Claims"* means (a) all claims or causes of action of a Liquidating Debtor against any of the Specified D&O Litigation Parties related to the actions or omissions of such parties, *provided* that any and all such claims shall be capped by the aggregate amounts covered by the D&O Liability Insurance Policies, if any, and no action shall be taken to collect all or any portion of any settlement or judgment from the assets or the properties of any Specified D&O Litigation Party or the Debtors' Estates and (b) all claims or causes of action of a Liquidating Debtor constituting commercial tort claims within the meaning of section 9-102(a)(13) of the Uniform Commercial Code as enacted in New York, but excluding any such Claims or Causes of Action against (i) post-Effective Date customers, vendors or employees of the Reorganized Debtors (with respect to such customers and vendors, solely to the extent more fully described in the Plan Supplement), (ii) Altegrity, Inc. or any of its affiliates, (iii) Providence Equity Partners L.L.C. or one of its subsidiaries or affiliates, (iv) any person who was an employee, officer or director of any Debtor as of the Petition Date, (v) any employee or board designee of Providence Equity Partners L.L.C. or one of its subsidiaries or affiliates (to the extent any such board member was designated prior to May 1, 2015 and to the extent disclosed to the counsel of the Creditors' Committee on or before May 7, 2015 (as amended by electronic mail to counsel of the Creditors' Committee on May 15, 2015)), (vi) any current or former holders of claims, or current or former trustees or agents, under the First Lien Credit Agreement, First Lien Notes, Second Lien Notes or Third Lien Notes, (vii) the First Lien Lenders, the First Lien Arrangers, the First Lien Issuing Banks and the Underwriters, or (viii) the employees or advisors of any of the foregoing (other than the Specified D&O Litigation Parties).

190.     *"Subsidiary Debtors"* means all of the Debtors other than Altegrity Holding Corp.

191.     *"Third Lien Avoidance Action Liens"* means all liens granted to the holders of Third Lien Notes on the proceeds of Avoidance Actions pursuant to, and to the extent provided in, the Final DIP Order.

192.     *"Third Lien Distribution"* means (i) 1.98% of the New Common Stock issued as of the Effective Date, which shall be subject to dilution by any New Common Stock issued in connection with the New Incentive Plan and (ii) 2.00% of the AHC Common Stock issued as of the Effective Date.

16

193.    "*Third Lien Notes*" means the Senior Secured Third Lien 15% Notes due 2021, issued by Altegrity pursuant to the Third Lien Notes Indenture.

194.    "*Third Lien Notes Claims*" means any Claim arising under the Third Lien Notes or the Third Lien Notes Indenture, other than any Claims for fees and expenses by the Third Lien Notes Trustee as set forth in Section 13.4 of the Plan.

195.    "*Third Lien Notes Collateral Agent*" means Wilmington Trust, National Association or its duly appointed successor, in its capacity as collateral agent under the Third Lien Notes Indenture.

196.    "*Third Lien Notes Deficiency Claims*" means Allowed Unsecured Claims representing the portion of Third Lien Notes Claims, other than any claims for fees and expenses by the Third Lien Notes Trustee as set forth in Section 13.4 of the Plan, that is not Secured.

197.    "*Third Lien Notes Indenture*" means the indenture providing for issuance of senior third lien secured notes in series, dated as of July 3, 2014, among Altegrity, the subsidiaries of Altegrity named as guarantors on the signature pages thereto and the Third Lien Notes Trustee, as well as any guarantees and other documents entered into in connection therewith, and as amended, supplemented, or otherwise modified from time to time.

198.    "*Third Lien Notes Trustee*" means Deutsche Bank Trust Company Americas or its duly appointed successor, in its capacity as indenture trustee and each other capacity, if applicable, under the Third Lien Notes Indenture.

199.    "*Underwriter*" means any person acting as underwriter, dealer, manager or initial purchaser in connection with the First Lien Notes, Second Lien Notes, Third Lien Notes, 2015 Senior Notes, 2016 Senior Subordinated Notes, or Junior Subordinated Notes.

200.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

201.    "*Unimpaired*" means any Claim or Interest that is not designated as Impaired. For the avoidance of doubt, Unimpaired Classes are Classes A1, A2, A3, A6, A11, B1, B2, B3 and B8.

202.    "*Unsecured Claims*" means, collectively, (a) Liquidating Debtors Unsecured Claims, (b) Operating Debtors Unsecured Notes Claims and (c) Operating Debtors General Unsecured Claims.

203.    "*U.S. Trustee*" means the United States Trustee for the District of Delaware.

204.    "*Waived Liquidating Debtors Intercompany Claim*" means any prepetition Intercompany Claim against any Liquidating Debtor held by any Operating Debtor.

205.    "*Waived Operating Debtors Intercompany Claim*" means any prepetition Intercompany Claim against any Operating Debtor held by any Liquidating Debtor.

206.    "*WARN Claims*" means any Claim that is the subject of any of the WARN Actions.

207.    "*WARN Actions*" means the actions entitled *Karaniewsky v. Altegrity, Inc. (In re Altegrity, Inc.)*, Ch. 11 Case No. 15-10226-LSS, Adv. No. 15-50204-LSS (Bankr. D. Del.) and *Karaniewsky v. US Investigations Services, LLC*, No. 14-01344-AJS (W.D. Pa.).

## 1.2    Rules of Interpretation

For purposes of this Plan: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument,

17

release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" or "Sections" are references to Articles or Sections, as applicable, hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order.

## 1.3    Computation of Time

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## 1.4    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan, any agreements, documents, instruments or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided, however,* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the jurisdiction of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

## 1.5    Reference to Monetary Figures

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## 1.6    Reference to the Debtors or the Reorganized Debtors

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

## 1.7    Controlling Document

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and a Plan Supplement document, the terms of the Plan Supplement document shall control unless stated otherwise in such Plan Supplement document.

## ARTICLE II

## ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, DIP CLAIMS AND STATUTORY FEES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Wage Claims, Priority Tax Claims and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III and shall receive the following treatment:

## 2.1 Administrative Claims

### (a) Administrative Claims

Except with respect to DIP Claims provided for pursuant to Section 2.4 of this Plan and Administrative Claims that are Claims for Accrued Professional Compensation and except to the extent that a holder of an Allowed Administrative Claim and the applicable Debtor or Reorganized Debtor agrees to less favorable treatment to such holder, each holder of an Allowed Administrative Claim shall be paid in full, in Cash, on the later of: (a) the Effective Date or as soon as reasonably practicable thereafter; (b) the first Business Day after the date that is ten (10) Business Days after the date such Administrative Claim becomes an Allowed Administrative Claim; (c) the date or dates agreed to by the Debtors and the Holder of the Allowed Administrative Claim; and (d) the date such Allowed Administrative Claim becomes due and payable by its terms, or as soon thereafter as is practicable. All distributions on account of Allowed Administrative Claims shall be made by the Debtors.

### (b) Professional Compensation

(i)     Claims for Accrued Professional Compensation

Professionals or other Entities asserting a Claim for Accrued Professional Compensation for services rendered before the Effective Date must file and serve on the Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Interim Compensation Order or other order of the Bankruptcy Court an application for final allowance of such Claim for Accrued Professional Compensation no later than 45 days after the Effective Date. Objections to any Claim for Accrued Professional Compensation must be filed and served on the Reorganized Debtors, the Creditors' Committee, the U.S. Trustee and the requesting party no later than 75 days after the Effective Date.

(ii)    Post-Effective Date Fees and Expenses

On or after the Effective Date, the Reorganized Debtors may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court.

(iii)   Professional Fee Escrow

On the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow. Funds held in the Professional Fee Escrow shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors after all Accrued Professional Compensation Claims allowed by the Bankruptcy Court have been paid in full. The Professional Fee Escrow shall be held in trust for the Professionals and for no other parties until all Accrued Professional Compensation Claims Allowed by the Bankruptcy Court have been paid in full. Accrued Professional Compensation owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court.

### (c) Administrative Claim Bar Date

Except for Administrative Claims of governmental units as provided in section 503(b)(1)(D) of the Bankruptcy Code or as otherwise provided in Section 2.1 or Section 13.4 of the Plan or the Final DIP Order, requests for payment of Administrative Claims must be filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than 45 days after the Effective Date. Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors or Reorganized Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be filed and served on the Reorganized Debtors and the requesting party no later than the Claims Objection Bar Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect

to an Administrative Claim previously Allowed by Final Order, including all Administrative Claims expressly Allowed under this Plan.

Holders of Administrative Claims who are required to file a request for payment of such Administrative Claims and who do not file such a request for payment in accordance with this Section 2.1 shall be (a) forever barred and estopped from asserting such Administrative Claims against the Debtors, their respective Estates, assets or properties and (b) forever enjoined from commencing or continuing any action to collect, offset, recoup or otherwise recover such Administrative Claims against the Debtors, their respective Estates, assets or properties.   Such Administrative Claims shall be deemed forever compromised, settled, and released as of the Effective Date.

The Debtors reserve the right to ask the Bankruptcy Court to establish an earlier deadline with respect to administrative claims against the Liquidating Debtors.   If such an earlier deadline is established, separate notice will be provided.

## 2.2   Priority Tax Claims

Each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, at the option of the Debtors, with the approval of the Consenting First Lien Creditors and Consenting Junior Lien Creditors, which approval shall not be unreasonably withheld, in full and final satisfaction, settlement, release, and compromise of its Allowed Priority Tax Claim, one of the following treatments: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is ten (10) Business Days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; (2) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in not less than annual installment payments commencing not later than the date of the following calendar year which coincides with the month and the day on which the Confirmation Order is entered and continuing not later than the same date each subsequent calendar year thereafter over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code (with any interest to which the holder of such Priority Tax Claim may be entitled, calculated in accordance with section 511 of the Bankruptcy Code); or (3) such other treatment as may be agreed upon by such holder and the Debtors, with the approval of the Consenting First Lien Creditors and Consenting Junior Lien Creditors, which approval shall not be unreasonably withheld, or otherwise determined upon an order of the Bankruptcy Court.   For the avoidance of doubt, once resolved, disputed Priority Tax Claims will be treated as Allowed Priority Tax Claims due and payable on the Effective Date pursuant to this paragraph.

All Allowed Priority Tax Claims that arose after the Petition Date but are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as they become due.   All distributions on account of Allowed Priority Tax Claims shall be made by the Reorganized Debtors.

## 2.3   Priority Wage Claims

Each holder of an Allowed Priority Wage Claim due and payable on or before the Effective Date shall receive, at the option of the Debtors, with the approval of the Consenting First Lien Creditors and Consenting Junior Lien Creditors, which approval shall not be unreasonably withheld, in full and final satisfaction, settlement, release, and compromise of its Allowed Priority Wage Claim, one of the following treatments: (1) Cash in an amount equal to the amount of such Allowed Priority Wage Claim, (2) Cash in an amount equal to the amount of such Allowed Priority Wage Claim, pursuant to section 1129(a)(9)(B)(ii) of the Bankruptcy Code, or (3) such other treatment as may be agreed upon by such holder and the Debtors, with the approval of the Consenting First Lien Creditors and Consenting Junior Lien Creditors, which approval shall not be unreasonably withheld, or otherwise determined upon an order of the Bankruptcy Court; provided that, notwithstanding the foregoing, as part of the settlements and compromises set forth in the Plan (i) no WARN Claims shall be Allowed against or payable by any Operating Debtor or its estate, and (ii) all recoveries on account of any WARN Claims Allowed against any Liquidating Debtor, including any such Allowed Priority Wage Claims, shall be limited to distributions from the Liquidating Debtors Unsecured Claims Distribution Pool as further provided in Sections 3.3(s), 8.11 and 8.12 below.

Each Holder of an Allowed Priority Wage Claim shall receive the distribution set forth above, without interest, on or as soon reasonably practicable after the latest of: (a) the Effective Date; (b) the first Business Day

after the date that is ten (10) Business Days after the date such Allowed Priority Wage Claim becomes an Allowed Priority Wage Claim; (c) the date or dates agreed to by the Debtors and the Holder of the Allowed Priority Wage Claim; and (d) the date such Allowed Priority Wage Claim becomes due and payable by its terms, or as soon thereafter as is practicable. All distributions on account of Allowed Priority Wage Claims shall be made by the Debtors.

### 2.4    DIP Claims

The DIP Claims shall be Allowed and deemed to be Allowed Claims in the amount of $90 million plus any DIP PIK Interest accrued through and including the Effective Date. Holders of DIP Claims will receive, on the Effective Date, as indefeasible payment in full and final satisfaction of the DIP Claims, New Second Lien Notes with a face amount equal to the Allowed amount of their Claims against the Operating Debtors, which Allowed amount shall be calculated by the DIP Agent and the Operating Debtors and delivered to the Second Lien Notes Trustee prior to the Effective Date. As provided in Section 5.7 hereof, the Second Lien Notes Indenture shall remain outstanding following the Effective Date to allow for the New Second Lien Notes to be issued, outstanding and governed thereunder and under the New Second Lien Notes Documents, and all liens, security and ancillary documents related thereto (including but not limited to all Note Security Documents and the Senior Intercreditor Agreement (each as defined in the Second Lien Notes Indenture)) shall remain in full force and effect with respect to such New Second Lien Notes; *provided* that the assets of the Liquidating Debtors shall not secure the New Second Lien Notes, and the Liquidating Debtors shall not guarantee the New Second Lien Notes.

### 2.5    Statutory Fees

The Debtors shall pay in full, in Cash, any fees due and owing to the U.S. Trustee, including quarterly fees payable under 28 U.S.C. § 1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717 (if any), on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' business at the time of Confirmation. On and after the Effective Date, the Plan Administrator shall (a) pay the applicable U.S. Trustee fees for each of the Reorganized Debtors when due in the ordinary course, until such time as the Bankruptcy Court enters (i) a final decree in such Reorganized Debtor's Chapter 11 Case, (ii) a Final Order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (iii) a Final Order dismissing such debtor's Chapter 11 Case, and (b) be responsible for the filing of consolidated post-Confirmation quarterly status reports with the Bankruptcy Court; provided that the Plan Administrator shall be reimbursed from assets of the Liquidating Debtors (including any assets in the Liquidating Debtors Unsecured Claims Distribution Pool or as otherwise permitted under the Senior Priority Documents) for amounts paid on behalf of the Liquidating Debtors.

## ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### 3.1    Classification of Claims and Interests; Elimination of Classes

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, the following designates the Classes of Claims and Interests under the Plan. A Claim or Interest is in a particular Class for the purposes of voting on, and receiving distributions pursuant to, the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released, withdrawn or otherwise settled before the Effective Date. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. Any Class of Claims that is not occupied as of the date of the Confirmation Hearing of the Plan by an Allowed Claim, or a Claim temporarily Allowed under Bankruptcy Rule 3018, and for which, on the Effective Date, there are no Disputed Claims in such Class pending, shall be deemed deleted from the Plan for all purposes.

## 3.2   Summary of Classification

This Plan constitutes a separate chapter 11 plan of reorganization for each Debtor, each of which shall include the classifications set forth below (and described in more detail in Section 3.3 below), except that Classes A1 through A7-b and A9 through A11 shall be applicable only to the Operating Debtors, Classes B1 through B8 shall be applicable only to the Liquidating Debtors, and Class A8 shall be applicable only to Altegrity, Inc. For the avoidance of doubt, to the extent a Class contains Allowed Claims or Interests with respect to a particular Debtor, such Class is designated with respect to such Debtor. To the extent there are no Allowed Claims or Interests with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor.

### (a)   Summary of Classification for the Operating Debtors

The following chart represents the general classification of Claims and Interests for each Operating Debtor pursuant to the Plan:

| Class | Claim | Impairment | Entitled to Vote |
|-------|-------|------------|------------------|
| A1 | Operating Debtors First Lien Credit Agreement Claims | Unimpaired | No (deemed to accept) |
| A2 | Operating Debtors First Lien Notes Claims | Unimpaired | No (deemed to accept) |
| A3 | Operating Debtors Lien Claims | Unimpaired | No (deemed to accept) |
| A4 | Operating Debtors Secured Second Lien Notes Claims | Impaired | Yes |
| A5 | Operating Debtors Secured Third Lien Notes Claims | Impaired | Yes |
| A6 | Operating Debtors Other Priority Claims | Unimpaired | No (deemed to accept) |
| A7-a | Operating Debtors Unsecured Notes Claims | Impaired | Yes |
| A7-b | Operating Debtors General Unsecured Claims | Impaired | Yes |
| A8 | Altegrity, Inc. Junior Subordinated Notes Claims | Impaired | No (deemed to reject) |
| A9 | Operating Debtors Intercompany Claims | Plan Proponent | No (deemed to accept) |
| A10 | Interests in Altegrity Holding Corp. | Impaired | No (deemed to reject) |
| A11 | Interests in the Subsidiary Debtors that are Operating Debtors | Plan Proponent | No (deemed to accept) |

### (b)   Summary of Classification for the Liquidating Debtors

The following chart represents the general classification of Claims and Interests for each Liquidating Debtor:

| Class | Claim | Impairment | Entitled to Vote |
|-------|-------|------------|------------------|
| B1 | Liquidating Debtors First Lien Credit Agreement Claims | Unimpaired | No (deemed to accept) |
| B2 | Liquidating Debtors First Lien Notes Claims | Unimpaired | No (deemed to accept) |
| B3 | Liquidating Debtors Lien Claims | Unimpaired | No (deemed to accept) |

22

| Class | Claim | Impairment | Entitled to Vote |
|-------|-------|------------|------------------|
| B4 | Liquidating Debtors Secured Second Lien Notes Claims | Impaired | Yes |
| B5 | Liquidating Debtors Secured Third Lien Notes Claims | Impaired | Yes |
| B6 | Liquidating Debtors Other Priority Claims | Impaired | Yes |
| B7 | Liquidating Debtors Unsecured Claims | Impaired | Yes |
| B8 | Interests in the Liquidating Debtors | Plan Proponent | No (deemed to accept) |

**3.3     Classification and Treatment of Claims and Interests**

To the extent a Class contains Allowed Claims or Interests with respect to any Debtor, the classification of Allowed Claims and Interests is specified below.

**Operating Debtors Classes**

(a)     **Treatment of Class A1 – Operating Debtors First Lien Credit Agreement Claims**

(i)     *Classification*:  Class A1 consists of all First Lien Credit Agreement Claims against the Operating Debtors.

(ii)     *Allowance*:  Class A1 Claims shall be Allowed Claims pursuant to the Plan in the aggregate principal amount of not less than $294,213,221, plus accrued but unpaid interest, fees, expenses, including any reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Loan Documents (as defined in the Final DIP Order), and other amounts due in accordance with the terms of the First Lien Credit Agreement, and without giving effect to the obligations arising under Section 2.12 of the First Lien Credit Agreement, as of the Petition Date.

(iii)     *Treatment*:  The legal, equitable and contractual rights of the holders of the First Lien Credit Agreement Claims against the Operating Debtors are unaltered by this Plan.  The First Lien Credit Agreement Claims shall be Reinstated upon the Effective Date.  For the avoidance of doubt, notwithstanding anything herein to the contrary, the Commitments, including without limitation the Revolving Credit Commitments, the Swingline Commitments and the L/C Commitments (each, as defined in the First Lien Credit Agreement), have been terminated in accordance with the First Lien Credit Agreement as of the Petition Date, and the lenders under the First Lien Credit Agreement and the First Lien Credit Agreement Agent shall be under no obligation to extend Revolving Loans, Swingline Loans, Letters of Credit (each, as defined in the First Lien Credit Agreement) or other financial accommodation under the First Lien Credit Agreement, including by permitting the renewal or extension of Letters of Credit that are or were outstanding under the First Lien Credit Agreement as of the Petition Date.

(iv)     *Impairment and Voting*:  Class A1 for each of the applicable Operating Debtors is Unimpaired, and holders of Class A1 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class A1 Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such First Lien Credit Agreement Claims.

**(b)**    **Treatment of Class A2 – Operating Debtors First Lien Notes Claims**

    (i)    *Classification*: Class A2 consists of all First Lien Notes Claims against the Operating Debtors.

    (ii)    *Allowance*: Class A2 Claims shall be Allowed Claims pursuant to the Plan in the aggregate principal amount of $825,000,000, plus accrued but unpaid interest, fees, expenses, including any reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Senior Priority Documents, and other amounts due in accordance with the terms of the First Lien Notes Indenture, and without giving effect to the obligations arising under Section 602 of the First Lien Notes Indenture, as of the Petition Date.

    (iii)    *Treatment*: The legal, equitable and contractual rights of the holders of the First Lien Notes Claims against the Operating Debtors are unaltered by this Plan. The First Lien Notes Claims shall be Reinstated upon the Effective Date, and the First Lien Notes Indenture and all other Senior Priority Documents related to the First Lien Notes shall be and continue in full force and effect thereafter.

    (iv)    *Impairment and Voting*: Class A2 for each of the applicable Debtors is Unimpaired, and holders of Class A2 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Class A2 Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such First Lien Notes Claims.

**(c)**    **Treatment of Class A3 – Operating Debtors Lien Claims**

    (i)    *Classification:* Class A3 consists of all Lien Claims against the Operating Debtors.

    (ii)    *Treatment*: On or as soon as practicable after the Effective Date, each holder of an Allowed Claim in Class A3 for each of the applicable Operating Debtors, in full and final satisfaction of its Secured Claim, shall receive one of the following treatments at the option of the applicable Operating Debtor (with the consent of the Consenting Junior Lien Creditors, which consent shall not be unreasonably withheld):

        A.    payment of the Allowed Claim in full in Cash on the later of the Effective Date or as soon as practicable after a particular Claim becomes Allowed;

        B.    such other treatment as may be agreed to by the applicable Operating Debtor and the holder (with the consent of the Consenting Junior Lien Creditors, which consent shall not be unreasonably withheld); or

        C.    the holder shall retain its Lien on such property and be Reinstated.

    (iii)    *Impairment and Voting*: Class A3 for each of the applicable Operating Debtors is Unimpaired, and holders of Class A3 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Class A3 Lien Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Lien Claims.

**(d)**    **Treatment of Class A4 – Operating Debtors Secured Second Lien Notes Claims**

    (i)    *Classification*: Class A4 consists of all Secured Second Lien Note Claims against the Operating Debtors.

(ii) *Allowance*: Class A4 Claims shall be Allowed Claims pursuant to the Plan in the aggregate amount of $519,265,011.85, plus fees, expenses and other amounts due in accordance with the terms of the Second Lien Notes Indenture, with the Secured portion of such Allowed Claim receiving treatment pursuant to this Class A4.

(iii) *Treatment*: Each holder of Class A4 Claims, in full and complete satisfaction, discharge and release of the Secured portion of such Claims against the Operating Debtors, shall receive its Pro Rata share of the Second Lien Distribution.

(iv) *Impairment and Voting*: Class A4 Claims are Impaired and the Holders thereof are entitled to vote on the Plan.

(v) *Second Lien Avoidance Action Liens*: As part of the settlements and compromises set forth in the Plan, holders of Class A4 Claims will agree to waive, and shall be conclusively deemed to have waived, their Second Lien Avoidance Action Liens with respect to the Operating Debtors.

(e) **Treatment of Class A5 – Operating Debtors Secured Third Lien Notes Claims**

(i) *Classification*: Class A5 consists of all Secured Third Lien Notes Claims against the Operating Debtors.

(ii) *Allowance*: Class A5 Claims shall be Allowed Claims pursuant to the Plan in the aggregate amount of $66,304,133.00, plus fees, expenses and other amounts due in accordance with the terms of the Third Lien Notes Indenture, with the Secured portion of such Allowed Claim receiving treatment pursuant to this Class A5.

(iii) *Treatment*: Each holder of Class A5 Claims, in full and complete satisfaction, discharge and release of the Secured portion of such Claims against the Operating Debtors, shall receive its Pro Rata share of the Third Lien Distribution.

(iv) *Impairment and Voting*: Class A5 Claims are Impaired and the Holders thereof are entitled to vote on the Plan.

(v) *Third Lien Avoidance Action Liens*: As part of the settlements and compromises set forth in the Plan, holders of Class A5 Claims will agree to waive, and shall be conclusively deemed to have waived, their Third Lien Avoidance Action Liens with respect to the Operating Debtors.

(f) **Treatment of Class A6 – Operating Debtors Other Priority Claims**

(i) *Classification*: Class A6 consists of all Other Priority Claims against the Operating Debtors.

(ii) *Treatment*: Each holder of an Allowed Claim in Class A6 for each of the applicable Operating Debtors shall receive, on or as soon as reasonably practicable after the Initial Distribution Date, in full and final satisfaction of its Claim, one of the following treatments on account of such Claim, determined at the option of the applicable Operating Debtor, with the approval of the Consenting Junior Lien Creditors, which approval shall not be unreasonably withheld:

> A.   payment of the Allowed Claim in full in Cash on the later of the Effective Date or as soon as practicable after such claim becomes Allowed; or

25

B.     such other treatment as may be agreed to by the applicable Operating
       Debtor and the holder, with the approval of the Consenting Junior Lien
       Creditors, which approval shall not be unreasonably withheld.

(iii)   *Impairment and Voting*:   Class A6 for each of the applicable Operating Debtors is
        Unimpaired, and holders of Class A6 Claims are conclusively presumed to have accepted
        the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Class
        A6 Claims are not entitled to vote to accept or reject the Plan, and the votes of such
        holders will not be solicited with respect to such Other Priority Claims.

**(g)     Treatment of Class A7-a – Operating Debtors Unsecured Notes Claims**

(i)    *Classification:*   Class A7-a consists of all (a) 2015 Senior Notes Claims, (b) 2016 Senior
       Subordinated Notes Claims, (c) Second Lien Notes Deficiency Claims, and (d) Third
       Lien Notes Deficiency Claims, each as against the Operating Debtors.

(ii)   *Treatment:*   Except to the extent a holder of an Allowed Class A7-a Claim agrees to less
       favorable treatment with the Debtors or the Reorganized Debtors, as applicable, in full
       and complete satisfaction, discharge and release of such Claims, each holder of an
       Allowed Class A7-a Claim shall receive its Pro Rata share of the Operating Debtors
       Unsecured Notes Claims New Common Stock Pool, subject to obligations of holders of
       2016 Senior Subordinated Notes Claims under the "pay over" provisions set forth in the
       2016 Senior Subordinated Notes Indenture. The Second Lien Notes Deficiency Claims
       shall be Allowed in the aggregate amount of $270,921,126.32; the Third Lien Notes
       Deficiency Claims shall be Allowed in the aggregate amount of $61,235,890.87; the 2015
       10.50% Senior Notes Claims shall be Allowed in the aggregate amount of
       $11,211,558.33; the 2015 12.00% Senior Notes Claims shall be Allowed in the aggregate
       amount of $11,617,500.00; and the 2016 Senior Subordinated Notes Claims shall be
       Allowed in the aggregate amount of $30,171,146.00.

(iii)   *Impairment and Voting:*   Class A7-a Claims are Impaired and the Holders thereof are
        entitled to vote on the Plan.

(iv)   *Second Lien Notes Deficiency Claim and Third Lien Notes Deficiency Claim:*
       Notwithstanding that holders of Second Lien Notes Deficiency Claims and Third Lien
       Notes Deficiency Claims are entitled to vote, as part of the settlements and compromises
       set forth in the Plan, the holders of Second Lien Notes Deficiency Claims and Third Lien
       Notes Deficiency Claims will agree to waive, and shall be conclusively deemed to have
       waived, distributions of the New Common Stock on account of such deficiency claims in
       Class A7-a. In calculating each holder's Pro Rata share of the Operating Debtors
       Unsecured Notes Claims New Common Stock Pool, Second Lien Notes Deficiency
       Claims and Third Lien Notes Deficiency Claims shall be excluded from both the
       numerator and the denominator, but there shall be no reduction in the aggregate amount
       of the New Common Stock in the Operating Debtors Unsecured Notes Claims New
       Common Stock Pool available to the other holders of Class A7-a Claims.

(v)    *Turnover:*   Pursuant to section 510(a) of the Bankruptcy Code, in making distributions to
       holders of Claims in Class A7-a, the Disbursing Agent shall give effect to any and all
       subordination and "pay over" provisions set forth in the 2016 Senior Subordinated Notes
       Indenture; provided, however, solely with respect to distributions to holders of Claims in
       Class A7-a, the holders of Second Lien Notes Deficiency Claims and Third Lien Notes
       Deficiency Claims will agree to waive, and shall be conclusively deemed to have waived
       any and all subordination and "pay over" provisions set forth in the 2016 Senior
       Subordinated Notes Indenture or otherwise available under applicable law; and *provided
       further* that, until the 2015 Senior Notes Claims have been paid in full in Cash, any
       distribution that otherwise would have been made to the holders of the 2016 Senior

Subordinated Notes Claims on account of Claims in Class A7-a shall be made to the applicable Indenture Trustees Pro Rata for the benefit of and distribution to the holders of (i) the 2015 10.50% Senior Notes Claims and (ii) the 2015 12.00% Senior Notes Claims.

(vi)     *Section 12(g) of the Exchange Act:*  If the number of holders of New Common Stock will exceed (A) 2,000 or more persons or (B) 500 or more persons who are not accredited investors such that New Altegrity would be required to register with the SEC under Section 12(g) of the Exchange Act, the Reorganized Debtors will provide a cashing-out program with respect to the Class A7-a Operating Debtors Unsecured Notes Claims and the number of holders of Operating Debtors Unsecured Notes Claims New Common Stock will be reduced so as not to exceed such threshold.  The Operating Debtors Unsecured Notes Claims New Common Stock will include transfer restrictions that will prevent such New Common Stock from being transferred if such transfer would result in registration under Section 12(g) of the Exchange Act.

**(h)     Treatment of Class A7-b – Operating Debtors General Unsecured Claims**

(i)     *Classification:*  Class A7-b consists of all Operating Debtors General Unsecured Claims.

(ii)     *Treatment:*  Except to the extent a holder of an Allowed Class A7-b Claim agrees to less favorable treatment with the Operating Debtors, each holder of an Operating Debtors General Unsecured Claim, in full and complete satisfaction, discharge and release of such Claim, shall receive its Pro Rata share of the Operating Debtors General Unsecured Claims Pool.

(iii)     *Impairment and Voting:*  Class A7-b Claims are Impaired and the Holders thereof are entitled to vote on the Plan.

(iv)     *Operating Debtors Intercompany Claims:*  Notwithstanding that holders of Waived Operating Debtors Intercompany Claims are entitled to vote, as part of the settlements and compromises set forth in the Plan, the holders of Waived Operating Debtors Intercompany Claims will agree to waive, and shall be conclusively deemed to have waived, distributions from the Operating Debtors General Unsecured Claims Pool on account of such Waived Operating Debtors Intercompany Claims in Class A7-b.  In calculating each holder's Pro Rata share of the Operating Debtors General Unsecured Claims Pool, Waived Operating Debtors Intercompany Claims shall be excluded from both the numerator and the denominator, but there shall be no reduction in the aggregate amount in the Operating Debtors General Unsecured Claims Pool available to the other holders of Class A7-b Claims.

**(i)     Treatment of Class A8 – Altegrity, Inc. Junior Subordinated Notes Claims**

(i)     *Classification:*  Class A8 consists of the Junior Subordinated Notes Claims against Altegrity, Inc.

(ii)     *Allowance:*  Class A8 Claims shall be Allowed Claims pursuant to the Plan in the aggregate amount of $86,969,472.00.

(iii)     *Treatment:*  Holders of Class A8 Claims shall not receive or retain any property on account of such Class A8 Claims, and all such Claims shall be cancelled and discharged.

(iv)     *Impairment and Voting:*  Class A8 is Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, the holders of Class A8 Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Claims.

(j)     **Treatment of Class A9 – Operating Debtors Intercompany Claims**

    (i)     *Classification*:  Class A9 consists of the Intercompany Claims held by any Operating Debtor against any other Operating Debtor.

    (ii)    *Treatment:*  At the election of the applicable Operating Debtor, with the approval of the Consenting First Lien Creditors and Consenting Junior Lien Creditors, which approval shall not be unreasonably withheld, Intercompany Claims shall (A) be Reinstated, (B) remain in place subject to certain revised documentation, (C) be modified or cancelled as of the Effective Date, (D) include Cash transfers on Intercompany Claims to address the treatment of certain foreign obligations of the Company, or (E) with respect to certain Intercompany Claims in respect of goods, services, interest and other amounts that would have been satisfied in Cash directly or indirectly in the ordinary course of business had they not been outstanding as of the Petition Date, may be settled in Cash. The Plan Supplement shall set forth the applicable Debtor's election with respect to the treatment of each Intercompany Claim.

    (iii)   *Voting:*  Class A9 for each of the applicable Operating Debtors is Impaired.  As proponents of the Plan, the holders of Class A9 Intercompany Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Claims.

(k)     **Treatment of Class A10 – Interests in Altegrity Holding Corp.**

    (i)     *Classification*:  Class A10 consists of any and all Altegrity Holding Corp. Interests, and all Claims arising from or relating to Interests in Altegrity Holding Corp. that are subject to subordination under section 510 of the Bankruptcy Code.

    (ii)    *Treatment:*  Holders of Class A10 Claims and Interests shall not receive or retain any property on account of such Class A10 Claims and Interests, and all such Claims and Interests shall be cancelled and discharged.

    (iii)   *Impairment and Voting:*  Class A10 Claims and Interests are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, the holders of Class A10 Claims and Interests are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Claims and Interests.

(l)     **Treatment of Class A11 – Interests in the Subsidiary Debtors that Are Operating Debtors**

    (i)     *Classification*:  Class A11 consists of any and all Interests in the Subsidiary Debtors that are Operating Debtors.

    (ii)    *Treatment:*  At the option of the Debtors, with the approval of the Consenting First Lien Creditors and Consenting Junior Lien Creditors, which approval shall not be unreasonably withheld, on the Effective Date, all Class A11 Interests shall either (A) be Reinstated and the legal, equitable and contractual rights to which Holders of such Allowed Interests are entitled shall remain unaltered so as to maintain the organizational structure of the Debtors as such structure existed on the Petition Date, (B) be cancelled, or (C) be transferred pursuant to the Plan.

    (iii)   *Impairment and Voting:*  Class A11 Interests are Impaired or Unimpaired.  As proponents of the Plan, the holders of Class A11 Interests are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Interests.

**Liquidating Debtors Classes**

(m)    **Treatment of Class B1 – Liquidating Debtors First Lien Credit Agreement Claims**

(i)    *Classification*: Class B1 consists of all First Lien Credit Agreement Claims against the Liquidating Debtors.

(ii)    *Allowance*:  Class B1 Claims shall be Allowed Claims pursuant to the Plan in the aggregate principal amount of not less than $294,213,221, plus accrued but unpaid interest, fees, expenses, including any reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Loan Documents (as defined in the Final DIP Order), and other amounts due in accordance with the terms of the First Lien Credit Agreement, and without giving effect to the obligations arising under Section 2.12 of the First Lien Credit Agreement, as of the Petition Date.

(iii)    *Treatment*:  The legal, equitable and contractual rights of the holders of the First Lien Credit Agreement Claims against the Liquidating Debtors are unaltered by this Plan. The First Lien Credit Agreement Claims shall be Reinstated upon the Effective Date and, in the course of the wind-down of the Liquidating Debtors, the proceeds of collateral, including any Cash proceeds resulting from the sale or other monetization of all assets of the Liquidating Debtors subject to valid security interests with respect to such Claims, shall be applied in accordance with the terms of the Senior Priority Documents.

(iv)    *Impairment and Voting*:  Class B1 for each of the applicable Liquidating Debtors is Unimpaired, and holders of Class B1 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Class B1 Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such First Lien Credit Agreement Claims.

(n)    **Treatment of Class B2 – Liquidating Debtors First Lien Notes Claims**

(i)    *Classification*:  Class B2 consists of all First Lien Notes Claims against the Liquidating Debtors.

(ii)    *Allowance*:  Class B2 Claims shall be Allowed Claims pursuant to the Plan in the aggregate principal amount of $825,000,000, plus accrued but unpaid interest, fees, expenses, including any reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Senior Priority Documents, and other amounts due in accordance with the terms of the First Lien Notes Indenture, and without giving effect to the obligations arising under Section 602 of the First Lien Notes Indenture, as of the Petition Date.

(iii)    *Treatment*:  The legal, equitable and contractual rights of the holders of the First Lien Notes Claims against the Liquidating Debtors are unaltered by this Plan.  The First Lien Notes Claims shall be Reinstated upon the Effective Date, and the First Lien Notes Indenture and all other Senior Priority Documents related to the First Lien Notes shall be and continue in full force and effect thereafter.  In the course of the wind-down of the Liquidating Debtors, the proceeds of collateral, including any Cash proceeds resulting from the sale or other monetization of all assets of the Liquidating Debtors subject to valid security interests with respect to such Claims, shall be applied in accordance with the terms of the Senior Priority Documents.

(iv)    *Impairment and Voting*:  Class B2 for each of the applicable Liquidating Debtors is Unimpaired, and holders of Class B2 Claims are conclusively presumed to have accepted

the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Class B2 Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such First Lien Notes Claims.

(o) **Treatment of Class B3 – Liquidating Debtors Lien Claims**

    (i)    *Classification:* Class B3 consists of all Lien Claims against the Liquidating Debtors.

    (ii)    *Treatment*: On or as soon as practicable after the Effective Date, each holder of an Allowed Claim in Class B3 for each of the applicable Liquidating Debtors, in full and final satisfaction of its Secured Claim, shall receive one of the following treatments at the option of the applicable Liquidating Debtor (with the consent of the Consenting Junior Lien Creditors, which consent shall not be unreasonably withheld):

        A.    the collateral securing such Allowed Secured Claim;

        B.    Cash in an amount equal to the value of the collateral securing such Allowed Secured Claim; or

        C.    such other treatment required under section 1124(2) of the Bankruptcy Code for such Claim to be rendered unimpaired within the meaning of section 1124 of the Bankruptcy Code.

    (iii)    *Impairment and Voting*: Class B3 for each of the applicable Liquidating Debtor is Unimpaired, and holders of Class B3 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Class B3 Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Liquidating Debtors Lien Claims.

(p) **Treatment of Class B4 – Liquidating Debtors Secured Second Lien Notes Claims**

    (i)    *Classification*: Class B4 consists of all Secured Second Lien Note Claims against the Liquidating Debtors.

    (ii)    *Allowance*: Class B4 Claims shall be Allowed Claims pursuant to the Plan in the aggregate amount of $519,265,011.85, plus fees, expenses and other amounts due in accordance with the terms of the Second Lien Notes Indenture, with the Secured portion of such Allowed Claim receiving treatment pursuant to this Class B4.

    (iii)    *Treatment*: Except to the extent a holder of an Allowed Class B4 Claim agrees to less favorable treatment with the Liquidating Debtors, in full and complete satisfaction, discharge and release of the Secured portion of such Claims against the Liquidating Debtors, holders of Allowed Class B4 Claims shall receive their Pro Rata share of distributions of proceeds of Liquidating Debtors Collateral, including any Cash proceeds resulting from the sale or other monetization of all assets of the Liquidating Debtors subject to valid security interests with respect to such Claims; *provided* that such proceeds and related distributions shall be treated and applied in accordance with the terms of the Second Lien Notes Indenture and the Notes Security Documents (as defined in the Second Lien Notes Indenture), including any intercreditor provisions related to the First Lien Credit Agreement and the First Lien Notes Indenture.

    (iv)    *Impairment and Voting*: Class B4 Claims are Impaired and the Holders thereof are entitled to vote on the Plan.

(v)     *Second Lien Avoidance Action Liens*:  As part of the settlements and compromises set forth in the Plan, if the Creditors' Committee and the members of the Creditors' Committee do not object to Confirmation of the Plan, holders of Class B4 Claims will waive, and shall be conclusively deemed to have waived, their Second Lien Avoidance Action Liens with respect to the Specified Avoidance Actions.  For the avoidance of doubt, if the Creditors' Committee, or any member of the Creditors' Committee in any capacity, objects to, or otherwise opposes, Confirmation of the Plan, the holders of Class B4 Claims will *not* waive the Second Lien Avoidance Action Liens with respect to the Specified Avoidance Actions and, until all Secured Second Lien Note Claims against the Liquidating Debtors have been satisfied in full, shall be entitled to assert any and all rights with respect to such Specified Avoidance Actions on account of the Second Lien Avoidance Action Liens.

**(q)     Treatment of Class B5 – Liquidating Debtors Secured Third Lien Notes Claims**

(i)     *Classification*:  Class B5 consists of all Secured Third Lien Notes Claims against the Liquidating Debtors.

(ii)    *Allowance*:  Class B5 Claims shall be Allowed Claims pursuant to the Plan in the aggregate amount of $66,304,133.00, plus fees, expenses and other amounts due in accordance with the terms of the Third Lien Notes Indenture, with the Secured portion of such Allowed Claim receiving treatment pursuant to this Class B5.

(iii)   *Treatment*:  Except to the extent a Holder of an Allowed Class B5 Claim agrees to less favorable treatment with the Liquidating Debtors, in full and complete satisfaction, discharge and release of the Secured portion of such Claims against the Liquidating Debtors, holders of Allowed Class B5 Claims shall receive their Pro Rata share of distributions of proceeds of Liquidating Debtors Collateral, including any Cash proceeds resulting from the sale or other monetization of all assets of the Liquidating Debtors subject to valid security interests with respect to such Claims; *provided* that such proceeds and related distributions shall be treated and applied in accordance with the terms of the Third Lien Notes Indenture and the Notes Security Documents (as defined in the Second Lien Notes Indenture), including any intercreditor provisions related to the First Lien Credit Agreement, the First Lien Notes Indenture and the Second Lien Notes Indenture.

(iv)    *Impairment and Voting*:  Class B5 Claims are Impaired and the Holders thereof are entitled to vote on the Plan.

(v)     *Third Lien Avoidance Action Liens*:  As part of the settlements and compromises set forth in the Plan, if the Creditors' Committee and the members of the Creditors' Committee do not object to Confirmation of the Plan, holders of Class B5 Claims will waive, and shall be conclusively deemed to have waived, their Third Lien Avoidance Action Liens with respect to the Specified Avoidance Actions.  For the avoidance of doubt, if the Creditors' Committee, or any member of the Creditors' Committee in any capacity, objects to, or otherwise opposes, Confirmation of the Plan, the holders of Class B5 Claims will *not* waive the Third Lien Avoidance Action Liens with respect to the Specified Avoidance Actions and, until all Secured Third Lien Note Claims against the Liquidating Debtors have been satisfied in full, shall be entitled to assert any and all rights with respect to such Specified Avoidance Actions on account of the Third Lien Avoidance Action Liens.

**(r)     Treatment of Class B6 – Liquidating Debtors Other Priority Claims**

(i)     *Classification*:  Class B6 consists of all Other Priority Claims against the Liquidating Debtors.

(ii)     *Treatment*:  Except to the extent a holder of an Allowed Class B6 Claim agrees to less favorable treatment with the Debtors or the Liquidating Debtors, as applicable (which agreement shall be subject to the approval of the Consenting Junior Lien Creditors, which shall not be unreasonably withheld), in full and complete satisfaction, discharge and release of such Claims, holders of Allowed Class B6 Claims shall receive their Pro Rata share of distributions in accordance with the payment waterfall set forth with respect to the Liquidating Debtors Unsecured Claims Distribution Pool set forth in Section 8.12 hereof.

(iii)    *Impairment and Voting*:  Class B6 Claims are Impaired and the Holders thereof are entitled to vote on the Plan.

## (s)     Treatment of Class B7 – Liquidating Debtors Unsecured Claims

(i)      *Classification:*  Class B7 consists of all Liquidating Debtors Unsecured Claims.

(ii)     *Treatment*:  Except to the extent a holder of an Allowed Class B7 Claim agrees to less favorable treatment with the Liquidating Debtors, in full and complete satisfaction, discharge and release of such Liquidating Debtors Unsecured Claims, each holder of an Allowed Class B7 Claim shall receive its Pro Rata share of distributions in accordance with the payment waterfall set forth with respect to the Liquidating Debtors Unsecured Claims Distribution Pool set forth in Section 8.12 hereof. The Second Lien Notes Deficiency Claims shall be Allowed in the aggregate amount of $270,921,126.32; the Third Lien Notes Deficiency Claims shall be Allowed in the aggregate amount of $61,235,890.87.

(iii)    *Impairment and Voting*:  Class B7 Claims are Impaired and the Holders thereof are entitled to vote on the Plan.

(iv)     *Second Lien Notes Deficiency Claims and Third Lien Notes Deficiency Claims:* Notwithstanding that the holders of Second Lien Notes Deficiency Claims and Third Lien Notes Deficiency Claims in Class B7 are entitled to vote, as part of the settlements and compromises set forth in the Plan, such holders will agree to waive, and shall be conclusively deemed to have waived, distributions on account of such claims in Class B7 to the extent such distributions represent Specified Litigation Claims, Specified Avoidance Actions, or the proceeds thereof, unless the Creditors' Committee, or any member of the Creditors' Committee in any capacity, objects to, or otherwise opposes, Confirmation of the Plan. If such claims in Class B7 are waived, in calculating each holder's Pro Rata share of distributions of Specified Litigation Claims, Specified Avoidance Actions, or the proceeds thereof, Second Lien Notes Deficiency Claims and Third Lien Notes Deficiency Claims shall be excluded from both the numerator and the denominator, but there shall be no reduction in the aggregate amount of the proceeds available for distribution in the Liquidating Debtors Unsecured Claims Distribution Pool available to other holders of Class B7 Claims.

(v)      *Phoenix Claims and WARN Claims*:  Notwithstanding that the holders of Phoenix Claims and WARN Claims in Class B7 are entitled to vote, as part of the settlements and compromises set forth in the Plan, such holders agree to waive, and without further action shall be conclusively deemed to have waived, distributions on account of such claims in Class B7 to the extent such distributions do not represent Specified Litigation Claims, Specified Avoidance Actions, or the proceeds thereof. In calculating each holder's Pro Rata share of distributions of any assets other than Specified Litigation Claims, Specified Avoidance Actions, or the proceeds thereof, the Phoenix Claims and the WARN Claims shall be excluded from both the numerator and the denominator, but there shall be no reduction in the aggregate amount of the proceeds available for distribution in the

Liquidating Debtors Unsecured Claims Distribution Pool available to other holders of Class B7 Claims.

(vi) *Liquidating Debtors Intercompany Claims:* Notwithstanding that holders of Waived Liquidating Debtors Intercompany Claims in Class B7 are entitled to vote, as part of the settlements and compromises set forth in the Plan, such holders will agree to waive, and shall be conclusively deemed to have waived, distributions on account of such claims in Class B7 to the extent such distributions represent Specified Litigation Claims, Specified Avoidance Actions, or the proceeds thereof, unless the Creditors' Committee, or any member of the Creditors' Committee in any capacity, objects to, or otherwise opposes, Confirmation of the Plan. If such claims in Class B7 are waived, in calculating each holder's Pro Rata share of distributions of Specified Litigation Claims, Specified Avoidance Actions, or the proceeds thereof, Waived Liquidating Debtors Intercompany Claims shall be excluded from both the numerator and the denominator, but there shall be no reduction in the aggregate amount of the proceeds available for distribution in the Liquidating Debtors Unsecured Claims Distribution Pool available to other holders of Class B7 Claims.

(vii) *Turnover:* Pursuant to section 510(a) of the Bankruptcy Code, in making distributions to holders of Claims in Class B7, the Disbursing Agent shall give effect to any and all subordination, turnover and "pay over" provisions set forth in the 2016 Senior Subordinated Notes Indenture, *provided, however,* solely with respect to the distributions to holders of Claims in Class B7 on account of Specified Litigation Claims, Specified Avoidance Actions, or the proceeds thereof, the holders of Second Lien Notes Deficiency Claims and Third Lien Notes Deficiency Claims will agree to waive, and shall be conclusively deemed to have waived any and all subordination and "pay over" provisions set forth in the 2016 Senior Subordinated Notes Indenture or otherwise available under applicable law with respect to such distributions; and, *provided further* that, until the 2015 Senior Notes Claims have been paid in full in Cash, any distribution that otherwise would have been made to the holders of the 2016 Senior Subordinated Notes Claims on account of Claims in Class B7 shall be made to the applicable Indenture Trustees Pro Rata for the benefit of and distribution to the holders of (i) the 2015 10.50% Senior Notes Claims and (ii) the 2015 12.00% Senior Notes Claims.

**(t)      Treatment of Class B8 – Interests in the Liquidating Debtors**

(i) *Classification:* Class B8 consists of any and all Interests in the Liquidating Debtors.

(ii) *Treatment:* At the option of the Debtors, with the approval of the Consenting Junior Lien Creditors, which approval shall not be unreasonably withheld, on the Effective Date, all Class B8 Interests shall either (A) be Reinstated and the legal, equitable and contractual rights to which Holders of such Allowed Interests are entitled shall remain unaltered so as to maintain the organizational structure of the Liquidating Debtors as such structure existed on the Petition Date, (B) be cancelled, or (C) be transferred pursuant to the Plan.

(iii) *Impairment and Voting:* Class B8 Interests are Unimpaired or Impaired. As proponents of the Plan, the holders of Class B8 Interests are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Interests.

## 3.4    Subordinated Claims

For the avoidance of doubt, except as otherwise expressly set forth in this Plan, the allowance, classification, and treatment of all Allowed Claims and the respective distributions and treatments under the Plan shall take into account and conform to the relative priorities and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights or turn-over provisions relating thereto, whether

arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, the underlying documentation related to such Claims, or otherwise. Except with respect to the Allowed First Lien Credit Agreement Claims, Allowed First Lien Notes Claims, Allowed Second Lien Notes Claims, Allowed Third Lien Notes Claims, and DIP Claims, or as otherwise specifically provided for in this Plan, pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV

## ACCEPTANCE REQUIREMENTS

### 4.1    Acceptance or Rejection of the Plan

#### (a)    Voting Class

Classes A4, A5, A7-a, A7-b, B4, B5, B6, and B7 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

#### (b)    Presumed Acceptance of the Plan

Classes A1, A2, A3, A6, B1, B2, and B3 are Unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Classes A9, A11, and B8 for each of the applicable Debtors are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code because all holders of Claims in Class A9 for each of the applicable Debtors and holders of Interests in A11 and B8 for each of the applicable Subsidiary Debtors are Plan proponents.

#### (c)    Presumed Rejection of the Plan

Classes A8 and A10 are not entitled to receive or retain any property under the Plan and are, therefore, conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

### 4.2    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right, with the approval of the Consenting Junior Lien Creditors and the Consenting First Lien Creditors, to modify the Plan in accordance with Article XI hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

### 4.3    Elimination of Vacant Classes

Any Class or sub-Class of Claims or Interests that is not occupied as of the date of the commencement of the Confirmation Hearing by at least one Allowed Claim or Allowed Interest, as applicable, or at least one Claim or Interest, as applicable, temporarily Allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for purposes of (i) voting on the acceptance or rejection of the Plan and (ii) determining acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THE PLAN

### 5.1    Continued Corporate Existence and Vesting of Assets in Debtors

#### (a)    Corporate Existence

34

Except as otherwise provided in this Plan, in the Corporate Governance Documents or elsewhere in the Plan Supplement, each Reorganized Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Reorganized Debtor is incorporated or formed. The Corporate Governance Documents shall be in the form filed with the Plan Supplement. On or after the Effective Date, each Reorganized Debtor, in its discretion, may take such action as permitted by applicable law and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, but not limited to, causing: (i) a Reorganized Debtor to be merged into another Reorganized Debtor, or its subsidiary or affiliate; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Reorganized Debtor's case on the Effective Date or any time thereafter. For the avoidance of doubt, any such actions shall be consented to in accordance with, or be in compliance with, the Senior Priority Documents, the First Lien Debt Amendments, the New Second Lien Notes Documents, the Second Lien Notes Indenture and the New Revolving Credit Facility.

(b)    **New Corporate Governance Documents**

On or immediately before the Effective Date, each of the Reorganized Debtors will file, as necessary, their respective Corporate Governance Documents with the applicable Secretaries of State and/or other applicable authorities in their respective jurisdictions of incorporation or in accordance with the corporate laws of the respective jurisdiction of incorporation. After the Effective Date, each of the Reorganized Debtors may amend and restate their respective Corporate Governance Documents and other constituent documents as permitted by the laws of their respective jurisdictions of incorporation and their respective Corporate Governance Documents. The Corporate Governance Documents shall be included in the Plan Supplement.

(c)    **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated therein, on the Effective Date all property in each Estate and all Causes of Action (except those released pursuant to the releases by the Debtors in Section 9.2 hereof) shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances (except for Liens, if any, granted to secure the New Revolving Credit Facility Agreement and Liens securing claims arising under the First Lien Credit Agreement, the First Lien Notes and the New Second Lien Notes). On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date pursuant to Section 7.4(b) hereof and for Professionals' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

(d)    **Further Actions**

On or after the date of entry of the Confirmation Order, and without the necessity of an order from the Bankruptcy Court, the Reorganized Debtors may take all actions that may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation (or other similar organizational documents), reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (4) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law; *provided* that all such actions are consented to by the Consenting Junior Lien Creditors, after consultation with the Consenting First Lien Creditors.

(e)     **Severance from Plan**

If, prior to Confirmation of the Plan, the Debtors determine, with the consent of the Consenting Junior Lien Creditors, after consultation with the Consenting First Lien Creditors, the Consenting Interest Holders and the Creditors' Committee, to seek confirmation of the Plan only with respect to the Operating Debtors, then each Liquidating Debtor shall be severed from the Plan and the Plan shall not apply to each Liquidating Debtor.

**5.2     General Settlement of Claims and Interests; Bankruptcy Rule 9019 Settlement**

As discussed in the Disclosure Statement and as otherwise provided herein, as one element of, and in consideration for, an overall negotiated settlement of numerous disputed Claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and in consideration for the classification, distributions, releases and other benefits provided under the Plan, the provisions of the Plan shall upon Consummation constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan. Subject to Article VII, all distributions made to holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

**5.3     New Revolving Credit Facility Agreement/Incurrence of New Indebtedness and Agreed Pay-down on First Lien Indebtedness/New Second Lien Notes**

(a)     **New Revolving Credit Facility Agreement/Incurrence of New Indebtedness**

On the Effective Date, each of the Reorganized Debtors is authorized to enter into the New Revolving Credit Facility Agreement (which shall be on terms consistent with the Restructuring Support Agreement and, after consultation with the First Lien Notes Trustee, the First Lien Notes Collateral Agent and the First Lien Credit Agreement Agent, reasonably acceptable to the Consenting First Lien Creditors and Consenting Junior Lien Creditors) and complete the transactions contemplated by the New Revolving Credit Facility in order to provide funding to the Reorganized Debtors' business operations, and the Debtors shall be authorized to execute and deliver those documents necessary or appropriate to obtain the New Revolving Credit Facility, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization or approval of any person. In connection with the New Revolving Credit Facility, the First Lien Credit Agreement Agent, the First Lien Notes Collateral Agent and the Second Lien Notes Collateral Agent will enter into one or more intercreditor agreements on market terms, and consistent with the terms of the Restructuring Support Agreement, which shall, after consultation with the First Lien Notes Trustee, the First Lien Notes Collateral Agent and the First Lien Credit Agreement, be in form and substance reasonably acceptable to the Consenting First Lien Creditors, the First Lien Notes Collateral Agent (which consent right shall be consistent with section 2(c) of the First Lien Notes Third Supplemental Indenture), and the Consenting Junior Lien Creditors (and which intercreditor agreements shall be deemed issued pursuant to Section 1511 of the Second Lien Notes Indenture), which will, among other things, provide for a purchase right of the New Revolving Credit Facility at par solely for the benefit of the lenders party to the First Lien Credit Agreement if there is an event of default under the New Revolving Credit Facility.

(b)     **Agreed Pay-down on First Lien Indebtedness**

The Reorganized Debtors shall, pursuant to the terms and conditions of the First Lien Credit Agreement and the First Lien Notes Indenture, within five (5) Business Days after the entry of the Confirmation Order make par offers to ratably repurchase an aggregate $110 million of First Lien Indebtedness (which amount shall not be reduced by fees or expenses paid on account of Collateral Agent Fees, Indenture Trustee Fees, or any similar fees or expenses), which repurchases shall be consummated on the Effective Date (or such later date as may be required so that such offers comply with applicable law) from release of Cash in the Segregated Account. Upon completion of the repurchases, any remaining Cash in the Segregated Account shall be available to the Reorganized Debtors in accordance with the permitted uses under the First Lien Credit Agreement, First Lien Notes Indenture, and Second Lien Notes Indenture, and no further segregation shall be required.

(c)     **New Second Lien Notes**

On the Effective Date, (i) each of the Reorganized Debtors is authorized to enter into the New Second Lien Notes Documents (which shall be on terms consistent with the Plan and Restructuring Support Agreement and otherwise reasonably acceptable to the Consenting First Lien Creditors, the Consenting Junior Lien Creditors, the Second Lien Notes Trustee and the Second Lien Notes Collateral Agent) and complete the transactions contemplated by the New Second Lien Notes Documents in order to issue the New Second Lien Notes, and (ii) each of the Reorganized Debtors is authorized to execute and deliver those documents necessary or appropriate to issue the New Second Lien Notes, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization or approval of any person. In connection with the execution of the New Second Lien Notes Documents, the Reorganized Debtors, the Second Lien Notes Agent and the Second Lien Notes Collateral Agent shall make any modifications or amendments to the terms of the Second Lien Notes Indenture and related ancillary documents (including the Note Security Documents, as defined in the Second Lien Notes Indenture) that are necessary to effect the transactions contemplated by the Restructuring Support Agreement and the Plan, which modifications or amendments shall be reasonably acceptable to the Consenting First Lien Creditors, the Consenting Junior Lien Creditors, the Second Lien Notes Trustee, and, as applicable, the Second Lien Notes Collateral Agent.

### 5.4    Sources of Consideration for Plan Distribution

#### (a)    Cash Consideration

All Cash consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained from: (i) the Operating Debtors' Cash on hand as of the Effective Date (including Cash derived from business operations); (ii) the proceeds of the DIP Term Loan; (iii) the proceeds of the New Revolving Credit Facility, to the extent necessary; (iv) the Cash released to the Reorganized Debtors from the Segregated Account; and (v) the Cash proceeds, if any, from the liquidation and monetization of the unencumbered assets to be deposited into the Liquidating Debtors Unsecured Claims Distribution Pool in accordance with this Plan. Further, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in the intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate or otherwise be affected by the terms of the Plan.

#### (b)    Issuance of New Common Stock and AHC Common Stock

On the Effective Date, New Altegrity shall issue New Common Stock for distribution to the holders of Allowed Claims in Class A4, Class A5 and Class A7-a, and AHC Common Stock for distribution to the holders of Allowed Claims in Classes A4 and A5, pursuant to the terms set forth herein. New Common Stock and AHC Common Stock shall also be reserved for the New Incentive Plan. All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable. Each distribution and issuance referred to in Article III shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### 5.5    Restructuring Transactions

On or after the date of entry of the Confirmation Order, the Debtors, after consultation with the First Lien Notes Trustee, the First Lien Notes Collateral Agent and the First Lien Credit Agreement Agent, with the consent of the Consenting Junior Lien Creditors and the Consenting First Lien Creditors, such consent not to be unreasonably withheld, may take all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan. The Restructuring Transactions may include one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions as may be determined by the Debtors, after consultation with the First Lien Notes Trustee, the First Lien Notes Collateral Agent and the First Lien Credit Agreement Agent, with the consent of the Consenting Junior Lien Creditors and the Consenting First Lien Creditors, such consent not to be unreasonably withheld, to be necessary; *provided* that all such corporate transactions shall comply with the terms of the First Lien

Credit Agreement and the First Lien Notes Indenture. The actions to implement the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state law; and (4) all other actions that the applicable Entities determine to be necessary, after consultation with the First Lien Notes Trustee, the First Lien Notes Collateral Agent and the First Lien Credit Agreement Agent, with the consent of the Consenting Junior Lien Creditors and Consenting First Lien Creditors, such consent not to be unreasonably withheld, including making filings or recordings that may be required by applicable law in connection with the Plan. For the purposes of effectuating the Plan, none of the Restructuring Transactions shall constitute a change of control under any agreement, contract, or document of the Debtors.

**5.6    Section 1145 Exemption**

The issuance of the New Common Stock, AHC Common Stock, and New Second Lien Notes to be distributed pursuant to the Plan to holders of Claims shall be authorized under section 1145 of the Bankruptcy Code as of the Effective Date without further act or action by any person, unless required by provision of applicable law, regulation, order or rule. Holders of New Common Stock and AHC Common Stock issued in respect of Allowed Claims will be provided with reasonable and customary registration rights, to be set forth in more detail in the Plan Supplement, solely to the extent such New Common Stock or AHC Common Stock may not be transferred without restriction pursuant to Rule 144 or is otherwise not freely saleable under the securities laws notwithstanding section 1145 of the Bankruptcy Code.

**5.7    Cancellation of Securities and Agreements**

**(a)    Cancellation of Securities and Agreements**

On and after the Effective Date, except as otherwise specifically provided for in the Plan, the First Lien Debt Amendments or the New Second Lien Notes Documents: (1) the obligations of the Debtors under the 2015 10.50% Senior Notes, 2015 12.00% Senior Notes, 2016 Senior Subordinated Notes, DIP Loan Agreement, Junior Subordinated Notes, Second Lien Notes, Third Lien Notes, and any other certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except for such certificates, notes or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan, including, without limitation, the First Lien Notes, the First Lien Notes Indenture and the First Lien Loan Documents and related documents), shall be cancelled as to the Debtors and the Debtors shall not have any continuing obligations thereunder, (2) the Second Lien Notes of the Debtors Supplemental Documents shall be deemed cancelled and of no further force and effect, and (3) the obligations of the Debtors pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligations of the Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan, including, without limitation, the First Lien Notes, the First Lien Notes Indenture and the First Lien Loan Documents and related documents) shall be released and discharged; *provided, however,* notwithstanding Confirmation or the occurrence of the Effective Date, that any such Indenture or agreement that governs the rights of the holder of a Claim or the rights of an Indenture Trustee shall continue in effect solely for purposes of (a) allowing holders of Second Lien Notes Claims, Third Lien Notes Claims and DIP Claims (as applicable) to receive distributions under the Plan as provided herein, (b) allowing the applicable Indenture Trustees, if applicable, to make distributions under the Plan as provided herein and perform such other necessary functions with respect thereto, if any, and deduct therefrom such compensation, fees and expenses due thereunder or incurred in making such distributions, (c) allowing the applicable Indenture Trustees to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of this Plan and (d)

permitting the applicable Indenture Trustees to maintain or assert any right or Charging Lien they may have against distributions pursuant to the terms of the applicable Indentures to recover unpaid fees and expenses (including the fees and expenses of their counsel, agents, and advisors) of the applicable Indenture Trustees; *provided, further, however,* that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan, or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under this Plan.

(b)    **Second Lien Notes Indenture**

Notwithstanding any other contrary provision of the Plan, the Second Lien Notes Indenture (as modified pursuant to Section 5.3(c) hereof) shall remain outstanding following the Effective Date to allow for the New Second Lien Notes to be issued, operative and governed thereunder, and all liens, security and ancillary documents related thereto (including but not limited to all Note Security Documents and the Senior Intercreditor Agreement (each as defined in the Second Lien Notes Indenture)) shall remain in full force and effect with respect to such New Second Lien Notes; *provided* that the assets of the Liquidating Debtors shall not secure the New Second Lien Notes and the Liquidating Debtors shall be deemed released as guarantors under the Second Lien Notes Indenture.

(c)    **Indenture Trustees**

On and after the Effective Date, all duties and responsibilities of the Indenture Trustees (other than the First Lien Notes Trustee and the Second Lien Notes Trustee) under the Indentures, as applicable, shall be discharged and deemed satisfied except to the extent required in order to effectuate the Plan.  On and after the Effective Date, all duties and responsibilities of the Second Lien Notes Trustee with respect to the Second Lien Notes shall be discharged except to the extent required in order to effectuate the Plan.  For the avoidance of doubt, nothing contained in the Plan or the Confirmation Order shall in any way limit or affect the standing of the Indenture Trustees to appear and be heard in the Chapter 11 Cases on and after the Effective Date.

**5.8    Surrender of Existing Securities**

As a condition precedent to receiving any distribution on account of any Note, each record holder of any Note shall be deemed to have surrendered such Notes or other documentation underlying such Note and all such surrendered Notes and other documents shall be deemed to be cancelled in accordance with Section 5.7 of the Plan as of the Effective Date.

**5.9    Boards of Directors and Officers of the Operating Debtors**

(a)    **Boards of Directors**

On the Effective Date, the New Board of New Altegrity and Altegrity Holding Corp. will consist of the five (5) directors identified in the Plan Supplement.  To the extent known, the identity of the members of the New Boards of New Altegrity and of each of the other Reorganized Debtors and the nature and compensation for any member of a New Board who is an "insider" under section 101(31) of the Bankruptcy Code will be identified in the Plan Supplement but, in any event, shall be disclosed at or before the Confirmation Hearing.

(b)    **Officers**

To the extent known, officers of New Altegrity and each of the other Reorganized Debtors shall be identified in the Plan Supplement but, in any event, shall be disclosed at or before the Confirmation Hearing.  Such officers shall serve in accordance with applicable non-bankruptcy law and, to the extent applicable, the New Employment Agreements with New Altegrity and each of the other Reorganized Debtors.

**5.10    Employee Benefits**

Except as otherwise provided herein, on and after the Effective Date, the Reorganized Debtors may honor, in the ordinary course of business, any prepetition contracts, agreements, policies, programs and plans for, among

other things, compensation (other than prepetition equity-based compensation related to Interests, which shall be cancelled as provided for pursuant to the Plan), health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation benefits, savings plans, severance benefits, welfare benefits, workers' compensation insurance, life insurance and accidental death and dismemberment insurance for the directors, officers and employees of any of the Debtors who served in such capacity at any time; *provided, however*, that the Debtors' or Reorganized Debtors' performance under any employment agreement will not entitle any person to any benefit or alleged entitlement under any contract, agreement, policy, program or plan that has expired or been terminated before the Effective Date, or restore, reinstate or revive any such benefit or alleged entitlement under any such contract, agreement, policy, program or plan. Nothing herein shall limit, diminish or otherwise alter the Reorganized Debtors' defenses, claims, causes of action or other rights with respect to any such contracts, agreements, policies, programs and plans, including the Reorganized Debtors' rights to modify unvested benefits pursuant to their terms.

## 5.11    Retiree Benefits

All employment, retirement and other agreements or arrangements in place as of the Effective Date with the Debtors' officers, directors, or employees who will continue in such capacities or similar capacities after the Effective Date, or retirement income plans and welfare benefit plans for such persons, shall remain in place after the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs and plans; *provided, however*, that the foregoing shall not apply to any stock-based compensation or incentive plan, agreement, or arrangement existing as of the Petition Date. Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, causes of action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

## 5.12    Corporate Action

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (1) entry into the New Employment Agreements; (2) selection of the directors and officers of the Reorganized Debtors; (3) the execution of and entry into the New Revolving Credit Facility Agreement; (4) the issuance of New Second Lien Notes (including the execution of the New Second Lien Notes Documents, and any required modifications or amendments to the Second Lien Notes Indenture contemplated by Section 5.3(c) hereof); (5) the distribution of the New Common Stock and AHC Common Stock as provided herein; and (6) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the Debtors or the Reorganized Debtors.

## 5.13    Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors and the managers, officers and members of the boards of directors thereof are authorized to issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents related to the foregoing and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan (including the New Revolving Credit Facility and the New Second Lien Notes Documents) and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan. The authorizations and approvals contemplated by this section shall be effective notwithstanding any requirements under non-bankruptcy law.

## 5.14    Section 1146 Exemption from Certain Taxes and Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or

agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any restructuring transaction authorized by this Plan; or (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under or pursuant to the Plan.

## 5.15    D&O Liability Insurance Policies

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue the D&O Liability Insurance Policies in full force) all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed. On or before the Effective Date, the Reorganized Debtors shall obtain reasonably sufficient tail coverage (*i.e.*, D&O insurance coverage that extends beyond the end of the policy period) under a directors and officers' liability insurance policy for the current and former directors, officers and managers for a period of five years, and placed with such insurers, the terms of which shall be set forth in the Plan Supplement. For the avoidance of doubt, any amounts owing under the D&O Liability Insurance Policies that accrued prior to the Petition Date but have not yet become payable obligations can be billed and paid in the ordinary course of business.

## 5.16    Preservation of Rights of Action

### (a)    Retention of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the releases by the Debtors provided by Section 9.2 hereof), the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against such Entity. **The Debtors and the Reorganized Debtors (including, for the avoidance of doubt, both the Liquidating Debtors and the Operating Debtors) expressly reserve all rights to prosecute any and all Causes of Action, including with respect to rejected Executory Contracts and Unexpired Leases, against any Entity, except as otherwise expressly provided in the Plan.** Except with respect to Causes of Action as to which the Debtors or Reorganized Debtors have released any Person or Entity on or before the Effective Date (including pursuant to the releases by the Debtors or otherwise), the Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after or as a consequence of the Confirmation or Consummation.

### (b)    Specified Litigation Claims

Notwithstanding anything in this Plan to the contrary, upon the Effective Date, all of the rights of the Liquidating Debtors to the Specified Litigation Claims, including all rights, powers, standing, attorney-client

41

privilege, and authority necessary to litigate, protect, conserve, abandon, dispose of, settle, transfer, sell, assign, encumber and otherwise liquidate the Specified Litigation Claims, shall vest in the applicable Reorganized Debtor free and clear of all Liens, Claims, charges or other encumbrances. All such rights shall be exercised by the Plan Administrator for and on behalf of the applicable Reorganized Debtor solely at and in accordance with the direction of the Specified Claims Oversight Committee; provided, however, that the Plan Administrator shall not be required to take any action in accordance with any such direction of the Specified Claims Oversight Committee unless all out-of-pocket costs and expenses of the Plan Administrator and applicable Reorganized Debtor(s) incurred in accordance with such instruction (including, without limitation, attorneys' fees) are funded by (i) proceeds of any unencumbered assets to be deposited into the Liquidating Debtors Unsecured Claims Distribution Pool and designated as proceeds of the Specified Litigation Claims or otherwise earmarked for such purpose in accordance with the terms of this Plan, (ii) unsecured creditors of the Liquidating Debtors (excluding holders of Second Lien Notes Deficiency Claims or Third Lien Notes Deficiency Claims), or (iii) other parties on behalf of the unsecured creditors of the Liquidating Debtors (excluding holders of Second Lien Notes Deficiency Claims or Third Lien Notes Deficiency Claims), and none of such out-of-pocket costs or expenses shall be borne by the Plan Administrator or any Reorganized Debtor (including any Liquidating Debtor). Neither the Plan Administrator nor any of the Reorganized Debtors shall take any action with respect to the Specified Litigation Claims unless directed to do so by the Specified Claims Oversight Committee in accordance with this Plan. For the avoidance of doubt, any recoveries on account of claims or actions against Specified D&O Litigation Parties shall be limited to, and any payments or settlements shall only be provided by, the D&O Liability Insurance Policies, and no action shall be taken to collect any portion of any settlement or judgment from the personal assets or the properties of any Specified D&O Litigation Party or the Debtors' Estates.

       (c)      **Specified Avoidance Actions**

Notwithstanding anything in this Plan to the contrary, upon the Effective Date, all of the rights of the Liquidating Debtors to the Specified Avoidance Actions, including all rights, powers, standing, attorney-client privilege, and authority necessary to litigate, protect, conserve, abandon, dispose of, settle, transfer, sell, assign, encumber and otherwise liquidate the Specified Avoidance Actions, shall vest in the applicable Reorganized Debtor free and clear of all Liens, Claims, charges or other encumbrances (other than the Second Lien Avoidance Action Liens and the Third Lien Avoidance Action Liens to the extent provided in Section 3.3 of this Plan). All such rights shall be exercised by the Plan Administrator for and on behalf of the applicable Reorganized Debtor solely at and in accordance with the direction of the Specified Claims Oversight Committee; provided, however, that the Plan Administrator shall not be required to take any action in accordance with any such direction of the Specified Claims Oversight Committee unless all out-of-pocket costs and expenses of the Plan Administrator and applicable Reorganized Debtor(s) incurred in accordance with such instruction (including, without limitation, attorneys' fees) are funded by (i) proceeds of any unencumbered assets to be deposited into the Liquidating Debtors Unsecured Claims Distribution Pool and designated as proceeds of the Specified Avoidance Actions or otherwise earmarked for such purpose in accordance with the terms of this Plan, (ii) unsecured creditors of the Liquidating Debtors (excluding holders of Second Lien Notes Deficiency Claims or Third Lien Notes Deficiency Claims), or (iii) other parties on behalf of the unsecured Creditors of the Liquidating Debtors (excluding holders of Second Lien Notes Deficiency Claims or Third Lien Notes Deficiency Claims), and none of such out-of-pocket costs or expenses shall be borne by the Plan Administrator or any Reorganized Debtor (including any Liquidating Debtor). Neither the Plan Administrator nor any of the Reorganized Debtors shall take any action with respect to the Specified Avoidance Actions unless directed to do so by the Specified Claims Oversight Committee in accordance with this Plan.

**5.17**    **Single Satisfaction of Claims**

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100% of the underlying Allowed Claim plus applicable interest, if any.

**5.18**    **Oversight Committee for the Liquidating Debtors**

       (a)      Oversight Committee Formation

On the Effective Date, the Oversight Committee shall be organized and comprised of the members set forth in the Plan Supplement. The Oversight Committee shall have only the powers and rights explicitly set forth in this Plan. The Oversight Committee shall terminate and cease to exist on the earlier of (i) the final distribution of all proceeds to be distributed from the Liquidating Debtors Unsecured Claims Distribution Pool pursuant to this Plan and (ii) the entry of an order of the Bankruptcy Court terminating the Oversight Committee. The members of the Oversight Committee shall receive no compensation, reimbursement, or other payment for the performance of their duties hereunder. No member of the Oversight Committee shall be liable for the acts or omissions of the Plan Administrator or any of the Reorganized Debtors or any of their respective agents or representatives, or any other member of the Oversight Committee. All decisions of the Oversight Committee shall be made upon a majority vote of its members (on the basis of one vote per member), *provided* that the Oversight Committee may unanimously delegate responsibility for any discrete issue or decision to one or more of its members and any actions taken in accordance with such delegated responsibility shall be deemed to be taken with a majority vote. Any member of the Oversight Committee may resign upon 15 days advance written notice to the Plan Administrator. Any member of the Oversight Committee may also be removed for cause by order of the Bankruptcy Court after notice and an opportunity for a hearing. Any such resigning member or member removed for cause will be replaced by a new member selected (i) by the unanimous vote of the remaining members of the Oversight Committee or (ii) if the remaining members cannot unanimously agree, by the Bankruptcy Court.

      (b)      Agents and Counsel

The Oversight Committee may, without Bankruptcy Court approval, select, determine compensation for (whether on a "time/materials" basis or other agreed to alternative fee arrangement), and employ, or have the Plan Administrator employ, attorneys, brokers, experts, consultants, custodians, investment advisors, asset services, auditors, accountants, and other agents as the Oversight Committee may deem necessary and/or advisable to assist it, or to assist the Plan Administrator, in performing its duties and obligations under the Plan (collectively, "**Oversight Committee Professionals**"). The Oversight Committee may pay the fees, and expenses of such Oversight Committee Professionals solely from (i) proceeds of any unencumbered assets to be deposited into the Liquidating Debtors Unsecured Claims Distribution Pool in accordance with the terms of this Plan, (ii) funds provided by unsecured creditors of the Liquidating Debtors, or (iii) funds provided by other parties funding on behalf of the unsecured creditors of the Liquidating Debtors; *provided* that all fees, expenses and costs of the Oversight Committee incurred in connection with the WARN Claims shall be paid solely from (i) the proceeds of any unencumbered assets to be deposited into the Liquidating Debtors Unsecured Claims Distribution Pool related to the Specified Litigation Claims or the Specified Avoidance Actions, (ii) funds provided by unsecured creditors of the Liquidating Debtors (excluding holders of Second Lien Notes Deficiency Claims or Third Lien Notes Deficiency Claims), or (iii) funds provided by other parties funding on behalf of the unsecured creditors of the Liquidating Debtors (excluding holders of Second Lien Notes Deficiency Claims or Third Lien Notes Deficiency Claims).

      (c)      Standard of Care

Each member of the Oversight Committee shall perform its respective duties and obligations under this Plan, with reasonable diligence and care under the circumstances. To the maximum extent permitted by law, the members of the Oversight Committee shall not be liable to any holder of Claims or any other person for any action taken or omitted to be taken in good faith and in the exercise of reasonable judgment and reasonably believed to be within the discretion or power conferred by the Plan, or responsible for the consequences of any act or failure to act, except for gross negligence or willful misconduct, or criminal conduct by such person. The Debtors, the holders of Claims, and other parties-in-interest (excluding the United States Government), by voting for the Plan and/or accepting the benefits thereof, have agreed not to sue or otherwise pursue or seek damages from the members of the Oversight Committee pursuant to the Plan, except for actions or omissions which violate the standard of care set forth in this Section. Each member of the Oversight Committee, the Plan Administrator, and all of the professionals and advisors of the foregoing shall, to the extent reasonably practicable, maintain and preserve the confidential information and the privilege rights of the Reorganized Debtors.

## 5.19    Claims Resolution Committee for the Operating Debtors

      (a)      Claims Resolution Committee Formation

On the Effective Date, the Claims Resolution Committee shall be organized and comprised of the members set forth in the Plan Supplement. The Claims Resolution Committee shall have only the powers and rights explicitly set forth in this Plan. The Claims Resolution Committee shall terminate and cease to exist on the earlier of (i) the final distribution of all proceeds to be distributed from the Operating Debtors General Unsecured Claims Pool pursuant to this Plan and (ii) the entry of an order of the Bankruptcy Court terminating the Claims Resolution Committee. The members of the Claims Resolution Committee shall receive no compensation, reimbursement, or other payment for the performance of their duties hereunder. No member of the Claims Resolution Committee shall be liable for the acts or omissions of the Plan Administrator or any of the Reorganized Debtors or any of their respective agents or representatives, or any other member of the Claims Resolution Committee. All decisions of the Claims Resolution Committee shall be made upon a majority vote of its members (on the basis of one vote per member), provided that the Claims Resolution Committee may unanimously delegate responsibility for any discrete issue or decision to one or more of its members and any actions taken in accordance with such delegated responsibility shall be deemed to be taken with a majority vote. Any member of the Oversight Committee may resign upon 15 days advance written notice to the Plan Administrator. Any member of the Claims Resolution Committee may also be removed for cause by order of the Bankruptcy Court after notice and an opportunity for a hearing. Any such resigning member or member removed for cause will be replaced by a new member selected (i) by the unanimous vote of the remaining members of the Claims Resolution Committee or (ii) if the remaining members cannot unanimously agree, by the Bankruptcy Court.

(b)    Counsel

The Claims Resolution Committee may, without Bankruptcy Court approval retain and employ, or have the Plan Administrator employ, an attorney to represent the Claims Resolution Committee as the Claims Resolution Committee may deem necessary and/or advisable to assist it, or to assist the Plan Administrator, in performing its duties and obligations under the Plan. The reasonable and documented fees and expenses of such attorney, up to $25,000, shall be paid by the Reorganizing Debtors without the need of such attorney to file fee applications with the Bankruptcy Court. Such fees and expenses shall be paid promptly by the Reorganizing Debtors upon submission of an invoice related thereto.

(c)    Standard of Care

Each member of the Claims Resolution Committee shall perform its respective duties and obligations under this Plan, with reasonable diligence and care under the circumstances. To the maximum extent permitted by law, the members of the Claims Resolution Committee shall not be liable to any holder of Claims or any other person for any action taken or omitted to be taken in good faith and in the exercise of reasonable judgment and reasonably believed to be within the discretion or power conferred by the Plan, or be responsible for the consequences of any act or failure to act, except for gross negligence or willful misconduct, or criminal conduct by such person. The Debtors, the holders of Claims, and other parties-in-interest (excluding the United States Government), by voting for the Plan and/or accepting the benefits thereof, have agreed not to sue or otherwise pursue or seek damages from the members of the Claims Resolution Committee pursuant to the Plan, except for actions or omissions which violate the standard of care set forth in this Section. Each member of the Claims Resolution Committee, the Plan Administrator, and all of the professionals and advisors of the foregoing shall, to the extent reasonably practicable, maintain and preserve the confidential information and the privilege rights of the Reorganized Debtors.

**5.20    Specified Claims Oversight Committee for the Liquidating Debtors**

(a)    Specified Claims Oversight Committee Formation

On the Effective Date, the Specified Claims Oversight Committee shall be organized and comprised of the members set forth in the Plan Supplement. The Specified Claims Oversight Committee shall have only the powers and rights explicitly set forth in this Plan. The Specified Claims Oversight Committee shall terminate and cease to exist on the earlier of (i) the final distribution of all proceeds to be distributed from the Liquidating Debtors Unsecured Claims Distribution Pool pursuant to this Plan and (ii) the entry of an order of the Bankruptcy Court terminating the Oversight Committee. The members of the Specified Claims Oversight Committee shall receive no compensation, reimbursement, or other payment for the performance of their duties hereunder. No member of the Specified Claims Oversight Committee shall be liable for the acts or omissions of the Plan Administrator or any of

the Reorganized Debtors or any of their respective agents or representatives, or any other member of the Specified Claims Oversight Committee. All decisions of the Specified Claims Oversight Committee shall be made upon a majority vote of its members (on the basis of one vote per member), provided that the Specified Claims Oversight Committee may unanimously delegate responsibility for any discrete issue or decision to one or more of its members and any actions taken in accordance with such delegated responsibility shall be deemed to be taken with a majority vote. Any member of the Specified Claims Oversight Committee may resign upon 15 days advance written notice to the Plan Administrator. Any member of the Specified Claims Oversight Committee may also be removed for cause by order of the Bankruptcy Court after notice and an opportunity for a hearing. Any such resigning member or member removed for cause will be replaced by a new member selected (i) by the unanimous vote of the remaining members of the Specified Claims Oversight Committee or (ii) if the remaining members cannot unanimously agree, by the Bankruptcy Court.

(b)     Agents and Counsel

The Specified Claims Oversight Committee may, without Bankruptcy Court approval, select, determine compensation for (whether on a "time/materials" basis or other agreed to alternative fee arrangement), and employ, or have the Plan Administrator employ, attorneys, brokers, experts, consultants, custodians, investment advisors, asset services, auditors, accountants, and other agents as the Specified Claims Oversight Committee may deem necessary and/or advisable to assist it, or to assist the Plan Administrator, in performing its duties and obligations under the Plan (collectively, "**Specified Claims Oversight Committee Professionals**"). The Specified Claims Oversight Committee may pay the fees, and expenses of such Specified Claims Oversight Committee Professionals solely from (i) proceeds of any unencumbered assets to be deposited into the Liquidating Debtors Unsecured Claims Distribution Pool related to the Specified Litigation Claims or the Specified Avoidance Actions in accordance with the terms of this Plan, (ii) funds provided by unsecured creditors of the Liquidating Debtors (excluding holders of Second Lien Notes Deficiency Claims or Third Lien Notes Deficiency Claims), or (iii) funds provided by other parties funding on behalf of the unsecured creditors of the Liquidating Debtors (excluding holders of Second Lien Notes Deficiency Claims or Third Lien Notes Deficiency Claims).

(c)     Standard of Care

Each member of the Specified Claims Oversight Committee shall perform its respective duties and obligations under this Plan, with reasonable diligence and care under the circumstances. To the maximum extent permitted by law, the members of the Specified Claims Oversight Committee shall not be liable to any holder of Claims or any other person for any action taken or omitted to be taken in good faith and in the exercise of reasonable judgment and reasonably believed to be within the discretion or power conferred by the Plan, or be responsible for the consequences of any act or failure to act, except for gross negligence or willful misconduct, or criminal conduct by such person. The Debtors, the holders of Claims, and other parties-in-interest (excluding the United States Government), by voting for the Plan and/or accepting the benefits thereof, have agreed not to sue or otherwise pursue or seek damages from the members of the Specified Claims Oversight Committee pursuant to the Plan, except for actions or omissions which violate the standard of care set forth in this Section. Each member of the Specified Claims Oversight Committee, the Plan Administrator, and all of the professionals and advisors of the foregoing shall, to the extent reasonably practicable, maintain and preserve the confidential information and the privilege rights of the Reorganized Debtors.

## ARTICLE VI

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**6.1     Assumption and Rejection of Executory Contracts and Unexpired Leases**

Except as otherwise provided herein, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, each of Altegrity Holding Corp.'s and the Subsidiary Debtors' Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to assume or reject filed on or before the Effective Date; or (4) is identified as an Executory Contract or Unexpired Lease to be rejected pursuant to the

Plan Supplement before the Effective Date, provided that each of the Liquidating Debtors' Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to assume or reject filed on or before the Effective Date; or (4) is identified as an Executory Contract or Unexpired Lease to be assumed pursuant to the Plan Supplement before the Effective Date.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify or supplement the list of Executory Contracts and Unexpired Leases identified in the Plan Supplement at any time before the Effective Date. Any alteration, amendment, modification or supplement to the list of Executory Contracts and Unexpired Leases identified in the Plan Supplement shall be agreed to by the Consenting Junior Lien Creditors after consultation with the Consenting First Lien Creditors. After the Effective Date, the Reorganized Debtors shall have the right to terminate, amend or modify any executory contracts, leases or other agreements without approval of the Bankruptcy Court.

### 6.2    Claims Based on Rejection of Executory Contracts or Unexpired Leases

All proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates or their property, without the need for any objection by the Reorganized Debtors or further notice to, or action, order or approval of the Bankruptcy Court.** All Allowed Claims arising from the rejection of the Operating Debtors' Executory Contracts or Unexpired Leases shall be deemed General Unsecured Claims and classified as Class A7-b Operating Debtors General Unsecured Claims against the applicable Operating Debtor and shall be treated in accordance with Article III of the Plan. All Allowed Claims arising from the rejection of the Liquidating Debtors' Executory Contracts or Unexpired Leases shall be deemed Liquidating Debtors Unsecured Claims and classified as Class B7 Liquidating Debtors Unsecured Claims against the applicable Liquidating Debtor and shall be treated in accordance with Article III of the Plan. The deadline to object to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, shall be the later of (a) 90 days following the date on which such Claim was filed and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims.

### 6.3    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on, or as soon as reasonably practicable after, the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. At least 14 days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties, and shall include procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases and any amounts of Cure Claims to be paid in connection therewith and resolution of disputes by the Bankruptcy Court; provided, that the Debtors

and the Reorganized Debtors reserve all rights with respect to any such proposed assumption and proposed cure amount in the event of an objection or dispute. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served and actually received by counsel to the Debtors and the Consenting Junior Lien Creditors at least three (3) days before the Confirmation Hearing. **Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.** A list of the Executory Contracts and Unexpired Leases to be assumed and the notices of proposed assumption and proposed amounts of Cure Claims shall be included in the Plan Supplement.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption. **Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to, action, order, or approval of the Bankruptcy Court.**

To the extent that an objection to the assumption of an Executory Contract or Unexpired Lease, proposed Cure Amount, "adequate assurance of future performance," or other issues related to assumption of Executory Contracts and Unexpired Leased shall have been filed within fifteen (15) days of service of notice of intent to assume or reject, and properly served on the Debtors with respect to the assumption of any contract or lease, then any Cure Dispute that was not scheduled for a hearing by the Bankruptcy Court on or before the date of the Confirmation Hearing shall be scheduled for a later date as may be determined by the Bankruptcy Court. Following resolution of a Cure Dispute by Final Order of the Bankruptcy Court, the contract or lease shall be deemed assumed effective as of the Effective Date, provided, however, that the Debtors reserve the right to reject any such contract or lease following entry of a Final Order of the Bankruptcy Court resolving any such Cure Dispute, by filing a notice indicating such rejection within five (5) Business Days of the entry of such Final Order.

## 6.4    Modifications, Amendments, Supplements, Restatements or Other Agreements

Unless otherwise provided in the Plan or specifically provided in the Plan Supplement, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

## 6.5    Reservation of Rights

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Executory Contract and Unexpired Lease lists in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**6.6      Contracts and Leases Entered Into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

**6.7      Assumption of Insurance Policies**

Notwithstanding anything in the Plan or the Confirmation Order, including any provision that purports to be preemptory or supervening, on the Effective Date, each of the Insurance Policies shall, as applicable, be deemed assumed to the extent such Insurance Policies are Executory Contracts of the applicable Debtor under section 365 of the Bankruptcy Code. Regardless of whether any Insurance Policy is or is not an Executory Contract, on and after the Effective Date, the Insurance Policies will remain valid and enforceable in accordance with their terms, shall not be impaired by the Plan or Confirmation Order, and the Debtors and the Insurers will perform their respective obligations to one another, if any, under the Insurance Policies; *provided, however,* that nothing contained in this Section 6.7 shall affect any Executory Contract or Claim of any Entity other than the Insurers. For the avoidance of doubt, any amounts owing under the Insurance Policies that accrued prior to the Petition Date but have not yet become payable obligations can be billed and paid in the ordinary course of business.

**6.8      Assumption of Employment Contracts or Incentive Plans**

Notwithstanding anything in the Plan or the Confirmation Order, including any provision that purports to be preemptory or supervening, the Debtors shall not assume, and shall reject, any employment contracts or management incentive plans that include any provisions requiring payments or benefits upon a change of control as a result of the consummation of the Plan; *provided* that the Operating Debtors may assume such contracts or incentive plans if the Debtors or the Operating Debtors either (i) obtain a written waiver of such payments or benefits prior to any such assumption or (ii) obtain a written consent to such assumption from the Consenting Junior Lien Creditors.

**ARTICLE VII**

**PROVISIONS GOVERNING DISTRIBUTIONS**

**7.1      Record Date for Distributions**

As of the entry of the Confirmation Order, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes made to reflect any new record holders of any Claims or Interests. The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. The Debtors shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated in the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

**7.2      Timing and Calculation of Amounts to Be Distributed**

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIII hereof. Except as otherwise provided herein (including in Section 7.6(a) with respect to Disputed Claims), holders of Claims shall not be entitled to

interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

## 7.3    **Disbursing Agent**

Except as otherwise provided herein, all distributions under the Plan shall be made by the Reorganized Debtors as Disbursing Agent or such other Entity designated by the Reorganized Debtors as a Disbursing Agent on the Effective Date. Distributions to holders of claims related to the 2015 Senior Notes Claims, First Lien Notes Claims, Second Lien Notes Claims and Third Lien Notes Claims (including distributions that otherwise would have been made to holders of the 2016 Senior Subordinated Notes Claims in accordance with Section 3.3) shall be (a) made to the applicable Indenture Trustee who shall in turn make distributions in accordance with the Notes and Indentures, and (b) deemed completed when made to the applicable Indenture Trustee as Disbursing Agent. Distributions to holders of DIP Claims shall be made by the DIP Agent in coordination with the Reorganized Debtors and the Second Lien Notes Trustee. For the avoidance of doubt, distributions made by the Indenture Trustees and DIP Agent to the record holders of the 2015 Senior Notes Claims, First Lien Notes Claims, Second Lien Notes Claims, Third Lien Notes Claims and DIP Claims shall be made (as it relates to the identity of recipients) in accordance with the applicable Indenture or credit agreement and the policies and procedures of DTC, to the extent applicable. To the extent that any Entity other than the Reorganized Debtors, the DIP Agent or any of the Indenture Trustees is designated as a Disbursing Agent, such Entity's designation and service thereunder shall be conditioned upon such Entity posting a bond satisfactory to the Bankruptcy Court.

## 7.4    **Rights and Powers of Disbursing Agent**

### (a)    **Powers of the Disbursing Agent**

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### (b)    **Expenses Incurred On or After the Effective Date**

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agents on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agents shall be paid currently, in Cash, by the Reorganized Debtors without the need of such parties to file fee applications with the Bankruptcy Court. Such fees and expenses shall be paid promptly by the Reorganized Debtors upon submission of an invoice related thereto.

## 7.5    **Distributions on Account of Claims Allowed After the Effective Date**

### (a)    **Payments and Distributions on Disputed Claims**

Notwithstanding any other provision of the Plan, no distributions shall be made under the Plan on account of any Disputed Claim, unless and until such Claim becomes an Allowed Claim. Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### (b)    **Special Rules for Distributions to Holders of Disputed Claims**

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors with the approval of the Consenting Junior Lien Creditors, or the Reorganized Debtors (provided that the Reorganized Debtors shall have obtained the necessary approvals, if any, of the Oversight Committee or the Specified Claims Oversight Committee, as applicable, with respect to Claims in Classes B6 or B7, and the Claims Resolution

Committee with respect to Claims in Class A7-b, as set forth in this Plan), on the one hand, and the holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

## 7.6    Delivery of Distributions and Undeliverable or Unclaimed Distributions

### (a)    Delivery of Distributions in General

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be made to holders of record as of the Distribution Record Date by the Disbursing Agent: (a) to the signatory set forth on the Proof of Claim filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is filed or if the Debtors have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address; or (d) on any counsel that has appeared in the Chapter 11 Cases on the holder's behalf. Distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan; *provided, however*, that the foregoing sentence shall in no way impair the rights of the Indenture Trustees or the Collateral Agents to exercise their Charging Liens. None of the Debtors, the Reorganized Debtors and the applicable Disbursing Agent shall incur any liability whatsoever on account of any distributions under the Plan except for gross negligence, willful misconduct or fraud.

Except as otherwise provided in the Plan, all distributions to holders of Notes Claims shall be governed by the Notes and Indentures, and shall be deemed completed when made to (i) the Indenture Trustees, who shall in turn make distributions in accordance with the Notes and Indentures, or (ii) DTC with the consent, and at the direction, of the applicable Indenture Trustee. In connection with any Notes Claims, the Claims of the Indenture Trustees (not including the Indenture Trustee Fees) shall be determined as of the Distribution Record Date, but distributions to holders of the Notes shall be effected through DTC as a mandatory exchange of such Notes for the share distributions provided for under the Plan, *provided* that any subsequent distributions with respect to Notes shall be made to holders of the Notes at the time of such subsequent distribution. Except as otherwise provided in the Plan, all distributions to holders of DIP Claims shall be governed by the DIP Loan Agreement, and shall be deemed completed when made to the DIP Agent, who shall in turn make distributions in accordance with the DIP Loan Agreement (in coordination with the Reorganized Debtors and the Second Lien Notes Trustee).

### (b)    Minimum and Fractional Distributions

Whenever any payment of a fraction of a share of New Common Stock or AHC Common Stock pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole share (up or down), with half or less being rounded down. Whenever any payment of New Second Lien Notes or Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down. No payment of Cash in an amount less than $25 shall be made to any holder of an Allowed Claim.

### (c)    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made as soon as practicable after such distribution has become deliverable or has been claimed to such holder without interest; *provided, however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable Distribution Date. After such date, all "unclaimed property" or interests in property shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any holder to such property or interest in property shall be discharged and forever barred.

### (d)     Time Bar to Cash Payments

Checks issued by the Disbursing Agent in respect of any distribution of Cash made on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim with respect to which such check originally was issued. Any Claim in respect of a voided check shall be made on or before the later of (a) the six-month anniversary of the Effective Date or (b) ninety (90) days after the date of issuance if the check represents a final distribution. After that date, all remaining Claims in respect of voided checks shall be discharged and forever barred and the applicable Reorganized Debtor shall retain all related monies as unclaimed property under Section 7.6(c).

## 7.7     Compliance with Tax Requirements and Allocations

In connection with the Plan and all instruments issued in connection therewith, to the extent applicable, the Reorganized Debtors and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any federal, state or local taxing authority, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right, in their sole discretion, to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, other spousal awards, Liens, and encumbrances.

For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

## 7.8     Setoff and Recoupment

The Debtors and the Reorganized Debtors may withhold (but not set off except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the holder of any such Allowed Claim. In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 558 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim) the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, equity interests, rights and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such holder, except as specifically provided herein.

For the avoidance of doubt, nothing in the Plan, including the release and exculpation provisions contained in Article IX, shall discharge, release or preclude (a) any valid right of setoff timely asserted against the Debtors prior to the Confirmation Hearing in a document filed with the Bankruptcy Court explicitly preserving such setoff right, (b) any valid right of setoff of any Debtor or Non-Debtor Affiliate against another Debtor or Non-Debtor Affiliate or (c) any valid defense to a claim held by the Debtors, their Estates or their successors or assigns.

## 7.9     Claims Paid or Payable by Third Parties

### (a)     Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce in part or in full an Allowed Claim to the extent that the holder of such Allowed Claim receives payment in part or in full on account of such Allowed Claim from a party that is not a Debtor or Reorganized Debtor. To the extent a holder of an Allowed Claim receives a distribution on account of such Allowed Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Allowed Claim, such holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Allowed Claim from the third party and under the Plan exceeds the amount of such Allowed Claim as of the date of any such distribution under the Plan.

### (b)     Claims Payable by Third Parties

An Insured Claim that has been settled, in whole or in part, with the express written consent of an Insurer, or resolved by a judgment entered after an actual trial or by summary judgment, may be expunged or reduced without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court to the extent so settled or resolved.

### (c)     Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to holders of Allowed Insured Claims shall be in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### 7.10    Transactions on Business Days

If the Effective Date or any other date on which a transaction may occur hereunder shall occur on a day that is not a Business Day, the transactions contemplated by the Plan to occur on such day shall instead occur on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 7.11    Class Proofs of Claim

If a class Proof of Claim is Allowed, it shall be treated as a single Claim for purposes of Article VII and Article VIII hereof.

## ARTICLE VIII

### PROCEDURES FOR RESOLVING CONTINGENT,
### UNLIQUIDATED AND DISPUTED CLAIMS

### 8.1     Prosecution of Objections to Claims on and after the Effective Date

#### (a)     Authority

The Debtors (before the Effective Date), with the approval of the Consenting Junior Lien Creditors, or (on or after the Effective Date) the Reorganized Debtors (with respect to all Reorganized Debtors other than the Liquidating Debtors) and the Plan Administrator (with respect to the Liquidating Debtors), as applicable, shall have the authority to file, settle, compromise, withdraw or litigate to judgment any objections to Claims as permitted under the Plan.

#### (b)     Objections to Claims

From and after the Effective Date, the Reorganized Debtors and the Plan Administrator, as applicable, shall consult with the Claims Resolution Committee prior to filing any objection to Claims in Class A7-b, and the Oversight Committee prior to filing any objection to Claims in Classes B6 or B7. Upon the reasonable request of

the Claims Resolution Committee or the Oversight Committee, as applicable, the Reorganized Debtors and the Plan Administrator, as applicable, shall file objections to any and all Claims in Classes A7-b, B6 or B7. Copies of all objections to Claims in Classes A7-b shall be provided to the Claims Resolution Committee, and copies of all objections to Claims in Classes B6 and B7 shall be provided to the Oversight Committee.

(c)     **Settlement and Compromise of Disputed Claims**

(i)     From and after the Effective Date, the Reorganized Debtors or the Plan Administrator, as applicable, may settle, compromise, or withdraw the objection to any Disputed Claim without prior approval of the Bankruptcy Court or any other party in interest whenever the aggregate Allowed amount of any such individual claim (the "**Settlement Amount**") is less than or equal to $100,000 (any such settlement being a "*De Minimis* **Settlement Amount**").

(ii)    If the Settlement Amount for a claim is not a *De Minimis* Settlement Amount but is (y) less than or equal to $250,000 or (z) within 10 percent (10%) of the noncontingent, liquidated amount listed on the Debtors' schedules of assets and liabilities or books and records, so long as the difference in amount does not exceed $500,000 (any settlement amount within (y) or (z) being a "**Committee Authorized Settlement Amount**"), the Debtors shall submit the proposed settlement with respect to Claims in Class A7-b to the Claims Resolution Committee and Claims in Class B6 and B7 to the Oversight Committee (such applicable committee, the "**Applicable Committee**"). Within ten (10) Business Days of receiving the proposed settlement, the Applicable Committee may object or request an extension of time within which to object (which objection or request for an extension of time within which to object may be in the form of an e-mail from counsel to the Applicable Committee to counsel to the Debtors). If a timely objection is made by the Applicable Committee, the Debtors may either (a) renegotiate the settlement and submit a revised notification to the Applicable Committee, or (b) file a motion with the Court seeking approval of the existing settlement under Bankruptcy Rule 9019 on no less than fourteen (14) days' notice. If no timely objection is made by the Applicable Committee or if the Debtors receive written approval from the Applicable Committee of the proposed settlement prior to the objection deadline (which approval may be in the form of an e-mail from counsel to the Applicable Committee to counsel to the Debtors), then the Debtors may proceed with the settlement, without prior approval of the Court.

(iii)   If the Settlement Amount for a claim is not a *De Minimis* Settlement Amount or a Committee Authorized Settlement Amount, the Debtors shall be required to seek approval of the Court pursuant to motion under Bankruptcy Rule 9019 on no less than fourteen (14) days' notice. The Claims Resolution Committee shall have standing to object to any such motion with respect to Claims in Class A7-b, and the Oversight Committee shall have standing to object to any such motion with respect to Claims in Class B6 or B7.

(iv)    The Debtors may settle Claims where some or all of the consideration is being provided by a third party and/or where the Debtors are releasing ordinary course claims against creditors or third parties related to the liquidation of the Claim provided the Debtors otherwise comply with the settlement procedures in this Article VIII.

(v)     On a monthly basis, beginning on the Effective Date, the Debtors, the Reorganized Debtors or the Plan Administrator, as applicable, shall provide the Claims Resolution Committee, the Oversight Committee and the United States Trustee with a report of all settlements of *De Minimis* Settlement Amounts entered in the preceding calendar month, with such report setting forth the names of the parties with whom the Debtors, the Reorganized Debtors or the Plan Administrator have settled, the relevant Proofs of Claim numbers, the types of Claims asserted by each such party, and the amounts for which such Claims have been settled.

### 8.2    **Estimation of Claims**

The Reorganized Debtors, the Debtors, or the Plan Administrator, as applicable, may, at any time, subject to the consent and notice procedures below, request that the Bankruptcy Court estimate any contingent or

unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors, the Reorganized Debtors or the Plan Administrator previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, such estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Reorganized Debtors, the Debtors or the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate allowance of such Claim. All of the aforementioned Claims objections, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. From and after the Effective Date, the Reorganized Debtors and the Plan Administrator, as applicable, shall obtain the necessary consent (or consultation) from the Claims Resolution Committee or the Oversight Committee, as applicable, prior to taking any actions set forth in this paragraph with respect to Claims in Class A7-b, B6 or B7, as applicable.

**8.3     Allowance of Claims**

Except as expressly provided herein or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), the Reorganized Debtors and the Plan Administrator after the Effective Date will have and retain any and all rights and defenses held by the Debtors with respect to any Claim as of the Petition Date. All claims of any Entity that owes money to the Debtors shall be disallowed unless and until such Entity pays, in full, the amount it owes the Debtors. Notwithstanding any other provision in the Plan, and in accordance with Section 7.5(a) no payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim. To the extent that all or a portion of a Disputed Claim is disallowed, the Holder of such Disputed Claim shall not receive any distribution on account of the portion of such Disputed Claim that is Disallowed.

**8.4     Distributions After Allowance**

To the extent that a Disputed Claim becomes an Allowed Claim, distribution (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan and Confirmation Order. As soon as practicable after the date that either (i) the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order or (ii) a Disputed Claim becomes an Allowed Claim without additional court orders, the Reorganized Debtors, the Disbursing Agent or the Plan Administrator, as applicable, shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan and Confirmation Order, without any interest to be paid on account of such Claim.

**8.5     Deadline to File Objections to Claims**

Any objections to Claims shall be filed no later than the applicable Claims Objection Bar Date, *provided, however,* that to the extent an objection to a Disputed Claim is withdrawn or compromised without approval of the Bankruptcy Court, deemed resolved subject to the procedures set forth in Section 8.1 or adjudicated by the Bankruptcy Court, the Debtors shall have 45 days from the date of withdrawal, compromise, resolution or adjudication to object to the Claim on any additional grounds.

Any fees, costs or expenses incurred by the Plan Administrator in objecting to Claims filed against the Liquidating Debtors shall be borne by the Liquidating Debtors, subject to any applicable provisions of the Plan that limit the use of the Liquidating Debtors Collateral, including but not limited to Sections 3.3(p), 3.3(q), and 8.14 of the Plan.

**8.6     Disallowed Claims**

Any Claim held by an Entity against whom any Debtor or the Plan Administrator has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549, 550, 551 and/or 553 of the Bankruptcy Code, shall be deemed a Disallowed Claim pursuant to section 502(d) of the Bankruptcy Code, pending

adjudication of such Cause of Action, and the Holder of such Claim shall not be entitled to vote to accept or reject the Plan. Claims that are deemed Disallowed Claims pursuant to this Section 8.6 shall continue to be Disallowed Claims for all purposes until such Cause of Action has been settled or resolved by Final Order and any sums due to the Debtors from such party have been paid.

**8.7**    **[RESERVED]**

**8.8**    **[RESERVED]**

**8.9**    **Operating Debtors General Unsecured Claims Pool**

On the Effective Date (or as soon thereafter as is reasonably practicable), New Altegrity shall deposit Cash into the Operating Debtors General Unsecured Claims Pool. Such Cash shall be held in a segregated account in trust for the holders of Claims in Class A7-b, and such Cash shall not constitute property of the Debtors or the Reorganized Debtors, shall not be commingled with any other funds of the Debtors or Reorganized Debtors, and shall at all times remain free and clear of all Liens. Each holder of a Disputed Operating Debtors Unsecured Claim in Class A7-b that ultimately becomes an Allowed Claim shall have recourse only to the undistributed Cash in the Operating Debtors General Unsecured Claims Pool for satisfaction of the distributions to which holders of Allowed Operating Debtors General Unsecured Claims are entitled under the Plan, and not to any Reorganized Debtor, their property or any assets previously distributed on account of any Allowed Claim.

**8.10**    **Distributions from Operating Debtors General Unsecured Claims Pool**

Notwithstanding anything to the contrary in this Plan, no distributions shall be made from the Operating Debtors Unsecured General Claims Pool until all Disputed Operating Debtors General Unsecured Claims in Class A7-b are resolved and either become Allowed or are Disallowed by Final Order.

On the Distribution Date following the date that all Disputed Operating Debtors General Unsecured Claims in Class A7-b are resolved and either become Allowed or are Disallowed by Final Order, then the Disbursing Agent shall provide to each holder of Allowed Claims in Class A7-b such holder's Pro Rata portion of the Operating Debtors General Unsecured Claims Pool in accordance with Section 3.3 of the Plan.

**8.11**    **Liquidating Debtors Unsecured Claims Distribution Pool**

Notwithstanding anything in this Plan to the contrary, the assets of the Liquidating Debtors that were not, at the time of the Petition Date, subject to a valid security interest, including, if applicable, the Specified Avoidance Actions and the Specified Litigation Claims, shall at all times remain free and clear of all Liens, except for the Second Lien Avoidance Action Liens and the Third Lien Avoidance Action Liens to the extent not waived pursuant to Section 3.3 of this Plan. On the Effective Date (or as soon thereafter as is reasonably practicable) such assets shall be liquidated and otherwise monetized in accordance with this Plan, and the Reorganized Debtors shall deposit the proceeds of such assets into the Liquidating Debtors Unsecured Claims Distribution Pool. Such proceeds shall be held in a segregated account in trust for the holders of Claims in Classes B6 and B7, and such proceeds shall not constitute property of the Debtors or the Reorganized Debtors, shall not be commingled with any other funds of the Debtors or Reorganized Debtors, and shall at all times remain free and clear of all Liens (except for the Second Lien Avoidance Action Liens and the Third Lien Avoidance Action Liens to the extent not waived pursuant to Section 3.3 of this Plan). Each holder of a Disputed Liquidating Debtors Unsecured Claim in Class B6 or Class B7 that ultimately becomes an Allowed Claim shall have recourse only to the undistributed proceeds held in the Liquidating Debtors Unsecured Claims Distribution Pool for satisfaction of the distributions to which holders of Allowed Liquidating Debtors Unsecured Claims are entitled under the Plan, and not to any Reorganized Debtor, their property or any assets previously distributed on account of any Allowed Claim.

**8.12**    **Distributions from Liquidating Debtors Unsecured Claims Distribution Pool**

Notwithstanding anything to the contrary in this Plan, unless otherwise provided in the Plan Supplement, (a) no distributions shall be made from the Liquidating Debtors Unsecured Claims Distribution Pool to holders of

Claims in Class B6 or, without duplication, holders of WARN Claims, until all Disputed Liquidating Debtors Other Priority Claims in Class B6, and, without duplication and solely with respect to distributions of the proceeds of the Specified Avoidance Actions and Specified Litigation Claims, all WARN Claims are resolved and either become Allowed or are disallowed by Final Order and (b) no distributions shall be made from the Liquidating Debtors Unsecured Claims Distribution Pool to holders of Claims in Class B7 until all Disputed Liquidating Debtors Other Priority Claims in Class B6, all Disputed Liquidating Debtors Unsecured Claims in Class B7 and, without duplication and solely with respect to distributions of the proceeds of Specified Avoidance Actions and Specified Litigation Claims, all WARN Claims are resolved and either become Allowed or are disallowed by Final Order.

Distributions from the Liquidating Debtors Unsecured Claims Distribution Pool will be made according to the priority provisions set forth in the Bankruptcy Code, including section 507 thereof, according to the following timing and mechanics, *provided, however*, that in no event shall holders of WARN Claims share in any recovery from assets that are not either Specified Avoidance Actions or Specified Litigation Claims. Unless otherwise provided in the Plan Supplement, on the Distribution Date following the date that the applicable condition in the preceding paragraph is satisfied, the Plan Administrator shall provide to each holder of an Allowed Claim in Class B6 such holder's Pro Rata portion of any proceeds from any unencumbered assets of the Liquidating Debtors then currently in the Liquidating Debtors Unsecured Claims Distribution Pool, *provided*, that, if the aggregate amount of proceeds in the Liquidating Debtors Unsecured Claims Distribution Pool at such Distribution Date is less than $50,000, the Plan Administrator may elect, after consultation with the Oversight Committee, to postpone any such distribution until the next Distribution Date. On each succeeding Distribution Date on which there are proceeds in the Liquidating Debtors Unsecured Claims Distribution Pool of at least $50,000, the Plan Administrator shall make Pro Rata distributions to holders of Allowed WARN Claims which constitute Priority Wage Claims (solely from assets in the Liquidating Debtors Unsecured Claims Distribution Pool that constitute proceeds of Specified Avoidance Actions and Specified Litigation Claims) and holders of Allowed Other Priority Claims until such claims are paid in full.

On the first Distribution Date on which (a) the Allowed Class B6 Claims are (or have been) paid in full, (b) all Disputed Liquidating Debtors Unsecured Claims in Class B7 and, without duplication, all WARN Claims are resolved and either are Allowed or are disallowed by Final Order, and (c) the Liquidating Debtors Unsecured Claims Distribution Pool holds proceeds from any unencumbered assets of the Liquidating Debtors of at least $50,000 available for distribution to holders of Allowed Claims in Class B7, the Plan Administrator shall provide to each holder of Allowed Claims in Class B7 such holder's Pro Rata portion of such proceeds in accordance with Section 3.3 hereof. On each succeeding Distribution Date on which there are proceeds in the Liquidating Debtors Unsecured Claims Distribution Pool of at least $50,000, the Plan Administrator shall make Pro Rata distributions to holders of Allowed Claims in Class B7 in accordance with Section 3.3 until such claims are paid in full. For the avoidance of doubt, distributions of assets in the Liquidating Debtors Unsecured Claims Distribution that do not constitute proceeds of Specified Avoidance Actions or Specified Litigation Claims may occur prior to the resolution of all WARN Claims.

Distributions of any excess amounts after the Allowed Claims in Class B6, and, without duplication, the Allowed Claims in Class B7, have been paid in full, if any, shall be provided to the holders of Allowed Interests in Class B8 for the benefit of the Reorganized Debtors for general corporate use.

Notwithstanding anything in this Section 8.12 to the contrary, any Covered Expenses shall be payable from the proceeds of Specified Avoidance Actions, Specified Litigation Claims or monies advanced or borrowed to fund the foregoing, and all distributions to creditors (other than distributions on account of Second Lien Notes Deficiency Claims and Third Lien Notes Deficiency Claims) from the Liquidating Debtors Unsecured Claims Distribution Pool shall be net of Covered Expenses.

## 8.13 Withholding Related to Distributions from Liquidating Debtors Unsecured Claims Distribution Pool or Operating Debtors Unsecured Notes Claims New Common Stock Pool

In connection with the Plan and all instruments issued in connection therewith, to the extent applicable, the Reorganized Debtors, the Plan Administrator and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any federal, state or local taxing authority, and distributions pursuant to the Plan to holders of interests in the Liquidating Debtors Unsecured Claims Distribution Pool or Operating Debtors

Unsecured Notes Claims New Common Stock Pool shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors, the Plan Administrator and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made to a holder of an interest in the Liquidating Debtors Unsecured Claims Distribution Pool or Operating Debtors Unsecured Notes Claims New Common Stock Pool to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right, in their sole discretion, to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, other spousal awards, Liens, and encumbrances.

## 8.14    Plan Administrator

On the Effective Date, New Altegrity shall be appointed the Plan Administrator. The Plan Administrator shall, subject to the terms of this Plan, oversee (a) the liquidation of assets of the Liquidating Debtors and distribution of assets of the Liquidating Debtors Unsecured Claims Distribution Pool; *provided* that the Specified Claims Oversight Committee shall oversee and direct the Plan Administrator with respect to the direction, settlement or other disposition of the Specified Litigation Claims or Specified Avoidance Actions, subject to the terms of this Plan, and (b) the resolution and settlement of claims against the Liquidating Debtors; *provided* that the Oversight Committee shall oversee and direct the Plan Administrator with respect to the direction, settlement or other disposition of the Claims in Class B6 and Class B7. The Plan Administrator shall produce and provide to the Claims Resolution Committee and the Oversight Committee periodic reports with respect to the status of settlements related to Claims in Class A7-b, Class B6 and Class B7 and distributions to holders of Allowed Claims in Class A7-b, Class B6 and Class B7. Costs and expenses incurred by the Plan Administrator in connection with the liquidation of unencumbered assets to be deposited into the Liquidating Debtors Unsecured Claims Distribution Pool shall be reimbursed from the Liquidating Debtors Unsecured Claims Distribution Pool, *provided* that (i) any such costs incurred in connection with the liquidation of assets that do not constitute Specified Litigation Claims or Specified Avoidance Actions shall not be charged to or deducted from the proceeds of Specified Litigation Claims or the Specified Avoidance Actions, and (ii) any such costs incurred in connection with the liquidation of Specified Litigation Claims or Specified Avoidance Actions shall be charged or deducted solely from the proceeds of Specified Litigation Claims and Specified Avoidance Actions.

Prior to the payment in full in Cash of the First Lien Indebtedness, the Plan Administrator shall consult with the First Lien Credit Agreement Agent and the First Lien Notes Collateral Agent with respect to the liquidation of any Liquidating Debtors Collateral. In consultation with the First Lien Credit Agreement Agent and the First Lien Notes Collateral Agent, proceeds of any Liquidating Debtors Collateral shall be distributed to holders of First Lien Credit Agreement Claims and First Lien Notes Claims in accordance with, and solely to the extent provided for in, the Senior Priority Documents. The Plan Administrator shall provide reports with respect to such liquidation and distributions to the First Lien Credit Agreement Agent, the First Lien Notes Collateral Agent and counsel to the Consenting First Lien Creditors on a quarterly basis and shall provide any information reasonably requested by any of the foregoing parties with respect to such liquidation and distributions.

After the payment in full in Cash of the First Lien Indebtedness, the Plan Administrator shall consult with the Second Lien Notes Collateral Agent with respect to the liquidation of any Liquidating Debtors Collateral. After the payment in full in cash of the First Lien Indebtedness or to the extent otherwise provided for in the Senior Priority Documents, in consultation with the Second Lien Notes Collateral Agent, proceeds of any Liquidating Debtors Collateral shall be distributed to holders of Second Lien Notes Claims in accordance with Sections 3.3(p) and 3.3(q) of the Plan. The Plan Administrator shall provide reports with respect to such liquidation and distributions to the Second Lien Notes Collateral Agent and counsel to the Consenting Second Lien Creditors on a quarterly basis and shall provide any information reasonably requested by any of the foregoing parties with respect to such liquidation and distributions.

After the payment in full in Cash of the First Lien Indebtedness and Second Lien Indebtedness, the Plan Administrator shall consult with the Third Lien Notes Collateral Agent with respect to the liquidation of any Liquidating Debtors Collateral. After the payment in full in cash of the First Lien Indebtedness and Second Lien Indebtedness, or to the extent otherwise provided for in the Senior Priority Documents, in consultation with the

Third Lien Notes Collateral Agent, proceeds of any Liquidating Debtors Collateral shall be distributed to holders of Third Lien Notes Claims in accordance with Sections 3.3(p) and 3.3(q) of the Plan.  The Plan Administrator shall provide reports with respect to such liquidation and distributions to the Third Lien Notes Collateral Agent and counsel to the Consenting Third Lien Creditors on a quarterly basis and shall provide any information reasonably requested by any of the foregoing parties with respect to such liquidation and distributions.

## ARTICLE IX

## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

### 9.1    Compromise and Settlement of Claims, Interests and Controversies

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.    The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and holders of Claims and Interests and is fair, equitable and reasonable.  In accordance with and subject to the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

### 9.2    Releases by the Debtors

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, the Reorganized Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan and Disclosure Statement, or related agreements, instruments or other documents, or any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any Released Party under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement, the Senior Priority Documents, the Second Lien Notes Indenture, the New Second Lien Notes Documents, and all liens, security and ancillary documents related thereto (including but not limited to all Note Security Documents and Senior Intercreditor Agreement (each as defined in the Second Lien Notes Indenture))) executed to implement the Plan, nor does it release any Cause of Action, obligation or liability expressly preserved by the Plan or the Plan Supplement.**

**Notwithstanding anything in the Plan to the contrary, the Debtors do not waive, release or discharge Thomas Karaniewsky, Angela Rodriguez, any holder of WARN Claims, or any other present or future party, or any member of the putative classes, in the WARN Actions, including their present, former and future partners, employees, agents, attorneys, predecessors, successors, affiliates, heirs, executors, administrators and assigns (collectively, the "WARN Group"), from any and all claims, counterclaims, actions, causes of**

action, suits, damages, setoffs, fees (including attorneys' fees) and demands that have been, are now, could have been, or could be asserted in the WARN Actions, or that in any way involve, relate to or arise out of, in whole or in part, the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101 et. seq. or the termination of employees of US Investigations Services, LLC and any of its subsidiaries, *provided, however,* that none of the Debtors or Reorganized Debtors will pursue affirmative recovery from any member of the WARN Group on account of such claims, but rather shall only pursue such claims defensively or as a right of offset or recoupment against claims asserted by members of the WARN Group.

9.3    Releases by Holders of Claims and Interests

As of the Effective Date, to the extent permitted by applicable law, each holder of a Claim or an Interest (except where an opt out election has been made as set forth below) shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtors, the Reorganized Debtors and the Released Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement or related agreements, instruments or other documents, or any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement, the Senior Priority Documents, the Second Lien Notes Indenture and the New Second Lien Notes Documents, and all liens, security and ancillary documents related thereto (including but not limited to all Note Security Documents and the Senior Intercreditor Agreement (each as defined in the Second Lien Notes Indenture))) executed to implement the Plan.

Each holder of a Claim or Interest that votes to reject the Plan or is otherwise deemed to reject the Plan shall be given the option to opt out of the releases contemplated by this Section 9.3.

Notwithstanding any other provision of this Plan, nothing in Section 9.2 or this Section 9.3 discharges or releases (1) US Investigations Services, LLC from any liability resulting from claims brought in the case *United States of America, ex rel., Blake Percival v. U.S. Investigations Services, LLC,* Case 14-cv-00726-RMC (D.C. Cir.) that are determined to be non-dischargeable under Section 1141(d)(6)(A) of the Bankruptcy Code, (2) Kroll Associates U.K. Limited from any liability resulting from claims brought by Dar Al Arkan Real Estate Development Company and Bank Alkhair BSC in the case *Dar Al Arkan Real Estate Development Company and Bank Alkhair BSC v. Majid Al-Sayed Bader Hashim Al Refai, Kroll Associates U.K. Limited, Alexander Richardson and FTI Consulting Group Limited,* [2014] EWCA Civ 749, which case is more fully described in Section IX.C of the Disclosure Statement, (3) the Specified Litigation Claims or the Specified Avoidance Actions, (4) any ERISA fiduciaries, parties in interest and knowing participants, in each case to the extent not a Debtor (the "Non-Debtor ERISA Parties") from any actions brought by the Secretary of Labor, United States Department of Labor pursuant to ERISA against Non-Debtor ERISA Parties, (5) the Debtors from prospective injunctive relief due to violation of law, or (6) otherwise enjoins any state taxing authority from pursuing any Person (as defined by 11 U.S.C. § 101(41)) or party that is not a Debtor, *provided* that as long as the Debtors or the Reorganized Debtors have paid all amounts that are due and owing that are not disputed, such state taxing authorities shall not pursue any non-Debtor parties.

9.4    Exculpation

Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any obligation, Cause of Action or

liability for any Exculpated Claim, except for gross negligence or willful misconduct (including fraud), but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors, the Reorganized Debtors and the Disbursing Agents (and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of the Plan and the distribution of securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan; *provided* that, for the avoidance of doubt, the Debtors, the Liquidating Debtors, the Operating Debtors, and the Reorganized Debtors, as applicable, remain liable under the Senior Priority Documents, the Second Lien Notes Indenture and the New Second Lien Notes Documents (with respect to the New Second Lien Notes to be issued, outstanding and governed thereunder), and, subject to Section 5.7 hereof, all liens, security and ancillary documents related thereto (including but not limited to all Note Security Documents and the Senior Intercreditor Agreement (each as defined in the Second Lien Notes Indenture)) will remain in full force and effect, each in accordance with the terms thereof; *provided* that the assets of the Liquidating Debtors shall not secure the New Second Lien Notes and the Liquidating Debtors shall not guarantee the New Second Lien Notes.

## 9.5    Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such Claim, debt, right or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

## 9.6    Injunction

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE IX HEREOF, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE IX HEREOF.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO SECTIONS 9.2 OR 9.3, OR DISCHARGED PURSUANT TO SECTION 9.5 OR ARE SUBJECT

TO EXCULPATION PURSUANT TO SECTION 9.4, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, THE INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, ALL INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

## 9.7     Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## 9.8     Protection Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors or another Entity with whom such Reorganized Debtors have been associated, solely because one of the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## 9.9    Release of Liens

Except as otherwise provided herein or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, in satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtors and their successors and assigns; *provided, however*, that, for the avoidance of doubt, the Liens securing the First Lien Credit Agreement Claims, First Lien Notes Claims and the New Second Lien Notes issued under the Second Lien Notes Indenture shall not be released by this Section 9.9.

## ARTICLE X

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE

### 10.1    Conditions Precedent to Confirmation

It shall be a condition to Confirmation hereof that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Section 10.3.

1.    The Bankruptcy Court shall have entered a Final Order, in form and substance acceptable to the Debtors, the Consenting First Lien Creditors, the Consenting Junior Lien Creditors, the Creditors' Committee and the Consenting Interest Holders, approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

2.    The Confirmation Order (a) shall be entered in form and substance acceptable to the Debtors, the Consenting First Lien Creditors, the Consenting Junior Lien Creditors, the Creditors' Committee and the Consenting Interest Holders and (b) shall include a finding by the Bankruptcy Court that the New Common Stock, AHC Common Stock, and New Second Lien Notes to be issued on the Effective Date will be authorized and exempt from registration under applicable securities law pursuant to section 1145 of the Bankruptcy Code.

3.    The Plan and the Plan Supplement, including any schedules, documents, supplements and exhibits thereto (in each case in form and substance) shall be reasonably acceptable to the Debtors, the Consenting First Lien Creditors, the Consenting Interest Holders and the Consenting Junior Lien Creditors and, with respect to the New Second Lien Notes, the New Second Lien Notes Documents, and any modifications or amendments to the Second Lien Notes Indenture, the Second Lien Notes Trustee and the Second Lien Notes Collateral Agent.

### 10.2    Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Section 10.3.

1.    The Restructuring Support Agreement shall be in full force and effect.

2.    The Bankruptcy Court shall have entered one or more Final Orders (which may be the Confirmation Order) authorizing the assumption and rejection of executory contracts and unexpired leases by the Debtors as contemplated herein.

3.    The Bankruptcy Court shall have entered a Final Order (which may be the Confirmation Order) approving a settlement between the Debtors and the putative class of holders of WARN Claims that disallows, and fully releases the Operating Debtors and their estates from, any and all Claims, including Priority Wage Claims, on account of, relating to, or arising in connection with, any class or individual WARN Claims.

4.   The New Revolving Credit Facility Agreement shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived by the Debtors, with the consent of the Consenting First Lien Creditors and the Consenting Junior Lien Creditors, which consent shall not be unreasonably withheld, or satisfied in accordance with the terms thereof, and funding pursuant to the New Revolving Credit Facility shall have occurred.

5.   The Bankruptcy Court shall have entered one or more Final Orders (which may be the Confirmation Order) which contain a finding that, as of the Effective Date, the First Priority Adequate Protection Liens (as defined in the Final DIP Order) are of no further effect, either as a consequence of there being no Diminution in Prepetition Collateral Value (as defined in the Final DIP Order) with respect to the collateral securing the First Lien Indebtedness on the Petition Date, or on any other basis the Court deems proper.

6.   The New Second Lien Notes Documents (and any required modifications to the Second Lien Notes Indenture) shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived by the Debtors, with the consent of the Consenting First Lien Creditors and the Consenting Junior Lien Creditors, which consent shall not be unreasonably withheld, or satisfied in accordance with the terms thereof, and funding pursuant to the New Second Lien Notes Documents shall have occurred.

7.   The Confirmation Order shall have become a Final Order in form and substance acceptable to the Debtors and reasonably acceptable to the Consenting Junior Lien Creditors, the Creditors' Committee, the Consenting Interest Holders and the Consenting First Lien Creditors.

8.   All of the schedules, documents, supplements and exhibits to the Plan shall have been filed in form and substance reasonably acceptable to the Debtors, the Consenting Junior Lien Creditors, the Creditors' Committee, the Consenting Interest Holders and the Consenting First Lien Creditors.

9.   The Effective Date shall occur no later than October 2, 2015.

10.  All objections to confirmation of the Plan filed as of July 29, 2015 on the docket maintained in the Chapter 11 Cases (as the same may be amended or supplemented from time to time) shall be resolved in a manner in form and substance reasonably acceptable to the Consenting First Lien Creditors, the Consenting Junior Lien Creditors and the Consenting Interest Holders.

11.  The Bankruptcy Court shall have entered an order, which shall not have been modified, stayed, reversed, revoked or vacated, (i) authorizing the Debtors to enter into, and approving, the Debtors' Settlement Agreement with the United States dated as of August 10, 2015 (the "**Settlement Agreement**"), and (ii) finding the Settlement Agreement fair, adequate and reasonable under 31 U.S.C. § 3730(c)(2)(B).

## 10.3   Waiver of Conditions

The conditions to Confirmation of the Plan and to Consummation of the Plan set forth in this Article X may be waived at any time by the Debtors, with the consent of the Creditors' Committee (solely as to conditions 10.1(1), 10.1(2), 10.2(2), 10.2(3), 10.2(5) 10.2(7) and 10.2(8)), the Consenting Junior Lien Creditors, the Consenting First Lien Creditors and the Consenting Interest Holders; *provided, however*, that the Debtors may not waive entry of the Order approving the Disclosure Statement and the Confirmation Order.

## 10.4   Effect of Failure of Conditions

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any holders of Claims or Interests or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any holders or any other Entity in any respect.

# ARTICLE XI

## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

**11.1    Modification and Amendments**

Except as otherwise specifically provided herein, and subject to the Restructuring Support Agreement, the Debtors reserve the right, with the consent of the Creditors' Committee, the Consenting Junior Lien Creditors, the Consenting First Lien Creditors and the Consenting Interest Holders, to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights, with the consent of the Creditors' Committee, the Consenting Junior Lien Creditors, the Consenting First Lien Creditors and the Consenting Interest Holders, and subject to the Restructuring Support Agreement, to alter, amend or modify materially the Plan with respect to any or all Debtors, one or more times, after Confirmation, and, to the extent necessary, and with the consent of the Creditors' Committee, the Consenting Junior Lien Creditors and the Consenting First Lien Creditors, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article XI.

**11.2    Effect of Confirmation on Modifications**

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**11.3    Revocation or Withdrawal of the Plan**

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor or any other Entity.

# ARTICLE XII

## RETENTION OF JURISDICTION

**12.1    Jurisdiction of the Bankruptcy Court**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate or establish the priority, Secured or Unsecured status or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or Unsecured status, priority, amount or allowance of Claims;

2.   decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.   resolve any matters related to: (a) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Rejection Claims, Cure Claims pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying or supplementing, after the Effective Date, pursuant to Article VI, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.   ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.   adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.   adjudicate, decide or resolve any and all matters related to any Cause of Action;

7.   adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.   enter and enforce any order for the sale of property pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code;

9.   resolve any avoidance or recovery actions under sections 105, 502(d), 542 through 551 and 553 of the Bankruptcy Code;

10.  resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

11.  resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with or under the Senior Intercreditor Agreement (as defined in the First Lien Notes Indenture), the Junior Lien Intercreditor Agreement (as defined in the Second Lien Notes Indenture) or the subordination provisions contained in the 2016 Senior Subordinated Notes Indenture;

12.  issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with Consummation or enforcement of the Plan;

13.  resolve any cases, controversies, suits, disputes or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications and other provisions contained in Article IX and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

14.  resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid pursuant to Section 7.9(a);

15.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

16.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement;

17.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.     consider any modifications of the Plan, cure any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.     hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

21.     hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

22.     hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

23.     enforce all orders previously entered by the Bankruptcy Court;

24.     hear any other matter not inconsistent with the Bankruptcy Code; and

25.     enter an order concluding or closing the Chapter 11 Cases.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

**13.1**     <u>**Immediate Binding Effect**</u>

Subject to <u>Section 10.2</u>, and notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

**13.2**     <u>**Additional Documents**</u>

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**13.3    Dissolution of Creditors' Committee**

On the Effective Date, the Creditors' Committee shall dissolve, except the Creditors' Committee will remain intact with respect to any pending litigation or contested matter to which the Creditors' Committee is a party, any appeals filed regarding Confirmation, the resolution of any substantial contribution applications and the resolution of applications for Accrued Professional Compensation.  On the Effective Date, subject to the prior sentence, the members of the Creditors' Committee shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

**13.4    Payment of Fees and Expenses of the Indenture Trustees and Collateral Agents**

Notwithstanding any provision in the Plan to the contrary, the Debtors or Reorganized Debtors (as applicable) shall promptly pay in full in Cash the reasonable and documented Indenture Trustee Fees incurred by the Indenture Trustees and Collateral Agent Fees incurred by the Collateral Agents (including pursuant to Section 8.14) without the need of such parties to file fee applications with the Bankruptcy Court; *provided* that each party and its counsel shall provide the Debtors with the invoices (or such other documentation as the Debtors may reasonably request) for which it seeks payment within five (5) Business Days following the Effective Date and *provided further* that if the Debtors have previously agreed to or have no objection to such fees, such fees shall be paid within thirty (30) Business Days of the Effective Date.  To the extent that the Debtors object in writing prior to the expiration of the 30 Business Day payment period to any of the Indenture Trustee Fees or the Collateral Agent Fees not previously agreed to, the Debtors shall not be required to pay any disputed portion of such amounts until a resolution of such objection is agreed to by the Debtors or a further order of the Bankruptcy Court upon a motion by any such Indenture Trustee or Collateral Agent, *provided* the Debtors shall be authorized and directed to pay the Indenture Trustee Fees and the Collateral Agent Fees to the extent not objected to in accordance with this paragraph.

Nothing herein shall be deemed to impair, waive, discharge, or negatively impact the Charging Lien of the Indenture Trustees and the Collateral Agents.

**13.5    Waiver of Federal Rule of Civil Procedure 62(a)**

The Debtors may request that the Confirmation Order include (a) a finding that Fed. R. Civ. P. 62(a) shall not apply to the Confirmation Order, and (b) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

**13.6    Vacatur of Confirmation Order**

If a Final Order denying confirmation of the Plan is entered, or if the Confirmation Order is vacated, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Interests in the Debtors or (b) prejudice in any manner the rights of the holder of any Claim against, or Interest in, the Debtors.

**13.7    Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the Plan, any statement or provision contained in the Plan or any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests before the Effective Date.

**13.8    Successors and Assigns**

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

**13.9     Service of Documents**

After the Effective Date, any pleading, notice or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

Altegrity, Inc.
600 Third Avenue, 4th Floor
New York, NY 10016
Attention:  David R. Fontaine, Executive Vice President,
            Chief Legal & Administrative Officer
Facsimile: (703) 637-1741

with copies to:

Debevoise & Plimpton, LLP
919 Third Avenue
New York, NY 10022
Attn:  M. Natasha Labovitz, Esq., Jasmine Ball, Esq. and
       Craig Bruens, Esq.
Facsimile: (212) 909-6836

After the Effective Date, the Debtors may, in their sole discretion, notify Entities that, in order to continue receiving documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

**13.10     Entire Agreement**

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

**13.11     Severability of Plan Provisions**

If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court or any other court exercising jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court or other court exercising jurisdiction shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) nonseverable and mutually dependent.

**13.12     Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be available upon request to the Debtors' counsel, by contacting Jasmine Ball, Debevoise & Plimpton LLP, 919 Third Avenue, New York, NY 10022, Telephone: (212) 909-6000, email: jball@debevoise.com, at the Bankruptcy Court's website at https://*ecf.deb.uscourts.gov* or at the website of the Claims and Noticing Agent, at https://*cases.primeclerk.com/Altegrity*. To the extent any exhibit or document is inconsistent with the terms of the

Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

### 13.13    Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of Plan securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale or purchase of the New Common Stock, AHC Common Stock, or New Second Lien Notes, offered and sold under the Plan.

### 13.14    Closing of Chapter 11 Cases

The Debtors shall, promptly after the full administration of the Chapter 11 Case with respect to each Debtor, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case for each such Reorganized Debtor.

### 13.15    Conflicts

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control; *provided, however,* that if there is a conflict between this Plan and a Plan Supplement document, including the First Lien Debt Amendments or the New Second Lien Notes Documents, the Plan Supplement document shall govern and control.

*[Remainder of page intentionally left blank.]*

Dated: August 14, 2015

Respectfully submitted,

Altegrity Holding Corp.

By: /s/ Jeffrey S. Campbell

Name:   Jeffrey S. Campbell
Title:    Senior Vice President and
          Chief Financial Officer


Altegrity Acquisition Corp.

By: /s/ Jeffrey S. Campbell

Name:   Jeffrey S. Campbell
Title:    Senior Vice President and
          Chief Financial Officer


Altegrity, Inc.

By: /s/ Jeffrey S. Campbell

Name:   Jeffrey S. Campbell
Title:    President and Chief Financial Officer

Altegrity Security Consulting, Inc.
CVM Solutions, LLC
D, D & C, Inc.
Engenium Corporation
FDC Acquisition, Inc.
HireRight Records Services, Inc.
      (f/k/a USIS Records Services, Inc.)
HireRight Solutions, Inc.
      (f/k/a USIS Commercial Services, Inc.)
HireRight, Inc.
HireRight Technologies Group, Inc.
John D. Cohen, Inc.
KCMS, Inc.
Kroll Associates, Inc.
Kroll Background America, Inc.
Kroll Crisis Management Group, Inc.
Kroll Cyber Security, Inc.
Kroll Factual Data, Inc.
Kroll Holdings, Inc.
Kroll Inc.
Kroll Information Assurance, Inc.
Kroll Information Services, Inc.
Kroll International, Inc.
Kroll Ontrack Inc.
Kroll Security Group, Inc.
National Diagnostics, Inc.
Ontrack Data Recovery, Inc.
The Official Information Company
USIS International, Inc.
USIS Worldwide, Inc.

By: /s/ Andrew E. Grimmig
Name:   Andrew E. Grimmig
Title:    Assistant Secretary


KIA Holding, LLC
Kroll Recovery, LLC
Altegrity Risk International LLC
      (f/k/a Altegrity Risk Consulting and
      Solutions, Inc.)
US Investigations Services, LLC

By: /s/ Andrew E. Grimmig
Name:   Andrew E. Grimmig
Title:    Assistant Secretary

Albatross Holding Company, LLC
By:  Kroll Associates, Inc., its Sole Member

By: /s/ Andrew E. Grimmig
Name:    Andrew E. Grimmig
Title:    Assistant Secretary


Albatross Marketing & Trading, LLC
By:  Albatross Holding Company, LLC
By:  Kroll Associates, Inc., its Sole Member

By: /s/ Andrew E. Grimmig
Name:    Andrew E. Grimmig
Title:    Assistant Secretary


Personnel Records International, LLC
By:  National Diagnostics, Inc., its Sole Member

By: /s/ Andrew E. Grimmig
Name:    Andrew E. Grimmig
Title:    Assistant Secretary


Prepared by:

DEBEVOISE & PLIMPTON LLP
M. Natasha Labovitz
Jasmine Ball
Craig A. Bruens
919 Third Avenue
New York, New York 10022
Telephone: (212) 909-6000
Facsimile: (212) 909-6836
Email:    nlabovitz@debevoise.com
          jball@debevoise.com
          cabruens@debevoise.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Edmon L. Morton (No. 3856)
Joseph M. Barry (No. 4221)
Ryan M. Bartley (No. 4985)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email:    emorton@ycst.com
          jbarry@ycst.com
          rbartley@ycst.com

*Co-Counsel for the Debtors and Debtors in Possession*